## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| EXAERIS, INC., and | : | Bankr. Case No. 07-10887 (KG) |
| INYX USA, LTD.,[1] | : | Bankr. Case No. 07-10888 (KG) |
| | : | |
| Debtors. | : | |
| | : | |
| DR. JACK KACHKAR, | : | |
| | : | |
| Appellant, | : | |
| | : | |
| v. | : | C.A. No. 07-621 GMS |
| | : | |
| STEPHEN S. GRAY, CHAPTER 11 | : | |
| TRUSTEE FOR INYX USA, LTD., and | : | |
| WESTERNBANK PUERTO RICO, | : | |
| | : | |
| Appellees. | : | |

## ADDENDUM OF STATUTES, RULES, REGULATIONS, OR SIMILAR MATERIAL TO BRIEF OF APPELLANT, DR. JACK KACHKAR

## APPEAL FROM THE ORDER OF SEPTEMBER 7, 2008
## ENTERED IN CASE NO. 07-10887 (KG)
## AS TO DEBTOR INYX, USA, LTD. (CASE NO. 07-10888 (KG))
## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

Tobey M. Daluz, Esq. (DE Bar No. 3939)
Leslie C. Heilman, Esq. (DE Bar No. 4716)
BALLARD SPAHR ANDREWS
 & INGERSOLL, LLP
919 N. Market Street, 12th Floor
Wilmington, DE 19801
(302) 252-4465

Dated: March 25, 2008

*Attorneys for Appellant, Dr. Jack Kachkar*

---

[1] The Exaeris, Inc. and Inyx USA, Ltd. bankruptcy cases were jointly administered at the outset of their cases at Bankruptcy Case No. 07-10887, however, on December 6, 2007, on the motion of Westernbank Puerto Rico, the Bankruptcy Court vacated the order for joint administration.

# INDEX

**Tab No.**

## Unreported Cases

*In re Qmect, Inc.*, No. 04-41044 T, 2006 Bankr. LEXIS 1478 (Bankr. N.D. Cal. June 2, 2006) ............................................................................................................................1

## Statutes

11 U.S.C. § 105 ..................................................................................................................2

11 U.S.C. § 361 ..................................................................................................................3

11 U.S.C. § 362 ..................................................................................................................4

11 U.S.C. § 363 ..................................................................................................................5

11 U.S.C. § 364 ..................................................................................................................6

11 U.S.C. § 506 ..................................................................................................................7

11 U.S.C. § 552 ..................................................................................................................8

28 U.S.C. § 158(a) .............................................................................................................9

28 U.S.C. § 1334 ..............................................................................................................10

124 Cong. Rec. H11,097-11,098 (daily ed. Sept. 28, 1978), *reprinted in Collier on Bankruptcy*, Vol. D, App. Pt. 4(f)(i), pp. 4-2446-4-2453 (15th ed. rev.) ................................11

124 Cong. Rec. S17,414 (daily ed. Oct. 6, 1978), .); *reprinted in Collier on Bankruptcy*, Vol. D, App. Pt. 4(f)(iii), pp. 4-2561-4-2564 (15th ed. rev.) ....................................12

## Rules

Fed. R. Bankr. P. 8013 .....................................................................................................13

Bankr. D. Del. L.R. 4001-2(a)(i)(C) ...............................................................................14

## Treatises and Other Authorities

O'Toole, Adequate Protection and Post-Petition Interest in Chapter 11 Proceedings, 56 Am.Bankr.L.J. 251 (1982) ...............................................................................................15

# TAB 1

LEXSEE 2006 BANKR. LEXIS 1478



Analysis
As of: Mar 25, 2008

### In re QMECT, INC., etc., Debtor-in-Possession.

### No. 04-41044 T, Chapter 11

### UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA

### *2006 Bankr. LEXIS 1478*

### June 2, 2006, Decided

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Creditors, who were lenders, sought relief from the automatic stay. The court essentially bifurcated the proceedings on several issues. After the court determined that the lenders had not lost their exemption from usury laws, the parties briefed the issue of whether, notwithstanding *11 U.S.C.S. § 552(a)*, all of the assets debtor acquired or created post-petition were the proceeds of the lenders' collateral.

**OVERVIEW:** Between them, the lenders had a blanket lien on all of debtor's pre-petition assets, including debtor's accounts receivable, except for several trucks. The lenders argued that, notwithstanding *11 U.S.C.S. § 552*, their security was not "cut off" as of the petition date. Although the orders granting the debtor the right to use the lenders' cash collateral granted them replacement liens in assets acquired or created by debtor post-petition, according to the lenders, they were not limited to the interest created by the replacement liens. They argued that all of the assets acquired or created by debtor post-petition were acquired or created with their pre-petition collateral and, consequently, all of the assets acquired or created post-petition constituted the proceeds of their collateral. Debtor pointed out that other assets also were used to create debtor's post-petition assets. Debtor received a loan to help it make payroll, and, as noted above, debtor had several unencumbered trucks. The lenders could claim the proceeds of post-petition accounts receivable if the lenders could properly trace the proceeds to its pre-petition collateral.

**OUTCOME:** The court identified the legal principles that would govern whether the lenders could claim as proceeds of their pre-petition collateral assets acquired by debtor post-petition. The lenders would have to provide evidence tracing the funds claimed as proceeds of their collateral. If those funds were commingled with funds from another source, detailed tracing would be required.

**LexisNexis(R) Headnotes**

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*
*Bankruptcy Law > Estate Property > General Overview*
[HN1] See *11 U.S.C.S. § 552(a)*.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*
*Bankruptcy Law > Estate Property > General Overview*
[HN2] See *11 U.S.C.S. § 552(b)(1)*.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*
*Bankruptcy Law > Estate Property > General Overview*
[HN3] The proceeds of post-petition accounts receivable do not automatically constitute the proceeds of a secured creditor's pre-petition security interest in accounts receivable. Revenue generated solely by services do not constitute the proceeds of a secured creditor's pre-petition security interest in accounts receivable.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*

*Bankruptcy Law > Estate Property > General Overview*
[HN4] A secured creditor can claim the proceeds of a post-petition account receivable if it can properly trace the proceeds to its pre-petition collateral. However, if the proceeds of the pre-petition collateral were commingled with funds obtained from some other source, the secured creditor must present detailed evidence tracing the funds claimed as proceeds.

*Bankruptcy Law > Claims > Types > Secured Claims & Liens > Secured Creditors Rights*

*Bankruptcy Law > Estate Property > General Overview*
[HN5] Traditionally, tracing of the proceeds of pre-petition collateral that has been commingled with other proceeds is done using the lowest intermediate balance rule. This rule assumes that the traced proceeds are the last funds withdrawn from the commingled account. However, once the traced proceeds are withdrawn and spent, the security interest disappears. The security interest does not reappear or increase if additional funds from another source are later deposited into the account. Thus, the security interest is limited to the lowest balance in the account during the period in question.

**COUNSEL:** [*1] For Qmect, Inc., aka, Electrochem, Debtor: Gregory A. Rougeau, Paul E. Manasian, Thomas T. Hwang, Law Offices of Manasian and Rougeau, San Francisco, CA.

For Office of the U.S. Trustee /Oak, U.S. Trustee: Margaret H. McGee, Office of the U.S. Trustee, Oakland, CA.

For Official Unsecured Creditors' Committee, Creditor Committee: Philip J. Nicholsen,Law Offices of Philip J. Nicholsen, San Francisco, CA.

**JUDGES:** LESLIE TCHAIKOVSKY, U.S. Bankruptcy Judge.

**OPINION BY:** LESLIE TCHAIKOVSKY

**OPINION**

**MEMORANDUM OF DECISION RE PROCEEDS ISSUE**

The Court scheduled a final evidentiary hearing on the motion of Burlingame Capital Partners II, L.P. ("Burlingame") and Electrochem Funding, LLC ("Burlingame Funding")(collectively "Lenders") for relief from the automatic stay for May 24, 2006. The Lenders filed a trial brief prior to the scheduled hearing in which they argued that, notwithstanding *11 U.S.C. § 552*, their security was not "cut off" as of the petition date. Although the orders granting the debtor ("Qmect") the right to use the Lenders' cash collateral granted them replacement liens in assets acquired or created by Qmect post-petition, according to the Lenders, they [*2] were not limited to the interest created by the replacement liens. Since all of the assets acquired or created by Qmect post-petition were acquired or created with their pre-petition collateral, all of the assets acquired or created post-petition constituted the proceeds of their collateral.

. As the Court noted in a prior memorandum, this argument assumed that the value of the collateral was less than the amount of the Lenders' claims. This assumption could not be relied upon until the Court resolved the claim asserted by the Official Creditors' Committee (the "Committee") that the Lenders had violated the regulations governing their license as finance lenders and as a result had lost their exemption from the usury laws. If not, their claims might be less than the value of the collateral. As discussed in a separate memorandum, the Court has concluded that the Committee's usury claim fails.

Qmect requested an opportunity to brief the "proceeds" issue, and the Court granted the request. The parties have filed their briefs, and the Court has reviewed them. The Court's conclusions are set forth below. [1]

> 1    The Lenders apparently misunderstood the purpose of the briefing schedule. Instead of tailoring their arguments to the "proceeds" issue as the Court directed, they reiterated their arguments concerning their rights pursuant to the Court's cash collateral orders. The Court has previously indicated that, if that the Lenders are relying on those orders as to their rights in the post-petition assets, it will require the presentation of valuation evidence. The Court deferred the presentation of that evidence because, if the Lenders "proceeds" theory were persuasive, no valuation would be necessary.

[*3] **DISCUSSION**

[HN1] *Section 552(a) of the Bankruptcy Code* provides that:

> Except as provided in subsection (b) . . ., property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into

by the debtor before the commencement of the case.

[HN2] *Section 552(b)(1)* provides, in pertinent part, that:
. . . [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds . . . of such property, then such security interest extends to such proceeds . . . acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

*11 U.S.C. § 552(a),(b)(1).*

The Court has previously concluded that, between them, at the time the bankruptcy case was filed, [*4] the Lenders held a "blanket lien" on all of Qmect's pre-petition assets with the exception of two or three trucks used in the operation of the business, referred to hereafter as the "Trucks". Based on the Court's findings and conclusions, as set forth in other memoranda, it is clear that, at the time the chapter 11 case was filed, the value of the Lender's collateral was less than the combined amount of their claims. Moreover, it does not appear to be disputed that the Lenders' security interests, by their terms, extend to the proceeds of the Lenders' collateral.

Based on the foregoing, the Lenders contend that all of the accounts receivable generated by Qmect post-petition and the funds collected from those accounts receivable are the proceeds of their pre-petition collateral. As a result, they contend it is unnecessary to value their collateral at the time of the filing and would be improper to limit their interest in the funds on hand now to that value. In support of this contention, they cite *In re Bumper Sales, Inc., 907 F.2d 1430, 1439 (4th Cir. 1990).*

In *Bumper Sales*, a secured creditor with a pre-petition lien in all of the debtor's assets consented to [*5] the use of its cash collateral without obtaining a replacement lien. It was undisputed that all of the new inventory and accounts receivable generated by the debtor post-petition was created through the use of the secured creditor's cash collateral: i.e., that the debtor "did not borrow any outside funds or incur any outside debt. . . ." *Id. at 1433.* The debtor contended that, based on *11 U.S.C. §*

*552(a)*, the secured creditor's pre-petition lien did not extend to the inventory and accounts receivable created post-petition. The secured creditor disagreed, arguing that these post-petition assets were the proceeds of its pre-petition collateral and thus subject to its security interest pursuant to *11 U.S.C. § 552(b).* The *Bumper Sales* court ruled for the secured creditor, relying on the applicable state law definition of the term "proceeds." *Id. at 1435-41.*

Qmect notes that *Bumper Sales* is not binding authority in this Circuit. In any event, it argues that *Bumper Sales* is distinguishable on its facts. As noted above, in *Bumper Sales*, it was stipulated that all of the post-petition assets were [*6] created through the use of the secured creditor's collateral and that the debtor neither borrowed money from anyone else nor incurred other debt post-petition. In the instant case, Qmect reminds the Court that, shortly after its chapter 11 case was filed, a third party loaned Qmect $ 150,000 to make payroll. In addition, it notes that the Trucks, which were unencumbered, contributed to the value created post-petition.

Qmect contends that the more relevant authorities are *In re Skagit Pacific Corp., 316 B.R. 330 (Bankr. 9th Cir. 2004), In re Cafeteria Operators, L.P., 299 B.R. 400 (Bankr. N.D. Tex. 2003),* and *In re Photo Promotion Associates, 61 B.R. 936 (Bankr. S.D.N.Y. 1986).*

In *Photo Promotion*, a secured creditor had a blanket lien on all of the assets of the debtor which provided photographic portrait services in shopping malls and department stores. When the debtor's chapter 11 case was converted to chapter 7, the trustee obtained authorization to borrow funds from someone other than the secured creditor. Nevertheless, the secured creditor claimed the payments for the portraits as the proceeds of its collateral. It had liquidated [*7] its other assets and still had a substantial deficiency. *Id. at 937-38.*

The *Photo Promotion* court accepted the contention that the payments were the proceeds of the secured creditor's collateral. However, it observed that, if the orders had not been completed and completed promptly, they would have been of little or no value. Consequently, based on the equities of the case, it held that all of the proceeds should be treated as unencumbered property of the estate. *Id. at 938-40.*

Thus, *Photo Promotion* stands at the other end of the spectrum from *Bumper Sales*. In *Bumper Sales*, by stipulation, only the secured creditor's collateral was used to produce the post-petition asset; in *Photo Promotion*, the only portion of the secured creditor's collateral used to produce the post-petition asset was found to be of little or no value. The facts of the instant case bring it somewhere between these two extremes.

In *Cafeteria Operators*, the debtors operated family style restaurants in several states. The debtors did not dispute that the secured creditor held a "blanket security" interest in the debtors' assets which extended to the proceeds [*8] of its collateral. *Id. at 408.* However, the debtors contended that the revenues of its food sales did not constitute the proceeds of the secured creditors' collateral because the revenues were primarily generated by services: i.e., the value of the food component of a meal was less than one-third of the price of the meal. *Id. at 408.*

The *Cafeteria Operators* court adopted a middle ground. It concluded that, because a portion of the value of the revenues was produced by the secured creditor's collateral -- i.e., the food component -- the revenues were the proceeds of the secured creditor' s collateral. However, based on the equities, it limited the value of the secured creditor's interest in the revenues to the value of its inventory. *Id. at 410.* [2] This is the approach argued for by Qmect. [3]

> 2  The *Cafeteria Operators* court recognized that the debtors' fixtures and equipment also contributed to the production of the revenues. However, it concluded that restaurant revenues could not qualify as the "proceeds" of this type of asset. *Id. at 408.*
> 3  The Court notes that there is no discussion in *Cafeteria Operators* of whether the debtors borrowed money post-petition from any outside source or incurred unsecured debt to third parties during the chapter 11 case.

[*9] The final case to be examined is *Skagit Pacific*, the only case cited from this jurisdiction. In *Skagit Pacific*, the debtor manufactured and sold modular offices and trailers. The parties agreed that the secured creditor had a perfected security interest that extended to the proceeds in all of the debtor's assets except the vehicle and trailer inventory. [4] After filing for chapter 11, the debtor obtained a contract to build four modular trailers. Shortly after completing the project and before receiving payment, the case was converted to chapter 7. The secured creditor claimed the payment as the proceeds of its collateral. *Id. at 332-34.*

> 4  As to those assets, the secured creditor took possession of the certificates of title but failed to perfect its security interest by having its name placed on title. *Id. at 333, 340-42.*

The secured creditor contended that the proceeds of its collateral had been used to produce the trailers for which the disputed payment was made. The bankruptcy court conducted [*10] an evidentiary hearing at which the secured creditor presented evidence regarding the

deposits and withdrawals from the debtor's accounts. Based on the evidence presented, the bankruptcy court granted relief as to approximately one-half of the payment. *Id. at 334.* On appeal, the bankruptcy appellate panel reversed.

The *Skagit Pacific* panel noted that [HN3] the proceeds of post-petition accounts receivable do not automatically constitute the proceeds of a secured creditor's pre-petition security interest in accounts receivable. It noted further that revenue generated solely by services do not constitute the proceeds of a secured creditor's pre-petition security interest in accounts receivable. *Id. at 336.*

The panel acknowledged that [HN4] a secured creditor could claim the proceeds of a post-petition account receivable if it could properly trace the proceeds to its pre-petition collateral. *Id. at 337.* However, if the proceeds of the pre-petition collateral were commingled with funds obtained from some other source, the secured creditor must present detailed evidence tracing the funds claimed as proceeds. The panel concluded that the secured creditor had failed to do this.

[HN5] Traditionally, [*11] tracing is done using the lowest intermediate balance rule. *Id. at 338.* This rule assumes that the traced proceeds are the last funds withdrawn from the commingled account. However, once the traced proceeds are withdrawn and spent, the security interest disappears. The security interest does not reappear or revive if additional funds from another source are later deposited into the account. Thus, the security interest is limited to the lowest balance in the account during the period in question. *Id. at 338-40.*

The Court will adopt the approach set forth in *Skagit Pacific*, which is the most authoritative case in this jurisdiction and the rationale of which appears sound. Like the *Cafeteria Operators* court, the Court does not believe fact that the Lenders' lack of a security interest in the Trucks diminishes their right to claim the post-petition assets as their proceeds. However, if the proceeds of the pre-petition accounts receivable were commingled with the $ 150,000 loan made by a third party post-petition, the secured creditor will be required to trace its security interest in the proceeds of the pre-petition accounts receivable into the post-petition assets using [*12] the lowest intermediate balance rule. [5]

> 5  The Court does not mean to imply that, if the Lenders are unable to trace their pre-petition security interest into the post-petition assets, they may not rely on their rights pursuant to the cash collateral orders. Similarly, the Lenders may be able to supplement rights established under one theory with rights established under another.

2006 Bankr. LEXIS 1478, *

However, as discussed above, if the Lenders wish to rely on the cash collateral orders to any extent, valuation evidence must be presented.

The Court does not believe oral argument is necessary with respect to this issue. However, the Court directs the parties to appear by telephone for a status conference on Monday June 5, 2006 at 3:00 p.m. to discuss how best to proceed with respect to this issue. The par-

ties are directed to coordinate their appearance for this purpose with the judge's calendar clerk.

**Signed: June 02, 2006**

**LESLIE TCHAIKOVSKY**

**U.S. Bankruptcy Judge**

# TAB 2

Westlaw.

11 U.S.C.A. § 105                                                                                                      Page 1

**c**

**Effective:[See Notes]**

United States Code Annotated <u>Currentness</u>
  Title 11. Bankruptcy <u>(Refs & Annos)</u>
    ⌐⃞ Chapter 1. General Provisions <u>(Refs & Annos)</u>
      →**§ 105. Power of court**

**(a)** The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

**(b)** Notwithstanding subsection (a) of this section, a court may not appoint a receiver in a case under this title.

**(c)** The ability of any district judge or other officer or employee of a district court to exercise any of the authority or responsibilities conferred upon the court under this title shall be determined by reference to the provisions relating to such judge, officer, or employee set forth in title 28. This subsection shall not be interpreted to exclude bankruptcy judges and other officers or employees appointed pursuant to chapter 6 of title 28 from its operation.

**(d)** The court, on its own motion or on the request of a party in interest--

    **(1)** shall hold such status conferences as are necessary to further the expeditious and economical resolution of the case; and

    **(2)** unless inconsistent with another provision of this title or with applicable Federal Rules of Bankruptcy Procedure, issue an order at any such conference prescribing such limitations and conditions as the court deems appropriate to ensure that the case is handled expeditiously and economically, including an order that--

        **(A)** sets the date by which the trustee must assume or reject an executory contract or unexpired lease; or

        **(B)** in a case under chapter 11 of this title--

            **(i)** sets a date by which the debtor, or trustee if one has been appointed, shall file a disclosure statement and plan;

            **(ii)** sets a date by which the debtor, or trustee if one has been appointed, shall solicit acceptances of a plan;

            **(iii)** sets the date by which a party in interest other than a debtor may file a plan;

            **(iv)** sets a date by which a proponent of a plan, other than the debtor, shall solicit acceptances of such plan;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(v) fixes the scope and format of the notice to be provided regarding the hearing on approval of the disclosure statement; or

(vi) provides that the hearing on approval of the disclosure statement may be combined with the hearing on confirmation of the plan.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2555; Pub.L. 98-353, Title I, § 118, July 10, 1984, 98 Stat. 344; Pub.L. 99-554, Title II, § 203, Oct. 27, 1986, 100 Stat. 3097; Pub.L. 103-394, Title I, § 104(a), Oct. 22, 1994, 108 Stat. 4108; Pub.L. 109-8, Title IV, § 440, Apr. 20, 2005, 119 Stat. 114.)

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

# TAB 3

Westlaw.

11 U.S.C.A. § 361

**C**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 3. Case Administration (Refs & Annos)
            Subchapter IV. Administrative Powers
                → § 361. Adequate protection

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--

(1) requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2569; Pub.L. 98-353, Title III, § 440, July 10, 1984, 98 Stat. 370.)

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

# TAB 4

▷

**Effective: December 12, 2006**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 3. Case Administration (Refs & Annos)
      Subchapter IV. Administrative Powers
        → **§ 362. Automatic stay**

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a corporate debtor's tax liability for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay--

(1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

against the debtor;

(2) under subsection (a)--

    (A) of the commencement or continuation of a civil action or proceeding--

        (i) for the establishment of paternity;

        (ii) for the establishment or modification of an order for domestic support obligations;

        (iii) concerning child custody or visitation;

        (iv) for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or

        (v) regarding domestic violence;

    (B) of the collection of a domestic support obligation from property that is not property of the estate;

    (C) with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

    (D) of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

    (E) of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466(a)(7) of the Social Security Act;

    (F) of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law; or

    (G) of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

(3) under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organization exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

[(5) Repealed. Pub.L. 105-277, Div. I, Title VI, § 603(1), Oct. 21, 1998, 112 Stat. 2681-886]

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(6) under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

(7) under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(8) under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

(9) under subsection (a), of--

    (A) an audit by a governmental unit to determine tax liability;

    (B) the issuance to the debtor by a governmental unit of a notice of tax deficiency;

    (C) a demand for tax returns; or

    (D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

(10) under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has terminated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

(11) under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

(12) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49, or under applicable State law;

(13) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under chapter 537 of title 46;

(14) under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

(15) under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

(16) under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

(17) under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(18) under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

(19) under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer--

(A) to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986; or

(B) a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

(20) under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subsequent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

(21) under subsection (a), of any act to enforce any lien against or security interest in real property--

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(A) if the debtor is ineligible under section 109(g) to be a debtor in a case under this title; or

(B) if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

(22) subject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

(23) subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

(24) under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549;

(25) under subsection (a), of--

(A) the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

(B) the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power; or

(C) any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

(26) under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361) for the secured claim of such authority in the setoff under section 506(a);

(27) under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555, 556, 559, or 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555, 556, 559, or 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(28)** under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act pursuant to title XI or XVIII of such Act).

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

**(c)** Except as provided in subsections (d), (e), (f), and (h) of this section--

**(1)** the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

**(2)** the stay of any other act under subsection (a) of this section continues until the earliest of--

**(A)** the time the case is closed;

**(B)** the time the case is dismissed; or

**(C)** if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

**(3)** if a single or joint case is filed by or against debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under <u>section 707(b)</u>--

**(A)** the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

**(B)** on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

**(C)** for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

**(i)** as to all creditors, if--

**(I)** more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

**(II)** a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to--

**(aa)** file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the dismissal was caused by the negligence of the debtor's attorney);

**(bb)** provide adequate protection as ordered by the court; or

**(cc)** perform the terms of a plan confirmed by the court; or

**(III)** there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded--

**(aa)** if a case under chapter 7, with a discharge; or

**(bb)** if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

**(ii)** as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

**(4)(A)(i)** if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under section 707(b), the stay under subsection (a) shall not go into effect upon the filing of the later case; and

**(ii)** on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

**(B)** if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

**(C)** a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

**(D)** for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)--

**(i)** as to all creditors if--

**(I)** 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

**(II)** a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court; or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(III)** there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; or

**(ii)** as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

**(d)** On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

**(1)** for cause, including the lack of adequate protection of an interest in property of such party in interest;

**(2)** with respect to a stay of an act against property under subsection (a) of this section, if--

**(A)** the debtor does not have an equity in such property; and

**(B)** such property is not necessary to an effective reorganization;

**(3)** with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

**(A)** the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

**(B)** the debtor has commenced monthly payments that--

**(i)** may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

**(ii)** are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

**(4)** with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, and defraud creditors that involved either--

**(A)** transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

**(B)** multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

(e)(1) Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

(2) Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless--

    (A) a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

    (B) such 60-day period is extended--

        (i) by agreement of all parties in interest; or

        (ii) by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

(f) Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--

    (1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

    (2) the party opposing such relief has the burden of proof on all other issues.

(h)(1) In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2)--

    (A) to file timely any statement of intention required under section 521(a)(2) with respect to such personal

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to <u>section 722</u>, enter into an agreement of the kind specified in <u>section 524(c)</u> applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to <u>section 365(p)</u> if the trustee does not do so, as applicable; and

**(B)** to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

**(2)** Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by <u>section 521(a)(2)</u>, after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee. If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.

**(i)** If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.

**(j)** On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.

**(k)(1)** Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

**(2)** If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

**(l)(1)** Except as otherwise provided in this subsection, subsection (b) (22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that--

**(A)** under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and

**(B)** the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

**(2)** If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankrupcty [FN1] law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).

**(3)(A)** If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.

**(B)** If the court upholds the objection of the lessor filed under subparagraph (A)--

    **(i)** subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

    **(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

**(4)** If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)--

    **(A)** subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

    **(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

**(5)(A)** Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.

**(B)** The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify--

    **(i)** whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition; and

    **(ii)** whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

**(C)** The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.

**(D)** The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.

**(m)(1)** Except as otherwise provided in this subsection, subsection (b) (23) shall apply on the date that is 15 days after the date on which the lessor files and serves a certification described in subsection (b)(23).

**(2)(A)** If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**(B)** If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.

**(C)** If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section.

**(D)** If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied--

    **(i)** relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction; and

    **(ii)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

**(3)** If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)--

    **(A)** subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

    **(B)** the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

**(n)(1)** Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor--

    **(A)** is a debtor in a small business case pending at the time the petition is filed;

    **(B)** was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

    **(C)** was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or

    **(D)** is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

**(2)** Paragraph (1) does not apply--

    **(A)** to an involuntary case involving no collusion by the debtor with creditors; or

    **(B)** to the filing of a petition if--

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(i) the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

(ii) it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

(o) The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2570; Pub.L. 97-222, § 3, July 27, 1982, 96 Stat. 235; Pub.L. 98-353, Title III, §§ 304, 363(b), 392, 441, July 10, 1984, 98 Stat. 352, 363, 365, 371; Pub.L. 99-509, Title V, § 5001(a), Oct. 21, 1986, 100 Stat. 1911; Pub.L. 99-554, Title II, §§ 257(j), 283(d), Oct. 27, 1986, 100 Stat. 3115, 3116; Pub.L. 101-311, Title I, § 102, Title II, § 202, June 25, 1990, 104 Stat. 267, 269; Pub.L. 101-508, Title III, § 3007(a)(1), Nov. 5, 1990, 104 Stat. 1388-28; Pub.L. 103-394, Title I, §§ 101, 116, Title II, §§ 204(a), 218(b), Title III, § 304(b), Title IV, § 401, Title V, § 501(b)(2), (d)(7), Oct. 22, 1994, 108 Stat. 4107, 4119, 4122, 4128, 4132, 4141, 4142, 4144; Pub.L. 105-277, Div. I, Title VI, § 603, Oct. 21, 1998, 112 Stat. 2681-886; Pub.L. 109-8, Title I, § 106(f), Title II, §§ 214, 224(b), Title III, §§ 302, 303, 305(1), 311, 320, Title IV, §§ 401(b), 441, 444, Title VII, §§ 709, 718, Title IX, § 907(d), (o)(1), (2), Title XI, § 1106, Title XII, § 1225, Apr. 20, 2005, 119 Stat. 41, 54, 64, 75, 77, 79, 84, 94, 104, 114, 117, 127, 131, 176, 181, 182, 192, 199; Pub.L. 109-304, § 17(b)(1), Oct. 6, 2006, 120 Stat. 1706; Pub.L. 109-390, § 5(a)(2), Dec. 12, 2006, 120 Stat. 2696.)

[FN1] So in original. Probably should be "nonbankruptcy".

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

TAB 5

Westlaw.

▷

**Effective:[See Notes]**

United States Code Annotated <u>Currentness</u>
  Title 11. Bankruptcy <u>(Refs & Annos)</u>
    🗎 <u>Chapter 3</u>. Case Administration <u>(Refs & Annos)</u>
      🗎 <u>Subchapter IV</u>. Administrative Powers
        ➙ <u>§ 363. Use, sale, or lease of property</u>

**(a)** In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in <u>section 552(b)</u> of this title, whether existing before or after the commencement of a case under this title.

**(b)(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless--

  **(A)** such sale or such lease is consistent with such policy; or

  **(B)** after appointment of a consumer privacy ombudsman in accordance with <u>section 332</u>, and after notice and a hearing, the court approves such sale or such lease--

    **(i)** giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

    **(ii)** finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

**(2)** If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then--

  **(A)** notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

  **(B)** notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended--

    **(i)** pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ii) pursuant to subsection (g)(2) of such section; or

(iii) by the court after notice and a hearing.

**(c)(1)** If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

**(2)** The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--

**(A)** each entity that has an interest in such cash collateral consents; or

**(B)** the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

**(3)** Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

**(4)** Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

**(d)** The trustee may use, sell, or lease property under subsection (b) or (c) of this section only--

**(1)** in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust; and

**(2)** to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

**(e)** Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

**(f)** The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--

**(1)** applicable nonbankruptcy law permits sale of such property free and clear of such interest;

**(2)** such entity consents;

**(3)** such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

(g) Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

(h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

(i) Before the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated.

(j) After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

(k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

(l) Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

authorization and such sale or lease were stayed pending appeal.

(n) The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

(o) Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

(p) In any hearing under this section--

   (1) the trustee has the burden of proof on the issue of adequate protection; and

   (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2572; Pub.L. 98-353, Title III, § 442, July 10, 1984, 98 Stat. 371; Pub.L. 99-554, Title II, § 257(k), Oct. 27, 1986, 100 Stat. 3115; Pub.L. 103-394, Title I, § 109, Title II, §§ 214(b), 219(c), Title V, § 501(d)(8), Oct. 22, 1994, 108 Stat. 4113, 4126, 4129, 4144; Pub.L. 109-8, Title II, §§ 204, 231(a), Title XII, § 1221(a), Apr. 20, 2005, 119 Stat. 49, 72, 195.)

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Pub.L. 109-8, Title XII, § 1221(d), Apr. 20, 2005, 119 Stat. 196, provided that: "The amendments made by this section [amending this section and 11 U.S.C.A. §§ 541 and 1129, and enacting provisions set out as a note under this section] shall apply to a case pending under title 11, United States Code [11 U.S.C.A. § 101 et seq.], on the date of enactment of this Act [Apr. 20, 2005], or filed under that title on or after that date of enactment, except that the court shall not confirm a plan under chapter 11 of title 11, United States Code [11 U.S.C.A. § 1101 et seq.], without considering whether this section would substantially affect the rights of a party in interest who first acquired rights with respect to the debtor after the date of the filing of the petition. The parties who may appear and be heard in a proceeding under this section include the attorney general of the State in which the debtor is incorporated, was formed, or does business."

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

11 U.S.C.A. § 364

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      🕮 Chapter 3. Case Administration (Refs & Annos)
      🕮 Subchapter IV. Administrative Powers
        → **§ 364. Obtaining credit**

**(a)** If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

**(b)** The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

**(c)** If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

   **(1)** with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

   **(2)** secured by a lien on property of the estate that is not otherwise subject to a lien; or

   **(3)** secured by a junior lien on property of the estate that is subject to a lien.

**(d)(1)** The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

   **(A)** the trustee is unable to obtain such credit otherwise; and

   **(B)** there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

**(2)** In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

**(e)** The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(f) Except with respect to an entity that is an underwriter as defined in <u>section 1145(b)</u> of this title, section 5 of the Securities Act of 1933, the Trust Indenture Act of 1939, and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to the offer or sale under this section of a security that is not an equity security.

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 7

Westlaw.

11 U.S.C.A. § 506                                                                                    Page 1

▷

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter I. Creditors and Claims
            → **§ 506. Determination of secured status**

**(a)(1)** An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

**(2)** If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

**(b)** To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

**(c)** The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

**(d)** To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

    **(1)** such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

    **(2)** such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2583; Pub.L. 98-353, Title III, § 448, July 10, 1984, 98 Stat. 374; Pub.L. 109-8, Title III, § 327, Title VII, § 712(d), Apr. 20, 2005, 119 Stat. 99, 128.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

# TAB 8

Westlaw.

11 U.S.C.A. § 552

C

**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    ⌐⊞ Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
      ⌐⊞ Subchapter III. The Estate (Refs & Annos)
        → § 552. Postpetition effect of security interest

(a) Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b)(1) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

(2) Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2602; Pub.L. 98-353, Title III, § 466, July 10, 1984, 98 Stat. 380; Pub.L. 103-394, Title II, § 214(a), Oct. 22, 1994, 108 Stat. 4126; Pub.L. 109-8, Title XII, § 1204(2), Apr. 20, 2005, 119 Stat. 194.)

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

# TAB 9

Westlaw.

28 U.S.C.A. § 158

C

Effective:[See Notes]

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
      Part I. Organization of Courts (Refs & Annos)
         Chapter 6. Bankruptcy Judges (Refs & Annos)
            → § 158. Appeals

(a) The district courts of the United States shall have jurisdiction to hear appeals [FN1]

   (1) from final judgments, orders, and decrees;

   (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

   (3) with leave of the court, from other interlocutory orders and decrees;

and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

(b)(1) The judicial council of a circuit shall establish a bankruptcy appellate panel service composed of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a) unless the judicial council finds that--

   (A) there are insufficient judicial resources available in the circuit; or

   (B) establishment of such service would result in undue delay or increased cost to parties in cases under title 11.

Not later than 90 days after making the finding, the judicial council shall submit to the Judicial Conference of the United States a report containing the factual basis of such finding.

(2)(A) A judicial council may reconsider, at any time, the finding described in paragraph (1).

(B) On the request of a majority of the district judges in a circuit for which a bankruptcy appellate panel service is established under paragraph (1), made after the expiration of the 1-year period beginning on the date such service is established, the judicial council of the circuit shall determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

(C) On its own motion, after the expiration of the 3-year period beginning on the date a bankruptcy appellate panel service is established under paragraph (1), the judicial council of the circuit may determine whether a circumstance specified in subparagraph (A) or (B) of such paragraph exists.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(D) If the judicial council finds that either of such circumstances exists, the judicial council may provide for the completion of the appeals then pending before such service and the orderly termination of such service.

(3) Bankruptcy judges appointed under paragraph (1) shall be appointed and may be reappointed under such paragraph.

(4) If authorized by the Judicial Conference of the United States, the judicial councils of 2 or more circuits may establish a joint bankruptcy appellate panel comprised of bankruptcy judges from the districts within the circuits for which such panel is established, to hear and determine, upon the consent of all the parties, appeals under subsection (a) of this section.

(5) An appeal to be heard under this subsection shall be heard by a panel of 3 members of the bankruptcy appellate panel service, except that a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title.

(6) Appeals may not be heard under this subsection by a panel of the bankruptcy appellate panel service unless the district judges for the district in which the appeals occur, by majority vote, have authorized such service to hear and determine appeals originating in such district.

(c)(1) Subject to subsections (b) and (d)(2), each appeal under subsection (a) shall be heard by a 3-judge panel of the bankruptcy appellate panel service established under subsection (b)(1) unless--

    (A) the appellant elects at the time of filing the appeal; or

    (B) any other party elects, not later than 30 days after service of notice of the appeal;

to have such appeal heard by the district court.

(2) An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

(d)(1) The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

(2)(A) The appropriate court of appeals shall have jurisdiction of appeals described in the first sentence of subsection (a) if the bankruptcy court, the district court, or the bankruptcy appellate panel involved, acting on its own motion or on the request of a party to the judgment, order, or decree described in such first sentence, or all the appellants and appellees (if any) acting jointly, certify that--

    (i) the judgment, order, or decree involves a question of law as to which there is no controlling decision of the court of appeals for the circuit or of the Supreme Court of the United States, or involves a matter of public importance;

    (ii) the judgment, order, or decree involves a question of law requiring resolution of conflicting decisions; or

    (iii) an immediate appeal from the judgment, order, or decree may materially advance the progress of the case or proceeding in which the appeal is taken;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and if the court of appeals authorizes the direct appeal of the judgment, order, or decree.

**(B)** If the bankruptcy court, the district court, or the bankruptcy appellate panel--

**(i)** on its own motion or on the request of a party, determines that a circumstance specified in clause (i), (ii), or (iii) of subparagraph (A) exists; or

**(ii)** receives a request made by a majority of the appellants and a majority of appellees (if any) to make the certification described in subparagraph (A);

then the bankruptcy court, the district court, or the bankruptcy appellate panel shall make the certification described in subparagraph (A).

**(C)** The parties may supplement the certification with a short statement of the basis for the certification.

**(D)** An appeal under this paragraph does not stay any proceeding of the bankruptcy court, the district court, or the bankruptcy appellate panel from which the appeal is taken, unless the respective bankruptcy court, district court, or bankruptcy appellate panel, or the court of appeals in which the appeal in [FN2] pending, issues a stay of such proceeding pending the appeal.

**(E)** Any request under subparagraph (B) for certification shall be made not later than 60 days after the entry of the judgment, order, or decree.

CREDIT(S)

(Added Pub.L. 98-353, Title I, § 104(a), July 10, 1984, 98 Stat. 341, and amended Pub.L. 101-650, Title III, § 305, Dec. 1, 1990, 104 Stat. 5105; Pub.L. 103-394, Title I, §§ 102, 104(c), (d), Oct. 22, 1994, 108 Stat. 4108-4110; Pub.L. 109-8, Title XII, § 1233(a), Apr. 20, 2005, 119 Stat. 202.)

[FN1] So in original.

[FN2] So in original. Probably should read "is".

2005 Acts. Except as otherwise provided, amendments by Pub.L. 109-8 effective 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 10

Westlaw.

28 U.S.C.A. § 1334

Page 1

▷

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 28. Judiciary and Judicial Procedure (Refs & Annos)
     Part IV. Jurisdiction and Venue (Refs & Annos)
       Chapter 85. District Courts; Jurisdiction (Refs & Annos)
         → **§ 1334. Bankruptcy cases and proceedings**

**(a)** Except as provided in subsection (b) of this section, the district courts shall have original and exclusive jurisdiction of all cases under title 11.

**(b)** Except as provided in subsection (e)(2), and notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.

**(c)(1)** Except with respect to a case under chapter 15 of title 11, nothing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11.

**(2)** Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced, and can be timely adjudicated, in a State forum of appropriate jurisdiction.

**(d)** Any decision to abstain or not to abstain made under subsection (c) (other than a decision not to abstain in a proceeding described in subsection (c)(2)) is not reviewable by appeal or otherwise by the court of appeals under section 158(d), 1291, or 1292 of this title or by the Supreme Court of the United States under section 1254 of this title. Subsection (c) and this subsection shall not be construed to limit the applicability of the stay provided for by section 362 of title 11, United States Code, as such section applies to an action affecting the property of the estate in bankruptcy.

**(e)** The district court in which a case under title 11 is commenced or is pending shall have exclusive jurisdiction--

   **(1)** of all the property, wherever located, of the debtor as of the commencement of such case, and of property of the estate; and

   **(2)** over all claims or causes of action that involve construction of section 327 of title 11, United States Code, or rules relating to disclosure requirements under section 327.

CREDIT(S)

(June 25, 1948, c. 646, 62 Stat. 931; Nov. 6, 1978, Pub.L. 95-598, Title II, § 238(a), 92 Stat. 2667; July 10, 1984, Pub.L. 98-353, Title I, § 101(a), 98 Stat. 333; Oct. 27, 1986, Pub.L. 99-554, Title I, § 144(e), 100 Stat. 3096; Dec. 1,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1990, <u>Pub.L. 101-650, Title III, § 309(b)</u>, 104 Stat. 5113; Oct. 22, 1994, <u>Pub.L. 103-394, Title I, § 104(b)</u>, 108 Stat. 4109; Apr. 20, 2005, <u>Pub.L. 109-8, Title III, § 324(a), Title VIII, § 802(c)(2), Title XII, § 1219</u>, 119 Stat. 98, 145, 195.)

2005 Acts. Pub.L. 109-8, Title III, § 324(b), Apr. 20, 2005, 119 Stat. 98, provided that: "This section [amending subsecs. (b) and (e) of this section] shall only apply to cases filed after the date of enactment of this Act [Apr. 20, 2005]."

Except as otherwise provided, amendments by Pub.L. 109-8 effective 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-197 (excluding P.L. 110-181) approved 3-14-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

# TAB 11

interest in such property becomes property of the estate. If the debtor holds bare legal title or holds property in trust for another, only those rights which the debtor would have otherwise had emanating from such interest pass to the estate under section 541. Neither this section nor section 545 will affect various statutory provisions that give a creditor a lien that is valid both inside and outside bankruptcy against a bona fide purchaser of property from the debtor, or that creates a trust fund for the benefit of creditors meeting similar criteria. See Packers and Stockyards Act § 206, 7 U.S.C. 196(1976).

Section 541(c)(2) follows the position taken in the House bill and rejects the position taken in the Senate amendment with respect to income limitations on a spend-thrift trust.

Section 541(d) of the House amendment is derived from section 541(e) of the Senate amendment and reiterates the general principle that where the debtor holds bare legal title without any equitable interest, that the estate acquires bare legal title without any equitable interest in the property. Examples of this are mortgages sold for which legal title has been retained for servicing. Similarly, if the debtor holds an equitable interest in property without legal title, the estate would acquire only the equitable interest of the debtor in property and not the legal title. Thus, as section 541(a)(1) clearly states, the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. To the extent such an interest is limited in the hands of the debtor, it is equally limited in the hands of the estate except to the extent that defenses which are personal against the debtor are not effective against the estate.

Section 542(a) of the House amendment modifies similar provisions contained in the House bill and the Senate amendment treating with turnover of property to the estate. The section makes clear that any entity, other than a cus-

[H 11097]

todian, is required to deliver property of the estate to the trustee or debtor in possession whenever such property is acquired by the entity during the case, if the trustee or debtor in possession may use, sell, or lease the property under section 363, or if the debtor may exempt the property under section 522, unless the property is of inconsequential value or benefit to the estate. This section is not intended to require an entity to deliver property to the trustee if such entity has obtained an order of the court authorizing the entity to retain possession, custody, or control of the property.

The House amendment adopts section 542(c) of the House bill in preference to a similar provision contained in section 542(c) of the Senate amendment.

Protection afforded by section 542(c) applies only to the transferor or payor and not to a transferee or payee receiving a transfer or payment, as the case may be. Such transferee or payee is treated under section 549 and section 550 of title 11.

The extent to which the attorney client privilege is valid against the trustee is unclear under current law and is left to be determined by the courts on a case by case basis.

Section 543(a) is a modification of similar provisions contained in the House bill and the Senate amendment. The provision clarifies that a custodian may always act as is necessary to preserve property of the debtor. Section 543(c)(3) excepts from surcharge a custodian that is an assignee for the benefit of creditors, who was appointed or took possession before 120 days before the date of the filing of the petition, whichever is later. The provision also prevents a custodian from being surcharged in connection with payments made in accordance with applicable law.

Section 544(a)(3) modifies similar provisions contained in the House bill and Senate amendment so as not to require a creditor to perform the impossible in order to perfect his interest. Both the lien creditor test in section 544(a)(1), and the bona fide purchaser test in section 544(a)(3) should not require a transferee to perfect a transfer against an entity with respect to which applicable law does not permit perfection. The avoiding powers under section 544(a)(1),(2), and (3) are new. In particular, section 544(a)(1) overrules *Pacific Finance Corp. v. Edwards,* 309 F.2d 224 (9th Cir. 1962), and *In re Federals, Inc.,* 553 F.2d 509 (6th Cir. 1977), insofar as those cases held that the trustee did not have the status of a creditor who extended credit immediately prior to the commencement of the case.

The House amendment deletes section 544(c) of the House bill.

Section 545 of the House amendment modifies similar provisions contained in the House bill and Senate amendment to make clear that a statutory lien may be avoided under section 545 only to the extent the lien violates the perfection standards of section 545. Thus a Federal tax lien is invalid under section 545(2) with respect to property specified in sections 6323(b) and (c) of the Internal Revenue Code of 1954. As a result of this modification, section 545(b) of the Senate amendment is deleted as unnecessary.

Section 546(a) of the House amendment is derived from section 546(c) of the Senate amendment. Section 546(c) of the House amendment is derived from section 546(b) of the Senate amendment. It applies to receipt of goods on credit as well as by cash sales. The section clarifies that a demand for reclamation must be made in writing anytime before 10 days after receipt of

the goods by the debtor. The section also permits the court to grant the reclaiming creditor a lien or an administrative expense in lieu of turning over the property.

No limitation is provided for payments to commodity brokers as in section 766 of the Senate amendment other than the amendment to section 548 of title II. Section 547(c)(2) protects most payments.

Section 547(b)(2) of the House amendment adopts a provision contained in the House bill and rejects an alternative contained in the Senate amendment relating to the avoidance of a preferential transfer that is payment of a tax claim owing to a governmental unit. As provided, section 106(c) of the House amendment overrules contrary language in the House report with the result that the Government is subject to avoidance of preferential transfers.

Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c)(1) and (2).

Section 547(c)(6) of the House bill is deleted and is treated in a different fashion in section 553 of the House amendment.

Section 547(c)(6) represents a modification of a similar provision contained in the House bill and Senate amendment. The exception relating to satisfaction of a statutory lien is deleted. The exception for a lien created under title 11 is deleted since such a lien is a statutory lien that will not be avoidable in a subsequent bankruptcy.

Section 547(e)(1)(B) is adopted from the House bill and Senate amendment without change. It is intended that the simple contract test used in this section will be applied as under section 544(a)(1) not to require a creditor to perfect against a creditor on a simple contract in the event applicable law makes such perfection impossible. For example, a purchaser from a debtor at an improperly noticed bulk sale may take subject to the rights of a creditor on a simple contract of the debtor for 1 year after the bulk sale. Since the purchaser cannot perfect against such a creditor on a simple contract, he should not be held responsible for failing to do the impossible. In the event the debtor goes into bankruptcy within a short time after the bulk sale, the trustee should not be able to use the avoiding powers under section 544(a)(1) or 547 merely because State law has made some transfers of personal property subject to the rights of a creditor on a simple contract to acquire a juidicial lien with no opportunity to perfect against such a creditor.

Section 548(d)(2) is modified to reflect general application of a provision contained in section 766 of the Senate amendment with respect to commodity

brokers. In particular, section 548(d)(2)(B) of the House amendment makes clear that a commodity broker who receives a margin payment is considered to receive the margin payment in return for "value" for purposes of section 548.

Section 549 of the House amendment has been redrafted in order to incorporate sections 342(b) and (c) of the Senate amendment. Those sections have been consolidated and redrafted in section 549(c) of the House amendment. Section 549(d) of the House amendment adopts a provision contained in section 549(c) of the Senate amendment.

Section 550(a)(1) of the House amendment has been modified in order to permit recovery from an entity for whose benefit an avoided transfer is made in addition to a recovery from the initial transferee of the transfer. Section 550(c) would still apply, and the trustee is entitled only to a single satisfaction. The liability of a transferee under section 550(a) applies only "to the extent that a transfer is avoided". This means that liability is not imposed on a transferee to the extent that a transferee is protected under a provision such as section 548(c) which grants a good faith transferee for value of a transfer that is avoided only as a fraudulent transfer, a lien on the property transferred to the extent of value given.

Section 550(b) of the House amendment is modified to indicate that value includes satisfaction or securing of a present antecedent debt. This means that the trustee may not recover under subsection (a)(2) from a subsequent transferee that takes for "value", provided the subsequent transferee also takes in good faith and without knowledge of the transfer avoided.

Section 550(e) of the House amendment is derived from section 550(e) of the Senate amendment.

Section 551 is adopted from the House bill and the alternative in the Senate amendment is rejected. The section is clarified to indicate that a transfer avoided or a lien that is void is preserved for the benefit of the estate, but only with respect to property of the estate. This prevents the trustee from asserting an avoided tax lien against after acquired property of the debtor.

Section 552(a) is derived from the House bill and the alternative provision in the Senate amendment is rejected. Section 552(b) represents a compromise between the House bill and the Senate amendment. Proceeds coverage, but not after acquired property clauses, are valid under title 11. The provision allows the court to consider the equities in each case. In the course of such consideration the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party. Although this section

### [H 11098]

grants a secured party a security interest in proceeds, product, offspring, rents, or profits, the section is explicitly subject to other sections of title 11. For example, the trustee or debtor in possession may use, sell, or lease proceeds, product, offspring, rents, or profits under section 363.

Section 553 of the House amendment is derived from a similar provision contained in the Senate amendment, but is modified to clarify application of a two-point test with respect to set offs.

Section 554(b) is new and permits a party in interest to request the court to order the trustee to abandon property of the estate that is burdensome to the estate or that is of inconsequential value to the estate.

The House amendment deletes section 701(d) of the Senate amendment. It is anticipated that the Rules of Bankruptcy Procedure will require the appointment of an interim trustee at the earliest practicable moment in commodity broker bankruptcies, but no later than noon of the day after the date of the filing of the petition, due to the volatility of such cases.

The House amendment adopts section 702(a)(2) of the Senate amendment. An insubstantial equity interest does not disqualify a creditor from voting for a candidate for trustee. Section 704(8) of the Senate amendment is deleted in the House amendment. Trustees should give constructive notice of the commencement of the case in the manner specified under section 549(c) of title 11.

Section 705(a) of the House amendment adopts a provision contained in the Senate amendment that limits a committee of creditors to not more than 11; the House bill contained no maximum limitation.

Section 706(a) of the House amendment adopts a provision contained in the Senate amendment indicating that a waiver of the right to convert a case under section 706(a) is unenforceable. The explicit reference in title 11 forbidding the waiver of certain rights is not intended to imply that other rights, such as the right to file a voluntary bankruptcy case under section 301, may be waived.

Section 706 of the House amendment adopts a similar provision contained in H.R. 8200 as passed by the House. Competing proposals contained in section 706(c) and section 706(d) of the Senate amendment are rejected.

Section 707 of the House amendment indicates that the court may dismiss a case only after notice and a hearing.

Section 722 of the House amendment adopts the position taken in H.R. 8200 as passed by the House and rejects the alternative contained in section 722 of the Senate amendment.

Section 723(c) of the House amendment is a compromise between similar provisions contained in the House bill and Senate amendment. The section makes clear that the trustee of a partnership has a claim against each general partner for the full amount of all claims of creditors allowed in the case concerning the partnership. By restricting the trustee's rights to claims of "creditors," the trustee of the partnership will not have a claim against the general partners for administrative expenses or claims allowed in the case concerning the partnership. As under present law, sections of the Bankruptcy Act applying to codebtors and sureties apply to the relationship of a partner with respect to a partnership debtor. *See* sections 501(b), 502(e), 506(d)(2), 509, 524(d), and 1301 of title 11.

Section 724 of the House amendment adopts the provision taken in the House bill and rejects the provision taken in the Senate amendment. In effect, a tax claim secured by a lien is treated as a claim between the fifth and sixth priority in a case under chapter 7 rather than as a secured claim.

Section 725 of the House amendment adopts the substance contained in both the House bill and Senate amendment but transfers an administrative function to the trustee in accordance with the general thrust of this legislation to separate the administrative and the judicial functions where appropriate.

Section 726(a)(4) adopts a provision contained in the Senate amendment subordinating prepetition penalties and penalties arising in the involuntary gap period to the extent the penalties are not compensation for actual pecuniary laws.

The House amendment deletes a provision following section 726(a)(6) of the Senate amendment providing that the term "claim" includes interest due owed before the date of the filing of the petition as unnecessary since a right to payment for interest due is a right to payment which is within the definition of "claim" in section 101(4) of the House amendment.

Sections 727(a)(8) and (9) of the House amendment represent a compromise between provisions contained in section 727(a)(8) of the House bill and Senate amendment. Section 727(a)(8) of the House amendment adopts section 727(a)(8) of the House bill. However, section 727(a)(9) of the House amendment contains a compromise based on section 727(a)(8) of the Senate amendment with respect to the circumstances under which a plan by way of composition under chapter XIII of the Bankruptcy Actor chapter 13 of title 11 should be a bar to discharge in a subsequent proceeding under title 11. The paragraph provides that a discharge under section 660 or 661 of the Bankruptcy Actor section 1328 of title 11 in a case commenced within 6 years before the date of the filing of the petition in a subsequent case, operates as a bar to

discharge unless, first, payments under the plan totaled at least 100 percent of the allowed unsecured claims in the case; or second, payments under the plan totaled at least 70 percent of the allowed unsecured claims in the case and the plan was proposed by the debtor in good faith and was the debtor's best effort.

It is expected that the Rules of Bankruptcy Procedure will contain a provision permitting the debtor to request a determination of whether a plan is the debtor's "best effort" prior to confirmation of a plan in a case under chapter 13 of title 11. In determining whether a plan is the debtor's "best effort" the court will evaluate several factors. Different facts and circumstances in cases under chapter 13 operate to make any rule of thumb of limited usefulness. The court should balance the debtor's assets, including family income, health insurance, retirement benefits, and other wealth, a sum which is generally determinable, against the forseeable necessary living expenses of the debtor and the debtor's dependents, which unfortunately is rarely quantifiable. In determining the expenses of the debtor and the debtor's dependents, the court should consider the stability of the debtor's employment, if any, the age of the debtor, the number of the debtor's dependents and their ages, the condition of equipment and tools necessary to the debtor's employment or to the operation of his business, and other foreseeable expenses that the debtor will be required to pay during the period of the plan, other than payments to be made to creditors under the plan.

Section 727(a)(10) of the House amendment clarifies a provision contained in section 727(a)(9) of the House bill and Senate amendment indicating that a discharge may be barred if the court approves a waiver of discharge executed in writing by the debtor after the order for relief under chapter 7.

Section 727(b) of the House amendment adopts a similar provision contained in the Senate amendment modifying the effect of discharge. The provision makes clear that the debtor is discharged from all debts that arose before the date of the order for relief under chapter 7 in addition to any debt which is determined under section 502 as if it were a prepetition claim. Thus, if a case is converted from chapter 11 or chapter 13 to a case under chapter 7, all debts prior to the time of conversion are discharged, in addition to debts determined after the date of conversion of a kind specified in section 502, that are to be determined as prepetition claims. This modification is particularly important with respect to an individual debtor who files a petition under chapter 11 or chapter 13 of title 11 if the case is converted to chapter 7. The logical result of the House amendment is to equate the result that obtains whether the case is converted from another chapter to chapter 7, or whether the other chapter proceeding is dismissed and a new case is commenced by filing a petition under chapter 7.

Section 728 of the House amendment adopts a provision contained in the House bill that was deleted by the Senate amendment.

Section 741(6) of the House bill and Senate amendment is deleted by the House amendment since the defined term is used only in section 741(4)(A)(iii). A corresponding change is made in that section.

Section 742 of the House amendment deletes a sentence contained in the Senate amendment requiring the trustee in an interstate stockbrokerage liquidation to comply with the provisions of subchapter IV of chapter 7 if the debtor is also a commodity broker. The House amendment expands the requirement to require the SIPC trustee to perform such

[H 11099]

duties, if the debtor is a commodity broker, under section 7(b) of the Securities Investor Protection Act. The requirement is deleted from section 742 since the trustee of an intrastate stockbroker will be bound by the provisions of subchapter IV of chapter 7 if the debtor is also a commodity broker by reason of section 103 of title 11.

Subchapter IV of chapter 7 represents a compromise between similar chapters in the House bill and Senate amendment. Section 761(2) of the House amendment defines "clearing organization" to cover an organization that clears commodity contracts on a contract market or a board of trade; the expansion of the definition is intended to include clearing organizations that clear commodity options. Section 761(4) of the House amendment adopts the term "commodity contract" as used in section 761(5) of the Senate amendment but with the more precise substantive definitions contained in section 761(8) of the House bill. The definition is modified to insert "board of trade" to cover commodity options. Section 761(5) of the House amendment adopts the definition contained in section 761(6) of the Senate amendment in preference to the definition contained in section 761(4) of the House bill which errone-ously included opinions. Section 761(9) of the House amendment represents a compromise between similar provisions contained in section 761(10) of the Senate amendment and section 761(9) of the House bill. The compromise adopts the substance contained in the House bill and adopts the terminology of "commodity contract" in lieu of "contractual commitment" as suggested in the Senate amendment. Section 761(10) of the House amendment represents a compromise between similar sections in the House bill and Senate amend-ment regarding the definition of "customer property." The definition of "distribution share" contained in section 761(12) of the Senate amendment is deleted as unnecessary. Section 761(12) of the House amendment adopts a definition of "foreign futures commission merchant" similar to the definition

# TAB 12

excepts from surcharge a custodian that is an assignee for the benefit of creditors, who was appointed or took possession before 120 days before the date of the filing of the petition, whichever is later. The provision also prevents a custodian from being surcharged in connection with payments made in accordance with applicable law.

Section 544(a)(3) modifies similar provisions contained in the House bill and Senate amendment so as not to require a creditor to perform the impossible in order to perfect his interest. Both the lien creditor test in section 544(a)(1), and the bona fide purchaser test in section 544(a)(3) should not require a transferee to perfect a transfer against an entity with respect to which applicable law does not permit perfection. The avoiding powers under section 544(a) (1), (2), and (3) are new. In particular, section 544(a)(1) overrules *Pacific Finance Corp.* v. *Edwards*, 309 F.2d 224 (9th Cir. 1962), and *In re Federals, Inc.*, 553 F.2d 509 (6th Cir. 1977), insofar as those cases held that the trustee did not have the status of a creditor who extended credit immediately prior to the commencement of the case.

The House amendment deletes section 544(c) of the House bill.

Section 545 of the House amendment modifies similar provisions contained in the House bill and Senate amendment to make clear that a statutory lien may be avoided under section 545 only to the extent the lien violates the perfection standards of section 545. Thus a Federal tax lien is invalid under section 545(2) with respect to property specified in sections 6323 (b) and (c) of the Internal Revenue Code of 1954. As a result of this modification, section 545(b) of the Senate amendment is deleted as unnecessary.

Section 546(a) of the House amend-

[S 17414]

ment is derived from section 546(c) of the Senate amendment. Section 546(c) of the House amendment is derived from section 546(b) of the Senate amendment. It applies to receipt of goods on credit as well as by cash sales. The section clarifies that a demand for reclamation must be made in writing anytime before 10 days after receipt of the goods by the debtor. The section also permits the court to grant the reclaiming creditor a lien or an administrative expense in lieu of turning over the property.

No limitation is provided for payments to commodity brokers as in section 766 of the Senate amendment other than the amendment to section 548 of title II. Section 547(c)(2) protects most payments.

Section 547(b)(2) of the House amendment adopts a provision contained in the House bill and rejects an alternative contained in the Senate amendment

relating to the avoidance of a preferential transfer that is payment of a tax claim owing to a governmental unit. As provided, section 106(c) of the House amendment overrules contrary language in the House report with the result that the Government is subject to avoidance of preferential transfers.

Contrary to language contained in the House report, payment of a debt by means of a check is equivalent to a cash payment, unless the check is dishonored. Payment is considered to be made when the check is delivered for purposes of sections 547(c) (1) and (2).

Section 547(c)(6) of the House bill is deleted and is treated in a different fashion in section 553 of the House amendment.

Section 547(c)(6) represents a modification of a similar provision contained in the House bill and Senate amendment. The exception relating to satisfaction of a statutory lien is deleted. The exception for a lien created under title 11 is deleted since such a lien is a statutory lien that will not be avoidable in a subsequent bankruptcy.

Section 547(e)(1)(B) is adopted from the House bill and Senate amendment without change. It is intended that the simple contract test used in this section will be applied as under section 544(a)(1) not to require a creditor to perfect against a creditor on a simple contract in the event applicable law makes such perfection impossible. For example, a purchaser from a debtor at an improperly noticed bulk sale may take subject to the rights of a creditor on a simple contract of the debtor for 1 year after the bulk sale. Since the purchaser cannot perfect against such a creditor on a simple contract, he should not be held responsible for failing to do the impossible. In the event the debtor goes into bankruptcy within a short time after the bulk sale, the trustee should not be able to use the avoiding powers under section 544(a)(1) or 547 merely because State law has made some transfers of personal property subject to the rights of a creditor on a simple contract to acquire a judicial lien with no opportunity to perfect against such a creditor.

Section 548(d)(2) is modified to reflect general application of a provision contained in section 766 of the Senate amendment with respect to commodity brokers. In particular, section 543(d)(2)(B) of the House amendment makes clear that a commodity broker who receives a margin payment is considered to receive the margin payment in return for "value" for purposes of section 548.

Section 549 of the House amendment has been redrafted in order to incorporate sections 342 (b) and (c) of the Senate amendment. Those sections have been consolidated and redrafted in section 549(c) of the House amend-ment. Section 549(d) of the House amendment adopts a provision contained in section 549(c) of the Senate amendment.

Section 550(a)(1) of the House amendment has been modified in order to permit recovery from an entity for whose benefit an avoided transfer is made in addition to a recovery from the initial transferee of the transfer. Section 550(c) would still apply, and the trustee is entitled only to a single satisfaction. The liability of a transferee under section 550(a) applies only "to the extent that a transfer is avoided". This means that liability is not imposed on a transferee to the extent that a transferee is protected under a provision such as section 548(c) which grants a good faith transferee for value of a transfer that is avoided only as a fraudulent transfer, a lien on the property transferred to the extent of value given.

Section 550(b) of the House amendment is modified to indicate that value includes satisfaction or securing of a present antecedent debt. This means that the trustee may not recover under subsection (a)(2) from a subsequent transferee that takes for "value", provided the subsequent transferee also takes in good faith and without knowledge of the transfer avoided.

Section 550(e) of the House amendment is derived from section 550(e) of the Senate amendment.

Section 551 is adopted from the House bill and the alternative in the Senate amendment is rejected. The section is clarified to indicate that a transfer avoided or a lien that is void is preserved for the benefit of the estate, but only with respect to property of the estate. This prevents the trustee from asserting an avoided tax lien against after acquired property of the debtor.

Section 552(a) is derived from the House bill and the alternative provision in the Senate amendment is rejected. Section 552(b) represents a compromise between the House bill and the Senate amendment. Proceeds coverage, but not after acquired property clauses, are valid under title II. The provision allows the court to consider the equities in each case. In the course of such consideration the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party. Although this section grants a secured party a security interest in proceeds, product, offspring, rents, or profits, the section is explicitly subject to other sections of title II. For example, the trustee or debtor in possession may use, sell, or lease proceeds, product, offspring, rents, or profits under section 363.

Section 553 of the House amendment is derived from a similar provision contained in the Senate amendment, but is modified to clarify application of a two-point test with respect to setoffs.

Section 554(b) is new and permits a party in interest to request the court to order the trustee to abandon property of the estate that is burdensome to the estate or that is of inconsequential value to the estate.

The House amendment deletes section 701(d) of the Senate amendment. It is anticipated that the Rules of Bankruptcy Procedure will require the appointment of an interim trustee at the earliest practicable moment in commodity broker bankruptcies, but no later than noon of the day after the date of the filing of the petition, due to the volatility of such cases.

The House amendment adopts section 702(a)(2) of the Senate amendment. An insubstantial equity interest does not disqualify a creditor from voting for a candidate for trustee. Section 704(8) of the Senate amendment is deleted in the House amendment. Trustees should give constructive notice of the commencement of the case in the manner specified under section 549(c) of title II.

Section 705(a) of the House amendment adopts a provision contained in the Senate amendment that limits a committee of creditors to not more than 11; the House bill contained no maximum limitation.

Section 706(a) of the House amendment adopts a provision contained in the Senate amendment indicating that a waiver of the right to convert a case under section 706(a) is unenforceable. The explicit reference in title II forbidding the waiver of certain rights is not intended to imply that other rights, such as the right to file a voluntary bankruptcy case under section 301, may be waived.

Section 706 of the House amendment adopts a similar provision contained in H.R. 8200 as passed by the House. Competing proposals contained in section 706(c) and section 706(d) of the Senate amendment are rejected.

Section 707 of the House amendment indicates that the court may dismiss a case only after notice and a hearing.

Section 722 of the House amendment adopts the position taken in H.R. 8200 as passed by the House and rejects the alternative contained in section 722 of the Senate amendment.

Section 723(c) of the House amendment is a compromise between similar provisions contained in the House bill and Senate amendment. The section makes clear that the trustee of a partnership has a claim against each general partner for the full amount of all claims of creditors allowed in the case concerning the partnership. By restricting the trustee's rights to claims of "creditors," the trustee of the partnership will not have a claim against the general partners for administrative expenses or claims allowed in the case concerning the partnership. As under present law, sections of the Bankruptcy Act applying to codebtors and sureties ap-

# TAB 13



Federal Rules of Bankruptcy Procedure, Rule 8013

CUNITED STATES CODE ANNOTATED
BANKRUPTCY RULES
**PARTVIII--APPEALS TO DISTRICT COURT OR BANKRUPTCY APPELLATE PANEL**
→**Rule 8013. Disposition of Appeal; Weight Accorded Bankruptcy Judge's Findings of Fact**

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

Amendments received to 02-19-08

Copr. © 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. US Gov. Works.

# TAB 14

**Rule 4001-2**   **Cash Collateral and Financing Orders**.

(a)   Motions. Except as provided herein and elsewhere in these Local
Rules, all cash collateral and financing requests under
11 U.S.C. §§ 363 and 364 shall be heard by motion filed under
Fed. R. Bankr. P. 2002, 4001 and 9014 ("Financing Motions").

   (i)   Provisions to be Highlighted. All Financing Motions
must (a) recite whether the proposed form of order
and/or underlying cash collateral stipulation or loan
agreement contains any provision of the type indicated
below, (b) identify the location of any such provision
in the proposed form of order, cash collateral
stipulation and/or loan agreement and (c) justify the
inclusion of such provision:

   (A)   Provisions that grant cross-collateralization
protection (other than replacement liens or other
adequate protection) to the prepetition secured
creditors (i.e., clauses that secure prepetition
debt by postpetition assets in which the secured
creditor would not otherwise have a security
interest by virtue of its prepetition security
agreement or applicable law);

   (B)   Provisions or findings of fact that bind the estate
or other parties in interest with respect to the
validity, perfection or amount of the secured
creditor's prepetition lien or the waiver of
claims against the secured creditor without first
giving parties in interest at least seventy-five
(75) days from the entry of the order and the
creditors' committee, if formed, at least sixty
(60) days from the date of its formation to
investigate such matters;

   (C)   Provisions that seek to waive, without notice,
whatever rights the estate may have under
11 U.S.C. § 506(c);

   (D)   Provisions that immediately grant to the
prepetition secured creditor liens on the debtor's
claims and causes of action arising under
11 U.S.C. §§ 544, 545, 547, 548 and 549;

   (E)   Provisions that deem prepetition secured debt to
be postpetition debt or that use postpetition

41

loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F) Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G) Provisions that prime any secured lien without the consent of that lienor.

(ii) All Financing Motions shall also provide a summary of the essential terms of the proposed use of cash collateral and/or financing (e.g., the maximum borrowing available on a final basis, the interim borrowing limit, borrowing conditions, interest rate, maturity, events of default, use of funds limitations and protections afforded under 11 U.S.C. §§ 363 and 364).

(b) Interim Relief. When Financing Motions are filed with the Court on or shortly after the petition date, the Court may grant interim relief pending review by interested parties of the proposed Debtor-in-Possession financing arrangements. Such interim relief shall be only what is necessary to avoid immediate and irreparable harm to the estate pending a final hearing. In the absence of extraordinary circumstances, the Court shall not approve interim financing orders that include any of the provisions previously identified in Local Rule 4001-2(a)(i)(A)-(F).

(c) Final Orders. A final order shall be entered only after notice and a hearing under Fed. R. Bankr. P. 4001 and Local Rule 2002-1(b). Ordinarily, the final hearing shall be held at least ten (10) days following the organizational meeting of the creditors' committee contemplated by 11 U.S.C. § 1102.

42

# TAB 15

LEXSEE 56 AM. BANKR. L.J. 251

Copyright (c) 1982 National Conference of Bankruptcy Judges
The American Bankruptcy Law Journal

Summer, 1982

*56 Am. Bankr. L.J. 251*

**LENGTH:** 11637 words

ARTICLE: Adequate Protection and Postpetition Interest in Chapter 11 Proceedings. *

* The author wishes to express his gratitude to Professor Vern Countryman, who supervised the writing of this paper. The opinions and errors herein are, of course, the author's own.

**NAME:** Niall L. O'Toole **

**BIO:**

** A.B., 1979, J.D., 1982, Harvard University.

**SUMMARY:**
... Is this kind of right protected by section 361? In other words, does the concept of adequate protection extend to postpetition interest on secured claims? ... *Adequate Protection of Postpetition Interest Under the Bankruptcy Act.* ... *It is plain from his opinion that Justice Holmes was content to follow English practice without bothering to investigate, as Judge Hand tried to do, whether that practice was justified. ... What of the situation in which collateral value does decrease as a result of the reorganization process, not so much that its value falls below the amount of the debt secured at the time of the petition, but enough so that the creditor receives less postpetition interest at the time of the plan than he would have had the collateral not depreciated at all? Should the reorganization court act to insure that the collateral does not depreciate so that an equity cushion sufficient for anticipated postpetition interest remains? This is the question that was unasked and unanswered in the pre-Code cases. ... Now in order for this exception to endorse adequate protection of equity cushions, the secured creditor in Bermec* would have had to have been oversecured, for payments to undersecured creditors protect only their debt as it stood at the time of the petition, since such creditors have no entitlement to postpetition interest. ...

**TEXT:**

[*251] The new Bankruptcy Code  n1 improves on the old Bankruptcy Act  n2 by its attempt to give some statutory direction to courts that have in the past been forced to struggle without Congressional guidance in balancing the interests of secured creditors against those of junior creditors and equity holders in the process of corporate reorganization. The rehabilitation of a business enterprise almost always requires the use of property in which various creditors have security interests perfected under the Uniform Commercial Code or other laws. In recognition of these creditors' rights conferred by state law, *sections 362, 363,* and *364 of the Bankruptcy Code,* dealing respectively with the automatic stay, with the use, sale or leasing of collateral, and with postpetition credit, direct the court under certain circumstances to insure that secured creditors' interests are "adequately protected," as that concept is illustrated in section 361.

This article is directed to a narrow question, one that has relevance only in those reorganizations in which the debt owed a secured creditor at the commencement of the case is less than the value of his collateral at that time. The difference between the debt and the value of the collateral is often called the "equity cushion." Section 506(b) of the Code makes it clear that a creditor with such a cushion at the time of the plan is entitled to postpetition interest. Is this kind of

right protected by section 361? In other words, does the concept of adequate protection extend to postpetition interest on secured claims?

The reported bankruptcy decisions that are rapidly filling up the remaining shelf space of law libraries indicate that the courts have decided that it does. The contention is advanced in this article that these courts have, at a minimum, not given the question the attention it deserves. More specifically, this article attempts to demonstrate first, that such adequate protection had no basis in law under the Bankruptcy Act, second, that it finds no support **[\*252]** in the new Bankruptcy Code, and third, that it has no sound foundation in reorganization policy.

I. *Adequate Protection of Postpetition Interest Under the Bankruptcy Act.*

The general rule in bankruptcy disallowed any postpetition interest on any claims against the debtor, except when the debtor proved solvent. n3 Grounded in English practice, n4 this rule prevented creditors whose contracts with the debtor called for high rates of interest from gaining more of the estate than creditors whose contracts provided lower interest rates. n5 In *Thomas v. Western Car Company,* the Supreme Court in 1893 expressed the rule in the context of an equity receivership:

As a general rule, after property of an insolvent passes into the hands of a receiver or of an assignee in insolvency, interest is not allowed on the claims against the funds. The delay in distribution is the act of the law; it is a necessary incident to the settlement of the estate. n6

There were, however, two exceptions to this rule that worked in favor of certain secured creditors. The first exception received the rather casual approval of the Supreme Court in 1909, when it affirmed the decision of the Eighth Circuit in *Coder v. Arts.* n7 The Court of Appeals had permitted a secured creditor in a straight bankruptcy case to enjoy postpetition interest on his claim when the sale proceeds of the collateral were sufficient to cover the prepetition debt as well. The Supreme Court said only that this was not error, and the Court did not rule on the Eighth Circuit's notion that the mortgage agreement, which provided that the land subject to the mortgage was security for interest as well as principal, "ran with the land," n8 so that the trustee had to follow its terms and thus provide the creditor with postpetition interest from the sale proceeds.

**[\*253]** That reasoning has an old-fashioned flavor not quite compatible with later Supreme Court decisions setting out the wide scope of the bankruptcy court's power to stay enforcement of liens, n9 but the exception of *Coder v. Arts,* once enunciated, passed into the law never to be questioned. Beyond this, the Eighth Circuit's exercise in the law of property was not to the point. Doubtless the trustee took the land subject to the mortgage, but whether the creditor was entitled to postpetition interest was a different matter. *Western Car* had made it clear that postpetition interest was not a creditor's right, and neither the Eighth Circuit nor any one else has explained how a mortgage agreement between debtor and creditor could control the bankruptcy court's administration of the case. There is certainly no reason intrinsic to the phenomenon of credit that entitles over-secured creditors to interest out of their collateral before junior creditors, whether secured or unsecured, receive any of their principal. It is true that the *Coder* exception was later made subject to the equity powers of the bankruptcy court, n10 but the basic policy of the exception never received examination.

Mr. Justice Holmes provided the Supreme Court's imprimatur for the second exception in 1911 with his opinion for the Court in *Sexton v. Dreyfus,* n11 which, because it contained dictum approving the *Coder* exception as well, has become the leading case on postpetition interest. In the **[\*254]** course of the liquidation of the estate of a bankrupt individual, several secured creditors had sold their pledged collateral. When the proceeds were not enough to cover principle and postpetition interest, the creditors sought to marshal the proceeds first against postpetition interest, and then against principal. Then they sought to prove for the deficiency in principal against the estate along with the general creditors. District Judge Learned Hand had permitted them to do so, and the Second Circuit had no objections, but the Supreme Court reversed. n12

Both Judge Hand's opinion and that of Justice Holmes drew extensively on English bankruptcy law. The English precedents taught that a creditor was entitled to postpetition interest when the proceeds from the sale of the collateral were sufficient. Yet if the proceeds were insufficient to cover principal, the creditor was not permitted to prove for postpetition interest, but only for his prepetition unsecured deficiency. n13 When the collateral had produced income during the postpetition period, however, the secured creditor could apply that income to postpetition interest, and prove for any deficiency in principal after the sale proceeds were exhausted. This exception was first recognized in a case in which there had been a lengthy delay in selling the collateral, but it was later generalized to all cases. n14 The effect of *Sexton v. Dreyfus* was to adopt the entirety of English postpetition interest law.

Judge Hand's opinion reviewed the English rules, and pointed out the inconsistency of preferring undersecured creditors whose collateral produced income over those undersecured creditors whose collateral earned nothing:

No doubt the increase on the security is a part of the security itself and should follow the same rule. The only ground for an exception is that the increase between the date of the adjudication and the liquidation of the security is to be regarded as the return for the loss involved in waiting till it is realized; but, if so, consistency would require the result that a security which bears no increase should be discounted as of the date of the adjudication, a proposition which no one has suggested.   n15

Judge Hand went beyond this criticism to find that the basic English rule that undersecured creditors may not prove for postpetition interest unless **[\*255]** the collateral produces postpetition income was wrong. He accomplished this by asserting that the right of the creditor under non-bankruptcy law to marshal his security first against unpaid interest and then against unpaid principal   n16 was unaltered in bankruptcy.

In his opinion for the Court Justice Holmes met this objection by focusing on a question which Judge Hand did not address: the validity of postpetition interest in the first place. He began by noting that, as provided in section 63(a) of the Bankruptcy Act, postpetition interest did not run in favor of unsecured creditors.   n17 The position of the undersecured creditor was not so different that the same rule should not apply to him as well. At some point the debtor's affairs must be wound up, and it was just as convenient administratively to deprive undersecured as well as unsecured creditors of postpetition interest.

Moreover, fairness among creditors favored the same rule:

When there is delay in selling [the collateral] because of the hope of getting a higher price it is more for the advantage of the secured creditor than of any one else, as he takes the whole advance and the others only benefit by a percentage, which does not seem a good reason for allowing him to prove interest by indirection.   n18

Thus the Supreme Court dealt with Judge Hand's marshalling argument by depriving the undersecured creditor of an interest claim against which to marshal his security in the first place. Yet by endorsing *Coder v. Arts,* the Court did not so deprive the oversecured creditor. He kept his postpetition interest claim. Furthermore, the Court went on to hold, in accordance with the English rule, that secured creditors might apply any postpetition income earned by the security to postpetition interest, stating:

There is no more reason for allowing the bankrupt estate to profit by the delay beyond the day of settlement than there is for letting the creditors do so. Therefore to apply these subsequent dividends, & c., to subsequent interest seems just.   n19

This is precisely the kind of inconsistency which Judge Hand so effectively **[\*256]** criticized. Justice Holmes nowhere explained why the delay in settlement when income-bearing collateral is involved is not just as much for the secured creditor's benefit as it is when the collateral produces no postpetition income. The passing endorsement of the *Coder* exception was also without explanation. As a result of *Sexton,* some secured creditors were permitted postpetition interest while others were not, and their rights to such interest depended upon differences in the nature of their collateral that were not obviously related to any policy that might be behind the allowance of postpetition interest in bankruptcy. It is plain from his opinion that Justice Holmes was content to follow English practice without bothering to investigate, as Judge Hand tried to do, whether that practice was justified.

With *Coder* and *Sexton* the two exceptions to the disallowance of postpetition interest entered bankruptcy law. n20 They were soon applied to reorganizations. It became clear under the cases that if collateral was valued at the time of the plan in an amount greater than the secured creditor's claim at the time of the petition, the creditor was entitled to postpetition interest. Yet because their facts did not present the issue, the cases never dealt with the question of equity erosion over the course of the reorganization, and with the effect that erosion may have on postpetition interest claims. So it was in *American Iron & Steel Manufacturing Company v. Seaboard Airline Railway,* n21 an equity receivership case in which the Supreme Court first applied the *Coder* exception to reorganizations.

Appellants in *American Iron,* beneficiaries of a statutory lien prior to that of the first bondholders, had extended credit to the debtor railroad and were seeking postpetition interest on their loan. The Supreme Court applied the *Coder* exception to these facts by comparing a reorganization not to a sale by an oversecured creditor of his collateral but to a liquidation of an estate in which the debtor's assets prove sufficient to pay all creditors postpetition interest:

The principal is not limited to cases of technical bankruptcy, where the assets ultimately prove sufficient to pay all debts in full [,] but principal as well as interest, accruing during a receivership, is paid on debts of the highest dignity, even though what remains is not sufficient to pay claims of a lower rank in full.  n22

The Court held that appellants were entitled to postpetition interest because the plan had awarded such interest to the junior-ranking first bondholders. **[\*257]** Although it is reorganization which presents the issue of equity erosion in its acute form, both because reorganization generally delays compensation longer than straight bankruptcy and because the court in reorganization often commandeers collateral to aid the rehabilitation effort, the facts of no reorganization case before the Code presented the issue. In *American Iron,* the reorganization had already been completed and the fact that the bondholders had received postpetition interest indicated that there had been no harmful erosion during the reorganization period. Similarly, the Supreme Court denied junior bondholders postpetition interest in *Group, of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R. Co.*  n23 when their collateral's value was insufficient, but the bondholders did not argue that the collateral's value had been impaired during the reorganization process.

Equity erosion is rarely an issue in liquidation cases simply because there is no reason to think that the liquidation process systematically reduces collateral value between the time of the commencement of the case and the time of the sale. Reorganization, though, to the extent that the trustee or debtor in possession uses the collateral in the rehabilitation effort, may act systematically to reduce collateral value. As is apparent from *American Iron,* if the collateral is worth more at the time of the plan than the amount of the prepetition debt, the secured creditor is awarded postpetition interest. It is also clear from other cases decided before the Code that the amount of a creditor's secured claim at the time of the plan may not be less than the amount secured at the time of the commencement of the case.  n24 These cases are the source of the concept of adequate protection, but they are concerned only with protecting the amount of the debt secured at the time of the petition. Postpetition interest is a debt that arises, if at all, only after the petition has been filed.

What of the situation in which collateral value does decrease as a result of the reorganization process, not so much that its value falls below the amount of the debt secured at the time of the petition, but enough so that the creditor receives less postpetition interest at the time of the plan than he would have had the collateral not depreciated at all? Should the reorganization court act to insure that the collateral does not depreciate so that an equity cushion sufficient for anticipated postpetition interest remains? This is the question that was unasked and unanswered in the pre-Code cases.

In regard to income-bearing collateral the law was just as uncertain. The *Sexton* exception was never applied explicitly by the Supreme Court to reorganizations. The first lower court case doing so was *Eddy v. Prudence* **[\*258]** *Bonds Corporation,* in an opinion written by Judge Learned Hand in 1947.  n25 The court had to decide whether first bondholders should be paid postpetition interest before junior bondholders received anything at all. The collateral in *Eddy* consisted mostly of bonds and other securities which were being distributed to the bondholders by order of the reorganization court. The Second Circuit reasoned that the straight bankruptcy rules of *Coder* and *Sexton* must apply to reorganizations unless section 77B, under which the case was decided, "changed the law."  n26 The only relevant part of that statute, according to the court, was the plan confirmation standard of section 77B(b)(5), guaranteeing each class "adequate protection for the realization by them of the value of their interest, claims, or liens,"  n27 and that language suggested no change. This was so, Judge Hand asserted, because the liens must cover interest to the date of payment. *Eddy* presented no issue of value diminution, since the income on the collateral was sufficient to pay the first bondholders their postpetition interest.

Equity erosion was bound to appear as an issue for decision in some reorganization case, but the doctrine of *Vanston Bondholders Protective Committee v. Green*  n28 provided an easy way to avoid the question. The last development in the pre-Code law of postpetition interest came in the *Vanston* case in 1946. In *Vanston,* the reorganization court had ordered the debtor to cease paying to the debtor's bondholders any interest, and at the time of the plan's confirmation these bondholders applied for interest on the unpaid interest as provided in their indenture. The Supreme Court denied their request on equitable grounds, reasoning that allowance of the interest on interest would penalize the debtor for obeying the court's order not to pay interest. While the junior creditors had conceded that the bondholders should be awarded simple postpetition interest on their claims, the case contained broad language that subjected the *Coder* and *Sexton* exceptions to the equitable discretion of the bankruptcy court:

It is manifest that the touchstone of each decision on the allowance of interest in bankruptcy, receivership and reorganization has been a balance of equities between creditor and creditor or between creditors and the debtor. See *Sexton v. Dreyfus. . . .* That the proceedings before us have moved from equity receivership through § 77B to Chapter X in the

wake of statutory change does not make these equitable considerations here inapplicable. A Chapter X or § 77B reorganization court is just as much a court of **[\*259]** equity as were its statutory and chancery antecedents.  n29

The *Vanston* case had a salutary impact inasmuch as it encouraged examining the allowance of postpetition interest not under the mandates of rigid rules, but in the light of the purposes of bankruptcy reorganization in general and the facts of each case in particular. In this way the case has implications for our problem. Far from suggesting that postpetition interest claims are within the scope of adequate protection, *Vanston* indicates that secured creditors must also share some of the risks of the rehabilitation process.

Lower courts did not hesitate to invoke the *Vanston* rule in reorganizations. The Third Circuit in *In re Magnus Harmonica Corporation,*  n30 for example, denied a creditor secured by accounts receivable postpetition interest on interest the creditor had wrongly charged the debtor prior to the filing of the petition. The debtor was obligated by contract to accept any charges made under its factoring agreement by the secured creditor unless it timely objected. The factor had improperly billed the debtor excessive amounts of interest prior to the commencement of the case, but the debtor had failed to object. The factor sought postpetition interest on the full amount of its claim, which included the interest wrongly charged. The court held that the Chapter X trustee was bound to accept the charges, but it denied the factor postpetition interest on the interest wrongly billed, reasoning that as between the secured creditor and the general creditors, the equities favored the latter.

It is typical that *In re Magnus,* one of the few true reorganization cases dealing with postpetition interest for secured creditors, said nothing about collateral valuation.  n31 The necessary implication of the court's holding is that the accounts, as they were paid by the account debtors, would have provided enough money to cover postpetition interest. But the application of the *Vanston* doctrine obviated the issue.

The farthest extension of the *Vanston* principle occurred in *In re Leeds,*  n32 **[\*260]** where the Chapter X court denied a secured creditor all postpetition interest. The court thought that the "legal principle announced in the *Vanston* case cannot be limited only to the factual situation where interest upon interest is involved," and that the contractual rate of interest demanded by the secured creditor, which amounted to 15% per annum, would be "inequitable and unconscionable when the rights of other creditors are considered."  n33 The court felt it was without power to substitute a lower rate, and so left the secured creditor without any postpetition interest at all.

The denial of postpetition interest in *Leeds* rendered the question of collateral valuation moot. The collateral was inventory which the trustee had sold, and the court gave its ruling even though it did not appear from the record whether the proceeds were sufficient to cover postpetition interest. The fact that the court was inclined to look at sale proceeds rather than the value of the inventory at the time of the petition is not significant, however, since there is no indication that the reorganization process had reduced the collateral's value.

The cases expressly concerned with adequate protection of secured creditors' collateral interests in reorganizations also fail to provide any rules. There can be no doubt, though, that the Second Circuit considered postpetition interest in *In re Franklin Garden Apartments*  n34 when it refused to permit the Chapter X trustee to apply rents from a building toward completion of several unfinished units. Even though the plan had not been formulated, the court applied the confirmation standards of section 216(7)  n35 to test the trustee's proposed use of collateral. The court concluded that it could see "no equity, fairness or adequate protection of the mortgagee's rights in diverting rentals derived from the property covered by his mortgage . . . in order to build up an elusive equity."  n36 The inclusion of postpetition interest may have been unimportant under the facts of *Franklin Garden,* for prior liens and the principal amount of the mortgage absorbed almost all of the value of the building, even using the trustee's valuation. More important, it was the trustee who proposed to continue paying interest, and thus its allowance was not being contested.

A discussion of postpetition interest in a more nearly adversarial but just as inconclusive context appears in *In re Penn Central Transportation Company.*  n37 The case implies that the adequate protection given an undersecured creditor upon a decline in collateral value will not be afforded **[\*261]** him in regard to any income which the collateral produces during the postpetition period. Since that income could be applied to postpetition interest under the *Sexton* rule, the case suggests that security value available for postpetition interest is not entitled to adequate protection.

In *Penn Central,* the debtor had entered into a revolving credit agreement with a group of banks in which the debt was secured by almost all of the common stock of the debtor's subsidiary, Pennco, a diversified holding company. The debtor had defaulted on the notes executed under the agreement and the banks' agent had declared the principal amount of $ 287 million due before the commencement of the case.

When reorganization proceedings had begun, the banks were enjoined from selling their collateral and the debtor from causing Pennco to pay any dividends. The case involved a review of the proposed settlement agreement in which the banks would surrender their claims in return for ownership of their collateral. The court declined to approve the settlement, desiring to wait until it had a "clearer picture of the probable future course of this reorganization than is available at the present time," but stated in the course of its examination of the merits of the proposed settlement:

It would seem that the importance of this claim [by the banks for postpetition interest] will vary depending upon whether or not the pledged stock generates income, and whether or not the value of the stock exceeds the amount of the banks' claims. . . .

To date, no one has attempted to create a procedural context in which the question of postpetition interest on banks' claims can be squarely decided. About all that can be said at this point is that the banks' claim to postpetition interest is not clearly frivolous. The same observation applies to the contention that the banks might be entitled to assert administrative claims in the event of a decrease in the value of Pennco, or at least would be entitled to be regarded as secured creditors to the extent of such decrease. *See In re New York, New Haven & Hartford Railroad Co., 147 F.2d 40 (2d Cir. 1945).* n38

In the *New Haven* case cited by the *Penn Central* court, the Second Circuit approved the Section 77 trustee's offer to secured creditors of an administrative priority to the extent the value of their collateral declined during the reorganization, and thus inaugurated the awarding of such a priority **[*262]** as a form of adequate protection. n39 None of the creditors in *New Haven* was oversecured at the commencement of the case. In *Penn Central,* the court determined that the banks had an unsecured deficiency of $ 37 million in principal, since the value of the Pennco stock was only $ 250 million. The court's language suggests that the banks were entitled to adequate protection so far as their principal debt was concerned, but not as to postpetition interest. This is clear because the court considered granting an administrative expense priority, a form of adequate protection, only to the extent the collateral decreased in value. Since the banks were undersecured, such the collateral decreased in value. Since the banks were undersecured, such adequate protection could protect only their claim as it stood at the time of petition. The court did not, however, mention any possibility of any adequate protection with respect to any claim for postpetition interest based upon any income the Pennco stock may produce. In sum, the court in *Penn Central* acknowledged a duty to provide adequate protection only with regard to the claim as it stood at the time of the filing of the petition, leaving any claim for postpetition interest unprotected.

As should now be apparent, the pre-Code cases on postpetition interest and adequate protection say nothing definitive about protection of equity cushions to service postpetition interest claims in reorganizations. In the light of this fact, it is somewhat odd to see bankruptcy courts today providing such protection with so little analysis. Yet those courts do not purport to follow pre-Code practice; they rely on the new Bankruptcy Code. It is to that statute which we must now turn.

## II. *Adequate Protection of Postpetition Interest Claims Under the Bankruptcy Code.*

A quick reading of the new Bankruptcy Code reveals little more than the pre-Code cases about the question of adequate protection of postpetition interest. Yet close attention to section 361 and related provisions can leave little doubt that no such protection is contemplated by the Code. The emphasis supplied in the following reproduction of section 361 demonstrates the limited scope of adequate protection:

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by --

**[*263]** (1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a *decrease in the value of such entity's interest in such property;*

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a *decrease in the value of such entity's interest in such property;* or

(3) granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the *indubitable equivalent of such entity's interest in such property.*

Clearly, section 361 demands adequate protection only when there is a decrease in the value of a secured creditor's interest in his collateral. Section 506(a) sets out the extent of that value.

An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

Our concern is with the secured creditor whose collateral is valued at the commencement of the case in an amount in excess of his claim. His allowed claim at the time of the filing of the petition may never include anticipated postpetition interest, for section 502(b)(2) states that upon objection to a proof of claim filed under section 501, the court, after notice and hearing, shall fix the amount of such claim as of the date of the petition except to the extent that the claim includes unmatured interest. Since an allowed claim may not include postpetition interest, an allowed secured claim may not.

The allowed secured claim determined under section 506(a) is the value which may not be becreased under section 361. As was stated in the Congressional debates: "Adequate protection of an interest of an entity in property [*264] is intended to protect a creditor's allowed secured claim." n40 Now we come to the key point: even if postpetition interest is meant to increase the amount of a creditor's allowed secured claim as that interest accrues under section 506(b), that allowance does not decrease the creditor's interest in his collateral. On the contrary, it increases it.

A simple example will demonstrate this point. Let us assume that at the time of the petition, a secured creditor has a claim in matured principal of $ 100; that the reorganization court, at a hearing under section 363(e) on collateral use, values the collateral at $ 125; that the value of the collateral remains constant throughout the proceedings; and that the creditor's contract with the debtor provides for interest at the rate of $ 5 per month. The creditor will begin with an allowed secured claim of $ 100. If we assume the postpetition interest should be allowed as it accrues, at the end of the first month the creditor will have an allowed secured claim of $ 105. His equity cushion has decreased from $ 25 to $ 20, but the value of his interest in the collateral has risen by $ 5. By the express terms of section 361, no adequate protection is called for. After the passage of five months, the equity cushion will be completely gone. Yet all during that time, the creditor's interest in the collateral will have been increasing, not decreasing. n41

There is no suggestion anywhere in the legislative history of section 361 that it was meant to encompass postpetition interest. n42 The concerns expressed in the Committee Reports focus exclusively on changes in collateral value, and seem to view the creditor's claim as a constant that does not vary throughout the reorganization proceedings. This attitude is shown in the Senate Report's description of section 361(1):

[*265] The first method of adequate protection outlined is the making of cash payments to compensate for the expected decrease in value of the opposing entity's interest. This provision is derived from *In re Bermec Corporation, 445 F.2d 367 (2d Cir. 1971)*, though in that case it is not clear whether the payments offered were adequate to compensate the secured creditors for their loss. The use of periodic payments may be appropriate where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation and might, but need not necessarily, be in the same amount as payments due on the secured obligation. n43

Now in order for this exception to endorse adequate protection of equity cushions, the secured creditor in *Bermec* would have had to have been oversecured, for payments to undersecured creditors protect only their debt as it stood at the time of the petition, since such creditors have no entitlement to postpetition interest. The *Bermec* case, though, provides no support for the notion that section 361 was meant to cover postpetition interest. In *Bermec*, the Second Circuit upheld the approval of the debtor's Chapter X petition by finding no error in the district court's ruling that there was a reasonable possibility of a successful reorganization. In response to the secured creditors' concerns about collateral depreciation, the court said: "Nor can we find clearly erroneous the finding that the Trustee will be able to pay the 'economic depreciation' on the secured creditors' equipment so as approximately to preserve their *status quo.*" n44 It is impossible to tell either from the Second Circuit's or from the referee's opinion whether the debtor had any equity in the collateral. The fact that the security interests were likely purchase money, though, suggests that they did not. n45 In any event, neither opinion mentions postpetition interest.

[*266] One provision of the Code, however, does mention postpetition interest. This is section 506(b), which must be read in conjunction with section 506(c):

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such

claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement under which such claim arose.

(c) The trustee may recover from property securing an allowed claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

Though probably drafted with chapter 7 liquidations in mind, section 506(b) is fully applicable to chapter 11 by virtue of section 103(a). Section 506(b) makes it clear that a secured creditor may never have an allowed secured claim for postpetition interest under section 506(a) until after the trustee or debtor in possession has finished preserving or disposing of the collateral, which in the context of a reorganization means when the collateral is sold or when the plan is confirmed. If this interpretation is correct, an allowed secured claim under section 506(a) can never expand day by day or month by month as postpetition interest accrues. The secured creditor is allowed interest only when the reorganization is completed or when the collateral is sold, and then only if the value of the collateral exceeds the amount of his claim at the time of the petition plus the amount of the trustee's expenses under section 506(c). In other words, section 506(b) is a timing provision. The Code denies the allowance of any claim for postpetition interest until *after* the plan is confirmed or the trustee disposes of the property. Section 506(b) directs the allowance of postpetition interest to the secured creditor only if the creditor is oversecured *after* the trustee has been compensated for the categories of expenses enumerated in section 506(c). Those **[\*267]** expenses are the costs of preserving or disposing of the collateral to the extent the secured creditor is benefitted. It is impossible to determine the amount of the expenses the trustee has incurred until after he has incurred them, and until the expenses have been incurred, section 506(b) forbids the allowance of postpetition interest.

The Senate Report states that each of these two subsections "codifies current law." n46 As we have seen, there is no pre-Code law on the adequate protection of postpetition interest. The structure of the section, as well as what pre-Code law we have, indicates that postpetition interest is allowed to secured creditors only after the collateral is sold or when the plan is confirmed. Section 361 can hardly be said to reach claims that do not even arise until the end of the reorganization process, because section 361 ceases to operate at the end of the reorganization process.

It is true that there will be some cases in which the nature of the collateral is such that its value is certain to remain stable over the course of the reorganization and in which the trustee's expenses associated with the collateral could be easily and accurately predicted. In such a case, the bankruptcy court may be inclined to perform the calculations mandated by sections 506(b) and (c) in advance by estimation in order to provide a secured creditor with an allowed secured claim under section 506(a) for anticipated postpetition interest.

Unfortunately for secured creditors, there are simply too many objections for such a procedure to be tolerated. First, nothing in section 506(b) or (c) suggests that the costs mentioned therein are hypothetical, estimated, or anything other than the *actual* costs incurred by the trustee. There is no warrant for such a departure from the language of the Code, especially in light of the Senate Report's statement that those sections codify pre-Code law, which, as we have seen, contemplates no such favors for secured creditors. Second, estimating the amount of the secured creditor's equity cushion requires a valuation of his collateral. Guaranteeing the secured creditor postpetition interest by estimating the expenses under section 506(c) and deducting those expenses from the equity cushion under section 506(b) would effectively negate the last sentence of section 506(a), which provides that no determination of collateral value shall bind the court at any later time. Finally, it is unclear how many cases would present the situation in which so many estimations could be made confidently. There is no indication in section 506 that its provisions were to be modified by the court according to the nature of the case.

Section 506(b) represents the codification of the *Coder* exception. What **[\*268]** of the exception for secured creditors with income-producing collateral? n47 The drafters seem to have codified the *Vanston* rule of equitable discretion in section 552(b), which provides:

Except as provided in sections 363, 506(c), 544, 545, 547, and 548 of this title, if the debtor and a secured party enter into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable non-bankruptcy law, except to the extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

56 Am. Bankr. L.J. 251, *

Cases construing section 552(b) so far are sparse, n48 and do not discuss the **[\*269]** postpetition interest issue. Yet the clear implication of the section is to authorize the court to deprive secured creditors of the income their collateral produces in the postpetition period even when they seek to apply it to principal, let alone postpetition interest. If the drafters were so solicitous of secured creditors' rights to postpetition interest, it is strange indeed that they codified the *Coder* doctrine and extended adequate protection to that right, as the recent cases would have us believe, while allowing the bankruptcy courts to eliminate, at their own discretion, the *Sexton* postpetition interest right altogether, as section 552(b) provides.

In view of the lack of such treatment under pre-Code law, in view of the contrary implication of the several Code provisions just reviewed, and in view of the absence of any approval of such treatment in the legislative history of the Code, it is remarkable how bankruptcy courts today are providing adequate protection for unmatured claims for postpetition interest in summary fashion.

The leading case is *In re Rogers Development Corp.,* n49 in which the secured creditor's claim at the time of his petition for a lifting of the automatic stay was approximately $ 548,000 and whose collateral was valued at that time at about $ 750,000. The creditor's $ 548,000 claim apparently included postpetition interest to date, and that interest was accruing at the rate of $ 63,000 per year. The case is significant for its teaching that the debtor must maintain an equity cushion in order to provide adequate protection. In fact, the court went so far as to say that:

remaining [sic] an equity cushion is the purpose of § 361(1) (periodic payments) of the Bankruptcy Code. The periodic payments provided for by this section maintain the equity cushion by compensating for the decrease in value of an entity's **[\*270]** interest in the debtor's property. n50

As shown in the explication of section 361 and its legislative history above, this statement is completely without support. The court nowhere explained how the value of an entity's interest in property includes unmatured postpetition interest. Perhaps sensing the impediment to effective reorganizations its interpretation of section 361 would impose, though, the court declined to lift the automatic stay, stating:

although the amount of the equity cushion may decrease daily as a result of the accruing interest and other cost [sic] exceeding any enhancement of value in the security, the amount of the cushion is sufficiently large at this time to make a granting of the relief from stay a premature action. n51

Thus the debtor was at least temporarily spared the consequences of the court's rather summary reading of the Code.

The debtor in *In re Nixon Machinery* n52 was also saved when the court declined to lift the automatic stay, but the court agreed that postpetition interest was entitled to protection:

If the collateral is worth more than the debt, then the creditor is fully secured. It will be adequately protected if it remains fully secured. Accruing interest must be considered. *11 U.S.C. § 506*(b). A sufficiently large equity may adequately protect the secured party, particularly if the collateral is increasing in value. Compare *In re Rogers Development Corp. . . .* n53

It is true that section 506(b) says postpetition interest must be considered, but it does not say that it must be allowed as a secured claim as it accrues, and still less does it say that an equity cushion must be maintained under section 361 to cover anticipated accruals. Yet the five words, "accruing interest must be considered," are the most detailed analysis of the relationship between sections 361 and 506(b) that has so far appeared in the reported cases.

That such a reading of the Code can severely impact the debtor is shown by *In re American Properties, Inc.* n54 There, creditor TBT had the first lien on real property, creditor USB the second, and creditor FNB the third. **[\*271]** The court stated:

Both TBT and USB have fully secured claims. The balance due them respectively is $ 105,000 and $ 45,000. The total amount of $ 150,000 due is secured by property presently worth $ 294,000 and an additional $ 37,000 in cash, held by TBT. These two creditors have a substantial cushion and are, pursuant to *11 U.S.C. § 506*(b), entitled to interest on their claims. Adequate protection for them is allowance of the accumulation of interest at their contract rates on a monthly basis. See *In re Regers Dev. Corp. . . .* n55

The third lienor, FNB, with a claim of $ 212,000, was undersecured at the commencement of the case. Each monthly allowance to TBT and USB of postpetition interest reduced the value of FNB's interest by increasing the amount of

prior liens. In order to adequately protect FNB from this diminution, the court ordered the debtor to pay in cash to FNB the monthly interest accruing to the first two lienors. n56

In contrast, the court in *In re Alyucan Interstate Corp.* n57 expressed serious doubts about the validity of equity cushion analysis. The secured creditor in *Alyucan* had a claim of $ 1.22 million with an equity cushion of over $ 127,000 at the time of the debtor's petition. Even though the cushion had declined to just over $ 94,000 at the time of the creditor's petition for relief under section 362(d)(1), the court refused to lift the stay merely on account of the decline in the equity cushion, reasoning that focusing on the cushion alone ignored the fact that section 361 speaks "not in terms of preserving equity but in terms of compensating for any 'decrease in the value of [an] interest in property.'" What is more, equity cushion analysis neglected methods of preserving value from sources other than the original collateral, and was "alien" to traditional notions of adequate protection in which the "facts of such case, thoughtfully weighed, not formalized, define adequate protection." n58 The creditor's equity cushion in *Alyucan*, however, was declining not as a result of any depreciation in the value of the collateral but as a result of the court's allowance of postpetition interest at the rate of $ 8,000 per month. The *Alyucan* court, then, went only half-way, recognizing **[*272]** the limited scope of section 361 but failing to discover the restraints section 506 places on the allowance of postpetition interest. n59

At least one court has attempted to confront the limits imposed by the test of section 361. When the secured creditor in *In re Pitts* petitioned the court to lift the automatic stay, the debtor argued that section 361 calls for decreases in value before adequate protection must be provided. n60 The court acknowledged that this was true, but pointed to language in the House Report about guaranteeing the secured creditor the benefit of his bargain. Part of that language follows:

The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for. n61

Armed with this commentary, the court defined the nature of the secured creditor's bargain:

The existence of an equity, in terms of collateral value in excess of the secured creditor's claim, is an elementary and fundamental part of the transaction. True, the secured creditor assumes the risk that default and sale may occur at a time when the market is depressed so that foreclosure and sale may not produce sufficient funds to pay the claim. However, to deprive the secured creditor of the right to proceed with foreclosure at a time when a cushion exists and to compel postponement of his remedy in the face of a clearly foreseeable possibility that the cushion may disappear, is to expose the secured creditor to risks which were not part of the bargain. This is particularly important to the secured creditor who assumed the position of second **[*273]** lienor. n62

The Court in *Pitts* cannot mean that the bankruptcy court may not expose a secured creditor to risks which were not part of his bargain. The superpriority of section 507(b) indicates that the drafters realized that adequate protection is no guarantee, that the reorganization process exposes even oversecured creditors to new risks. n63 The court also cannot mean that the secured creditor's "bargain" must be preserved, for it is artificial to speak of a "bargain" in bankruptcy, when the law has intervened to change the contract made between debtor and creditor in many ways.

Even if the "bargain" notion gives some guidance as to the scope of adequate protection, there is no reason to think that most "bargains" between debtor and creditor are in any way concerned with the possibility of a postpetition interest claim in bankruptcy. Taken on its own terms, the reasoning of the *Pitts* court does not make much sense. The first two sentences of the passage quoted above suggest quite reasonably that the secured creditor bargains for an equity in order to insure that the amount of his loan, which will probably be accelerated upon default, will be covered at foreclosure by the value of the collateral. Section 361 preserves this bargain by directing the court to insure that the collateral value will remain sufficient to cover the secured creditor's claim as it stands at the time of the filing of the petition. But the court's third sentence implies that this is not being done insofar as the secured creditor is required to wait while his equity vanishes. The court fails to realize that section 361 does away with equity cushions by having the court value the collateral and protect that value. Should the court err, Congress intended the creditor to have only his section 507(b) superpriority as a safety net. Beyond this, the only reason that equity vanishes is because the court is permitting postpetition interest to accrue. Since the secured creditor's prepetition claim is already protected by section 361, the only

new risk to which the court is referring can be none other than the automatic stay which prevents the secured creditor from foreclosing on his collateral. There can be no doubt that the automatic stay was not part of the secured creditor's bargain. The *Pitts* court is really saying that since the secured creditor did not bargain for the judicial intervention the debtor's bankruptcy would bring, the debtor and the undersecured and unsecured **[\*274]** creditors must compensate the secured creditor for the inconvenience the reorganization causes him.

The House Report relied on by the *Pitts* court is looking toward the situation between secured creditor and debtor outside the bankruptcy, and outside of bankruptcy there can be no postpetition interest. It is only the advent of bankruptcy and the stay of creditors' remedies that causes postpetition interest to run, and then only if the collateral is worth enough to cover such interest after the proceeding is over. Postpetition interest, therefore, is not part of the secured creditor's nonbankruptcy bargain. Section 361 already provides the secured creditor with the value of his nonbankruptcy bargain by protecting the value of his collateral necessary to cover his claim at the time of the petition from any decline resulting from the automatic stay, use, sale or lease of the collateral by the trustee, or the securing of postpetition credit. Postpetition interest is outside of the scope of the non-bankruptcy bargain; it is a right accorded by the Code and the bankruptcy court in the course of the administration of the case.

The reasoning of the *Pitts* court would permit the private bargains of secured creditors to control the bankruptcy process merely because those creditors had anticipated bankruptcy. Does this accord with the policies behind reorganization law?

### III. *The Policy Considerations.*

The great weakness of the Code cases protecting postpetition interest is their failure to reconcile openly the fact of reorganization proceedings with the rights of secured creditors. Some disturbance of those rights is essential if the rehabilitation effort is to succeed. The decision where to draw the line should be made by reference not to the private bargains between debtor and creditor but to the general policies of reorganization law.

American bankruptcy law has long endorsed the proposition that oversecured creditors are to be compensated for postpetition interest, subject to equitable considerations. Yet to extend adequate protection to this right is to remove virtually all the risks of reorganization from the oversecured creditor, who is, after all, the one creditor most likely to be compensated for his prepetition debt. No compelling reason has been advanced demonstrating why junior creditors should assume the risk of postpetition collateral depreciation when that depreciation affects only the oversecured creditors' ability to recover postpetition interest. Moreover, there are good reasons why they should not.

One clear detriment to such an extension of adequate protection is the cash drain with which it threatens the rehabilitation effort. Rehabilitation was aborted in at least one case so far in part by the debtor's inability to support **[\*275]** cash payments to a secured creditor in order to maintain an equity cushion. n64 Adequate protection of postpetition interest rights will only saddle the debtor with additional expenses at a time when they can be least afforded.

Further, such adequate protection presents significant problems in case administration. More precise valuations of collateral will be necessary. It will no longer suffice to determine that the creditor is oversecured; the amount of the equity cushion will have to be estimated to see if it can absorb anticipated interest accruals. The court will also have to estimate how long the reorganization will take in order to gauge how much interest will accumulate, or it will have to reconsider the adequate protection issue more frequently. If it errs, the court may have to order the debtor to begin making cash payments to secured creditors half-way through the reorganization, an eventuality that may destroy the rehabilitation effort. Additionally, the court will have to decide at the beginning of the case what rate of interest the equities require the secured creditor to receive on his claim during the postpetition period. n65 This judgment may require an estimation of all the expenses the debtor will face in the immediate future. In short, there will be significant complications of a procedure designed to be narrow in scope and expeditious. And if the court makes a mistake, the secured creditor will be entitled to a section 507(b) superpriority to the extent of the error.

### IV. *Conclusion.*

Without any support in statute, legislative history, or past cases, bankruptcy courts today are working a significant expansion of creditors' rights in bankruptcy. n66 The policies behind reorganization law lend no support to changes designed to aid further those creditors who have least to fear from the rehabilitation process. These recent cases are in error, and the provision of adequate protection to secured creditors' postpetition interest claims should be abandoned.

**Legal Topics:**

For related research and practice materials, see the following legal topics:
Bankruptcy LawCase AdministrationAdministrative PowersAdequate ProtectionBankruptcy LawCase Administra-
tionAdministrative PowersPostpetition CreditBankruptcy LawClaimsTypesSecured Claims & LiensSecured Creditors
Rights

**FOOTNOTES:**

n1 *11 U.S.C. §§ 101 et seq.* (Supp. IV 1981).

n2 30 Stat. 544 (1898).

n3 *Sexton v. Dreyfus, 219 U.S. 339 (1911); Thomas v. Western Car Company, 149 U.S. 95 (1893); Ameri-
can Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261 (1914). See generally 6 COLLIER ON
BANKRUPTCY P9.08* (14th ed. 1978).

n4 "Commissioners, after a man becomes a bankrupt, compute interest no lower than the date of the com-
mission, because it is a dead fund, and in such a shipwreck, if there is a salvage of part to each person, it is as
much as can be expected." *Ex parte Bennet, 2 Atk. 527, 528 (1743).* "But there is no direction in the [bank-
ruptcy] act for that purpose, it has been used only as the best method of settling the proportion among the credi-
tors, that they may have a rate-like satisfaction." *Brombey v. Goodere, 1 Atk. 75, 79 (1743). Cf.* 1. W. COOKE,
THE BANKRUPT LAWS 181 (4th ed. 1797).

n5 *American Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261 (1914); Ticonic National Bank
v. Sprague, 303 U.S. 406 (1938); Nicholas v. United States, 384 U.S. 678 (1966).*

n6 *149 U.S. 95, 116-117 (1893).*

n7 *Coder v. Arts, 152 F. 943 (8th Cir. 1907), aff'd, 213 U.S. 223 (1909).*

n8 *152 F. at 950.*

n9 That postpetition interest is entitled to constitutional protection seems unlikely in view of the statement
of the Supreme Court when it upheld an injunction preventing pledgees in a Section 77 reorganization from sell-
ing their collateral:

The injunction here in no way impairs the lien, or disturbs the preferred rank of the pledgees. It does no
more than suspend the enforcement of the lien by a sale of the collateral pending further action. It may be, as
suggested, that during the period of restraint the collateral will decline in value; but the same may be said in re-
spect of an injunction against the sale of real estate upon foreclosure of a mortgage; and such an injunction may
issue in an ordinary proceeding in bankruptcy. *Straton v. New, 283 U.S. 318, 321,* and cases cited. A claim that
injurious consequences will result to the pledgee or the mortgagee may not, of course, be disregarded by the dis-
trict court; but it presents a question addressed not to the power of the court but to its discretion -- a matter not
subject to the interference of an appellate court unless such discretion be improvidently exercised.

*Continental Ill. National Bank & Trust Co. v. Chicago, Rock Island & Pacific Ry. Co., 294 U.S. 648, 676-677
(1935).*

Those who find Justice Douglas' statement in *Wright v. Union Central Life Insurance Co., 311 U.S. 273,
278 (1940),* that a secured creditor has no constitutional claim beyond the "extent of the value of the property" of
great importance do not purport to find therein any right to postpetition interest. *In re Rogers Development*

56 Am. Bankr. L.J. 251, *

Corp., 2 Bankr. 679, 685 (E.D. Va. 1980); see generally Murphy, Restraint and Reimbursement: The Secured Creditor in Reorganization and Arrangement Proceedings, 30 BUS. LAW. 15 (1974).

n10 Vanston Bondholders Protective Committee v. Green, 329 U.S. 156 (1946). See infra text accompanying notes 28-29.

n11 219 U.S. 339 (1911).

n12 In re Kessler, 171 F.751 (S.D.N.Y. 1909) aff'd, 180 F. 979 (2d Cir. 1910), rev'd sub. nom. Sexton v. Dreyfus, 219 U.S. 339 (1911).

n13 1 W. COOKE, THE BANKRUPT LAWS 181-182 (4th ed. 1797).

n14 The exception was first set out in Ex parte Ramsbottom, 2 Mont. & Aryton 79 (1835), and generalized in Ex parte Penfold, 4 DeG. & Smale 282 (1851).

n15 In re Kessler, 171 F. 751, 754, aff'd, 180 F.979 (2d Cir. 1910), rev'd sub. nom. Sexton v. Dreyfus, 219 U.S. 339 (1911).

n16 Story v. Livingston, 13 Pet. 359, 371 (1839).

n17 219 U.S. at 344. More precisely, Justice Holmes referred to section 63(a)(1) of the Act, barring post-petition interest on instruments and judgments. Section 63(a)(5) stopped postpetition interest on provable debts reduced to judgment after the petition but before consideration of the bankrupt's application for discharge.

n18 Id. at 345.

n19 Id. at 346.

n20 The rule for solvent estates is not discussed here. See, e.g., In re Maryvale Community Hospital, Inc., 307 F. Supp. 304 (D. Ariz. 1969), aff'd, 456 F.2d 410 (9th Cir. 1972).

n21 233 U.S. 261 (1914).

n22 Id. at 267.

n23 318 U.S. 523 (1943).

n24 See, e.g., In re Third Ave. Transit Corp., 198 F.2d 703 (2d Cir. 1952); Reconstruction Fin. Corp. v. Kaplan, 185 F.2d 791 (1st Cir. 1950); In re Penn Central Transp. Co., 474 F.2d 832 (3d Cir. 1973).

n25 165 F.2d 157 (2d Cir. 1947), cert. denied, 338 U.S. 845 (1948).

n26 Id. at 160.

n27 48 Stat. 911, 914 (1934).

n28 *329 U.S. 156 (1946).*

n29 *Id. at 165.*

n30 *262 F.2d 515 (3d Cir. 1959).*

n31 It is typical of the confusion in this area that some courts fail to realize that cases they cite for the proposition that the *Coder* and *Sexton* exceptions apply to reorganizations as well as liquidations do not involve reorganizations at all. The court in *In re Leeds, 222 F. Supp. 20, 32 (E.D. Tenn. 1963), aff'd, 332 F.2d 648* (6th Cir.), *cert. denied, 379 U.S. 836 (1964),* for example, cites five cases for the point, but only two, the *Eddy v. Prudence Bonds Corporation, 165 F.2d 157 (2d Cir. 1947), cert. denied, 338 U.S. 845 (1948),* and *Magnus Harmonica* cases, are truly reorganization cases. The others are straight bankruptcy liquidations: *In re Macomb Trailer Coach, Inc., 200 F.2d 611 (6th Cir. 1952)* (sale of realty by trustee); *Palo Alto Mutual Savings & Loan Assoc. v. Williams, 245 F.2d 77 (9th Cir. 1957)* (same); *Kagan v. Industrial Washing Machine Corporation, 182 F.2d 139 (1st Cir. 1950)* (sale of collateral in straight bankruptcy after failed attempt at Chapter X reorganization). The court in *In re Magnus* made similar mistakes. *262 F.2d at 518 & nn. 9-10.*

n32 *222 F. Supp. 20 (E.D. Tenn. 1963), aff'd, 332 F.2d 648* (6th Cir.), *cert. denied, 379 U.S. 836 (1964).*

n33 *Id. at 32, 33.*

n34 *124 F.2d 451 (2d Cir. 1941).*

n35 52 Stat. 840, 896 (1938).

n36 *124 F.2d at 454.*

n37 *358 F. Supp. 154 (E.D. Pa. 1973).*

n38 *Id. at 183-184, 170.*

n39 *Cf. In re Yale Express Systems, Inc., 384 F.2d 990, 992 (2d Cir. 1967).* Such treatment no longer constitutes adequate protection, *see* section 361(3), because in "every case there is the uncertainty that the estate will have sufficient property to pay administration expenses in full." 124 CONG. REC. 33,994-995 (1978) (statement of Sen. DeConcini); 124 CONG. REC. 32,395 (1978) (statement of Rep. Edwards). Yet should the adequate protection turn out to be inadequate, the secured creditor will still be subject to that uncertainty. *See* section 507(b).

n40 124 CONG. REC. 32,395 (1978) (statement of Rep. Edwards); 124 CONG. REC. 33,995 (1978) (statement of Sen. DeConcini).

n41 Even if the phrase "decrease in the value of such entity's interest" in section 361 is somehow read to encompass a decline in an equity cushion, that decline is not the "result" of the automatic stay or of the trustee's use of the collateral, but of the court's allowance of postpetition interest under section 506. The accumulation of postpetition interest does not meet the causation requirement of section 361 even should it meet the decline in interest test.

n42 It is worth noting that the proposals of the Commission on the Bankruptcy Laws of the United States also did not deal with postpetition interest in the context of adequate protection. Section 7-203(b) of the Commission's proposal would have permitted a secured creditor to petition the court to "modify the stay by imposing such conditions on the use of the property or the proceeds thereof as will adequately protect the secured party." The *Note* to section 7-203, though, suggests the Commission thought protection of any equity cushion was not required: "Conditions which may be imposed by the court, when appropriate, include . . . (2) if there is no equity or the equity is marginal, requiring additional security to the extent of the anticipated decrease in the value of the collateral as a result of use. . . ." The negative implication of the comment is that no adequate protection is needed when there is an equity. REPORT TO THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, PART II, H.R. DOC. NO. 137, 93d Cong., 1st Sess. 236-237 (1973). *See generally* Trost & King, *Congress and Bankruptcy Reform Circa 1977 33 BUS. LAW. 489, 539-543 (1978).*

n43 S. REP. NO. 989, 95th Cong., 2d Sess. 54, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5840. H.R. REP. NO. 595, 95th Cong., 1st Sess. 339, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6296, cites *In re Yale Express Systems, Inc., 384 F.2d 990 (2d Cir. 1967),* using language quite similar to the Senate Report's, but this is probably a mistake, since no payments were ordered in *Yale Express.*

n44 *445 F.2d at 369.*

n45 The extent of a purchase money secured party's oversecurity can at most be the down payment required upon sale. The value of the collateral will rarely exceed the purchase price it secures. Thus, the secured party has a margin only to the extent the debtor reduces the debt secured by paying money at the time of sale, though future installment payments might further increase the margin. Even this might not provide the secured party with much additional protection, given the fact that the sale itself reduces the value of the collateral significantly by converting it into a "used" item.

This was probably the position of the secured creditors in *Bermec.* That they were undersecured seems implicit in the referee's following characterization of the trustee's proposal (which he approved): "The trustee now proposes to make monthly payments to the secured creditors of amounts calculated to preserve the value of their security interests as of the date of inception of the Chapter proceedings." *In re* Bermec, No. 71-B-291 (S.D.N.Y. 1971), *abridged and reprinted in* D. EPSTEIN & M. SHEIFELD, BUSINESS REORGANIZATION UNDER THE BANKRUPTCY CODE 90-93 (1980). Since the value of a security interest is that amount of the claim which the collateral can cover, the necessity to pay the depreciation in the collateral over to the secured creditors indicates that the entire collateral value was needed to cover the debts as they stood at the time of the petition. Even if the creditors had been oversecured at the time of the petition, the court sought to protect not the equity cushion but only that portion of the collateral's value needed to cover the debt as it stood at the time of the petition, which of course could not have included postpetition interest.

n46 S. REP. NO. 989, 95th Cong., 2d Sess. 68, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5854.

n47 The distinction between collateral that generates income and collateral that does not is a practical classification without theoretical justification. Financial theory tells us that the

fundamental characteristic of business assets is that they give rise to income flows. Sometimes these flows are easy to determine and measure -- the interest on a bond is an example. At other times, the cash flows attributable to the asset must be estimated . . . . Regardless of the difficulties of measuring income flows, it is the prospective income from business assets that gives them value.

J. WESTON & E. BRIGHAM, MANAGERIAL FINANCE 274-275 (4th ed. 1972). It seems that only collateral whose income flows are "easy to determine and measure" are the kinds that produce income for postpetition interest purposes. *See, e.g., Sexton v. Dreyfus, 219 U.S. 339 (1911)* (securities); *In re Black Ranches Inc., 362 F.2d 8 (8th Cir.), cert. denied, 385 U.S. 990 (1966)* (grazing land rentals). A mortgaged manufacturing plant would generate income if used to produce during the reorganization period, but a court would doubtless be re-

56 Am. Bankr. L.J. 251, *

luctant to compute the amount so generated for the benefit of the mortgagee's postpetition interest claim. In this sense, there is a further inconsistency to the *Sexton* exception beyond that pointed out by Judge Hand. Many kinds of collateral produce income, but only some kinds are deemed to do so for postpetition interest purposes.

n48 Those decided so far: *In re S & Z International Management, Inc., 10 Bankr. 580 (S.D. Fla. 1981); In re A.E.I. Corporation, 11 Bankr. 97 (E.D. Pa. 1981); In re All-Brite Sign Service Co., Inc., 11 Bankr. 409 (W.D. Ky. 1981); In re Stratbucker, 4 Bankr. 251 (D. Neb. 1980); In re Abernathy, 10 Bankr. 418 (M.D. Ala. 1981).*

The original Senate and House versions of section 552(b) gave the court much less discretion. The Senate bill, S. 2266, provided that

If the security agreement extends to proceeds, product, offspring, rents, or profits of the property in question, then the proceeds would continue to be subject to the security interest pursuant to the terms of the security agreement and provisions of applicable law, except to the extent that where the estate acquires the proceeds at the expense of other creditors holding unsecured claims, the expenditure resulted in an improvement in the position of the secured party.

S. REP. NO. 989, 95th Cong., 2d Sess. 91, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5877. The House bill, H.R. 8200, denied the secured creditor his after-acquired collateral of the kind mentioned above so long as the "estate acquired the proceeds to the prejudice of other creditors holding unsecured claims," without requiring that the secured creditor's overall position improve as a result of that prejudice. The security interest was cut off to the extent that the "estate expends funds that result in an increase in the value of the collateral." H.R. REP. NO. 595, 95th Cong., 1st Sess. 377, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6333. The final version of section 552(b) as passed is said to represent a compromise but it is a compromise that goes beyond each of the original bills.

The provision allows the court to consider the equities in each case. In the course of such consideration the court may evaluate any expenditures by the estate relating to proceeds and any related improvement in position of the secured party.

124 CONG. REC. 34,000 (1978) (statement of Sen. DeConcini); 124 CONG. REC. 32,400 (1978) (statement of Rep. Edwards). There is no suggestion either in section 552(b) itself or in the floor debates that the "equities in each case" were to be limited to the two factors which the court *"may"* evaluate" (emphasis supplied). It should also be noted that the final version added section 506(c) to the sections enumerated in the exceptions clause at the beginning of section 552(b), thereby providing for these two factors by indirection, leaving the "equities of the case" to cover other considerations.

n49 *2 Bankr. 679 (E.D. Va. 1980).*

n50 *Id. at 683 n. 2.*

n51 *Id. at 685.*

n52 *9 Bankr. 316 (E.D. Tenn. 1981).*

n53 *Id. at 318.*

n54 *8 Bankr. 68 (D. Kan. 1980).*

n55 *Id. at 71.*

n56 The third lienor in *American Properties* should not have received any adequate protection relief, since the decrease in the value of his interest in the collateral was not the result of the automatic stay but of the court's allowance of postpetition interest to the first two lienors. *See* note 41 *supra.* The court nowhere justified providing FNB with adequate protection, and it is interesting that the third lienor was the one who received cash, while the first two lienors were awarded only increased liens. Such strange results are the consequence of allowing postpetition interest before the sale of the collateral or the confirmation of the plan, contrary to the provisions of section 506.

n57 *12 Bankr. 803 (D. Utah 1981).*

n58 *Id. at 810-811, 813.*

n59 The court left its discussion of the propriety of the allowance of postpetition interest to an unreported hearing transcript. *Id. at 808 n. 10.*

n60 *2 Bankr. 476 (C.D. Cal. 1979).*

n61 H.R. REP. NO. 595, 95th Cong., 1st Sess. 339, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6295.

n62 *2 Bankr. at 478.* The court declined to lift the automatic stay. The court supposed that where the collateral had a "reasonably stable" value of $ 125,000, first and second liens without postpetition interest equalled almost $ 97,000, and costs of foreclosure would be about $ 9,000, there was an equity cushion of about $ 19,000. This cushion, despite its "fragile and precarious nature," was enough to justify denial of an immediate lifting of the stay. Yet the court continued the matter for a trial to be held about a month later in order to "receive further evidence concerning valuation, and [for] a reanalysis of the cushion." *Id. at 479.*

n63 *See supra* note 38.

n64 *In re Castle Ranch of Ramona, Inc., 3 Bankr. 45 (S.D. Cal. 1980)* (stay lifted on debtor's only asset because debtor could not pay postpetition interest).

n65 Section 506(b) does not seem to require payment of interest at the contract rate, for it separates "interest on such claim" from "any reasonable fees, costs, or charges provided under the agreement under which such claim arose," by the conjunction "and." If interest at the contractual rate were meant, it would have been more natural to group them together. The Committee Reports do not mention interest at all when they discuss what charges under any agreements should be allowed. S. REP. NO. 989, 95th Cong., 2d Sess. 68, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5787, 5854; H.R. REP. NO. 595, 95th Cong., 1st Sess. 356-357, *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6312-6313. Cases in which the point has been contested tend to follow this interpretation. *See In re Marx, 11 Bankr. 819 (S.D. Ohio 1981)* (Section 506(b) limits postpetition interest to legal rate); *In re Minguey, 10 Bankr. 806 (W.D. Wisc. 1981)* (Section 506(b) codifies *Vanston;* interest to be set in court's equitable discretion).

n66 Some courts tend toward my interpretation, but only by hints and intimations. *See In re Caudle, 13 Bankr. 29, 34 (E.D. Tenn. 1981); In re A & A Transport, Inc., 10 Bankr. 867, 869 (D. Mass. 1981).*