IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXAERIS, INC., and | ) | Case No. 07-10887 (KG) |
| INYX USA, LTD.,[1] | ) | Case No. 07-10888 (KG) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| DR. JACK KACHKAR, | ) | |
| | ) | |
| Appellant | ) | Civil Action No. 07-621 (GMS) |
| v. | ) | |
| | ) | |
| WESTERNBANK PUERTO RICO, | ) | |
| STEPHEN S. GRAY, Chapter 11 | ) | |
| Trustee of INYX USA, LTD. | ) | |
| | ) | |
| Appellees. | ) | |

**ADDENDUM OF STATUTES, RULES,
UNREPORTED ORDERS, OR SIMILAR MATERIAL TO
BRIEF OF APPELLEE, CHAPTER 11 TRUSTEE OF INYX USA, LTD.**

Richard Pachulski
Bruce Grohsgal (DE Bar No. 3583)
PACHULSKI STANG ZIEHL & JONES LLP
919 North Market Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email: bgrohsgal@pszjlaw.com

*Attorneys for the Chapter 11 Trustee of Inyx USA, Ltd.*

Dated: April 14, 2008

_____

[1] The Exaeris, Inc. and Inyx USA, Ltd. bankruptcy cases were jointly administered for procedural purposes at the commencement of those cases, by order entered on July 12, 2007 (Docket No. 39 in Bankruptcy Case No. 07-10887). On December 6, 2007 (Docket No. 421 in Bankruptcy Case No. 07-10887), the Bankruptcy Court vacated the order for joint administration, and the bankruptcy cases have been separately administered since the entry of that order.

## INDEX

**Tab No.**

### Unreported Orders

*In re American Home Mortgage Holdings, Inc.*, Ch. 11 Case No. 07-11047 (CSS) (Bankr. D. Del. Nov. 28, 2007)..................................................................................1

*In re Buffets Holdings Inc.*, Ch. 11 Case No. 08-10141 (MFW) (Bankr. D. Del. Feb. 22, 2008) ...........................................................................................................2

*In re Domain, Inc.*, Ch. 11 Case No. 08-10132 (PJW) (Bankr. D. Del. Feb 14, 2008).........3

*In re Foamex International, Inc.*, Ch. 11 Case No. 05-12685 (PJW) (Bankr. D. Del. Oct. 17, 2005)...................................................................................4

*In re HomeBanc Mortgage Corp.*, Ch. 11 Case No. 07-11079 (KJC)....................................5

*In re New Century TRS Holdings*, Ch. 11 Case No. 07-10416 (KJC) (Bankr. D. Del. May 7, 2007)...................................................................................................6

*In re Sharper Image Corp.*, Ch. 11 Case No. 08-10322 (KG) (Bankr. D. Del. Mar. 7, 2008) ......................................................................................................................7

*In re Tweeter Home Entertainment Group*, Ch. 11 Case No. 07-10787 (PJW) (Bankr. D. Del. June 29, 2007) ...............................................................................8

### Statutes and Rules

11 U.S.C. § 361.....................................................................................................................9

11 U.S.C. § 363...................................................................................................................10

11 U.S.C. § 364...................................................................................................................11

11 U.S.C. § 506...................................................................................................................12

11 U.S.C. § 552...................................................................................................................13

Fed. R. Bankr. P. 8013 .......................................................................................................14

Del.Bankr.L.R. 4001-2........................................................................................................15

# EXHIBIT 1

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| *In re* | : |
| | :    Chapter 11 |
| AMERICAN HOME MORTGAGE | :    Case No. 07-11047 (CSS) |
| HOLDINGS, INC., *et al.*, | : |
| | :    Jointly Administered |
| Debtors. | : |
| | :    Re: Docket Nos. 1967 & 1999 |

## FINAL ORDER PURSUANT TO SECTIONS 105(a), 362, AND 364 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 2002, 4001 AND 9014: (A) APPROVING LIMITED RECOURSE DEBTOR-IN-POSSESSION FINANCING, (B) GRANTING LIENS, AND (C) GRANTING RELATED RELIEF

Upon the Motion for Interim and Final Orders (I) Authorizing Certain Debtors to Obtain

Postpetition Financing and Grant Security Interests Pursuant to 11 U.S.C. §§ 105, 362, 363, and

364(c); (II) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001(c); and (III) Granting

Related Relief (the "Motion") dated November 12, 2007 of American Home Mortgage

Investment Corp. ("AHMIC"), American Home Mortgage Corp. ("AHMC"), and American

Home Mortgage Servicing, Inc. ("AHMS"), seeking, *inter alia*:

(i) authorization for debtors AHMIC, AHMC, and AHMS (collectively, the

"Borrowers") to obtain limited recourse postpetition financing (the "Limited Recourse DIP

Facility") pursuant to sections 105(a), 362, and 364 of title 11 of the United States Code (the

"Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), by entering into that certain $50,000,000 Debtor-in-Possession Loan and

Security Agreement dated November 16, 2007 (as the same may be amended, supplemented, or

otherwise modified from time to time, the "Limited Recourse DIP Credit Agreement"[1], a copy of

---

[1] Capitalized terms used herein but not otherwise defined herein shall have the meanings set forth in the Limited Recourse DIP Credit Agreement.

which is annexed hereto as Exhibit "A") by and among the Borrowers, the several lenders from time to time party thereto (collectively, the "Lenders"), AH Mortgage Acquisition Co., Inc., in its capacity as Lender and Administrative Agent (collectively, the Lenders and the Administrative Agent, the "Secured Parties"), subject to the terms and conditions set forth in this order (the "Final Order"), the Limited Recourse DIP Credit Agreement, and all related security and other agreements, documents, notes, and instruments executed or delivered pursuant hereto or in connection herewith or therewith (collectively, with the Limited Recourse DIP Credit Agreement, and as any of the same shall be amended, restated, supplemented or otherwise modified from time to time in accordance with this Final Order, the "Limited Recourse DIP Financing Documents"); and

(ii) the granting of liens and security interests in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code.

The Emergency Interim Hearing having been held on November 14, 2007, and an interim order (the "Interim Order") having been entered on such date; and notice having been given of the final hearing with respect to the Motion (the "Final Hearing") in accordance with the Interim Order; and the Final Hearing having been held on November 28, 2007 at 10:00 a.m. (ET); and upon all of the pleadings filed with the Court and the evidence adduced at, and statements of counsel on the record of, the Emergency Interim Hearing and the Final Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS PURSUANT TO BANKRUPTCY RULE 7052:**

A.    **Commencement of Cases**.  On August 6, 2007 (the "Commencement Date"),

each of the debtors in the above-captioned cases (the "Debtors") filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their

businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and

1108.  On August 14, 2007, the United States Trustee for the District of Delaware appointed The

Official Committee of Unsecured Creditors (the "Committee") in these cases.  Pursuant to order

of the Court, the Debtors' cases are being jointly administered under the case number above.

B.    **Jurisdiction and Venue**.  The Court has jurisdiction over these proceedings and

the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and this is a

core proceeding pursuant to 28 U.S.C. § 157(b).  Venue for proceedings on the Motion is proper

in this Court pursuant to 28 U.S.C. § 1409.

C.    **Notice**.  Notice of the Final Hearing and entry of this Final Order was provided

pursuant to the Interim Order, and constitutes good and sufficient notice.

D.    **Sale of Servicing Business**.  On October 30, 2007, this Court entered its Order

Pursuant to Sections 105, 363, 364, 365, and 503(b) of the Bankruptcy Code and Rules 2002,

4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (A)

Approving (i) the Sale of the Debtors' Mortgage Servicing Business Free and Clear of Liens,

Claims and Interests, and (ii) Assumption and Assignment of Certain Executory Contracts and

Unexpired Leases Related Thereto, and (B) Granting Certain Related Relief [D.I. 1711] (the

"Sale Order").  Pursuant to the Sale Order, AH Home Mortgage Acquisition Co., Inc. (in such

capacity, the "Purchaser") has been granted a first priority security interest in and lien on

Purchaser's Collateral (as defined in the Sale Order) effective upon the Initial Closing (as

defined in the Purchase Agreement (defined below)) and the right to assign such security interest

- 3 -

and lien in connection with a Financing. In connection with the Purchase Agreement approved pursuant to the Sale Order, the Borrowers agreed to take certain actions in connection with a Financing.

E. **Willingness to Lend**. The Lenders are willing to make the Limited Recourse DIP Facility available and to make the loans and advances pursuant to the terms of the Limited Recourse DIP Financing Documents, but only if the Administrative Agent on behalf of the Lenders is granted a security interest in and liens on the Collateral (as defined in Paragraph 8 below), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, in the priority set forth herein.

F. **Business Judgment and Good Faith**. Based on the record before the Court, the terms of the Limited Recourse DIP Facility are fair, just, and reasonable under the circumstances, are consistent with the Purchase Agreement approved by the Court pursuant to the Sale Order, are appropriate for secured financing to a debtor in possession, reflect the Borrowers' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Based on the record before the Court, the terms of the Limited Recourse DIP Facility have been negotiated in good faith and at arm's length by and among the parties, with all parties represented by counsel. Based on the record before the Court, any credit extended under the terms of the Limited Recourse DIP Facility is hereby found to be extended in good faith by the Lenders as that term is used in section 364(e) of the Bankruptcy Code. Based on the record before the Court, the Secured Parties are hereby found to be acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the Limited Recourse DIP Financing Agreements after the entry of the Interim Order. Based on the record before the

- 4 -

Court, none of the Secured Parties is an "insider" or "affiliate" of any of the Debtors (as such terms are defined in the Bankruptcy Code).

G.      **Property of the Estate**. Each item of the Collateral constitutes property of the estate of at least one of the Borrowers.

H.      **Good Cause**. Authorizing the Limited Recourse DIP Facility and other relief granted herein is appropriate to provide the Borrowers with liquidity to support working capital needs to the extent incurred in the Ordinary Course of Business and as permitted by the Limited Recourse DIP Facility for the purpose of operating the Servicing Business (as defined in the Purchase Agreement) between the Initial Closing and the Final Closing (as defined in the Purchase Agreement).

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1.      The Motion is granted in accordance with the terms of this Final Order. Any objections to the Motion with respect to entry of this Final Order that have not been withdrawn, waived, or settled are hereby denied and overruled.

2.      The Borrowers are hereby authorized upon the Initial Closing, pursuant to the terms of this Final Order and the terms and conditions of the Limited Recourse DIP Financing Documents, to borrow funds under the Limited Recourse DIP Facility in such amount or amounts as may be available to or for the benefit of the Borrowers from the Secured Parties.

3.      Except as otherwise expressly set forth in this Final Order, the terms and conditions of the Limited Recourse DIP Financing Documents are hereby approved in all respects. The Limited Recourse DIP Financing Documents shall constitute valid and binding obligations of the Borrowers, enforceable against each of the Borrowers in accordance with their

- 5 -

terms. The Limited Recourse DIP Financing Documents shall be sufficient and conclusive evidence of the borrowing arrangements by and among the Borrowers and the Secured Parties. All provisions in the Limited Recourse DIP Financing Documents are binding and enforceable in full even if not expressly referenced in this Final Order.

4.    The Borrowers are hereby authorized and directed to do and perform all acts and to make, execute, and deliver all instruments and documents (including, without limitation, the execution of all security agreements, financing statements, and other filings and registrations) which may be required or necessary for the Borrowers' performance under the Limited Recourse DIP Financing Documents.

5.    Each officer of each Borrower, and each such other individual as may be so authorized by the Board of Directors of such Borrower, acting singly, is hereby authorized to execute and deliver any and all of the Limited Recourse DIP Financing Documents and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Borrowers.

6.    AHMS is hereby authorized to act as the Administrative Borrower on behalf of each other Borrower with respect to the Borrowers' rights and obligations under the Limited Recourse DIP Financing Documents, including, without limitation, requesting Loans thereunder. Subject in all cases to the limited recourse provisions set forth in Paragraph 7 of the Interim Order, Paragraph 7 below and in Section 3.05 of the Limited Recourse DIP Credit Agreement (collectively, the "Limited Recourse Provisions"), each Borrower shall be jointly and severally liable for all Obligations of the Borrowers arising under the Limited Recourse DIP Financing Documents (collectively, the "Limited Recourse DIP Obligations"). Any notice given to, or demand made on, any Borrower by the Secured Parties, pursuant to this Final Order or the

Limited Recourse DIP Financing Documents shall constitute notice to, or demand on, all Borrowers without any requirement to provide any such notice or demand (or copy thereof) to the other Borrowers.

7.      Notwithstanding anything contained herein, in the Interim Order, in the Limited Recourse DIP Credit Agreement or in any other Loan Document to the contrary, the liability of the Borrowers is limited solely to the extent, but only to the extent, of the interest of each Borrower in the Collateral only. Upon the occurrence and during the continuance of an Event of Default, any action taken by the Administrative Agent or any Lender against the Borrowers under the Limited Recourse DIP Credit Agreement or any other Loan Document shall be limited to the Collateral and no attachment, execution or other action or process shall be sought, issued or levied upon any assets, properties or funds of the Borrowers other than the Collateral. In the event of enforcement by the Administrative Agent or any Lender of their remedies under the Limited Recourse DIP Credit Agreement, no judgment for any deficiency upon the Obligations shall be obtained by the Secured Parties against the Borrowers. Any foreclosure on the Collateral by the Administrative Agent under the Limited Recourse DIP Credit Agreement which results in the Administrative Agent obtaining possession or ownership of the Purchased Assets (as defined in the Purchase Agreement) shall be deemed to satisfy and relieve the Borrowers of any requirement under the Purchase Agreement to deliver to the Purchaser any such Purchased Assets over which the Administrative Agent has obtained possession or ownership. Upon the occurrence and during the continuance of an Event of Default, the sole and exclusive remedy of the Secured Parties with respect to the Collateral shall be limited to the collection by the Secured Parties of the cash proceeds thereof upon the receipt of the same by the Borrowers and the application of such cash proceeds to the repayment of the Obligations. Neither the

- 7 -

Administrative Agent nor any other Secured Party shall have the right to foreclose upon, or sell, lease, transfer, assign or otherwise dispose of any of the Collateral or otherwise enforce their security interest or lien upon the Collateral other than with respect to the cash proceeds thereof in accordance with Section 3.05(b) of the Limited Recourse DIP Credit Agreement.

## LIENS AND COLLATERAL

8.      Upon the payment of the Purchase Price (as defined in the Purchase Agreement) at the Initial Closing in accordance with the provisions of the Purchase Agreement and as further protection to the Secured Parties and to secure the repayment of the Limited Recourse DIP Obligations, the Administrative Agent, for the benefit of the Secured Parties, shall have and is hereby granted (subject to the occurrence of the Initial Closing): (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, enforceable, and perfected security interest in and lien on all (i) the Purchased Assets (as such term is defined in that certain Asset Purchase Agreement by and among the Borrowers, as sellers, and AH Mortgage Acquisition Co., Inc., as purchaser, dated September 25, 2007 as amended, restated, supplemented or otherwise modified from time to time with the consent of the Administrative Agent, the "Purchase Agreement") of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and all cash and cash equivalents earned in connection with the Servicing Business (as defined in the Purchase Agreement) from and after the Initial Closing (as defined in the Purchase Agreement) until the later of the Final Closing (as defined in the Purchase Agreement) or the payment of the Reconciliation Payment (as defined in the Purchase Agreement); and (ii) all proceeds, products, rents and profits, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and

- 8 -

any and all tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof (collectively, (i) and (ii), the "Collateral") that is not encumbered by a Permitted Lien; and (b) pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, enforceable, and perfected security interest in and lien on the Collateral that is immediately junior to any Permitted Lien. The liens arising pursuant to the foregoing sentence shall not be released until the earliest of (a) the Final Closing, (b) the Termination Date (as defined in the Purchase Agreement) and (c) the Administrative Agent's written consent; except that with respect to any Disputed Servicing Agreement (as defined in the Purchase Agreement) that is designated an Excluded Contract (as defined in the Purchase Agreement) as provided in the Purchase Agreement, the liens arising pursuant to the foregoing sentence shall be automatically released upon such designation, and Bank of America, N.A.'s lien and security interest in such Excluded Contract shall automatically reattach upon such designation without any further action, by the Borrower, the Secured Parties, Bank of America, N.A. or the Bankruptcy Court and without the need for the entry of an order (with such liens to have the same priority and rights as existed prior to the Initial Closing). Notwithstanding the foregoing, if any Permitted Lien is voided, extinguished, or determined not to be valid, the liens granted to the Administrative Agent pursuant to this paragraph shall, notwithstanding anything to the contrary in section 551 of the Bankruptcy Code, be deemed first priority liens without any further action by the Borrowers, the Secured Parties, or the Bankruptcy Court.

9.      Notwithstanding anything to the contrary herein, the Secured Parties shall not have, and nothing herein shall be construed as granting the Secured Parties a security interest in or lien on any (i) proceeds of the Sale (as defined in the Purchase Agreement), (ii) proceeds of

the B of A Collateral received by the Sellers (as defined in the Purchase Agreement) on or before

the Initial Closing Date (as defined in the Purchase Agreement) but not paid to Bank of America,

N.A. as of the Initial Closing Date (which proceeds of the B of A Collateral shall be held in trust

and segregated for the benefit of the Bank of America, N.A. and paid to Bank of America, N.A.

in the manner set forth in that certain Final Order (i) Authorizing Debtors' Use of Cash

Collateral and (ii) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition

Secured Creditors, dated September 4, 2007, entered by the Bankruptcy Court in the Bankruptcy

Cases, as extended and amended by the (a) First Interim Stipulation and Order Extending

Limited Use of Cash Collateral Pursuant to the Final Order (I) Authorizing Debtors' Limited Use

of Cash Collateral, (II) Granting Replacement Liens and Adequate Protection to Certain Pre-

Petition Secured Parties and (III) Scheduling Final Hearing Pursuant to Bankruptcy Rule 4001

entered on October 31, 2007 and (b) First Final Stipulation and Order Extending Limited Use of

Cash Collateral Pursuant to the Final Order (I) Authorizing Debtors' Limited Use of Cash

Collateral, and (II) Granting Replacement Liens and Adequate Protection to Certain Pre-Petition

Secured Parties entered on November 14, 2007  (the "Cash Collateral Order"), regardless of

whether the Termination Date (as defined in the Cash Collateral Order) has occurred), (iii) assets

of the Sellers that are not being purchased by AH Mortgage Acquisition Co., Inc. pursuant to the

Purchase Agreement, or (iv) any other assets of the Debtors used in the Servicing Business not

being purchased by the AH Mortgage Acquisition Co., Inc., in accordance with the terms of the

Purchase Agreement.

10.     The liens and security interests granted to the Administrative Agent herein and

pursuant to the Limited Recourse DIP Facility in the Collateral shall not (a) be subject to any lien

or security interest that is avoided and preserved for the benefit of the Borrowers' estates as a

result of any Avoidance Actions, or (b) be subordinated to or made pari passu with any other lien or security interest pursuant section 364(d) of the Bankruptcy Code or otherwise.

11.     After the Initial Closing and prior to the earlier of the Final Closing and the Termination Date (as defined in the Purchase Agreement), no other liens in or priority status with respect to the Collateral, other than Permitted Liens, shall have priority superior to or pari passu with the liens granted by this Final Order to the Secured Parties, or shall be granted in the Collateral while any portion of the Limited Recourse DIP Obligations remains outstanding, absent the express written consent of the Administrative Agent.

12.     After the Initial Closing, this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Administrative Agent's liens upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction, or the taking of any other action to validate or perfect such liens or security interests in the Collateral or to entitle the Administrative Agent to the priorities granted herein.  The Administrative Agent shall not be required to file any financing statements, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the Administrative Agent's liens and security interests granted by or pursuant to the Interim Order, this Final Order or the Limited Recourse DIP Financing Documents.

13.     Any provision of any lease or other license, contract, or other agreement that requires the consent or approval of one or more Persons, or requires the payment of any fees or obligations to any Person, in order for any of the Borrowers to pledge, grant, or otherwise perfect the Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect.

DB02:6399076.1                                                                    066585.1001

14.    After the Initial Closing, should the Secured Parties, in their sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, notices of lien or similar instruments, take possession of any Collateral as permitted by the Limited Recourse DIP Financing Documents, or take any other action to validate or perfect any such security interests or liens in the Collateral, the Borrowers and their officers are hereby directed to execute any such documents or instruments as the Secured Parties may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the Initial Closing.

15.    After the Initial Closing, the Secured Parties may, in their discretion, file a copy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any similar office in any jurisdiction in which the Collateral is located, and, in such event, the applicable filing or recording officer or registrar is authorized to file or record such copy of this Final Order.

16.    After the Initial Closing and prior to the earlier of the Final Closing and the Termination Date (as defined in the Purchase Agreement), until such time as all Limited Recourse DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the Limited Recourse DIP Financing Documents, the Borrowers shall not in any way prime or otherwise adversely affect the liens on the Collateral granted under this Final Order by granting a subsequent lender or a party-in-interest a superior or pari passu lien pursuant to sections 364 of the Bankruptcy Code or otherwise.

17.    After the Initial Closing and prior to the earlier of the Final Closing and the Termination Date (as defined in the Purchase Agreement), until such time as all Limited Recourse DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder

are terminated in accordance with the Limited Recourse DIP Financing Documents, the
Borrowers shall not create, permit, or suffer to exist any liens on the Collateral other than
Permitted Liens.

18.     After the Initial Closing and prior to the earlier of the Final Closing and the
Termination Date (as defined in the Purchase Agreement), neither the Collateral nor the Secured
Parties shall be subject to surcharge, pursuant to sections 105(a) or 506(c) of the Bankruptcy
Code or otherwise, by any of the Borrowers or any other party, and no such consent shall be
implied from any action, inaction, or acquiescence by the Secured Parties, provided, however,
that the Borrowers may use the Collateral to pay the disbursements set forth in the Budget (as
defined in the Purchase Agreement) that were properly and actually incurred by the Borrowers
prior to the Final Closing Date; provided further, however, that all rights of B of A under the
Cash Collateral Order are hereby preserved.

19.     In no event shall the Secured Parties be subject to the equitable doctrine of
"marshalling" or any similar doctrine with respect to the Collateral.

20.     Notwithstanding anything in this Final Order to the contrary, the liens and
security interests granted to the Administrative Agent shall not extend to any assets that are not
Collateral.

**REMEDIES**

21.     Notwithstanding the provisions of section 362 of the Bankruptcy Code and
without any further order of, or application or motion to, the Court, in the event of the occurrence
of an Event of Default, and at all times thereafter, and without any restriction or restraint by any
stay under section 362 of the Bankruptcy Code against the enforcement of the liens and security
interests or any other rights granted in the Collateral to the Secured Parties pursuant to the

- 13 -

Limited Recourse DIP Financing Documents, the Administrative Agent may, by written notice to the Borrowers as provided in the Limited Recourse DIP Financing Documents, (a) terminate forthwith all or any portion of the Limited Recourse DIP Facility and the Secured Parties' obligation to make any further loans or advances, (b) declare the Limited Recourse DIP Obligations to be immediately due and payable, and (c) subject to the Limited Recourse Provisions, exercise the sole rights and remedies against the Collateral allowed under Paragraph 7 of the Interim Order, Paragraph 7 of this Final Order and Section 3.05 of the Limited Recourse DIP Financing Documents.

22. The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to grant the liens and security interests to the Secured Parties contemplated by the Limited Recourse DIP Financing Documents and this Final Order, and subject to the Limited Recourse Provisions, is further lifted to the extent of the exercise by the Secured Parties of any rights or remedies permitted under this Final Order and under the Limited Recourse DIP Financing Documents.

**OTHER PROVISIONS**

23. **Use of Proceeds.** From and after the Initial Closing, the Borrowers shall use the proceeds of the Loans solely in accordance with and subject to the conditions set forth in this Final Order and the Limited Recourse DIP Financing Documents. Nothing in this Final Order shall be construed to require the Lenders to make advances or extensions of credit or other financial accommodations to permit the Borrowers to make any payments, except to the extent expressly provided for in this Final Order and the Limited Recourse DIP Financing Documents.

24. **Bank Accounts.** Any proceeds of the sale, lease or other disposition of the Collateral, including all Cash Collateral of the Secured Parties, shall be used in accordance with

- 14 -

the provisions of this Final Order and the Limited Recourse DIP Financing Documents and shall be applied in payment of the Borrowers' obligations under, and in the manner provided in, the Limited Recourse DIP Financing Documents. The Borrowers are authorized and directed to deposit such proceeds of the Collateral into such account or accounts as the Administrative Agent shall direct and as provided for in the Limited Recourse DIP Financing Documents, and upon such deposit, such proceeds of the Collateral shall become the sole and exclusive property of the Secured Parties and may be applied by the Administrative Agent against the Borrowers' obligations as provided in the Limited Recourse DIP Financing Documents. The Borrowers are deemed to have irrevocably waived any right to direct the manner of application of any payments to the Secured Parties or any other receipts by the Secured Parties of proceeds of any of the Collateral, including all of the Lenders' Cash Collateral, other than as expressly set forth in this Final Order and the Limited Recourse DIP Financing Documents. The Borrowers are hereby directed to establish one or more bank accounts as provided in the Limited Recourse DIP Financing Documents, into which all of the Lenders' Cash Collateral shall be held.

25.    **Immediate Effectiveness.**  Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

26.    **Survival.**  (a) The terms and provisions of this Final Order and the Limited Recourse DIP Financing Documents, and the liens and security interests granted to the Administrative Agent and payment provisions contained in this Final Order and the Limited Recourse DIP Financing Documents shall continue in full force and effect until the Limited

Recourse DIP Obligations are indefeasibly paid in full in cash, and Limited Recourse DIP Financing Documents are terminated.

(b)     The liens, security interests and other rights and remedies granted to the Secured Parties by the provisions of this Final Order, as well as the Borrowers' obligations pursuant to the Limited Recourse DIP Financing Documents and this Final Order, shall continue beyond and survive the expiration of this Final Order, and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of indebtedness by any of the Borrowers under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the Limited Recourse DIP Financing Documents), (b) the entry of an order or orders confirming any plan or plans of reorganization or liquidation in these cases, or (c) the entry of an order converting these cases to cases under chapter 7 of the Bankruptcy Code, suspending, or dismissing these cases.

(c)     This Final Order and DIP Financing Documents shall be valid, binding and enforceable by the Secured Parties against the Borrowers, their respective successors and assigns, including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of any of the Borrowers' estates; *provided*, the Secured Parties shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

(d)     If any provision of this Final Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the Limited Recourse DIP Obligations incurred under this Final Order and the Limited Recourse DIP Financing Documents, and, prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the Limited Recourse DIP Obligations shall be governed

- 16 -

in all respects by the original provisions of this Final Order, and the Secured Parties and Lender-Related Parties shall be entitled to all the rights, privileges and benefits granted herein. The transactions contemplated by the Limited Recourse DIP Facility have been entered into by the Secured Parties in good faith, and, as a result, the Secured Parties are entitled to the protections afforded by Section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Final Order.

(e)    Under no circumstances, except with the written consent of the Administrative Agent, shall the liens, rights and remedies granted to the Secured Parties pursuant to or in connection with the Limited Recourse DIP Financing Documents and this Final Order be modified, altered or impaired in any manner by a chapter 11 plan or order of confirmation of a chapter 11 plan for any of the Borrowers.

27.    **No Waiver of Secured Parties' Rights.** Notwithstanding anything to the contrary herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair any of the rights of the Secured Parties under the Bankruptcy Code or under non-bankruptcy law.

28.    **Conflicts.** To the extent of any conflict between or among the express terms or provisions of any of the Limited Recourse DIP Financing Documents and the Motion, the terms and provisions of the Limited Recourse DIP Financing Documents shall govern. To the extent of any conflict between or among the express terms or provisions of any of the Limited Recourse DIP Financing Documents or the Motion on the one hand, and the terms and provisions of this Final Order on the other hand, the terms and provisions of this Final Order shall govern.

29.    **Amendments.** The Borrowers and the Secured Parties may finalize, amend, modify, supplement or waive any provision of the Limited Recourse DIP Financing Documents

if such amendment, modification, supplement or waiver is permitted under the terms of the Limited Recourse DIP Financing Documents and is not material (in the good faith judgment of the Secured Parties and the Borrowers) without any need to apply to, or receive further approval from, the Court.

30.     **No Third Party Beneficiaries.**  No third party is intended to be or shall be deemed to be a third party beneficiary of the provisions of this Final Order or the Limited Recourse DIP Financing Documents.

31.     **Purchaser Agreement Obligations**.  Notwithstanding anything else in the Interim Order, this Final Order or the Limited Recourse DIP Financing Documents to the contrary, (a) in the event of any conflict between terms and provisions of the Limited Recourse DIP Financing Documents and the Sale Order or the Purchase Agreement, the terms and provisions of the Sale Order and the Purchase Agreements shall prevail, and (b) nothing in the Interim Order, this Final Order or the Limited Recourse DIP Financing Documents is intended to, nor shall it (i) limit, modify or affect the obligations of AH Mortgage Acquisition as "Purchaser" under the Purchase Agreement, including, without limitation the obligation of AH Mortgage Acquisition to provided liquidity or working capital in accordance in Section 6.2 of the Purchase Agreement, or (ii) expand or increase the obligations of the Borrowers under the Purchase Agreement.  Any failure or inability of the Borrowers to perform or comply with their obligations under the Purchase Agreement that is due to the exercise by the Secured Parties of their remedies pursuant to Paragraph 7 of the Interim Order, Paragraph 7 of this Final Order or the Limited Recourse DIP Financing Documents shall not constitute a default or be deemed a breach by the Borrowers of their obligations to the Purchaser under the Purchase Agreement.

32.    **Retention of Jurisdiction.** The Court shall retain jurisdiction to hear and determine all matters arising from this Final Order and its implementation.

33.    **Headings.** Paragraph headings used herein are solely for a convenience and shall convey no substantive import.

Dated: November 2ȣ, 2007
　　　　Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

DH02:6399076.1                                   066585.1001

# EXHIBIT 2

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) Chapter 11 |
| | ) |
| BUFFETS HOLDINGS, INC., | ) Case No. 08-10141 (MFW) |
| a Delaware corporation, *et al.*[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) Related Docket Nos. 16, 39, 61 |

## FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION SENIOR SECURED SUPER-PRIORITY FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c)(2), 364(c), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL OF PRE-PETITION LENDERS, AND (II) GRANTING ADEQUATE PROTECTION TO PRE-PETITION LENDERS PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364

Upon the motion (the "Motion") dated January 22, 2008 (the "Petition Date") of

Buffets, Inc. and its affiliated debtors, each as debtor and debtor-in-possession

(collectively, the "Debtors"), in the above-captioned chapter 11 cases (the "Cases")

pursuant to sections 105, 361, 362, 363(c)(2), 364(c), 364(d)(1) and 364(e) of title 11 of

the United States Code, 11 U.S.C. §§ 101 *et seq*. (as amended, the "Bankruptcy Code"),

and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), seeking, among other things:

    (1)    authorization for Buffets Inc. (the "Borrower") to obtain post-

petition debtor-in-possession financing (the "Financing"), and for each of the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Buffets Holdings, Inc. (4018); Buffets, Inc. (2294); HomeTown Buffet, Inc. (3002); OCB Restaurant Company, LLC (7607); OCB Purchasing Co. (7610); Buffets Leasing Company, LLC (8138); Ryan's Restaurant Group, Inc. (7895); Buffets Franchise Holdings, LLC (8749); Tahoe Joe's, Inc. (7129); HomeTown Leasing Company, LLC (8142); OCB Leasing Company, LLC (8147); Big R Procurement Company, LLC (5198); Ryan's Restaurant Leasing Company, LLC (7405); Fire Mountain Restaurants, LLC (8003); Ryan's Restaurant Management Group, LLC (6739); Tahoe Joe's Leasing Company, LLC (8145); Fire Mountain Leasing Company, LLC (7452); Fire Mountain Management Group, LLC (7299). The address for all of the Debtors is 1460 Buffet Way, Eagan, MN 55121.

other Debtors (collectively, the "Guarantors") to guaranty the Borrower's

obligations in connection with the Financing, up to an aggregate principal amount

of $285,000,000 (the "Financing Amount") (the actual available principal amount

at any time being subject to those conditions set forth in that certain Senior

Secured Super Priority Debtor In Possession Credit Agreement (the "DIP Credit

Agreement" and, together with that certain Facility Fee Letter dated January 22,

2008 and each of the other Loan Documents (as defined in the DIP Credit

Agreement), the "DIP Documents"), from Credit Suisse, Cayman Islands Branch

("Credit Suisse"), as Administrative Agent (in such capacity, the "Agent") for

itself and the banks and other financial institutions or entities that may become

parties to the DIP Credit Agreement from time to time (together with Credit

Suisse and including the fronting and issuing banks for the letters of credit, and in

such capacities, the "DIP Lenders"), to be arranged by Credit Suisse Securities

(USA) LLC ("CS Securities"), as Sole Lead Arranger and Sole Bookrunner, and,

at the option of CS Securities, one or more financial institutions as Syndication

Agent. The Financing consists of (i) an $85,000,000 New Money Facility (as that

term is defined in the DIP Credit Agreement) and (ii) a $200,000,000 Rollover

Facility (as that term is defined in the DIP Credit Agreement);

    (2)    authorization for the Debtors to execute and enter into the DIP

Documents and to perform such other and further acts as may be required in

connection with the DIP Documents;

2

(3)     the granting of adequate protection of the security interests and

liens (such security interests and liens the "Pre-Petition Liens") of the lenders

(such lenders in such capacities, the "Pre-Petition Lenders") to that certain Credit

Agreement dated as of November 1, 2006 as amended from time to time among

the Borrower, Buffets Holdings, Inc. ("Holdings"), the lenders named therein,

Credit Suisse, as Administrative Agent, CS Securities and UBS Securities LLC,

as Joint Bookrunners and Co-Lead Arrangers, UBS Securities LLC, as

Syndication Agent and Goldman Sachs Credit Partners L.P., as Documentation

Agent (the "Existing Credit Agreement"), which adequate protection is granted

until the DIP Pay-Out (as defined below);

(4)     (a) authorization for the Debtors to use cash collateral (as defined

in the Bankruptcy Code) in which the Pre-Petition Lenders have any interest and

(b) the granting of adequate protection to the Pre-Petition Lenders with respect to,

*inter alia*, such use of cash collateral and all use and diminution in the value of

the Pre-Petition Lenders' interest in the Debtors' interest in the Pre-Petition

Collateral (as defined in paragraph 16 herein);

(5)     the granting of superpriority administrative expense claims to the

Agent and the DIP Lenders payable from, and having recourse to, all pre-petition

and post-petition property of the Debtors' estates (including property that

currently constitutes Pre-Petition Collateral) and all proceeds thereof, subject only

to the Carve-Out (as defined in paragraph 6 herein) and the granting of first

priority priming liens for the benefit of the Agent and the DIP Lenders in all DIP

3

NY\1374223.8

Collateral (as defined in paragraph 7 herein) in accordance with the Security Documents (as defined in the DIP Credit Agreement) and this Final Order to secure any and all of the DIP Obligations (as defined in paragraph 4 herein);

(6)    the granting to the Borrower of a superpriority claim against each of the other Debtors that is equal to the net amount of funds transferred by the Borrower to the other Debtors after the Petition Date, which claim shall be junior in priority only to the Superpriority Claim (as defined in paragraph 6 herein) and the Section 507(b) Claim (as defined in paragraph 14 herein);

(7)    upon entry of this Final Order, (a) the limitation of the Debtors' and their estates' right to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and (b) the conversion of up to $200,000,000 of the Debtors' obligations under the Existing Credit Agreement into post-petition debt under the DIP Credit Agreement (the "Roll-Up");

(8)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of an interim order (the "Interim Order") (a) authorizing the Borrower, on an interim basis, to borrow in a single drawing under the DIP Documents up to an aggregate principal or face amount not to exceed $30,000,000, subject to any limitations of credit extensions under the DIP Documents (the "Maximum Interim Borrowing"), (b) granting the DIP Liens (as defined in paragraph 7 herein) and the Superpriority Claim to the DIP Lenders, (c) authorizing the Debtors' use of cash

4

collateral of the Pre-Petition Lenders and (d) granting the adequate protection described therein; and

(9)      that this Court schedule a final hearing (the "Final Hearing") to be held within thirty days of the entry of the Interim Order to consider entry of a final order (the "Final Order") authorizing, *inter alia,* (a) the balance of the borrowings under the DIP Documents on a final basis and (b) the Roll-Up, as set forth in the Motion and the DIP Documents.

Due and appropriate notice of the Motion under the circumstances and in accordance with section 102 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the relief requested therein and the Final Hearing having been served by the Debtors on the forty largest unsecured creditors of the Debtors on a consolidated basis as certified by the Debtors or their noticing agent, counsel to the Agent, counsel to the administrative agent under the Existing Credit Agreement, counsel to the indenture trustee for the Debtors' 12 1/2% senior notes (the "Notes"), counsel to the official committee of unsecured creditors appointed in the Cases (the "Creditors' Committee"), the Office of the United States Trustee for the District of Delaware, and the other parties listed in the *Notice of Interim Order and Final Hearing of Debtors' Request for Post-Petition Financing, Use of Cash Collateral and Related Relief,* filed with this Court on January 24, 2008 (Docket No. 62).

The Interim Hearing having been held by this Court on January 23, 2008 and this Court having entered the Interim Order on January 23, 2008. The Final Hearing having been held and concluded before this Court on February 22, 2008.

5

Upon the record made at the Interim Hearing and the Final Hearing, the record of the Cases and the Affidavit of Keith Wall in Support of First Day Motions (the "Wall Affidavit") and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:[1]

1.    *Disposition.* The Motion hereby is granted on the terms set forth herein. Any objections to the relief sought in the Motion that have not previously been resolved or withdrawn hereby are overruled on the merits. This Final Order shall be valid, binding on all parties in interest and fully effective immediately upon entry by this Court.

2.    *Jurisdiction and Venue.* This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. On January 29, 2008, the Office of the United States Trustee appointed the Creditors' Committee pursuant to section 1102(a)(1) of the Bankruptcy Code.

3.    *Notice.* Under the circumstances, the notice given by the Debtors and their noticing agent of the Motion, the Interim Hearing and the Final Hearing constitutes due and sufficient notice thereof and complies with section 102 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c).

4.    *Findings Regarding the Financing.*

    (a)    Good cause has been shown for the entry of this Final Order.

---

[1] Findings of fact shall also constitute conclusions of law, and conclusions of law shall also constitute findings of fact.

6

(b)     The Debtors have an immediate need to obtain the Financing and use Cash Collateral (as defined in paragraph 12 herein) to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, to pay the costs of administration of their estates and to satisfy other working capital and operational needs. The Debtors' access to sufficient working capital and liquidity through the use of Cash Collateral, incurrence of new indebtedness and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors also are unable to obtain secured credit under sections 364(c) or 364(d) of the Bankruptcy Code on equal or more favorable terms than those set forth in the DIP Documents within the time frame required by their needs to avoid immediate and irreparable harm. A loan facility in the amount and under the terms provided by the DIP Documents is not available without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve-Out as provided for herein, the DIP Liens and the Superpriority Claim under the terms and conditions set forth in the DIP Documents.

(d)     The terms of the Financing and the use of Cash Collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent

7

with their fiduciary duties and constitute reasonably equivalent value and fair consideration. For the avoidance of doubt, the signature of any officer of each one or more of the Debtors, appearing on any one or more of the DIP Documents shall bind the Debtors. No approval of the board of directors or any other approval shall be necessary.

(e)     The Financing has been negotiated in good faith and at arm's length among the Debtors, the Agent, the DIP Lenders and their respective affiliates. All of the Debtors' obligations and indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including, but not limited to, (i) all loans made to the Debtors pursuant to the DIP Documents and (ii) all Obligations incurred (as defined in the DIP Credit Agreement) (collectively, the "DIP Obligations"), have been extended by the Agent and the DIP Lenders in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code. The Agent and the DIP Lenders shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final Order or any provision herein is vacated, reversed or modified, on appeal or otherwise.

(f)     The Pre-Petition Lenders are entitled to rely upon the terms and enforceability of this Final Order inasmuch as the Pre-Petition Lenders' liens and security interests shall be junior to the DIP Liens.

(g)     The Debtors have requested entry of this Final Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent the relief in this Final Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Financing, therefore, is in the best interest of the Debtors' estates.

8

5.    *Authorization of the Financing and the DIP Documents.*

(a)    The Debtors hereby are authorized to enter into the DIP
Documents. The Borrower hereby is authorized to borrow money pursuant to the DIP
Documents in the principal amount of up to the Financing Amount. The Guarantors
hereby are authorized to guaranty such borrowings in an aggregate principal or face
amount of up to the Financing Amount (plus interest, fees and other expenses provided
for in the DIP Documents), subject to any limitations of borrowings under the DIP
Documents. In accordance with the terms of this Final Order and the DIP Documents,
the borrowings under the DIP Documents shall be used solely for purposes permitted
under the DIP Documents.

(b)    In furtherance of the foregoing and without further approval of this
Court, each Debtor is authorized and directed to perform all acts, to make, execute and
deliver all instruments and documents (including the execution or recordation of security
agreements, mortgages and financing statements), and to pay from the borrowings under
the DIP Documents interest, fees and expense reimbursements, including all fees
(including, but not limited to, an annual administrative agent fee of $200,000 and an
arrangement fee of $250,000) and expense reimbursements of Credit Suisse and CS
Securities, and the reasonable fees and expense reimbursements of their attorneys,
financial advisors and other professionals, and the reasonable fees and expenses of the
attorneys for each of the DIP Lenders; *provided* that such attorneys, financial advisors
and other professionals shall issue invoices to the Debtors with copies to counsel to the
Creditors' Committee, counsel to any other statutory committee, and the Office of the

9

United States Trustee, and *provided further* that the Debtors shall promptly pay all reasonable fees and expenses not subject to objection by the Creditors' Committee or the Office of the United States Trustee within ten business days after receipt of such invoices, and *provided further* that Blackstone shall be paid in accordance with that certain agreement dated December 13, 2007 (the "Blackstone Engagement Letter"), which payment shall include the Restructuring Fee (as that term is defined in the Blackstone Engagement Letter), that may be required or necessary for the Debtors' performance of the DIP Obligations, including:

(i)     the execution, delivery and performance of the DIP Documents and any exhibits attached thereto;

(ii)     with the express written consent of the Agent and the DIP Lenders in accordance with the DIP Credit Agreement, the execution, delivery and performance of one or more amendments to the DIP Documents for, among other things, the purpose of (A) adding additional financial institutions as DIP Lenders, (B) reallocating the commitments for the Financing among the DIP Lenders or (C) implementing this Order;

(iii)     making the non-refundable payment to Credit Suisse, CS Securities or the DIP Lenders, as the case may be, of all of the principal, interest, charges, fees and the reimbursement of expenses, all of which unpaid principal, interest, charges, fees (including, but not limited to, an administrative agent fee of $200,000 and an arrangement fee of $250,000 to Credit Suisse and CS Securities) and expenses shall be included in and

10

constitute part of the principal amount of the DIP Obligations (subject only to the Creditors' Committee's challenge rights with respect to the Roll-Up as set forth in paragraph 19 of this Final Order), be deemed a Superpriority Claim and be secured by a first priority lien on and security interest in all of the DIP Collateral as and to the extent provided for in this Final Order and the DIP Documents (for the avoidance of doubt, all fees and expense reimbursements of Credit Suisse or CS Securities shall be deemed fully earned when paid by the Debtors, and shall not be subject to disgorgement by Credit Suisse or CS Securities for any reason, including as a result of a successful Challenge or Excepted Challenge (as such terms are defined in paragraph 19 below));

(iv)    the performance of all other acts required under or in connection with the DIP Documents; and

(v)    with the express written consent of the administrative agent under the Existing Credit Agreement, the execution, delivery and performance of one or more amendments to the Existing Credit Agreement for, among other things, the purpose of implementing this Final Order.

(c)    The DIP Documents shall and hereby do constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents. No DIP Obligation, payment, transfer or grant of security under the DIP Documents or this Final Order shall be stayed,

11

restrained, voidable or recoverable under the Bankruptcy Code or under any applicable

law (including under section 502(d) of the Bankruptcy Code), or subject to any defense,

reduction, setoff, recoupment or counterclaim (subject only to the Creditors' Committee's

challenge rights with respect to the Roll-Up as set forth in paragraph 19 of this Final

Order).

      6.    *Superpriority Claim.*

      (a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the

DIP Obligations (including the Roll-Up) shall constitute an allowed claim, subject to

payment of the Carve-Out (the "Superpriority Claim") against each Borrower and each

Guarantor, with priority over any and all administrative expenses, diminution claims

(including all Adequate Protection Obligations (as defined in paragraph 14 herein)), all

claims of any kind asserted by the Pre-Petition Lenders, and all other claims against the

Debtors, now existing or hereafter arising, of any kind whatsoever, including all

administrative expenses of the kind specified in sections 503(b) and 507(b) of the

Bankruptcy Code, and over any and all administrative expenses or other claims arising

under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 or 1114 of

the Bankruptcy Code, whether or not such expenses or claims may become secured by a

judgment lien or other non-consensual lien, levy or attachment, and which Superpriority

Claim shall be payable from and have recourse to all pre- and post-petition property of

the Debtors and all proceeds thereof (including proceeds of all claims and causes of

action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or

any other avoidance actions under the Bankruptcy Code or other applicable law

12

(collectively, the "Avoidance Actions")), subject only to the payment of the Carve-Out to the extent specifically provided for herein. Prior to the DIP Pay-Out (as defined below), the Debtors shall deposit in escrow all money and other property recovered arising out of, relating to, or in connection with any Avoidance Action (whether or not an adversary proceeding is commenced), and no such money and other property shall be distributed to any party other than the DIP Lenders until the DIP Pay-Out. DIP Liens (as defined in paragraph 7 hereof) shall attach to the escrow accounts into which any money and other property recovered arising out of, relating to, or in connection with any Avoidance Action are deposited.

(b)     The term "Carve-Out" means (i) the unpaid fees due and payable to the Clerk of the Court and the Office of the United States Trustee pursuant to 28 U.S.C. § 1930; (ii) the accrued and unpaid fees and expenses incurred by professionals retained pursuant to an order of this Court until the earlier of (x) the occurrence of an Event of Default (as defined in the DIP Documents), *provided* that accrued and unpaid professional fees and expenses incurred after an Event of Default which is waived or cured, shall also be included in the Carve-Out (so long as an unwaived or uncured Event of Default has not occurred and is not continuing) or (y) the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, *provided* that such fees and expenses incurred pursuant to either (ii)(x) or (ii)(y) must be approved by this Court; and (iii) the accrued and unpaid fees and expenses incurred by professionals retained pursuant to an order of this Court upon and after the occurrence of an Event of Default and during the continuance of such an Event of Default which is not waived or cured, or upon and after

13

the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, in an aggregate amount not to exceed $600,000, plus any allowed fees and expenses reasonably incurred by professionals retained pursuant to an order of this Court solely in connection with responding to requests a chapter 7 trustee appointed by order of this Court for the Cases makes of such professionals for transmittal of documents in their possession. In no event shall any of the Carve-Out be used to pay any fees or expenses of any person retained in a chapter 7 case under sections 326, 327 or 328 of the Bankruptcy Code.

(c)     No Loans (as defined in the DIP Documents) or cash collateral (as that term is defined in 11 U.S.C. § 363(a)) shall apply to or be available for any fees or expenses incurred in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Agent or the DIP Lenders, including (x) challenging the amount, validity, perfection, priority or enforceability of or asserting any defense, counterclaim or offset to, the DIP Obligations under the New Money Facility or the DIP Liens granted in respect of the New Money Facility or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Agent or the DIP Lenders of any of their respective rights and remedies under the DIP Documents and this Final Order, or the enforcement or realization upon any of the liens on or security interests in any DIP Collateral and (ii) the Pre-Petition Lenders in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part or taking or attempting to take any other action to render unenforceable, the Pre-Petition Lenders' liens, claims, interests, and Adequate Protection Obligations granted to the Pre-Petition

14

Lenders pursuant to the Existing Credit Agreement and this Final Order.

Notwithstanding the previous sentence, up to $150,000 of the Loans shall apply to or be

made available for the investigation of the Pre-Petition Liens or claims or causes of

action against the Pre-Petition Lenders. Nothing herein shall be construed to impair the

ability of any party in interest in the Cases to object to any of the professional fees,

expenses, reimbursement or compensation described in clause (c)(ii) above.

    7.    *DIP Liens.* As security for the DIP Obligations under the New Money

Facility, effective and perfected upon the date of the entry of the Interim Order, the

security interests and liens described in subparagraphs (a) through (d) below hereby are

granted to the Agent for its own benefit and the benefit of the DIP Lenders with respect

to the New Money Facility (all property identified in subparagraphs (a) through (d) below

being collectively referred to as the "DIP Collateral"), subject only to the extent of any

payment of the Carve-Out (all such liens and security interests granted to the Agent, for

its benefit and for the benefit of the DIP Lenders pursuant to this Final Order and the DIP

Documents, the "DIP Liens"). As security for the DIP Obligations under the New Money

Facility, the Agent and the DIP Lenders shall have a DIP Lien on, among other things, (i)

the Avoidance Actions, (ii) any proceeds or property recovered or otherwise the subject

of successful Avoidance Actions, and (iii) the assets that were subject to any lien or

security interest that is avoided and preserved for the benefit of the Debtors and their

estates under section 551 of the Bankruptcy Code, *provided* that upon the occurrence of

the DIP Pay-Out, the DIP Lien on the Avoidance Actions and the proceeds and property

recovered thereunder shall automatically be released (but the Section 507(b) Claim (as

15

defined in paragraph 14 of this Final Order) shall continue to extend to proceeds of

Avoidance Actions), and *provided further* that the DIP Lenders shall be entitled to the

proceeds and property recovered or the subject of Avoidance Actions only to the extent

the DIP Obligations are not fully satisfied by the proceeds of other DIP Collateral. As

described in greater detail in paragraph 17 herein, the DIP Liens shall be valid,

enforceable, effective and perfected by operation of law without the necessity of the

execution, recordation or filing by the Debtors, the Agent or the DIP Lenders of

mortgages, security agreements, pledge agreements, financing statements, control

agreements or other agreements. For the avoidance of doubt, the Agent and DIP Lenders

shall not obtain any DIP Lien on property that is not included in the Debtors' estates

(including property subject to a PACA trust, and the Credit-Linked Deposits and the

Credit-Linked Deposit Account (as such terms are defined in the Existing Credit

Agreement)).

   (a)  *First Lien on Cash Balances and Unencumbered Property.*

Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing,

enforceable, fully-perfected first priority senior security interest in and lien upon all pre-

and post-petition property of the Debtors (including but not limited to (i) all fee,

leasehold and other interests of the Debtors in all real property except the Excluded

Leases (as defined below) and (ii) all intercompany claims of the Borrower and each

Guarantor against the Debtors' affiliates and subsidiaries), whether existing on the

Petition Date or thereafter acquired and that as of the Petition Date is not subject to valid,

perfected and non-avoidable liens (collectively, "Unencumbered Property"). With

16

respect to the Debtors' leasehold interests, the Agent and the DIP Lenders shall not be granted DIP Liens on any Debtor's interest in a leasehold in which the terms of the underlying lease, underlying mortgage or applicable state law expressly prohibits or otherwise restricts (but only to the extent of such restriction) the grant of a security interest by such Debtor in such leasehold without the consent of the lessor or other specified party in the underlying lease or underlying mortgage (the "Excluded Leases"). With respect to the Excluded Leases, the Agent and the DIP Lenders shall be granted DIP Liens on any proceeds of a Debtor's interest in such Excluded Leases in the event of any proposed assumption, assignment or sale by the Debtors of such interests in Excluded Leases (subject to the rights in such lease under applicable law of the lessor or other party in interest who is party to the lease or lease-related documents) (the "Lease Proceeds").

(b)    *Liens Priming the Pre-Petition Lenders' Liens.*  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors, including but not limited to all fee, leasehold and other interests of the Debtors in all real property (other than the Excluded Leases) and all intercompany claims of the Borrower and each Guarantor against the Debtors' affiliates and subsidiaries, whether now existing or hereafter acquired, that is subject to the existing liens presently securing the Existing Obligations (as defined below), including in respect of issued but undrawn letters of credit.  The security interests and liens granted to the Agent for its own benefit and the benefit of the DIP Lenders shall be senior in all respects to the interests in such property of the Pre-Petition Lenders arising from current

17

and future liens of the Pre-Petition Lenders (including the Adequate Protection Liens granted hereunder).

(c)    *Liens Senior to Certain Other Liens.*  The DIP Liens shall not be subject to, made *pari passu* with, or subordinated to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) any other lien or security interest pursuant to sections 364(c) or (d) of the Bankruptcy Code or (iii) except for tax or other liens entitled to priority by statute (the "Permitted Priority Liens"), any other liens arising after the Petition Date, including any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors.

(d)    *Liens Junior to Certain Other Liens.*  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected security interest in and lien upon all pre-petition and post-petition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 7, as to which the liens and security interests in favor of the Agent for its benefit and the benefit of the DIP Lenders will be as described in such clauses), whether now existing or hereafter acquired, that is subject to the Permitted Priority Liens (if any), which security interests and liens granted in favor of the Agent or its benefit and the benefit of the DIP Lenders shall be subject to and junior to only the Permitted Priority Liens.

(e)    In connection with the Agent's and DIP Lenders' foreclosure on their security interests in the Debtors' leasehold interests in real property (other than the Excluded Leases, but including the Lease Proceeds), section 365 of the Bankruptcy Code

18

shall not apply. Unless otherwise provided for in the preceding sentence or elsewhere in this Final Order, any lessor's rights under sections 362 and 365 of the Bankruptcy Code shall not be impaired.

8.    *Protection of DIP Lenders' Rights.*

(a)    Until all DIP Obligations under the New Money Facility (including any non-contingent claim for indemnification by the Agent or the DIP Lenders and payment of all fees and expense reimbursements) shall have been indefeasibly paid in full in cash (other than contingent indemnity obligations as to which no claim has been asserted when all other amounts have been paid) and all commitments under the DIP Documents have terminated (the occurrence of such actions, collectively, the "DIP Pay-Out"), no amounts shall be paid in respect of Rollover Loans, other than payments of regularly scheduled interest, which shall be paid only so long as no Default or Event of Default shall have occurred and be continuing under the DIP Credit Agreement.

(b)    Until the DIP Pay-Out, the Pre-Petition Lenders shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Existing Credit Agreement (or any document entered into in connection with the Existing Credit Agreement) or this Final Order, otherwise exercise remedies against any DIP Collateral or seek court authorization to exercise remedies against any DIP Collateral or seek to lift the automatic stay to exercise any remedies against any DIP Collateral, (ii) be deemed to have consented to any release of DIP Collateral authorized under the DIP Documents and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to

19

perfect their security interests in the DIP Collateral, unless required by applicable state law to continue the perfection of valid and unavoidable liens or security interests in effect as of the Petition Date.

(c)    The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the Agent and the DIP Lenders to exercise, upon the occurrence of an Event of Default or the Termination Date (as defined paragraph 13 herein) and upon five business days' written notice to the Debtors and the Creditors' Committee (with copies to counsel to any other statutory committee and the Office of the United States Trustee) of such occurrence, all rights and remedies provided for in the DIP Documents (including the right to set off monies of the Debtors in accounts maintained with the Agent or any DIP Lender). In any hearing regarding the entitlement of the Agent or the DIP Lenders to exercise any rights or remedies set forth in this Final Order or in the DIP Documents, the only issue that may be raised by any party in opposition thereto shall be whether an Event of Default has occurred and is continuing. The Debtors (for themselves and for their estates) and the Pre-Petition Lenders hereby waive their right to seek relief, including under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair, restrict or delay the exercise of the rights and remedies of the Agent or the DIP Lenders set forth in this Final Order or in the DIP Documents. Subject to paragraph 7 of this Final Order, the Agent and the DIP Lenders shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

(d)    Without limiting any of the rights or remedies of the Agent or the DIP Lenders (including, without limitation, all rights afforded under applicable state law) provided herein or in any of the DIP Documents, upon (i) an Event of Default and (ii) five business days' written notice to the applicable real property lessor (and, if and only if the identity and address of counsel to such real property lessor is actually known to the Agent or if a notice of appearance has been filed with this Court, the counsel to such real property lessor) of such an Event of Default, the Agent, on behalf of the DIP Lenders, shall have the right to direct and require the Debtors and their successors to immediately file and diligently pursue any motion with this Court, pursuant to and in accordance with Section 365 of the Bankruptcy Code, seeking the assumption, assignment or rejection of any leasehold interest in real property. In the case of an assignment, the Agent or the DIP Lenders shall have the right to specify the proposed assignee, and such assignment shall be on terms and conditions as are acceptable to the DIP Lenders and subject to section 365 of the Bankruptcy Code and, without limitation, all of the affected lessor's rights under the applicable lease and any related agreements (to the extent such rights are enforceable and effective) and, without limitation, all of the affected lessor's rights under the Bankruptcy Code. The Debtors are authorized and directed to execute and deliver such agreements, documents and instruments as the Agent or the DIP Lenders may request to effectuate the foregoing, but no such agreements, documents or instruments shall be required for such purpose.

(e)    Upon (i) an Event of Default and (ii) five business days' notice (a "Landlord Notice") to any Debtor's real property lessor (and, if and only if the identity

21

and address of counsel to such real property lessor is actually known to the Agent or if a notice of appearance has been filed with this Court, the counsel to such real property lessor), the Agent and the DIP Lenders shall have the right, following the expiration of such five business day notice period, to enter onto or into such lessor's leased premises for the purpose of exercising any remedy with respect to the DIP Collateral in accordance with applicable law, including this Final Order, *provided* that (i) all of the lessors' rights and privileges, if any, are reserved, (ii) the Debtors shall remain obligated to pay any rent and other obligations due under the terms of their leases, and in the event that such obligations are not fulfilled by the Debtors, the Agent and the DIP Lenders using or occupying any leased premises as set forth in this paragraph shall timely pay rent and timely perform other obligations (including any obligations in the applicable lease or under applicable law to repair any damage to the premises caused by the entry into the leased premises and the removal of the DIP Collateral, and any sales and use taxes arising under applicable law as a consequence of the Agent's or the DIP Lenders' activities upon the leased premises) of the applicable Debtor under any such lease that arise after the Landlord Notice is delivered, through and including the date on which the Agent and the DIP Lenders vacate the leased premises and provides such lessor with written confirmation of such vacation and delivers in connection with such written confirmation any keys, access cards or other means of access to the leased premises to the extent such items are them available to the Agent or the DIP Lenders (the "Collateral Access Period"), calculated on a *per diem* basis, (iii) the duration of the Collateral Access Period must be reasonable, and (iv) the Landlord Notice to Weingarten Realty Investors,

22

Developers Diversified Realty Corp., Gregory Greenfield & Associates, Turnberry

Associates, WP East End Associates, Realty Income Corp., and Serve (MN) QRS 14-38,

Inc., shall specify the Collateral Access Period, which may be increased or reduced by

agreement of the Agent, the DIP Lenders, and the applicable lessor or by order of this

Court, with such dispute regarding the Collateral Access Period to be heard on shortened

notice at the earliest convenience of the Court. Each lessor reserves the right to request

that this Court limit the Collateral Access Period with respect to its properties, and the

Debtors, the Agent and the DIP Lenders reserve the right to oppose any lessor's request

to limit the Collateral Access Period, and this Court retains jurisdiction to determine such

a request by any lessor. Nothing herein shall require the Agent or the DIP Lenders to

assume any lease as a condition to the rights afforded to the Agent and the DIP Lenders

in this paragraph. Nothing in this subparagraph shall impair the rights of any party under

section 365 of the Bankruptcy Code. Notwithstanding anything contained herein to the

contrary or otherwise, in relation to the Debtors' leased locations, the Debtors, the Agent

or the DIP Lenders, as the case may be, shall be entitled to move this Court for approval

to conduct liquidation or "going-out-of-business sales" in accordance with terms to be

approved by this Court, which hearing shall be upon not less than five business days'

written notice to interested parties, including the lessor of any affected leased location

and the Creditors' Committee. Nothing herein shall be deemed to prejudice the rights of

interested parties other than the Debtors, including the lessor to any affected leased

location and the Creditors' Committee, to object to such a request.

23

(f)     For the avoidance of doubt, (i) nothing in this Final Order shall affect the parties' respective rights and obligations under that certain Agreement Regarding Leasehold Mortgages and Landlord's Purchase Option, dated as of November 2006 among the Hold Landlord (as defined in such agreement), FIGRYANF LLC, Credit Suisse, Cayman Islands Branch, and German American Capital Corporation; and (ii) the rights and obligations under such agreement shall apply to the Agent and DIP Lenders, to the same extent as if they were signatories thereto in their respective capacities as Agent and DIP Lenders under the DIP Credit Agreement. With respect to the lease between Buffets, Inc. and Serve (MN) QRS 14-38, Inc. (the "Serve Lease"), the Debtors and the DIP Lenders shall be jointly responsible for the timely performance of all obligations under the Serve Lease during the period commencing with the foreclosure on the Debtors' leasehold interest in the Serve Lease, and ending with the assignment or rejection of such lease.

(g)     The Superpriority Claim and the DIP Liens granted to the Agent and the DIP Lenders under this Final Order shall continue if the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, and such liens and security interests shall maintain their priority as provided in this Final Order until the DIP Pay-Out.

(h)     The Adequate Protection Obligations granted to the Pre-Petition Lenders under this Final Order shall continue if the Debtors' chapter 11 cases are converted to cases under chapter 7 of the Bankruptcy Code, and such liens and security

24

interests shall maintain their priority as provided in this Final Order until the DIP Pay-Out.

(i)  Each Debtor shall have an allowed claim, equal to the amount by which the fair value of property (including cash) or benefit transferred post-petition to another Debtor exceeds the aggregate value of property (including cash) or benefit received post-petition, under sections 364(c)(1) and 507(b) of the Bankruptcy Code having priority over any and all administrative expenses of the kind specified in section 503(b) of the Bankruptcy Code and any other claim under section 507(b) of the Bankruptcy Code, other than the Carve-Out and the superpriority administrative expense claims and Section 507(b) Claims granted to the Agent, the DIP Lenders and the Pre-Petition Lenders herein. The Agent and the DIP Lenders shall retain their DIP Liens on all property or benefits that are transferred among Debtor entities after the Petition Date.

9.    *DIP Fees and Expenses.* All fees payable and expenses reimbursable by the Debtors to Credit Suisse, CS Securities (and their respective affiliates) and the DIP Lenders under the DIP Documents hereby are approved and shall promptly be paid by the Debtors in accordance with the DIP Documents and this Final Order, and the Debtors may pay such fees and expenses from the proceeds of the Financing. All fees and expense reimbursements of Credit Suisse or CS Securities shall be deemed fully earned when paid by the Debtors, and shall not be subject to disgorgement by Credit Suisse or CS Securities for any reason, including as a result of a successful Challenge or Excepted Challenge (as such terms are defined in paragraph 19 below). The Debtors hereby are authorized and directed to pay all such fees and expense reimbursements (together with

25

any applicable sales, use or similar taxes) arising in connection with any matter referred
to in the DIP Documents, without the necessity of the Debtors, the Agent or the DIP
Lenders filing any further application with this Court for approval of payment of such
fees and expense reimbursements. For the avoidance of doubt, the Debtors are
authorized to pay the reasonable fees and disbursements of the attorneys, financial
advisors and other professionals of Credit Suisse and CS Securities and the reasonable
fees and expenses of the attorneys for each of the DIP Lenders, without the necessity of
such attorneys or financial advisors or other professionals filing retention applications or
fee applications with this Court; *provided* that such attorneys, financial advisors and other
professionals shall issue invoices to the Debtors with copies to counsel to any statutory
committee and the Office of the United States Trustee, and *provided further* that the
Debtors shall promptly pay all reasonable fees and expenses not subject to objection by
the Creditors' Committee or the Office of the United States Trustee within ten business
days after receipt of such invoices, and *provided further* that Blackstone shall be paid in
accordance with the Blackstone Engagement Letter, which payment shall include the
Restructuring Fee.

　　　　10.　　*Acknowledgements of the Debtors.* In connection with the Financing, the
Debtors acknowledge, represent, stipulate and agree, *inter alia,* that:

　　　　　　　　(a)　　the Debtors have obtained all authorizations, consents and
approvals required to be obtained from, and have made all filings with and given all
notices required to be made or given to all federal, state and local governmental agencies,

26

authorities and instrumentalities in connection with the execution, delivery, performance, validity and enforceability of the DIP Documents to which any Debtor is a party;

(b)    until the DIP Pay-Out, the Debtors agree that they will not prime or seek to prime the DIP Liens provided to the Agent and the DIP Lenders under this Final Order or the DIP Documents by offering a subsequent lender or other party a lien on the DIP Collateral with a priority that is superior to or *pari passu* with the DIP Liens, *provided however*, that the Debtors may offer or provide a subsequent lender or other party a lien on the DIP Collateral with a priority that is superior to or *pari passu* with the DIP Liens (including liens on cash to secure the Debtors' obligations under a post-petition letter of credit facility prior to the DIP Pay-Out) on terms reasonably satisfactory to the Agent and the DIP Lenders in accordance with the DIP Credit Agreement; and

(c)    until the DIP Pay-Out, the Debtors shall not permit to exist any administrative expense claim against any Borrower or any Guarantor (now existing or hereafter arising) of any kind or nature whatsoever, including any administrative expenses specified in or arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507, 546(c), 726, 1113 and 1114 of the Bankruptcy Code, that has a priority that is equal to or superior to the priority of the Superpriority Claim, other than the Carve-Out.

11.    *Limitation on Charging Expenses Against Collateral.* Except to the extent of the Carve-Out, no expenses of administration of the Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under any chapter of the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of

27

law without the prior written consent of the Agent and the DIP Lenders in accordance with the DIP Credit Agreement. No such consent shall be implied from any other action, inaction, or acquiescence by the Agent or the DIP Lenders; *provided that*, the foregoing waiver of the Debtors' right to seek to surcharge the DIP Collateral shall apply solely for the benefit of the Agent and the DIP Lenders.

      12.    *The Cash Collateral*. To the extent any funds were on deposit with the Pre-Petition Lenders as of the Petition Date, including all funds deposited in, or credited to, an account of any Debtor with any Pre-Petition Lender, including any lockboxes or accounts held in the name of any Pre-Petition Lender in which the Debtors hold an interest immediately prior to the filing of the Cases, such funds (the "Deposited Funds") are subject to rights of setoff. By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of such Pre-Petition Lenders pursuant to sections 506(a) and 553 of the Bankruptcy Code. Any proceeds of the Pre-Petition Collateral (including the Deposited Funds or any other funds on deposit at the Pre-Petition Lenders or at any other institution (to the extent a valid setoff right exists) as of the Petition Date) are cash collateral of the Pre-Petition Lenders within the meaning of section 363(a) of the Bankruptcy Code. The Deposited Funds and all cash proceeds of Pre-Petition Collateral are referred to herein as "Cash Collateral." For avoidance of doubt, the Credit-Linked Deposits and the Credit-Linked Deposit Account, as such terms are defined in the Existing Credit Agreement, are not property of the Debtors' estates, and are not Cash Collateral.

28

13.    *Use of Cash Collateral.* The Debtors hereby are authorized to use all Cash Collateral of the Pre-Petition Lenders, and the Pre-Petition Lenders are directed promptly to turn over to the Debtors all Cash Collateral received or held by them, *provided* that the Pre-Petition Lenders are granted adequate protection as hereinafter set forth. The Debtors' right to use Cash Collateral shall terminate automatically on the Termination Date without further order or relief from this Court. The term "Termination Date" shall mean the earlier to occur of (i) the acceleration of any DIP Obligations and (ii) this Final Order ceasing to be in full force and effect for any reason.

14.    *Adequate Protection.* Until the DIP Pay-Out, and only to the extent that their interests in the Pre-Petition Collateral constitute valid and perfected security interests and liens as of the Petition Date, the Pre-Petition Lenders are entitled, pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Pre-Petition Collateral, including the Cash Collateral to the extent of the diminution in the value of their valid and perfected security interests and liens in the Pre-Petition Collateral as of the Petition Date, as set forth below.

(a)    As adequate protection, the Pre-Petition Lenders shall be granted the Adequate Protection Liens, the Section 507(b) Claim and the Adequate Protection Interest (each as defined and described herein), and the Roll-Up shall occur (collectively, the "Adequate Protection Obligations"), in each case subject to the Carve-Out:

(i)    *Adequate Protection Liens.* The Pre-Petition Lenders shall be granted (effective and perfected by operation of law and without the necessity of the execution by the Debtors of mortgages, security

29

agreements, pledge agreements, financing statements or other agreements

to the fullest extent as otherwise provided herein respecting the DIP Liens)

replacement and additional security interests in and liens upon the DIP

Collateral and any proceeds of a Debtor's interest in Excluded Leases in

the event of any proposed assumption, assignment or sale by the Debtors

of such interest in Excluded Leases (subject to the rights in such lease

under applicable law of the lessor or other party in interest who is party to

the lease or lease-related documents), *provided*, however, that such

security interests and liens shall not extend to Avoidance Actions (the

"Adequate Protection Liens"), as adequate protection for any diminution

in the value of their valid and perfected security interests and liens in the

Pre-Petition Collateral as of the Petition Date.  The Adequate Protection

Liens shall be subject and subordinate only to (i) the DIP Liens, (ii) the

Permitted Priority Liens and (iii) the Carve-Out.

(ii)  *Section 507(b) Claim.*  If the Adequate Protection Liens

are insufficient to provide adequate protection, then the Pre-Petition

Lenders shall be granted (subject to the payment of the Carve-Out) a

superpriority claim as provided for in section 507(b) of the Bankruptcy

Code (the "Section 507(b) Claim") in an amount equal to the aggregate

diminution in value of their interest in the Debtors' interest in the Pre-

Petition Collateral resulting from the sale, lease or use by the Debtors of

Cash Collateral and any other Pre-Petition Collateral, the priming of the

30

Pre-Petition Lenders' security interests and liens in the Pre-Petition

Collateral by the Agent and the DIP Lenders pursuant to the DIP

Documents and this Final Order, the imposition of the automatic stay

pursuant to section 362 of the Bankruptcy Code, and any foreclosure or

other disposition by the DIP Lenders of the Pre-Petition Collateral. The

priority of the Section 507(b) Claim shall be junior to the Superpriority

Claim and the Carve-Out, but senior to the Debtors' intercompany

administrative claims. For the avoidance of doubt, the Section 507(b)

Claim may be asserted against the proceeds of Avoidance Actions.

However, none of the Pre-Petition Lenders shall receive or retain any

payment, property or other amounts in respect of the Section 507(b) Claim

until the DIP Pay-Out.

      (iii)    *Adequate Protection Interest.*  Until the later of (i) the DIP

Pay-Out and (ii) the indefeasible payment in full, in cash, of the Existing

Obligations (as defined below), interest (the "Adequate Protection

Interest") on the Existing Obligations (including the Roll-Up and the PF

L/C Loans (as defined in the Existing Credit Agreement), including the

approximately $16 million of PF L/C Loans outstanding as of the

commencement of these Cases) shall be paid in cash, on a monthly basis,

at the LIBO Rate (as defined in the Existing Credit Agreement) plus

7.25% *per annum.* The PF L/C Commitment Fee (as defined in the

Existing Credit Agreement) shall be paid in cash, on a monthly basis at a

31

rate of 7.25% *per annum* plus the Credit-Linked Deposit Cost Amount (as defined in the Existing Credit Agreement). The Debtors' first payment of Adequate Protection Interest pursuant to the term loan under the Existing Credit Agreement shall be the next scheduled interest payment due on February 29, 2008 (which payment shall include all accrued interest attributable to the increase in the interest rate for the term loan, revolving loans, and letter of credit obligations as provided for in the Forbearance Agreement and Second Amendment to Credit Agreement), and the Debtors shall make payments of Adequate Protection Interest thereafter on a monthly basis. The Debtors' first payment of Adequate Protection Interest pursuant to the revolving loans (including the letter of credit obligations) under the Existing Credit Agreement shall be the next scheduled interest payment due on March 31, 2008 (which payment shall include all accrued interest attributable to the increase in the interest rate for the revolving loans and letter of credit obligations as provided for in the Forbearance Agreement and Second Amendment to Credit Agreement), and the Debtors shall make payments of Adequate Protection Interest thereafter on a monthly basis.

(iv)    *Roll-Up.* The Roll-Up shall occur. Notwithstanding the foregoing sentence, the Roll-Up shall not affect the rights of the Issuing Bank in the Credit-Linked Deposits and the Credit-Linked Deposit

32

Accounts with respect to the PF Letters of Credit (as such terms are defined in the Existing Credit Agreement).

(v)    *Additional Adequate Protection.*  The Debtors shall promptly pay the reasonable monthly fees and expenses, without the necessity of any further application to this Court for approval or payment, of (i) Latham & Watkins LLP and Duane Morris LLP, co-counsel to the Administrative Agent under the Existing Credit Agreement, (ii) Blackstone Advisory Services, L.P., financial advisor to the Administrative Agent under the Existing Credit Agreement (iii) any other professional permitted to be retained by the Administrative Agent under the Existing Credit Agreement, and (iv) attorneys for each of the DIP Lenders, *provided* that such attorneys, financial advisors and other professionals shall issue invoices to counsel to the Debtors, counsel to the Creditors' Committee, counsel to any other statutory committee and the Office of the United States Trustee, and *provided further* that the Debtors shall promptly pay all fees and expenses that are not subject to objection by the Debtors, the Creditors' Committee or the Office of the United States Trustee (the Debtors' right to object shall only extend to services performed on behalf of the Pre-Petition Lenders in their capacity as such) within ten business days after receipt of such invoices, and *provided further* that Blackstone shall be paid in accordance with the Blackstone

33

Engagement Letter, which payment shall include the Restructuring Fee (as

that term is defined in the Blackstone Engagement Letter).

(b)    Until the DIP Pay-Out, the pre-petition security interests and liens

asserted by the Pre-Petition Lenders in the Pre-Petition Collateral shall remain in place

(but shall be junior in priority to the DIP Liens).

15.    *Consent to/Sufficiency of Adequate Protection.*  The Pre-Petition Lenders

and the Administrative Agent under the Existing Credit Agreement have consented to the

adequate protection provided herein.

16.    *Debtors' Stipulations Regarding the Pre-Petition Lenders.*  Subject to

paragraph 19 of this Final Order, in connection with the Financing and the entry of this

Final Order, the Debtors acknowledge, represent, stipulate and agree, *inter alia*, that:

(a)  as of the Petition Date, the Debtors were indebted to the Pre-Petition

Lenders pursuant to the Existing Credit Agreement in the aggregate principal

amount of $565,353,000 under the revolving credit facilities and the term facility,

and $67,261,633 in face amount of issued letters of credit, each plus accrued per

diem interest with respect thereto and any fees, costs and charges provided under

the Existing Credit Agreement; and

(b)    as collateral for the Debtors' Obligations (as that term is defined in

the Existing Credit Agreement) arising under or related to the Existing Credit

Agreement (the "Existing Obligations"), the Debtors granted to the Pre-Petition

Lenders, a valid, enforceable and perfected security interest in and lien upon all or

substantially all of the Debtors' property, including without limitation, all of the

34

Debtors' accounts, inventory, equipment, general intangibles, documents, instruments and chattel paper (collectively, the "Pre-Petition Collateral").

      (c)    the Debtors further acknowledge, agree and stipulate that (w) each of the Pre-Petition Liens in and to the Pre-Petition Collateral constitutes a valid, binding, enforceable, and perfected lien in and to the Pre-Petition Collateral having the priority set forth in the Existing Credit Agreement and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (x) the Existing Obligations each constitute allowed secured claims against each Debtor and the Debtors' estates, (y) without prejudice to the rights, if any, of any other party (but subject to the limitations thereon described below in paragraph 19), the Pre-Petition Lenders assert, and the Debtors agree not to contest, that the value of the Pre-Petition Collateral is not less than the aggregate amount of the Existing Obligations as of the Petition Date and (z) no claim or cause of action held by the Debtors exists against the Pre-Petition Lenders, their officers, directors, employees, agents, subsidiaries, assigns, successors or professionals, in their respective capacities as such, whether arising under applicable state or federal law, or whether arising under or in connection with any of the Existing Credit Agreement (or the transactions contemplated thereunder), the Existing Obligations, the liens granted to the Pre-Petition Lenders or any Adequate Protection Obligations, including without limitation, any right to assert any disgorgement or recovery.

35

17.    *Perfection of DIP Liens and Adequate Protection Liens.*

(a)    All DIP Liens granted herein and in the DIP Documents to or for
the benefit of the Agent and the DIP Lenders and the Adequate Protection Loans granted
herein shall pursuant to this Final Order be, and they hereby are, valid, enforceable and
perfected, effective as of the Petition Date, and (notwithstanding any provisions of any
agreement, lease, instrument, document, the Uniform Commercial Code or any other
relevant law or regulation of any jurisdiction) no further notice, filing or other act shall be
required to effect such perfection, and all DIP Liens on any deposit accounts or securities
accounts shall, pursuant to this Final Order be, and they hereby are, deemed to confer
"control" for purposes of sections 8-106, 9-104 and 9-106 of the New York Uniform
Commercial Code as in effect as of the date hereof in favor of the Agent and the DIP
Lenders.  Except to the extent otherwise provided in this Final Order, none of the
Debtors, the Agent, the DIP Lenders or the Pre-Petition Lenders shall be required to enter
into or to obtain landlord waivers of any kind, landlord access agreements, mortgagee
waivers, bailee waivers, warehouseman waivers or similar agreements or waivers or to
file or record financing statements, mortgages, deeds of trust, leasehold mortgages,
notices of lien or similar instruments in any jurisdiction (including trademark, copyright,
trade name or patent assignment filings with the United States Patent and Trademark
Office, Copyright Office or any similar agency with respect to intellectual property), or
obtain consents from any licensor or similarly situated party in interest, or take any other
action to validate and to perfect the security interests in the DIP Liens and Adequate
Protection Liens granted pursuant to this Final Order.

36

(b)    The Debtors, the Agent, the DIP Lenders and the Pre-Petition

Lenders are hereby authorized, but not required, to file or record financing statements,

mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in

any jurisdiction (including trademark, copyright, trade name or patent assignment filings

with the United States Patent and Trademark Office, Copyright Office or any similar

agency with respect to intellectual property) or take any other action to validate and

perfect the liens and security interests granted hereunder.  Whether or not the Agent on

behalf of the DIP Lenders or any of the Pre-Petition Lenders shall choose to file or record

such financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien

or similar instruments in any jurisdiction (including trademark, copyright, trade name or

patent assignment filings with the United States Patent and Trademark Office, Copyright

Office or any similar agency with respect to intellectual property) or otherwise confirm

perfection of the liens and security interests granted hereunder, such liens and security

interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not

subject to challenge, dispute or subordination, at the time and on the date of entry of the

Interim Order.  Upon the request of the Agent, the Pre-Petition Lenders, without any

further consent of any party, are authorized and directed to take, execute and deliver such

instruments (in each case without representation or warranty of any kind) to enable the

Agent to further validate, perfect, preserve and enforce the DIP Liens, and to provide

additional evidence of perfection.

(c)    A copy of this Final Order may, in the discretion of any of the

Agent, the DIP Lenders, and the Pre-Petition Lenders, be filed with or recorded in any

37

filing or recording office in addition to or in lieu of such financing statements, mortgages, deeds of trust, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, trade name or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar agency with respect to intellectual property), and all filing offices are hereby authorized and directed to accept such copy of this Final Order for filing and recording. The Agent and the DIP Lenders may deliver a copy of this Final Order to any third parties having possession or control of DIP Collateral, Cash Collateral or Pre-Petition Collateral.

(d)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment by the Agent, any DIP Lender or any landlord of any fees, taxes or obligations to any governmental entity, for any Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or other post-petition collateral related thereto, shall be deemed to have no force and effect with respect to the transactions granting DIP Liens or Adequate Protection Liens in such leasehold interest in favor of the Agent, the DIP Lenders, and the Pre-Petition Lenders, respectively, in accordance with the terms of the DIP Documents or this Final Order (though the Debtors may be required to pay recordation or filing fees); *provided*, that nothing in this sentence shall apply to Excluded Leases (or to the Serve Lease, *provided*, that all of the Debtors' rights under the Serve Lease and the Debtors' authority to grant liens to the Agent on the leasehold interest under the Serve Lease are expressly preserved).

38

18.    *Preservation of Rights Granted Under this Final Order.*

(a)    No claim or lien having a priority superior to or *pari passu* with those granted to the Agent, the DIP Lenders and the Pre-Petition Lenders by this Final Order shall be granted or allowed until the DIP Pay-Out, except as provided in this Final Order or in the DIP Documents. The DIP Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Until the DIP Pay-Out, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Documents and a termination of the right to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this Final Order without the prior written consent of the Agent and the DIP Lenders in their sole discretion, and no such consent shall be implied by any other action, inaction or acquiescence by the Agent or the DIP Lenders, (ii) an order dismissing any of the Cases, (iii) any plan of reorganization that does not provide for the DIP Pay-Out or (iv) any motion involving the sale of substantially all of the Debtors' assets that does not provide for the DIP Pay-Out. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide that (x) the Superpriority Claim, the Section 507(b) Claim, priming liens, security interests and replacement security interests granted to the Agent, the DIP Lenders and the Pre-Petition Lenders, as applicable, pursuant to this Final Order shall

39

continue in full force and effect and shall maintain their priorities as provided in this Final Order until the DIP Pay-Out and until all Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claim, Section 507(b) Claim, priming liens, security interests and replacement security interests shall, notwithstanding such dismissal, remain binding on all parties in interest) and (y) subject to the provisions of section 350 of the Bankruptcy Code, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests or replacement security interests referred to in (x) above.

(c)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Agent and the Pre-Petition Lenders of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any security interest, lien or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any DIP Obligations and Adequate Protection Obligations incurred by the Debtors to the Agent, the DIP Lenders, or the Pre-Petition Lenders prior to the actual receipt of written notice by the Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the provisions of this Final Order, and the Agent and the DIP Lenders shall be entitled to all the rights, remedies,

privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Final Order

and pursuant to the DIP Documents with respect to all DIP Obligations.

    (d)  Except as expressly provided in this Final Order or in the DIP

Documents, the DIP Liens, Adequate Protection Liens, the Superpriority Claim, the

Section 507(b) Claim and all other rights and remedies of the Agent, the DIP Lenders and

the Pre-Petition Lenders granted by the provisions of this Final Order and the DIP

Documents shall survive, and shall not be modified, impaired or discharged by the entry

of an order converting any of the Cases to a case under chapter 7, dismissing any of the

Cases, terminating the joint administration of the Cases or by any other act or omission,

nor shall the DIP Liens, the Superpriority Claim or any of the other rights and remedies

of the Agent, the DIP Lenders or the Pre-Petition Lenders granted by the provisions of

this Final Order and the DIP Documents be modified, impaired or discharged by the entry

of an order confirming a plan of reorganization in any of the Cases and, pursuant to

section 1141(d)(4) of the Bankruptcy Code, the Debtors will waive any discharge as to

any remaining DIP Obligations. The terms and provisions of this Final Order and the

DIP Documents shall continue in the Cases, in any successor cases if the Cases are

substantively consolidated, or in any superseding chapter 7 cases under the Bankruptcy

Code, and the DIP Liens, the Superpriority Claim, the Adequate Protection Obligations

and all other rights and remedies of the Agent, the DIP Lenders and the Pre-Petition

Lenders granted by the provisions of this Final Order and the DIP Documents shall

continue in full force and effect until the DIP Pay-Out.

41

19.    *Limitation on Use of Financing Proceeds and Collateral/Bar Date.*

(a)    Notwithstanding anything herein or in any other order by this

Court to the contrary (but subject to paragraph 19(d) hereof), no borrowings, Cash

Collateral, DIP Collateral or the Carve-Out may be used (i) to object, contest or raise any

defense to, the validity, perfection, priority, extent or enforceability of any amount due

under the DIP Documents, or the liens or claims granted under this Final Order or the

DIP Documents, (ii) to assert any action for preferences, fraudulent conveyances, other

avoidance action claims or any other claims, counterclaims or causes of action,

objections, contests or defenses against the Agent, the DIP Lenders, or their respective

agents, affiliates, representatives, attorneys or advisors, in respect of the DIP Documents,

(iii) to prevent, hinder or otherwise delay the Agent's or the DIP Lenders' assertion,

enforcement or realization on the Cash Collateral or the DIP Collateral in accordance

with the DIP Documents or this Final Order, (iv) to seek to modify any of the rights

granted to the Agent or the DIP Lenders under this Final Order or under the DIP

Documents, in each of the foregoing cases without such parties' prior written consent or

(v) to pay any amount on account of any claims arising prior to the Petition Date unless

such payments on account of such pre-petition claims are approved by the Interim Order

or this Final Order or are consistent with the Final Budget (as defined in the DIP Credit

Agreement) and approved by a contemporaneous or subsequent order of this Court.

(b)    In addition to and not in limitation of the foregoing, no

borrowings, Cash Collateral, DIP Collateral or the Carve-Out may be used by any party

in interest, subject to the proviso below, (i) to object, contest or raise any defense to, the

42

validity, perfection, priority, extent or enforceability of the Existing Obligations or the

Adequate Protection Obligations granted to the Pre-Petition Lenders under this Final

Order, (ii) to assert any action for preferences, fraudulent conveyances, other avoidance

power claims or any other claims or causes of action, objections or defenses against the

Pre-Petition Lenders, (iii) to prevent, hinder or otherwise delay the Pre-Petition Lenders'

assertion or enforcement of any of their rights and remedies granted pursuant to this Final

Order or (iv) to seek to modify any of the rights granted hereunder to the Pre-Petition

Lenders, in each of the foregoing cases without such parties' prior written consent;

*provided however*, that the foregoing limitations in this subparagraph shall not apply to

(i) any actions taken by the Debtors or other parties in interest in opposition to any

requests by any of the Pre-Petition Lenders for additional adequate protection or other

relief and (ii) claims for services rendered by the professionals retained by the Creditors'

Committee in an amount not to exceed $150,000 in the aggregate (the "Challenge

Expense Cap") in connection with the investigation of the validity, extent, priority,

avoidability, or enforceability of the Existing Obligations or the Pre-Petition Lenders'

Pre-Petition Liens on and security interests in any of the Pre-Petition Collateral and any

claims or causes of action against the Pre-Petition Lenders, to the extent such fees and

expenses are allowed pursuant to sections 330, 331 and 503(b) of the Bankruptcy Code.

      (c)    Notwithstanding anything herein to the contrary, including the

Debtors' stipulations and releases herein solely as they relate to the Pre-Petition Lenders,

the Creditors' Committee (or any other party in interest with the requisite standing,

including a subsequently appointed chapter 7 trustee, but other than the Debtors), shall

NY\1374223.8

have 99 days after the Petition Date, or (subject to paragraph 19(d)) such other time period as this Court shall determine (the "<u>Investigation Termination Date</u>") to file, on behalf of the Debtors' estates any claims, causes of action or proceedings arising from or related to the matters subject to the Debtors' stipulations, including those in paragraph 16 of this Final Order, against such parties (a "<u>Challenge</u>"), *provided, however*, that the Creditors' Committee's authority to pursue claims, causes of action or proceedings with respect to or in connection with: (x) the Debtors' pre-petition sale/leaseback transactions, (y) the going-concern valuation of the Debtors' enterprise and the value of the collateral securing the Debtors' obligations to the Pre-Petition Lenders under the Existing Credit Agreement and (z) the characterization of any payment made to the Pre-Petition Lenders pursuant to paragraphs 14(a)(iii) and 14(a)(v) of this Final Order (each, an "<u>Excepted Challenge</u>"), shall not terminate on the Investigation Termination Date. Without further order of this Court, the Creditors' Committee is vested with standing to investigate, file, prosecute, or settle any Challenge or Excepted Challenge.

(d)      The Creditors' Committee's authority to assert a Challenge or an Excepted Challenge with respect to or in connection with the Roll-Up shall be limited to the issue of whether the Pre-Petition Lenders' lack of perfected pre-petition security interests in certain property of the Debtors results in the Pre-Petition Lenders not possessing liens on the going-concern value of the Debtors' enterprise. The deadline by which the Committee may assert a Challenge or an Excepted Challenge set forth in the preceding sentence shall be 99 days after the Petition Date, and no party shall request an extension of such deadline from this Court. The Challenge Expense Cap shall not apply

44

to a Challenge or Excepted Challenge brought by the Creditors' Committee solely in connection with this paragraph 19(d). Irrespective of paragraph 19(a) of this Final Order, all professional fees and expense reimbursements of the Creditors' Committee in asserting, prosecuting or settling a Challenge or Excepted Challenge under this paragraph 19(d) shall be paid to the extent allowed by this Court, subject to any limitation in the available amount of the Carve-Out, if applicable.

(e)    If, with respect to the Pre-Petition Lenders, (i) a Challenge is not filed on or before the Investigation Termination Date or (ii) a final order is entered denying a Challenge or an Excepted Challenge in its entirety, then the Debtors, all official committees and any other party in interest (including without limitation a receiver, administrator, examiner or trustee appointed in any of the Cases or in any jurisdiction) without further action by any party or this Court and the Committee and any other party in interest (including without limitation a receiver, administrator, or trustee appointed in any of the Cases or in any jurisdiction) shall thereafter be forever barred from bringing such Challenge or Excepted Challenge, and the Existing Obligations shall be allowed in full without defense, offset, counterclaim or reduction, and the Pre-Petition Liens of the Pre-Petition Lenders shall be deemed valid, enforceable, perfected, unavoidable and not subject to subordination or recharacterization under applicable nonbankruptcy law or the Bankruptcy Code, in each case without further notice to or order of this Court.

(f)    In the event of a successful Challenge or Excepted Challenge, this Court shall fashion an appropriate remedy after hearing from all parties in

45

interest, *provided* that any reduction in the amount of the Pre-Petition Lenders' secured claims or recharacterization of Adequate Protection Interest shall first be applied to reduce the amount of Pre-Petition Lenders' secured claims on account of the obligations under the Existing Credit Agreement that are not included in the Roll-Up, and *provided further* that the Agent and the DIP Lenders reserve the right to assert that all fees and expense reimbursements paid by the Debtors pursuant to paragraph 14(a)(v) of this Final Order were properly characterized as adequate protection and should not be disgorged or applied to the principal obligations under the Existing Credit Agreement, and the Creditors' Committee reserves the right to assert the contrary.

20.    *Final Order Governs.*  Except as otherwise specifically provided in this Final Order, in the event of any conflict between the provisions of this Final Order, the Interim Order, the Motion and the DIP Documents, the provisions of this Final Order shall govern.

21.    *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon all parties in interest in the Cases, including the Agent, the DIP Lenders, the Pre-Petition Lenders, all official committees appointed in the Cases and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Agent, the DIP Lenders, the Pre-Petition Lenders and the Debtors and their respective successors and assigns; *provided however*, that the Agent and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee, chapter 11

46

trustee, examiner or similar responsible person appointed for the estates of the Debtors. In determining to make any loan under the DIP Documents or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the Agent and the DIP Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).

22.    *Proofs of Claim.*  Notwithstanding any order of this Court establishing a claims bar date or administrative expense bar date in the Cases, the Agent and the DIP Lenders hereby are relieved of any obligation or requirement to file proofs of claim in the Cases with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.  Moreover, notwithstanding any order of this Court establishing a claims bar date in the Cases, the administrative agent under the Existing Credit Agreement and the Pre-Petition Lenders are relieved of any obligation or requirement to file proofs of claim in the Cases with respect to any of the Debtors' obligations under the Existing Credit Agreement.

Dated:    February 22, 2008
          Wilmington, Delaware

_____
MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

47

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------x
In re:                                    :    Chapter 11
                                          :
DOMAIN, INC., ct al.[1],                  :    Case No. 08-10132 (PJW)
                                          :
            Debtors.                      :    Jointly Administered
                                          :    Related to Docket No. 42
-------------------------------------------------------x

**FINAL ORDER (1) AUTHORIZING INCURRENCE OF SECURED INDEBTEDNESS
WITH PRIORITY OVER ALL OTHER SECURED INDEBTEDNESS AND WITH
ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING SECURITY INTERESTS,
(3) PROVIDING FOR ADEQUATE PROTECTION, (4) APPROVING AGREEMENTS
RELATING TO THE FOREGOING AND
(5) GRANTING OTHER RELIEF**

THIS MATTER having come before the Court upon motion (the "**DIP Motion**") by

Domain, Inc. and Domain Home Holding Company, LLC (each a "**Debtor**" and collectively the

"**Debtors**"), each as a debtor and debtor-in-possession in the above captioned chapter 11 cases

(collectively, the "**Cases**") seeking, among other things, entry of a final order (this "**Final

Order**") authorizing the Debtors to:

(i)      Obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d)

of the Bankruptcy Code, up to the aggregate committed amount of $6,000,000 (on terms and

conditions more fully described herein) secured by first priority priming perfected liens (as

defined in section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the

"**Bankruptcy Code**") and referred to and defined in more detail herein as the "**DIP Liens**") on

property of the Debtors' estates pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the

---

[1]      The Debtors are Domain, Inc. and Domain Home Holding Company, LLC.

Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)    Approve (a) the financing arrangement (as amended, modified and in effect from time to time, the **"DIP Credit Facility"**) as provided for in that certain Debtor in Possession Credit and Security Agreement substantially in the form filed of record in the Cases and introduced into evidence at the final hearing on the DIP Motion, and as such may be modified by this Final Order (the **"DIP Credit Agreement"**) by and among the Debtors and Wells Fargo Bank N.A. acting through its Wells Fargo Business Credit operating division (the **"DIP Lender"**) and (b) the incurrence by the Debtors of the **"Obligations"** under and as defined in the DIP Credit Agreement (collectively, the **"DIP Obligations"**);

(iii)    Authorize the use of the proceeds of the DIP Credit Facility (net of any amounts used to pay interest and fees under the DIP Credit Agreement) in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and strictly in accordance with the Budget (as defined below) solely for (a) necessary and reasonable costs and expenses incurred in connection with the liquidation of the assets of the Debtors, the wind down of the Debtors' estates and administration of the Cases, in such amounts not to exceed the amounts set forth in the Budget, and (b) payment of such prepetition expenses as contemplated in the Budget or as consented to by the DIP Lender in its sole discretion and as approved by the Bankruptcy Court;

(iv)    Grant the DIP Lender, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, first priority priming perfected liens, subject only to the Carve-Out (as defined below), upon all of the Debtors' real and personal property as provided in and as contemplated by this Final Order, the DIP Credit Facility and the DIP Credit Agreement;

(v)     Grant the DIP Lender, pursuant to section 364(c)(1) of the Bankruptcy Code, superpriority administrative claim status in respect of all DIP Obligations, subject to the Carve Out as provided herein;

(vi)    Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and this Final Order;

(vii)   Grant the relief requested in the DIP Motion on a final basis; and

(viii)  Waive the ten (10) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(h).

The Court having considered the DIP Motion, the Declaration of Gary A. Nacht in support of the Debtors' first day motions and orders, the exhibits attached thereto, the DIP Credit Facility and the DIP Credit Agreement, and the evidence submitted at the hearing on this Final Order (the **"Final Hearing"**); and in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), due and proper notice of the DIP Motion and the Final Hearing having been given; and a Final Hearing having been held and concluded on February 8, 2008; and it appearing that approval of the final relief requested in the DIP Motion is otherwise fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Debtors are unable to secure unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code section 503(b)(1); and there is adequate protection of the interests of holders of liens on the property of the estates on which liens are to be granted; and all objections, if any, to

the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and

after due deliberation and consideration, and for good and sufficient cause appearing therefore:

**BASED UPON THE RECORD ESTABLISHED AT THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.  **Petition Date**

On January 18, 2008 (the "**Petition Date**"), the Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware. The Debtors have filed a motion requesting joint administration of the Cases. The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these cases.

B.  **Jurisdiction and Venue**

This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.  **Committee Formation**

An official committee of unsecured creditors (the "**Committee**") was appointed in the Cases on January 28, 2008.

D.  **Notice**

Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by telecopy, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the Securities and Exchange Commission, (iii) the Internal Revenue Service, (iv) the Debtors' thirty (30) largest unsecured

creditors, (v) counsel to the Pre-Petition Credit Agreement Lenders (as defined below), (vi) counsel to AGA Foodservice, Inc. ("AGA"), the Debtors' pre-petition junior secured creditor, (vii) counsel to the Committee; and (vii) counsel to the DIP Lender. Under the circumstances, such notice of the Final Hearing and the relief requested in the DIP Motion is due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(c).

### E. Debtors' Acknowledgements and Agreements

Subject to paragraphs 8 through 9 herein, after consultation with their attorneys and financial advisors, but without prejudice to the rights of parties in interest as set forth in paragraph 7 below, the Debtors admit, stipulate, acknowledge and agree that (collectively, paragraphs E (i) through E (iv) hereof shall be referred to herein as the "**Debtors' Stipulations**"):

   (i)    **Pre-Petition Credit Liens**. Prior to the commencement of the Cases, the Pre-Petition Credit Agreement Lenders (as defined below) made loans and advances and provided credit accommodations to the Debtors pursuant to (i) the Credit and Security Agreement, dated as of June 20, 2007, by and between Wells Fargo Bank, National Association, Acting though its Wells Fargo Business Credit operating division (collectively the "**Pre-Petition Credit Agreement Lenders**" and Debtors, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date (collectively, the "**Pre-Petition Credit Agreements**"), copies of which are included as Exhibit "A" in the Exhibit Supplement to the DIP Motion, and (ii) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of Pre-Petition Credit Agreement Lenders, including, without limitation, the security agreements, notes, guarantees, mortgages, and Uniform Commercial Code ("UCC") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto;

   (ii)    **Pre-Petition Obligations Amount**. As of the Petition Date, the aggregate amount of all loans and other Pre-Petition Obligations totaled the aggregate amount of $4,905,215.20, plus all costs, expenses, fees (including attorneys' fees and legal expenses) and other charges, plus any further advances and less any collected and applied proceeds (collectively the "**Pre-Petition Debt**").

(iii)    **Pre-Petition Collateral.**    As of the Petition Date, the Pre-Petition Obligations are fully secured pursuant to the Pre-Petition Credit Agreements by security interests and liens (the **"Pre-Petition Credit Liens"**) granted by the Debtors to the Pre-Petition Credit Agreement Lenders upon all of the Debtors' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, Investment Property, letter-of-credit rights, letters of credit, all sums on deposit in any Collateral Account, and any items in any Lockbox; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of the Borrower that now or hereafter come into the possession, custody, or control of the Lender; (vii) all sums on deposit in the Special Account; (viii) proceeds of any and all of the foregoing; (ix) books and records of the Debtors, including all mail or electronic mail addressed to the Debtors; and (x) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Debtors now have or hereafter acquire any rights (each as defined in the Pre-Petition Credit Agreements) (collectively, the **"Pre-Petition Collateral"**),[2] with priority over all other liens except any liens otherwise permitted by the Pre-Petition Credit Agreements (to the extent any such permitted liens are valid, properly perfected, unavoidable, and senior, they are referred to herein as the **"Permitted Prior Liens"**).[3]  To avoid any doubt, the term "Permitted Prior Liens" does not include, and specifically excludes, the pre-petition liens and claims of Aga Foodservice, Inc., which pre-petition liens and claims are contractually subordinated to, and junior to, the liens and claims of the Pre-Petition Credit Agreement Lenders and the DIP Lenders.

The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Credit Agreements Lenders' liens, claims and/or security interests in the Pre-Petition Collateral.

(iv)    **Pre-Petition Credit Agreements.**  (a) As of the Petition Date, (i) the Pre-Petition Credit Liens are valid, binding, enforceable, and perfected first-priority

---

[2]    The acknowledgment and agreement by Debtors of the Pre-Petition Obligations and the liens, rights priorities and protections granted to or in favor of the Pre-Petition Credit Agreement Lenders, as set forth herein and in the Pre-Petition Credit Agreements, shall constitute a proof of claim on behalf of the Pre-Petition Credit Agreement Lenders in these Cases.

[3]    Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, perfected and unavoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the DIP Lenders and the Committee to challenge the validity, priority, perfection and extent of any such Permitted Prior Lien and/or security interest.

liens subject only to any Permitted Prior Liens and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Pre-Petition Debt constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Credit Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Debt exists, and no portion of the Pre-Petition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Debt constitutes allowed secured claims, and (b) on the date that this Final Order is entered, the Debtors have waived, discharged and released the Pre-Petition Credit Agreement Lenders, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Pre-Petition Debt, (y) to challenge or object to the security for the Pre-Petition Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or chooses in action arising out of, based upon or related to the Pre-Petition Credit Agreement or otherwise.

In addition, AGA asserts a second-priority lien and security interest in the Pre-Petition Collateral in the original principal amount of $4 million, plus interest and other fees and expenses. The Debtors, the Trustee (defined below) and the Committee reserve the right to challenge or object to AGA's asserted claims, liens and security interest and to pursue any and all claims, objections, challenges, causes of action and/or choses in action against AGA.

F.    **Findings Regarding the Post-Petition Financing**

(i)    **Need for Post-Petition Financing**.  A need exists for the Debtors to obtain funds from the DIP Credit Facility in order to continue operations and to administer and preserve the value of their estates. The ability of the Debtors to finance their operations requires the availability of working capital from the DIP Credit Facility, the absence of which would immediately and irreparably harm the Debtors, their estates, their creditors and equity holders and the possibility for a successful sale of the Debtors' assets.

(ii)    **No Credit Available on More Favorable Terms**.  The Debtors have been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors are also unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and

conditions than those provided in the DIP Credit Agreement and this Final Order. The Debtors are unable to obtain credit for borrowed money without the granting of liens on their assets.

(iii)    **Prior Liens**. Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens, including the Expeditors Liens (as defined below) are valid, senior, perfected and unavoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Prior Lien, including the Expeditors Liens, and or security interest. For the avoidance of doubt, subject to the liens of the DIP Lender, as provided for herein, the Pre-Petition Credit Liens have priority over and above all other liens except any liens which were valid, senior, perfected and otherwise unavoidable as of the Petition Date.

G.    **Section 506(c) Waiver**

The DIP Lender, and the Pre-Petition Credit Agreement Lenders are granted a waiver of the provisions of sections 506(c) of the Bankruptcy Code as part of the DIP Credit Facility.

H.    **Use of Proceeds of the DIP Credit Facility**

Proceeds of the DIP Credit Facility (net of any amounts used to pay interest, fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and strictly in accordance with the budget attached hereto as Exhibit A (the "**Budget**"), solely for (a) necessary and reasonable costs and expenses incurred in connection with the liquidation of the assets of the Debtors, the wind down of the Debtors' estates and administration of the Cases, in such amounts not to exceed the amounts set forth in the Budget, and and (b) payment of such prepetition expenses as contemplated in the Budget or as consented to by the DIP Lender in its sole discretion and as

approved by the Bankruptcy Court; provided, however, that notwithstanding anything in Section 1.1 of the DIP Credit Agreement in the definition of "Borrowing Base" or elsewhere therein to the contrary, the Budget shall control for all borrowing purposes under the DIP Credit Agreement and this Final Order.

I.    **Application of Proceeds of Collateral to Pre-Petition Debt**

Net proceeds of the sale or other disposition of the Collateral (as defined below) shall be applied: (a) first, to permanently reduce the Pre-Petition Debt, and (b) second, to reduce the DIP Obligations (with exceptions to be mutually agreed) in accordance with the DIP Credit Agreement. Payment of the Pre-Petition Debt in accordance with this Final Order is necessary as the Pre-Petition Credit Agreement Lenders will not otherwise consent to the priming of the Pre-Petition Liens. Such payment will not prejudice the Debtors or their estates, because payment of such amounts is subject to the rights of parties-in-interest under paragraph 7 below.

J.    **Adequate Protection for Wells Fargo**

As a result of the grant of the DIP Liens to the DIP Lender, the Pre-Petition Credit Agreement Lenders are entitled to receive adequate protection pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any diminution in the value of their interest in the Pre-Petition Collateral resulting from the Debtors' use, sale or lease of the Pre-Petition Collateral during the Cases. As adequate protection, the Pre-Petition Credit Agreement Lenders will receive: (1) the Pre-Petition Credit Agreement Replacement Liens, (2) the Pre-Petition Superpriority Claim, and (3) the Adequate Protection Payments (each as defined below).

K.    **Adequate Protection for AGA**

As a result of the grant of the DIP Liens to the DIP Lender, AGA is entitled to receive adequate protection pursuant to sections 361, 362, and 363 of the Bankruptcy Code for any

diminution in the value of their interest in Pre-Petition Collateral resulting from the Debtors' use, sale, or lease of the Pre-Petition Collateral during the Cases. As adequate protection, AGA will receive the AGA Replacement Liens (as defined below).

L.    **Section 552**

In light of their agreement to (i) subordinate their liens and superpriority claims to the Carve Out and (ii) consent to the creation and implementation of the Sharing Trust (defined below) provided for in paragraphs 10-11 below, including the division of Sharing Proceeds as provided for in paragraphs 12-13 below, the DIP Lender and the Pre-Petition Credit Agreement Lenders are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

M.    **Extension of Financing**

The DIP Lender has indicated a willingness to provide financing to the Debtors in accordance with the DIP Credit Agreement and subject to (i) the entry of this Final Order, and (ii) findings by the Court that such financing is essential to the Debtors' estates, that the DIP Lender is a good faith financier, and that the DIP Lender's claims, superpriority claims, security interests and liens and other protections granted pursuant to this Final Order and the DIP Credit Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

N.    **Business Judgment and Good Faith Pursuant to Section 364(e)**

The terms and conditions of the DIP Credit Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP

Credit Facility was negotiated in good faith and at arms' length between the Debtors, the DIP

Lender and the Pre-Petition Credit Agreement Lenders.  Use of the proceeds to be extended

under the DIP Credit Facility will be so extended in good faith, and for valid business purposes

and uses, consistent with the Budget, the consequence of which is that the DIP Lender and is

entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

O.     **Entry of Final Order**

For the reasons stated above, the Debtors have requested immediate entry of this Final

Order.

**NOW, THEREFORE,** on the DIP Motion of the Debtors and the record before the

Court with respect to the DIP Motion, and with the consent of the Debtors, the Pre-Petition

Credit Agreement Lenders, and the DIP Lender to the form and entry of this Final Order, and

good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.     **Motion Granted**

The DIP Motion is granted in its entirety subject to the terms and conditions set forth in

this Final Order and the DIP Credit Agreement.

2.     **DIP Credit Agreement Authorization**

(a)     **Approval of Entry Into DIP Credit Agreement**. The Debtors are

expressly and immediately authorized, empowered and directed to execute and deliver the DIP

Credit Agreement and to incur and to perform the DIP Obligations in accordance with, and

subject to, the terms of this Final Order and the DIP Credit Agreement, and to deliver all

instruments and documents which may be required or necessary for the performance by the

Debtors under the DIP Credit Facility and the creation and perfection of the DIP Liens described in and provided for by this Final Order and the DIP Credit Agreement. The Debtors are hereby authorized and directed to pay the principal, interest, fees, expenses and other amounts described in the DIP Credit Agreement and all other documents comprising the DIP Credit Facility as such become due, without limitation, reasonable lender fees, facility fees, arranger fees, commitment fees, letter of credit fees as provided for in the DIP Credit Agreement which amounts should not otherwise be subject to approval of this Court. The Debtors are authorized to pay all reasonable attorneys', financial advisors' and accountants' fees and disbursements within ten (10) days after the Debtor, the Committee, AGA and the U.S. Trustee are provided copies of invoices detailing such fees and disbursement to the DIP Lender; provided, however, that unresolved disputes as to the reasonableness of any professional fees and expenses may be determined by the Court. If no objections are filed with the Court any such objections shall be deemed waived. Upon execution and delivery, the DIP Credit Agreement shall represent valid and binding obligations of the Debtors enforceable against each of the Debtors in accordance with its terms.

(b)    **Authorization to Borrow**. In order to enable them to continue to operate their business, and subject to the terms and conditions of this Final Order, the DIP Credit Agreement, documents comprising the DIP Credit Facility, and the Budget (as defined below) the Debtors are hereby authorized under the DIP Facility to request extensions of credit up to a total committed amount of $6,000,000 (inclusive of the Pre-Petition Debt), of which the entire amount shall be authorized, to the extent provided in the DIP Credit Agreement, subject to the Budget.

(c)    **Application of DIP Proceeds**. The Debtors are authorized to borrow the DIP Loan under the DIP Credit Facility, and the proceeds of the DIP Credit Facility (net of any

amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and strictly in accordance with the Budget) solely for (a) necessary and reasonable costs and expenses incurred in connection with the liquidation of the assets of the Debtors, the wind down of the debtors' estates and administration of the Cases, in such amounts not to exceed the amounts set forth in the Budget, and (b) payment of such prepetition expenses as contemplated in the Budget or as consented to by the DIP Lender in its full discretion, and as approved by the Bankruptcy Court, provided, however, that notwithstanding anything in Section 1.1 of the DIP Credit Agreement in the definition of "Borrowing Base" or elsewhere therein to the contrary, the Budget shall control for all borrowing purposes under the DIP Credit Agreement and this Final Order.

(d)     **Conditions Precedent**.  The DIP Lender shall have no obligation to make any loan under the DIP Credit Agreement unless (i) the conditions precedent to make such loan under the DIP Credit Agreement have been satisfied in full or waived by the DIP Lender in its sole discretion, and (ii) the requested advance is to be used to fund necessary and reasonable costs and expenses incurred in connection with the liquidation of the assets of the Debtors, the wind down of the Debtors' estates and administration of the Cases, in an amount consistent with the applicable line item in the Budget.

(e)     **Post-Petition Liens**.  Effective immediately upon the execution of this Final Order, DIP Lender is hereby granted pursuant to sections 361, 362, 364(c)(2), 364(e)(3), and 364(d) of the Bankruptcy Code, priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests and liens (collectively, the "**DIP Liens**"), senior and superior in priority to all other secured and unsecured

creditors of the Debtors' estates, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following: All of the Debtors' Accounts, chattel paper and electronic chattel paper, deposit accounts, documents, Equipment, General Intangibles, goods, instruments, Inventory, Investment Property, leases of real property (provided however, that to the extent applicable non-bankruptcy law or if a given non-residential real property lease by its express terms prohibits the granting of a lien on any particular leasehold interest, the DIP liens shall extend only to the proceeds of such leasehold interest), letter-of-credit rights, letters of credit, all sums on deposit in any Collateral Account, and any items in any Lockbox; together with (i) all substitutions and replacements for and products of any of the foregoing; (ii) in the case of all goods, all accessions; (iii) all accessories, attachments, parts, equipment and repairs now or hereafter attached or affixed to or used in connection with any goods; (iv) all warehouse receipts, bills of lading and other documents of title now or hereafter covering such goods; (v) all collateral subject to the Lien of any Security Document; (vi) any money, or other assets of the Debtors that now or hereafter come into the possession, custody, or control of the Lender; (vii) all sums on deposit in the Special Account; (viii) proceeds of any and all of the foregoing; (ix) books and records of the Debtors, including all mail or electronic mail addressed to the Debtors; and (x) all of the foregoing, whether now owned or existing or hereafter acquired or arising or in which the Debtors now has or hereafter acquires any rights; and shall include the Debtors' causes of action arising under Chapter 5 of the Bankruptcy Code and any proceeds thereof (collectively, the "**DIP Collateral**[4]"and, together with the Pre-Petition Collateral, the "**Collateral**")

---

[4] All defined terms used in the description of the DIP Collateral as set forth in **paragraph 7** shall have the meanings ascribed thereto in the DIP Credit Agreement. All terms not specifically defined in the DIP Credit Agreement and used in **paragraph 7** shall have the meanings assigned to such term in Article 8 or 9

(f)    **DIP Lien Priority**.  The DIP Liens to be created and granted to the DIP Lender, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to any of the DIP Collateral, and are subject only to: (w) the Carve Out, (x) the Prior Permitted Liens, (y) the liens and security interest, if any, of Expeditors International of Washington, Inc. ("**Expeditors**"), to the extent that Expeditors' said lien and security interest, if any, are valid, senior, perfected, and otherwise unavoidable as of the Petition Date (the "**Expeditors Lien**") and (z) the creation and implementation of the Sharing Trust in accordance with paragraphs 10-13 below, such DIP Liens shall secure all DIP Obligations.  The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases except for the Prior Permitted Liens and the Expeditors Lien; and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), and/or upon the dismissal of any of the Cases.  The DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

(g)    **Enforceable Obligations**.    The DIP Credit Agreement and DIP Obligations shall constitute and evidence the valid and binding obligations of the Debtors, which obligations shall be enforceable against the Debtors, their estates and any successors thereto and their creditors, in accordance with their terms.

(h)    **Protection of DIP Lender and Other Rights**.  The DIP Lender shall have no obligation to make any extension of credit pursuant to the DIP Credit Facility unless all

---

of the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State

of the conditions precedent to the making of such extension of credit under the DIP Credit Facility are satisfied or waived by the DIP Lender in its sole discretion. From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Final Order and strictly in compliance with the Budget.

(i)     **Superpriority Administrative Claim Status.** Subject to the Carve Out and the provisions relating to the Sharing Trust under paragraphs 10-13 below, all DIP Obligations shall be an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens, the "**DIP Protections**") with priority (except as otherwise provided in paragraph 8 below) in any Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330 of the Bankruptcy Code (except as otherwise provided in paragraph 8 below), 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114, provided, however, that the Pre-Petition Superpriority Claim (as defined below) shall be granted a priority claim that is *pari passu* with the DIP Superpriority Claim. Other than the Carve Out and the Sharing Trust provisions of paragraphs 10-13 below, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any successor cases, and no priority claims are, or will be, senior to, prior to, or (subject to the Pre-Petition Superpriority Claim as set forth herein)

---

of Delaware.

on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lender arising hereunder.

3.    **Authorization to Use Proceeds of DIP Credit Agreement**

Pursuant to the terms and conditions of this Final Order, the DIP Credit Facility and the DIP Credit Agreement, and strictly in accordance with the Budget the Debtors are authorized to use the advances under the DIP Credit Agreement (during the period commencing immediately after the entry of the Final Order and terminating upon the earlier to occur of notice being provided by the Debtors that an Event of Default (as defined in the DIP Credit Agreement) has occurred and is continuing, and the Termination Date (as defined in the DIP Credit Agreement), in accordance with the Budget. The Budget may be updated (with the consent and/or at the request of the DIP Lender) from time to time, provided that such updated Budget shall be in form and substance acceptable to the DIP Lender in its sole discretion, and the Debtors shall be required always to comply with the Budget pursuant to the terms of the DIP Credit Facility. As set forth above, the Debtors' authorization to use the proceeds of the DIP Credit Agreement shall terminate upon notice being provided by the DIP Lenders to the Debtors that an Event of Default has occurred and is continuing, provided, however, the Debtors may use the DIP Credit Agreement solely to meet payroll obligations and pay necessary and reasonable costs and expenses essential to the preservation of the Debtors and their estates and as agreed by the DIP Lender, provided that any such payments are made in a manner consistent with the terms and provisions of the Budget. Nothing in this Final Order shall authorize the disposition of any assets of the Debtors or their estates outside the ordinary course of business or other proceeds resulting therefrom, except as permitted in the DIP Credit Facility and the DIP Credit Agreement and strictly in accordance with the Budget.

4.    <u>**Adequate Protection for Wells Fargo**</u>

On the Closing Date, as adequate protection for the interest of the Pre-Petition Credit Agreement Lenders in the Collateral on account of the granting of the DIP Liens, the Pre-Petition Credit Agreement Lenders shall receive adequate protection as follows:

(a)    <u>**Pre-Petition Credit Agreement Replacement Liens**</u>.  The Pre-Petition Credit Agreement Lenders shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(c) and 364(d) of the Bankruptcy Code additional and replacement security interests and liens (the "**Pre-Petition Credit Agreement Replacement Liens**") which shall be *pari passu* with the DIP Liens and subject to the Carve Out and the Sharing Trust provisions contained in paragraphs 10-13 below, to the extent of the diminution, if any, in the value of the interest in the Pre-Petition Collateral during the Cases.

(b)    <u>**Pre-Petition Superpriority Claim**</u>.  The Pre-Petition Credit Agreement Lenders shall have an allowed superpriority administrative expense claim (the "**Pre-Petition Superpriority Claim**") which shall be *pari passu* with the DIP Superpriority Claim and which shall have priority (except with respect to the DIP Liens and the Pre-Petition Credit Agreement Replacement Liens, the Carve Out, the Sharing Trust provisions contained in paragraphs 10-13 below, the Permitted Prior Liens and the Expeditors Lien) in any Case under sections 364(0(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d),.726(b), 1113, and 1114 of the Bankruptcy Code, to the extent of the diminution, if any, in the value of the interest in the Pre-Petition Collateral during the Cases

and subject to the Carve Out and the Sharing Trust provisions contained in paragraphs 10-13 below.

### 5.    Adequate Protection for AGA

On the Closing Date, as adequate protection for the interest of AGA in the Pre-Petition Collateral on account of the Debtors' use, sale, or lease of the Pre-Petition Collateral as provided for herein, among other things, AGA shall receive adequate protection pursuant to sections 361, 362, and 363(e) of the Bankruptcy Code in the form of additional and replacement security interests and liens in the Collateral (the **"AGA Replacement Liens"**) which shall be subordinate in all respects to the DIP Liens and the Pre-Petition Credit Liens and subject to the Carve-Out, to the extent of the diminution, if any, in the value of AGA's interest in the Pre-Petition Collateral during the Cases.

### 6.    Section 507(b) Reservation

Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Pre-Petition Credit Agreement Lenders or AGA hereunder is insufficient to compensate for the diminution in value of the interest of the Pre-Petition Credit Agreement Lenders in the Pre-Petition Collateral during the Cases or any successor cases, provided, however, that any section 507(b) claim granted in the Cases shall be *pari passu* in right of payment to all DIP Obligations and subject to the Carve Out and the Sharing Trust provisions contained in paragraphs 10-13 below.

### 7.    Post-Petition Lien Perfection

This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Pre-Petition Credit Agreement Replacement Liens and the AGA Replacement Liens without the necessity of filing or recording any financing statement or

other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens and the AGA Replacement Liens or to entitle the DIP Lender and AGA to the priorities granted herein. Notwithstanding the foregoing, the DIP Lender or AGA may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the respective Cases. The Debtors shall execute and deliver to the DIP Lender or AGA all such financing statements, mortgages, notices and other documents as the DIP Lender or AGA may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the AGA Replacement Liens granted pursuant hereto. Notwithstanding anything contained in this Order, the Pre-Petition Credit Agreement Replacement Lien and AGA Replacement Lien shall have the same validity, enforceability, and priority as the Pre-Petition Credit Agreement Lien and the pre-petition AGA lien and security interest in the Pre-Petition Collateral. The DIP Lender or AGA, in its discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. The DIP Lender shall, in addition to the rights granted to it under the DIP Credit Agreement, be deemed to be the successor in interest to the Pre-Petition Credit Agreement Lenders with respect to all third party notifications in connection with the Pre-

Petition Credit Agreement, all Pre-Petition Collateral access agreements and all other agreements with third parties (including any agreement with a customs broker) relating to, or waiving claims against, any Pre-Petition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtors and including, for the avoidance of doubt, all deposit account control agreements.

8. **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**

Nothing in this Final Order or the DIP Credit Agreement shall prejudice whatever rights any official committee(s) or any other party in interest with requisite standing other than the Debtors may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the mortgage, security interests and liens of the Pre-Petition Credit Agreement Lenders in and to the Pre-Petition Collateral, or (ii) the validity, allowability, priority, status or amount of the Pre-Petition Debt, or (b) to bring suit against the Pre-Petition Credit Agreement Lenders in connection with or related to the Pre-Petition Credit Agreement, or the actions or inactions of Pre-Petition Credit Agreement Lenders arising out of or related to the Pre-Petition Credit Agreement; provided, however, that, unless the Committee or any other party in interest with requisite standing commences a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Pre-Petition Credit Agreement Lenders in the nature of a setoff, counterclaim or defense to the Pre-Petition Debt (including but not limited to, those under sections 506, 544, 547, 548, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Credit Agreement Lender) or seek disgorgement of all or any part of any payment made by the Debtors to the Pre-Petition Credit Agreement Lender, within 75 days following the appointment of the Committee (the **"Challenge Period,"** and the date that is the

next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), unless such challenge period is extended by agreement between the Pre-Petition Credit Agreement Lender and Committee or extended by court order. The Committee is hereby granted standing to commence and prosecute such adversary proceeding and to file pleadings or motions on behalf of the estate asserting such claims, objections or defenses without further order of this Court. If any such adversary proceeding or contested matter is timely commenced, nothing in this Order shall otherwise prevent the Court from granting any appropriate relief regarding the Pre-Petition Credit Agreement, Pre-Petition Liens, Pre-Petition Debt. Except as otherwise agreed among the Pre-Petition Credit Agreement Lender and the Committee, upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any official creditors' committee(s) and any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Cases) shall be deemed to be forever waived and barred, and the Pre-Petition Debt shall be deemed to be allowed in full and, to the extent of the value of the Pre-Petition Credit Collateral on the Petition Date, shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Cases and the Debtors' Stipulations shall be binding on all creditors, interest holders and parties in interest. Nothing in this Order shall be deemed to waive any of the rights of the Debtors, the Trustee (defined below) or Committee to challenge or object to AGA's asserted claims, liens, and security interests and to pursue any and all claims, objections, challenges, causes of action and/or choses in action, if any, against AGA, its affiliates, subsidiaries, successors, officers, directors, employees, shareholders, members, advisors, agents and assigns (collectively, the "**AGA Entities**"). Nothing in this Order

shall be deemed a waiver of any claims or rights of any of the AGA Entities, including, without limitation, any defenses of the AGA Entities to any such claims, objections, challenges, causes of action and/or choses in action, if any, to the extent asserted.

9.    **Carve Out**

Notwithstanding any provision of this Final Order or the DIP Credit Agreement to the contrary, any and all liens, security interests and claims of the DIP Lender, whether existing as of the Petition Date or to be granted or provided for pursuant to the terms hereof, shall be subject and subordinate to a carve-out (the **"Carve-Out"**) in the aggregate amount of $200,000 for: (a) the payment of all allowed professional fees and disbursements incurred by the professionals retained, pursuant to Bankruptcy Code §§ 327 or 1103(a), by Debtors and the Creditors' Committee (if any) from the Filing Date until the occurrence and continuation of an Event of Default (as defined in the DIP Credit Agreement) and the reasonable expenses of individual Committee members; (b) quarterly fees required to be paid to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (c) any fees payable to the Clerk of the Bankruptcy Court. Any and all payments made by the DIP Lenders pursuant to the Carve-Out shall be immediately added to and included as part of the outstanding principal balance of the DIP Credit Facility. The Carve-Out shall not exceed $200,000 and will be reduced by one-half of the aggregate amount of any and all fees and expenses paid pursuant to subparagraph (a) through (c) above. In no event shall the Carve-Out fall below $100,000 after the reduction set forth in the preceding sentence and shall not apply to any fees and expenses identified in subparagraphs (a) through (c) above incurred after May 1, 2008. So long as no Event of Default has occurred, the Debtors shall, to the extent provided in the Budget, be permitted to pay fees, compensation and reimbursement of expenses allowed and payable (including any such fees and

expenses that are accrued but unpaid and ultimately allowed) under Bankruptcy Code §§ 330, 331 and/or 503, as the same may be due and payable.

10.    **Creation of Creditors Sharing Trust**.

(a)    As a carve-out from (i) the Pre-Petition Credit Agreement Lenders' liens, (ii) DIP Lender's liens and (iii) AGA's liens securing any and all pre-petition debt and DIP Obligations, the DIP Lender shall fund a trust (the **"Sharing Trust"**) from the proceeds of their Collateral consisting of (x) a sum equal to the Minimum Augment Recovery Amount ($75,000), as that term is defined in the Agency Agreement by and among Great American Group, Hudson Capital Partners and the Debtors dated as of February 9, 2008 (the **"Augment Proceeds"**); (y) any and all cash proceeds from the disposition of the Debtors' non-residential real estate leases, after netting out all reasonable allowable fees, costs and expenses of procuring such proceeds by a designated real estate advisor retained by the Debtors with the consent of the DIP Lender and the Committee pursuant to an Order of this Court (such net sum being referred to as **"Lease Proceeds"**); and (z) cash proceeds, after netting out all reasonable and allowable fees, costs and expenses of litigation including, without limitation, reasonable attorneys' fees and expenses, expert witness fees and expenses and other retained professional fees and expenses (such net sum being referred to as **"Net Litigation Proceeds"**) from the prosecution, litigation, compromise and/or settlement, of any and all claims and causes of action, choses in action of every nature and kind, including without limitation, arising under Chapter 5 of the Bankruptcy Code excluding, any action under section 549 of the Bankruptcy Code or any action or claim relating to the Pre-Petition Collateral or the Pre-Petition Credit Agreement Lender (collectively, the **"Litigation Claims"**).    Collectively, the Augment Proceeds, Lease Proceeds and Net Litigation Proceeds shall hereinafter be referred to as the **"Sharing Proceeds"**).    The budget shall provide that the

Augment Proceeds shall be paid to the Sharing Trust as follows: $37,500 on February 15, 2008, and $37,500 on March 14, 2008.

(b)    The Sharing Proceeds shall be held in a separate trust account with the law firm of Cooley Godward Kronish LLP (or such other party designated by further order of this Court) (the "**Sharing Trust Account**") free and clear of all liens, claims and encumbrances, but subject to the provisions of this Order and the further orders of the Court.  The Parties hereby agree that the Debtors shall wire all Sharing Proceeds directly to the Sharing Trust Account.  A trustee for the Sharing Trust (the "**Trustee**") shall be designated to (i) administer and distribute Sharing Proceeds from the Sharing Trust, and (ii) subject to paragraph 11 below, investigate, prosecute, settle, and or compromise the Litigation Claims, all in accordance with this Order and further Orders of the Court.  The Trustee shall be selected by the Committee, subject to the consent of the DIP Lender (which consent will not be unreasonably withheld), and in consultation with the Debtors.  If the Debtors object to the selection of the Trustee, the Debtors may file a Motion on notice to all parties including the U.S. Trustee, objecting to the Trustee's appointment and seek to install an alternative Trustee.

11.    **Transfer of Certain Causes of Action to the' Committee and Trustee.**

(a)    Any and all Litigation Claims of the Debtors and their estates against (i) AGA Foodservice, Inc., AGA Home, Inc., its predecessors, successors, affiliates, subsidiaries, officers, directors, members, employees, shareholders, advisors, agents and assigns, if any (the "**AGA Claims**"); (ii) all present and former affiliates, subsidiaries, employees, agents and insiders of the Debtors (as defined in section 101(31) of the Bankruptcy Code) other than those parties covered in connection with the AGA Claims, if any ("**Insider Claims**") and (iii) all other non-insider entities, if any (the "**Non-Insider Claims**"), but excluding any action under section

549 of the Bankruptcy Code or any action or claim relating to the Pre-Petition Collateral or the Pre-Petition Credit Agreement Lender (collectively, the **"Avoidance Actions"**) shall be sold, transferred and conveyed and for the benefit of the Sharing Trust for prosecution, settlement or compromise, as shall be determined by the Trustee in its reasonable discretion with the consent of the Committee and the DIP Lender (until such time as the DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations are paid in full and satisfied), and after consultation with the Debtors. Any and all Sharing Proceeds realize by the Sharing Trust shall be allocated and distributed as provided in paragraph 12 hereof.

(b)    The Trustee is hereby granted standing to commence and prosecute adversary proceedings, file pleadings or motions or to assert defenses on behalf of the estates and the Sharing Trust in connection with the Avoidance Actions without further order of this Court. The Trustee and its successors or assigns, shall have control and power to prosecute, compromise, settle and/or otherwise deal with the AGA Claims and Insider Claims, if any, with the consent of the Committee and the DIP Lender (until such time as the DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations are paid in full and satisfied). Until the DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations are paid in full, the Trustee shall keep the DIP Lender and the Debtors apprised as to the status of the Avoidance Actions in writing on a semi-monthly basis. Notwithstanding anything else in this Order, the Trustee, with the consent of the Committee, shall have sole control and power to prosecute, compromise, settle and/or otherwise deal with the Non-Insider Claims.

(c)    The Debtors and any estate representative in the Case or any Successor Case, and their respective officers, directors, employees, advisors and other agents, shall (a) preserve, and provide to the Trustee and its professionals, agents, successors and assigns with

reasonable access (at reasonable times and places) to any and all information, records, "documents" and "electronically stored information" (which terms shall be synonymous in meaning and equal in scope to the usage of such terms in Federal Rule of Civil Procedure 34(a)) relating in any way to the Avoidance Actions and any and all matters and transactions related thereto.

12.    **Disposition of Sharing Trust Proceeds**

(a)    The Sharing Proceeds (net of all allowable fees, expenses and costs) shall be allocated by the Trustee as follows:

(i)    The first $500,000 in Sharing Proceeds collected shall be allocated equally between the DIP Lender and the Pre-Petition Credit Agreement Lender on the one hand, and the Sharing Trust on the other;

(ii)    The remaining proceeds shall be allocated 25% in favor of the DIP Lender and the Pre-Petition Credit Agreement Lenders and 75% in favor of the Sharing Trust until all DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations are paid in full and satisfied. The Sharing Proceeds allocated to the DIP Lender and the Pre-Petition Credit Agreement Lenders shall be paid by the Trustee within three (3) days of receipt of such proceeds by the Sharing Trust with notice to the U.S. Trustee, the Committee, and the Debtors.

(b)    The proceeds remaining in the Sharing Trust after allocation pursuant to subparagraph 12(a)(i) & (ii) above, shall be allocated and paid by the Trustee as follows:

(i)    The first $500,000 of funds allocated to the Sharing Trust shall be segregated in a separate fund used solely to pay any and all allowed claims pursuant to 11 U.S.C. 507(a)(3) and 507(a)(7) up to an aggregate amount of $650,000 ("**Rent/Deposit Fund**")to satisfy the priority portion of any claims of (x) lessors of no-residential real property for unpaid rent for

the period January 18-31, 2008 ("**Stub Rent Claims**") and (y) claims of consumers for pre-petition deposits for goods not delivered (the "**Customer Deposit Claims**"), with any funds remaining reverting back to the Sharing Trust to be distributed in accordance with this Order and any further Orders of this Court.

(ii)    The funds remaining in the Sharing Trust after payment on account of the Rent/Deposit Fund as set forth in sub-paragraph 12.(b)(i) shall be for the benefit of the holders of allowed non-priority general unsecured claims (exclusive of any claims of the Pre-Petition Credit Agreement Lender and the DIP Lender) and shall be distributed by the Trustee in accordance with a further order from this Court with notice to the DIP Lender, the Pre-Petition Credit Agreement Lender, AGA, the Debtors, the Committee and the U.S. Trustee.

(iii)    Notwithstanding anything contained herein, the DIP Lender, the Pre-Petition Credit Agreement Lender and the Debtors consent to the payment of the Trustee's and its professionals' reasonable and allowable fees, costs and expenses if no objection is received after 20 days after an invoice detailing such fees and costs are delivered to the U.S. Trustee, the Debtors, the Committee, the DIP Lender and AGA.  The Court will adjudicate all unresolved disputes as to the reasonableness of any Trustee fees and costs and their professional fees, costs and expenses.

13.    **Reversion of Funds to the Estates**.  If, after payment in full of the DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations pursuant to the allocation set forth in paragraph 12 above, additional Sharing Proceeds are collected by the Sharing Trust, such funds shall be allocated as follows:

(a) The first $250,000 of proceeds (after payment in full of the DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations) shall be shared equally between the Sharing Trust and the Debtors' estates; and

(b) The remaining proceeds shall be allocated solely to the Debtors' estates and distributed pursuant to a further Orders of this Court (but shall not be used to pay any claims of the Pre-Petition Credit Agreement Lender and the DIP Lender, unless otherwise ordered by the Court).

14.    **Payment of Compensation**

Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, the Committee, the Trustee, the Trustee's professionals or of any Person or shall affect the right of the DIP Lender, the Pre-Petition Credit Agreement Lenders, or AGA to object to the allowance and payment of such fees and expenses.

15.    **Section 506(c) Claims**

No costs or expenses of administration which have been or may be incurred in the Cases at any time shall be charged against the DIP Lender, their claims, or the DIP Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Lender, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender.

16.    **Collateral Rights**

Until the DIP Lender has provided its prior written consent or all DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a)

below), all commitments to lend have terminated, there shall not be entered in these proceedings, or in any Successor Cases, any order which authorizes any of the following:

(a)    the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Lender, or the Pre-Petition Credit Agreement Lenders; or

(b)    the enforcement of any claimed junior security, mortgage, or collateral interest or other junior lien of any person other than of the DIP Lender on all or any portion of the Collateral (other than in connection with the Prior Permitted Liens or Expeditors Lien); or

(c)    the Debtors' return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code.

17.    **Proceeds of Subsequent Financing**

Without limiting the provisions and protections of paragraph 11 above, if at any time prior to the repayment in full of all DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations and the termination of the DIP Lender's obligation to make loans and advances under the DIP Credit Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors, the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Lender and the Pre-Petition Credit Agreement Lender in reduction of the DIP Obligations and the Pre-Petition Credit Agreement Lender's Obligations .

18.    **Commitment Termination Date**

All (i) DIP Obligations of the Debtors to the DIP Lender shall be immediately due and payable, and (ii) authority to use the proceeds of the DIP Credit Agreement shall cease, both on the date (the "**Commitment Termination Date**") that is the earliest to occur of: (i) May 1, 2008, subject to extension by consent, (ii) the date the Debtors repay the Obligations in full, or (iii) the date the Lender demands payment of the Obligations, following an Event of Default (as set forth in the DIP Credit Agreement).

18.1    **Rights and Remedies Upon Event of Default**.

(a)     Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Lender may declare all obligations owing under the DIP Credit Agreement to be immediately due and payable and may declare the termination, reduction or restruction of any further commitment to extend credit to the Debtors to the extent any such commitment remains (the declaration of any of the foregoing being herein referred to as a "**Termination Declaration**" and the date of such declaration being herein referred to as the "**Termination Declaration Date**" ), (ii) the DIP Lenders may declare a termination, reduction or restriction of the ability of the Debtors to use any proceeds of the DIP Credit Agreement, (iii) the DIP Lender may increase the rate of interest applicable to the advances to the Default Rate under the DIP Credit Agreement.

(b)     In addition to the remedies described above and other customary remedies, any automatic stay otherwise applicable to the DIP Lender is hereby modified so that upon the occurrence and during the continuance of an Event of Default, and following the giving of three (3) business days' prior written notice (the "**Remedies Notice Period**") to the Debtors, the Committee, any effected landlords and the United States Trustee, the DIP Lender may foreclose on all or any portion of the DIP Collateral, collect accounts receivables and apply the proceeds

thereof in accordance with the Section 7.2 of the DIP Credit Agreement and may be permitted, after a hearing and entry of an order by the Bankruptcy Court to occupy the Debtors' premises to complete inventories, fulfill orders and sell inventories, execute going out-of-business sales or otherwise exercise remedies against the DIP Collateral and only as may permitted by applicable non-bankruptcy law (the "**Lease Related Remedies**"); provided, however, during the Remedies Notice Period, the Debtors, the Committee and any effected landlords shall be entitled to an emergency hearing with the Bankruptcy Court to challenge the propriety of the Lease Related Remedies. In all events, the Committee, shall have standing to challenge the occurrence of an Event of Default. Unless ordered otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to the DIP Lender shall be deemed automatically terminated at the end of the Remedies Notice Period provided that the DIP Lender shall not be permitted to exercise the Lease Related Remedies without further notice or order of the Court.

(c)    If the DIP Lender exercises any of its rights and remedies upon the occurrence of an Event of Default, the DIP Lender may retain one or more agents to sell, lease or otherwise dispose of the DIP Collateral. In any exercise of their rights and remedies, subject to subparagraph (b) above, upon an Event of Default under the DIP Credit Agreement, the DIP Lender is authorized to proceed under or pursuant to the DIP Credit Agreement.

(d)    Except as otherwise agreed by the DIP Lenders, all proceeds realized from any of the foregoing shall be turned over to the DIP Lender for indefeasible application in accordance with the provisions of the DIP Credit Agreement and this Final Order.

(e)    Modification of Automatic Stay.    The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (1) permit the Debtors to grant the Pre-Petition Credit Agreement

Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Pre-Petition Credit Agreement Lenders, the DIP Lender under the DIP Credit Agreement, the DIP Credit Facility and this Final Order, and (2) authorize the DIP Lender and the Pre-Petition Credit Agreement Lenders to retain and apply payments hereunder.

(f)     Other Remedies.   Nothing included herein shall prejudice, impair, or otherwise affect (1) the Pre-Petition Credit Agreement Lender's right to seek any other or supplemental relief in respect of the Debtors, (2) the DIP Lender's rights to seek any other or supplemental relief in respect of the Debtors, or (3) the DIP Lender's rights, as provided in the DIP Credit Agreement or the DIP Credit Facility, to suspend or terminate providing any form or type of financial accommodation to the Debtors, including, without limitation, in relation to any of the DIP Loan, the DIP Obligations, the DIP Credit Agreement, or the DIP Facility, in accordance with the terms of and to the extent provided for in the DIP Credit Agreement

19.     **Payment Upon Maturity**

The DIP Obligations shall be due and payable in accordance with the terms of the DIP Credit Agreement, without notice or demand, on the Commitment Termination Date.

20.     **Payment from Proceeds of Collateral**

Net proceeds of all Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions of Collateral, whether or not in the ordinary course) will be applied as follows: (a) first, to permanently reduce the Pre-Petition Debt until paid in full in cash, and (b) second, to reduce the DIP Obligations in accordance with the DIP Credit Agreement.

21.     **Disposition of Collateral**

The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, or assume, reject or assign any Leasehold Property (as defined in the DIP Credit Agreement) without the prior written consent of the Pre-Petition Credit Agreement Lender or the DIP Lender (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lender or an order of this Court), except for sales of the Debtors' inventory in the ordinary course of business or except as otherwise provided for in the Pre-Petition Credit Agreement, the DIP Credit Agreement and this Final Order and as approved by the Bankruptcy Court. If there are any inconsistencies between the terms of the Pre-Petition Credit Agreement, the DIP Agreement and this Final Order, the terms of the Final Order shall control.

22.    **Events of Default**

The occurrence of any of the following events shall constitute an Event of Default under this Final Order:

(a)    Failure by any of the Debtors to comply with any term of this Final Order.

(b)    An "Event of Default" as defined in the DIP Credit Agreement, which Events of Default include usual and customary events of default for transactions of this type and, in addition, include, but are not limited to, the failure by the Debtors to comply with any of the covenants set forth below, which comprise sections 5.3, 7.1, 7.2 and 7.3 of the DIP Credit Agreement:

(c)    The failure of each of the following to occur on the dates indicated:

(i)  on or before February 12, 2008, (A)  the Debtors shall receive the approval of the Bankruptcy Court for the Sale transaction and the order approving such Sale transaction shall be in form and substance satisfactory to the DIP Lender; and (B) all of the

documents or purchase agreements and all other relevant documents in connection with the Sale transaction shall have been executed and the Sale Transaction consummated.

23. **Proofs of Claim**

DIP Lender will not be required to file proofs of claim in any of the Cases or Successor Cases. The Pre-Petition Credit Agreement Lenders are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) aggregate proofs of claim in each of the Cases or Successor Cases. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Credit Agreement Lenders. Any order entered by the Bankruptcy Court in relation to the establishment of a bar date in any of the Cases or Successor Cases will so provide.

24. **Other Rights and Obligations**

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Final Order**. Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Credit Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Lender is entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Lender hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Lender shall be governed in all respects by the original provisions of this Final Order, and the DIP Lender shall be entitled to all of the rights, remedies,

privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Final Order, the obligations owed the DIP Lender prior to the effective date of any stay, modification or vacation of this Final Order cannot, as a result of any subsequent order in the Cases, or in any Successor Case, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lender under this Final Order and/or the DIP Credit Agreement.

(b)    **Expenses**.  As provided in the DIP Credit Agreement, all costs and expenses of the DIP Lender in connection with the DIP Credit Facility, including, without limitation, reasonable, documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtors, whether or not the transactions contemplated hereby are consummated.  Payment of such fees shall not be subject to allowance by the Court. The DIP Lender shall provide to the U.S. Trustee and counsel to the Committee(s) appointed in these chapter 11 cases, on a monthly basis, the total amount of professional fees and expenses incurred per calendar month in these chapter 11 cases along with the invoices relating to such fees and expenses. Under no circumstances shall professionals for the DIP Lender be required to comply with the U.S. Trustee fee guidelines.

(c)    **Binding Effect**. The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lender and the Pre-Petition Credit Agreement Lenders, the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of

the estate of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

(d)     **No Waiver**.   The failure of the Pre-Petition Credit Agreement Lenders, the DIP Lender to seek relief or otherwise exercise their rights and remedies under the DIP Credit Agreement, the DIP Credit Facility or this Final Order, as applicable, shall not constitute a waiver of any of the Pre-Petition Credit Agreement Lenders', and the DIP Lender's rights hereunder, thereunder, or otherwise.   Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the Pre-Petition Credit Agreement Lenders or the DIP Lender under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Pre-Petition Credit Agreement Lenders, the DIP Lender to (i) request conversion of any of the Cases to cases under Chapter 7, dismissal of any of the Cases, or the appointment of a trustee in any of the Cases (but only in the event an Event of Default has occurred and is continuing), or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Lender.

(e)     **No Third Party Rights**.   Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)     **No Marshaling**.   Neither the DIP Lender nor the Pre-Petition Credit Agreement Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral.

(g)    **Section 552(b)**.  The DIP Lender and the Pre-Petition Credit Agreement Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lender or the Pre-Petition Credit Agreement Lenders with respect to proceeds, product, offspring or profits of any of the Pre-Petition Credit Collateral or the Collateral.

(h)    **Amendment**.  Paragraph 2.6(a) of the DIP Credit Agreement is hereby amended to provide the DIP Lender with an Origination Fee of $75,000.  The Debtors and the DIP Lender may amend or waive any provision of the DIP Credit Agreement, provided that such amendment or waiver, in the judgment of the Debtors, AGA, the Committee, the Trustee and the DIP Lender, is either nonprejudicial to the rights of third parties or is not material.  Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Debtors and the DIP Lender (after having obtained the approval of the DIP Lender as provided in the DIP Credit Agreement) and approved by the Bankruptcy Court.

(i)    **Survival of Final Order**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any plan of reorganization in any of the Cases, (ii) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or (iii) dismissing any of the Cases, and the terms and provisions of this Final Order as well as the DIP Protections granted pursuant to this Final Order and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Final Order until all the obligations of the Debtors to the DIP Lender pursuant to the DIP Credit

Agreement, and all obligations of the Debtors to the Pre-Petition Credit Agreement Lenders under the Pre-Petition Credit Agreement are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Credit Facility which survive such discharge by their terms). The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code. None of the Debtors shall propose or support any Plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)     **Inconsistency.** In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement and of this Final Order, the provisions of this Final Order shall govern and control.

(k)     **Joint and Several Liability.** Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Debtors shall be jointly and severally liable to the DIP Lender in accordance with the terms of the DIP Credit Facility and the DIP Credit Agreement.

(l)     **Enforceability.** This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nun pro tunc* to the Petition Date immediately upon execution hereof

(m)     **Objections Overruled.** All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(n)     **No Waivers or Modification of Final Order.** The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior

written consent of the DIP Lender and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Lender.

(o)    **Waiver of the Ten (10) Day Stay Under Bankruptcy Rule 6004(h)**. The ten (10) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Final Order.

21.    **Modification of Order**

In the event this Court modifies any of the provisions of this Final Order or the DIP Credit Agreement following such further hearing, such modifications shall not affect the rights and priorities of DIP Lender pursuant to this Final Order with respect to the Collateral, and any portion of the DIP Obligations which arises or is incurred, advanced or paid prior to such modifications (or otherwise arising prior to such modifications), and this Final Order shall remain in full force and effect except as specifically amended or modified by further order of this Court.

22.    **DIP Lender's Commitment To Fund The Budget**

Notwithstanding anything to the contrary contained in the DIP Credit Agreement, including, but not limited to Section 7.1(n), and this Final Order, The DIP Lender shall fund only the necessary and reasonable costs and expenses identified in the Budget.

23.    **Retention of Jurisdiction**

The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

SO ORDERED by the Court this ⟩ 4 day of February, 2008.

_____
The Honorable Peter J. Walsh
United States Bankruptcy Judge

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | ) |
| | ) CHAPTER 11 |
| FOAMEX INTERNATIONAL INC., *et al.*, | ) |
| | ) Case No. 05-12685 (PJW) |
| Debtors. | ) |
| | ) (Jointly Administered) |
| | ) Re: Docket Nos. 15 and 44 |

## FINAL ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-PETITION FINANCING ON A SECURED AND SUPER-PRIORITY BASIS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND (B) TO UTILIZE CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, AND (II) GRANTING ADEQUATE PROTECTION TO CERTAIN PRE-PETITION SECURED PARTIES PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364,

Upon the motion (the "Motion"), dated September 19, 2005, of Foamex L.P. (the

"Borrower") and its affiliated debtors party to the DIP Financing Documents (as defined below)

(other than Foamex Canada Inc.),[1] each as debtor and debtor-in-possession (collectively, the

"Debtors"), in the above-captioned cases (the "Cases") pursuant to sections 105, 361, 362,

363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States

Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things:

> (1)    authorization for the Borrower to obtain post-petition financing

(the "Financing"), and for each of the guarantors named in the DIP Financing

---

[1]    In response to the Limited Objection of the Pension Benefit Guaranty Corporation to the Motion, the Debtors represent that Foamex Canada Inc. is the only non-Debtor guarantor under the DIP Facilities (as defined below).

Documents (the "Guarantors") to guaranty the Borrower's respective obligations under or in connection with (x) a debtor-in-possession revolving credit facility (the "DIP Revolving Credit Facility") in an amount up to the aggregate principal amount of $240 million (including a $40 million sub-limit for letters of credit) (the "DIP Revolving Credit Loans") (the actual available principal amount at any time being subject to those conditions set forth in the DIP Revolving Credit Documents (as defined below)) from Bank of America, N.A. ("B of A"), as administrative agent (in such capacity, the "DIP Revolving Credit Agent"), for itself and a syndicate of financial institutions (together with B of A, the "DIP Revolving Credit Lenders") and arranged by Banc of America Securities LLC and (y) a debtor-in-possession term loan facility (the "DIP Term Loan Facility" and, together with the DIP Revolving Credit Facility, the "DIP Facilities") in the principal amount of $80 million (the "DIP Term Loan" and, together with the DIP Revolving Credit Loans, the "DIP Loans") from Silver Point Finance LLC ("Silver Point"), as administrative agent (the "DIP Term Loan Agent" and, together with the DIP Revolving Credit Agent, the "DIP Agents") for itself and a syndicate of financial institutions (together with Silver Point, the "DIP Term Loan Lenders" and, together with the DIP Revolving Credit Lenders, the "DIP Lenders") to be arranged by Silver Point or affiliates thereof;

(2)    authorization for the Debtors to execute and enter into the DIP Financing Documents and to perform such other and further acts as may be required in connection with the DIP Financing Documents;

(3)    the granting of adequate protection to the lenders under or in connection with that certain Indenture, dated as of March 25, 2002 (as heretofore amended, supplemented or otherwise modified, the "Senior Secured Notes Indenture"), among the Borrower, Foamex Capital Corporation ("Foamex Capital") and U.S. Bank National Association, as trustee and collateral agent (in such capacity, the "Senior Secured Notes Trustee") under the Senior Secured Notes Indenture pursuant to which the Borrower and Foamex Capital issued $300 million (original principal amount) of 10-3/4% Senior Secured Notes due April 1, 2009 (the "Senior Secured Notes");

(4)    authorization for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) in which the Senior Secured Notes Trustee has an interest, and the granting of adequate protection to the Senior Secured Notes Trustee with respect to, *inter alia,* such use of its cash collateral and all use and diminution in the value of the Pre-Petition Collateral (as hereinafter defined);

(5)    the granting of superpriority claims to the DIP Agents and the DIP Lenders on the terms and conditions described herein payable from, and having recourse to, all pre-petition and post-petition property of the Debtors' estates and all proceeds thereof, subject to the Carve Out (as defined below);

(6)    pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of the interim order presented at the Interim Hearing (the "Interim Order") (a) authorizing the Borrower, on an interim basis, to forthwith execute (x) the DIP

Revolving Credit Documents (as defined below) and borrow or obtain letters of credit from the DIP Revolving Credit Lenders under the DIP Revolving Credit Documents up to an aggregate principal or face amount at any time outstanding not to exceed $221 million to be used (i) for working capital and other general corporate purposes of the Debtors (subject to any limitations of borrowings and issuances of letters of credit under the DIP Revolving Credit Documents) including the payment of interest, fees and expenses under the DIP Credit Agreements (as defined below) and the payment of interest, fees (other than prepayment penalties, premiums or similar payments) and expenses under the Pre-Petition Term Loan B Agreement (as defined below) and (ii) to refinance all amounts outstanding as of September 19, 2005 (the "Petition Date") under the Credit Agreement, dated as of August 18, 2003 (as heretofore amended, supplemented or otherwise modified, the "Pre-Petition Revolving Credit Agreement"), among the Borrower, certain of its affiliates, B of A, as administrative agent (the "Pre-Petition Revolving Credit Agent"), and the lenders party thereto (collectively, the "Pre-Petition Revolving Credit Lenders") pursuant to which, among other things, the Pre-Petition Revolving Credit Lenders made certain loans and extended certain other financial accommodations to the Borrower, including deeming all outstanding letters of credit issued under the Pre-Petition Revolving Credit Agreement to constitute letters of credit issued under the DIP Revolving Credit Agreement and (y) the DIP Term Loan Documents (as defined below) and borrow from the DIP Term Loan Lenders an amount equal to $80 million to be used to refinance all amounts outstanding as of the Petition Date

4

under the Credit Agreement, dated as of August 18, 2003 (as heretofore amended, supplemented or otherwise modified, the "Pre-Petition Term Loan B Agreement" and, together with the Pre-Petition Revolving Credit Agreement, the "Pre-Petition Credit Agreements") among Borrower, certain of its affiliates, Silver Point, as administrative agent (the "Pre-Petition Term Loan B Agent" and, together with the Pre-Petition Revolving Credit Agent, the "Pre-Petition Agents"), and the lenders party thereto (collectively, the "Pre-Petition Term Loan B Lenders" and, together with the Pre-Petition Revolving Credit Lenders, the "Pre-Petition Lenders") pursuant to which the Pre-Petition Term Loan B Lenders made a term loan to the Borrower, (b) authorizing the Debtors' use of cash collateral of the Senior Secured Notes Trustee, and (c) granting the Senior Secured Notes Trustee the adequate protection described therein; and

(7)    that this Court schedule a final hearing (the "Final Hearing") to be held within 45 days of the entry of the Interim Order to consider entry of a final order (the "Final Order") authorizing and approving (a) (i) the DIP Revolving Credit Documents and the balance of the borrowings and letter of credit issuances under the DIP Revolving Credit Documents on a final basis, as set forth in the Motion and the DIP Revolving Credit Documents filed with this Court and (ii) the DIP Term Loan Documents on a final basis, as set forth in the Motion and the DIP Term Loan Documents filed with this Court and (b) authorizing the Debtors to waive the right to charge, pursuant to section 506(c) of the Bankruptcy Code, any costs of administration of the Cases (except as permitted by the Carve Out)

against any of the Pre-Petition Collateral (as defined below) and the Collateral (as defined below).

Due and appropriate notice of the Motion, the relief requested therein and the Final Hearing having been given by the Debtors, as set forth in the Motion and the Interim Order.

The Interim Hearing and the Final Hearing (the "Hearings") having been held by this Court on September 20, 2005 and October 17, 2005, respectively.

Upon the record made by the Debtors at the Hearings and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

2.    *Jurisdiction.*  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 11 U.S.C. §§ 1408 and 1409.

3.    *Notice.*  The notice given by the Debtors of the Motion and the Hearings constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c).

4.    *Debtors' Stipulations.*  Without prejudice to the rights of any other party including any Committee (as defined below) authorized to assert any claims on behalf of the estates (but subject to the limitations thereon contained in paragraphs 15 and 16 below), the Debtors admit, stipulate and agree that:

(a)    (i) as of the Petition Date, the Borrower and Guarantors party to (x) the Pre-Petition Revolving Credit Documents (as defined below) were indebted and liable to the Pre-Petition Revolving Credit Lenders, without defense, counterclaim or offset of any kind, in the

aggregate principal amount of $195,984,108.30 consisting of revolving credit loans having the aggregate outstanding principal amount of $141,464,143.46, term loans in the aggregate outstanding principal amount of $32,863,742.26 and letters of credit having an aggregate undrawn amount of $21,656,222.58, in each case, provided by the Pre-Petition Revolving Credit Lenders pursuant to, and in accordance with the terms of, the Pre-Petition Revolving Credit Agreement and all collateral and ancillary documents executed in connection therewith (the "Pre-Petition Revolving Credit Documents"), including in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Pre-Petition Revolving Credit Documents), charges, indemnities and other obligations incurred in connection therewith as provided in the Pre-Petition Revolving Credit Documents (collectively, the "Pre-Petition Revolving Credit Obligations"), and (y) the Pre-Petition Term Loan B Documents (as defined below) were indebted and liable to the Pre-Petition Term Loan B Lenders, without defense, counterclaim or offset of any kind, in the aggregate outstanding principal amount of $80 million in respect of term loans made by the Pre-Petition Term Loan B Lenders pursuant to, and in accordance with the terms of, the Pre-Petition Term Loan B Agreement and all collateral and ancillary documents executed in connection therewith (the "Pre-Petition Term Loan B Documents" and, together with the Pre-Petition Revolving Credit Documents, the "Pre-Petition Financing Documents"), including in each case, interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Pre-Petition Term Loan B Documents), charges, indemnities and other obligations incurred in connection therewith as provided in the Pre-Petition Term Loan B Documents (collectively, the "Pre-Petition Term Loan B Obligations" and, together with the Pre-Petition Revolving Credit

Obligations, the "Pre-Petition Obligations"), (ii) the Pre-Petition Obligations constitute the legal, valid and binding obligation of the Debtors, enforceable in accordance with their terms (except as enforcement thereof may be limited or affected by the Bankruptcy Code) and (iii) no portion of the Pre-Petition Obligations are subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law;

(b)      the liens and security interests granted to (x) the Pre-Petition Revolving Credit Agent for its benefit and for the benefit of the Pre-Petition Revolving Credit Lenders pursuant to and in connection with the Pre-Petition Revolving Credit Documents (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of and for the benefit of the Pre-Petition Revolving Credit Agent and/or the Pre-Petition Revolving Credit Lenders) are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the personal property, real property and fixtures described in the Pre-Petition Revolving Credit Documents (including the set off rights described in the Pre-Petition Revolving Credit Documents and arising by operation of law, collectively, the "Pre-Petition Revolving Credit Collateral") and (ii) not subject to avoidance, recharacterization, impairment or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (y) the Pre-Petition Term Loan B Agent for its benefit and for the benefit of the Pre-Petition Term Loan B Lenders pursuant to and in connection with the Pre-Petition Term Loan B Documents (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of and for the benefit of the Pre-Petition Term Loan B Agent and/or the Pre-Petition Term Loan B Lenders) are (i) valid, binding, perfected, enforceable, liens and security interests in the personal property, real property and fixtures

described in the Pre-Petition Term Loan B Documents (including the set off rights described in the Pre-Petition Term Loan B Documents and arising by operation of law, collectively, the Pre-Petition Term Loan B Collateral" and together with the Pre-Petition Revolving Credit Collateral, the "Pre-Petition Collateral") and (ii) not subject to avoidance, recharacterization, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(c)    The aggregate value of the Pre-Petition Collateral provided to the Pre-Petition Agents and the Pre-Petition Lenders exceeds the aggregate amount of the Pre-Petition Obligations;

(d)    (i) as of the Petition Date, Foamex, L.P. and its affiliates who have guaranteed the Senior Secured Notes Indenture were indebted and liable to the Senior Secured Notes Trustee, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately \$300 million of principal, interest, fee and expenses (the "Pre-Petition Senior Secured Note Obligations") pursuant to the Senior Secured Notes Indenture and related collateral and ancillary documents executed in connection therewith (the "Senior Secured Notes Collateral Documents"), and (ii) no portion of the Pre-Petition Senior Secured Note Obligations are subject to disallowance, avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and

(e)    the liens and security interests granted to the Senior Secured Notes Trustee for its benefit and for the benefit of the holders of the Senior Secured Notes pursuant to and in connection with the Senior Secured Notes Collateral Documents (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of and for the benefit of the Senior Secured Notes Trustee or the holders of the Senior Secured Notes) are (i) valid, binding, perfected,

31158498_V7                                     9

enforceable, liens and security interests in the Pre-Petition Collateral and (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law.

     5.    *Findings Regarding the Financing.*

         (a)    Good cause has been shown for the entry of this Final Order.

         (b)    The Debtors have an immediate need to obtain the Financing and use cash collateral in order to permit, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures and to satisfy other working capital and operational needs. The access of the Debtors to sufficient working capital and liquidity through the use of cash collateral, incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern values of the Debtors and to a successful reorganization of the Debtors.

         (c)    The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders under the DIP Financing Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Agents and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens (as defined below) and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Order and in the DIP Financing Documents.

(d)     The terms of the Financing and the use of cash collateral are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Financing as it relates to the DIP Revolving Credit Facility has been negotiated in good faith and at arm's-length among the Debtors, the DIP Revolving Credit Agent and the DIP Revolving Credit Lenders, and all of the Debtors' obligations and indebtedness arising under, in respect of, or in connection with the DIP Revolving Credit Facility and the DIP Revolving Credit Documents, including without limitation, (i) DIP Revolving Credit Loans made pursuant to the Debtor-in-Possession Credit Agreement substantially in the form attached as Exhibit B to the Motion (as amended, modified or supplemented from time to time, the "DIP Revolving Credit Agreement"), and (ii) any "Obligations" (as defined in the DIP Revolving Credit Agreement), including credit extended in respect of overdrafts and related liabilities and other depository, treasury and cash management services and other clearing services provided by B of A or its affiliates (all of the foregoing in clauses (i) and (ii) collectively, the "DIP Revolving Credit Obligations"), shall be deemed to have been extended by the DIP Revolving Credit Agent and the DIP Revolving Credit Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Financing as it relates to the DIP Term Loan Facility has been negotiated in good faith and at arm's-length among the Debtors, the DIP Term Loan Agent and the DIP Term Loan Lenders, and all of the Debtors' obligations and indebtedness arising under,

in respect of or in connection with the DIP Term Loan Facility and the DIP Term Loan Documents, including without limitation, (i) DIP Term Loans made pursuant to the Debtor-in-Possession Credit Agreement substantially in the form attached as Exhibit C to the Motion (as amended, modified or supplemented from time to time, the "DIP Term Loan Agreement" and, together with the DIP Revolving Credit Agreement, the "DIP Credit Agreements"), and (ii) any "Obligations" (as defined in the DIP Term Loan Agreement) (all of the foregoing in clauses (i) and (ii) collectively, the "DIP Term Loan Obligations" and, together with the DIP Revolving Credit Obligations, the "DIP Obligations"), shall be deemed to have been extended by the DIP Term Loan Agent and the DIP Term Loan Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(g)    The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent granting the relief sought by this Order, the Debtors' estates will be immediately and irreparably harmed.  Consummation of the Financing and the use of cash collateral in accordance with this Order and the DIP Financing Documents is therefore in the best interest of the Debtors' estates.

6.    *Authorization of the Financing and the DIP Financing Documents.*

(a)    The Debtors are hereby authorized to enter into the DIP Financing Documents including without limitation, the DIP Credit Agreements.  The Borrower is hereby authorized to borrow money under the respective DIP Credit Agreements and to cause to be issued letters of credit under the DIP Revolving Credit Agreement, and the Guarantors are hereby

authorized to guaranty such borrowings and the obligations of the Borrower with respect to such letter of credit issuances in accordance with the terms of this Order and the respective DIP Financing Documents, which shall be used for all purposes permitted under the respective DIP Financing Documents, including, without limitation, to provide working capital for the Borrower and the Guarantors and to pay interest, fees and expenses in accordance with this Order and the respective DIP Financing Documents.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be reasonably required or necessary or desirable for the Debtors' performance of its obligations under the Financing, including, without limitation:

(i)     the execution, delivery and performance of the Loan Documents (as defined in each of the DIP Credit Agreements) and all collateral and ancillary documents to be executed in connection therewith (collectively, the "DIP Financing Documents"),

(ii)    the execution, delivery and performance of one or more amendments to either or both of the DIP Credit Agreements for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the relevant DIP Lenders, in each case in such form as the Debtors, the respective DIP Agent and the respective DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to either or both of the DIP Credit Agreements that do not change the scheduled maturity of the extensions of credit thereunder or increase the aggregate commitments, the rate of interest or are otherwise considered not material

13

(in the good faith judgment of the respective DIP Agent, respective DIP Lenders and the Debtors), provided that such amendments shall, promptly after the effectiveness thereof, be filed on the Court's docket and served upon any statutory committee appointed in these Cases, the ad hoc committee of holders of Senior Secured Notes (the "Ad Hoc Committee") and the Senior Secured Notes Trustee),

        (iii)    the non-refundable payment to the DIP Agents or the DIP Lenders, as the case may be, of the fees referred to in the DIP Financing Documents and reasonable costs and expenses as may be due from time to time, including, without limitation, fees and expenses of the professionals retained as provided for in the DIP Financing Documents, provided that the Debtors shall provide copies of all invoices for such professional fees and expenses to counsel for the Creditors' Committee (as defined below), and

        (iv)    the performance of all other acts required under or in connection with the DIP Financing Documents.

        (c)    Upon execution and delivery of the DIP Financing Documents, the DIP Financing Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Financing Documents. Subject to paragraphs 15 and 16, no obligation, payment, transfer or grant of security under the DIP Financing Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under section 502(d) of the Bankruptcy Code), or subject to any defense, reduction, setoff, recoupment or counterclaim.

        7.    *Superpriority Claims.*

(a)     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations (as defined below)) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claims"), which allowed claims shall be payable from and have recourse to all pre- and post-petition property of the Debtors and all proceeds thereof, subject only to the payment of the Carve Out; provided, however, that (i) the Superpriority Claims granted to the DIP Revolving Credit Agent and the DIP Revolving Credit Lenders in respect of the DIP Revolving Credit Facility shall be senior in all respects to the Superpriority Claims granted to the DIP Term Loan Agent and the DIP Term Loan Lenders in respect of the DIP Term Loan Facility; (ii) with respect to the proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code, or any other avoidance actions under the Bankruptcy Code (collectively, "Avoidance Actions"), the DIP Obligations shall constitute allowed administrative expense claims under section 503(b) of the Bankruptcy Code, pari passu with all other holders of allowed administrative expense claims under section 503(b) of the Bankruptcy Code; and (iii) the Superpriority Claims shall not be payable from or have recourse to any payments payable directly to third parties (other than any of the Debtors, Foamex Canada Inc., either DIP Agent or any of the DIP Lenders) arising under any liability insurance policies maintained by the Debtors or Foamex Canada Inc.

(b)      For purposes hereof, the "Carve Out" means (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; (ii) after the occurrence and during the continuance of an Event of Default (as defined in each of the DIP Credit Agreements) an amount not exceeding $3,000,000.00 (inclusive of the amounts set forth in clause (iii) below as well as the amount of unpaid professional fees and expenses incurred by the Debtors and any official committee(s) appointed in the Cases (each, a "Committee") prior to the occurrence of a Default or Event of Default (as defined in each of the DIP Credit Agreements)) ("Priority Professional Expense Cap"), which amount may be used subject to the terms of this Order, including, without limitation, paragraphs 15 and 16 hereof, to pay any fees or expenses incurred by the Debtors and any Committee in respect of (A) allowances of compensation for services rendered or reimbursement of expenses awarded by the Bankruptcy Court to the Debtors' or any Committee's professionals and (B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by Committee members in the performance of their duties (but excluding fees and expenses of third party professionals employed by such members) (collectively, "Professional Expenses"); *provided, however* (x) that the Priority Professional Expense Cap shall neither be reduced nor increased by the amount of any compensation or reimbursement of expenses awarded and paid prior to the occurrence of an Event of Default in respect of which the Carve Out is invoked, (y) that nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses, reimbursement or compensation described in clauses (A) and (B) above and (z) nothing herein shall be construed to exempt those persons hereafter receiving interim compensation payments or reimbursement of expenses pursuant to any such Court-approved procedure for interim payments of administrative expenses from the applicable

provisions of bankruptcy law, including the requirements that such compensation or reimbursement be allowed on a final basis after the filing of appropriate fee applications; (iii) in the event of the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, to pay fees and expenses incurred by a trustee and any professionals retained by such trustee, in an amount not exceeding $200,000 in respect of allowances of compensation for services rendered and reimbursement of expenses awarded by the Bankruptcy Court to the trustee or any professional retained by such trustee and (iv) effective upon entry of this Order, in exchange for priority payment of the Professional Expenses, the parties entitled to be paid therefrom shall not be entitled, directly or indirectly, to charge the Collateral whether by operation of sections 105, 506(c) or 552(b) or otherwise. The waiver set forth in the immediately preceding sentence is for the sole benefit of the DIP Lenders, the DIP Agents, the Pre-Petition Lenders, the Pre-Petition Agents and the Senior Secured Notes Trustee and no other party shall be entitled to assert any claim or defense on account of such waiver.

8.    *Waiver of Section 506(c) Expenses.* Except to the extent of the Carve Out, no expenses of administration of the Cases or any future proceeding or case which may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged pursuant to section 506(c) of the Bankruptcy Code or otherwise against the Pre-Petition Collateral and the Collateral without the prior written consent of the DIP Agents, the Pre-Petition Agents and the Senior Secured Notes Trustee and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agents, the Pro-Petition Agents, the DIP Lenders, the Pre-Petition Lenders or the Senior Secured Notes Trustee.

9.    *DIP Liens.* As security for the DIP Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution by any of the Debtors or

31158498_V7                    17

recordation or filing of mortgages, security agreements, control agreements, pledge agreements, financing statements or other similar documents, the following security interests and liens are hereby granted to each of the DIP Agents for its own benefit and the benefit of the respective DIP Lenders for whom it acts as DIP Agent (all property identified in clauses (a), (b) and (c) below being collectively referred to as the "Collateral"), provided, however, that Collateral shall not include any payments payable directly to third parties (other than any of the Debtors, Foamex Canada Inc., either DIP Agent or any of the DIP Lenders) arising under any liability insurance policies maintained by the Debtors or Foamex Canada Inc., subject, only in the event of the occurrence and during the continuance of an Event of Default, to the payment of the Carve Out (all such liens and security interests granted to the DIP Agents, for their own benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP Financing Documents, the "DIP Liens"):

(a)    First Lien on Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date (or as a result of the refinancing of the Pre-Petition Obligations) is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), including without limitation, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, payment intangibles, chattel paper, documents, instruments, investment property, fixtures, real property, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and

the proceeds of all the foregoing.  Unencumbered Property shall exclude the Debtors' Avoidance Actions.

(b)    Priming Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and post-petition property of the Debtors (including, without limitation, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, payment intangibles, chattel paper, documents, instruments, investment property, fixtures, real property, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries and the proceeds of all the foregoing), whether now existing or hereafter acquired.  Such security interests and liens shall be senior in all respects to interests of other parties arising out of security interests or liens, if any, on such property existing immediately prior to the Petition Date, including in any event the interests in such property of the Senior Secured Notes Trustee arising from current and future liens of the Senior Secured Notes Trustee (including, without limitation, adequate protection liens granted hereunder), but shall not be senior to any valid, perfected and unavoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date to the extent (and only to such extent) that such liens were senior to the liens of the Pre-Petition Agents and the Pre-Petition Lenders as of the Petition Date and were permitted under the Pre-Petition Financing Documents to be in existence and to be senior to the liens of the Pre-Petition Agents and the Pre-Petition Lenders.

(c)    Liens Junior to Certain Other Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon all pre- and post-petition property of the Debtors (other than the property

31158498_V7                    19

described in clauses (a) or (b) of this paragraph 8, as to which the liens and security interests in favor of the DIP Agents and the DIP Lenders will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the DIP Agents and the DIP Lenders are junior to such valid, perfected and unavoidable liens.

(d)    Liens Senior to Certain Other Liens. Except as otherwise provided herein, the DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, except for any liens arising after the Petition Date that are senior to the DIP Liens by operation of law.

(e)    Lien Intercreditor Agreement. Notwithstanding anything to the contrary contained herein, the DIP Liens granted to the DIP Revolving Credit Agent and the DIP Revolving Credit Lenders to secure the DIP Revolving Credit Loans shall have priority over the DIP Liens granted to the DIP Term Loan Agent and the DIP Term Loan Lenders to secure the DIP Term Loans in accordance with the terms of the Post-Petition Intercreditor Agreement between the DIP Revolving Credit Agent, for itself and the DIP Revolving Credit Lenders, and the DIP Term Loan Agent, for itself and the DIP Term Loan Lenders (the "Post-Petition Intercreditor Agreement").

10.    *Protection of DIP Lenders' Rights.*

(a)    So long as there are any DIP Loans or other amounts outstanding under the DIP Credit Agreements or any other DIP Obligations, or the DIP Revolving Credit Lenders have any Commitments (as defined in the DIP Revolving Credit Agreement) under the DIP Revolving Credit Agreement, the Senior Secured Notes Trustee shall (i) take no action to foreclose upon or recover in connection with the liens granted pursuant to the Senior Secured Notes Indenture or the Senior Secured Notes Collateral Documents or this Order, or otherwise exercise remedies against any Collateral, (ii) be deemed to have consented to any release of Collateral authorized under the DIP Financing Documents and, effective upon such release, be deemed to release its lien therein, (iii) not file any financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect its security interests in the Collateral unless solely as to this clause (iii), the DIP Lenders file financing statements or other documents to perfect the liens granted pursuant to this Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date, and (iv) not seek to terminate or modify the use of Cash Collateral, obtain additional (or different) adequate protection than that set forth in this Order or seek to litigate or relitigate the priming of the Senior Secured Notes Trustee's liens and the grant of the Superpriority Claims of the DIP Agents and the DIP Lenders granted by this Order.

(b)    To the extent applicable the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified (i) whether or not an Event of Default or a default by any of the Debtors of any of their obligations under this Order has occurred, to require all cash,

checks or other collections or proceeds from Collateral received by or on behalf of any of the Debtors to be deposited in accordance with the DIP Financing Documents, and to apply any amounts so deposited and other amounts paid to or received by the DIP Lenders or the DIP Agents, under the DIP Financing Documents and this Order, as provided in the DIP Financing Documents and this Order; (ii) to permit the DIP Agent and the DIP Lenders party thereto to exercise, upon the occurrence of an Event of Default under the relevant DIP Facility, all rights and remedies under the DIP Financing Documents relating to such DIP Facility (other than those rights and remedies against the Collateral as provided in clause (iii) below) and (iii) subject to the terms of the Post-Petition Intercreditor Agreement, to the extent necessary to permit the DIP Agent and the DIP Lenders party thereto to exercise, upon the occurrence and during the continuance of an Event of Default under the relevant DIP Facility and subject to the giving of five (5) business days prior written notice to counsel for the Debtors, counsel for any Committee, counsel for the Ad Hoc Committee, counsel for the Senior Secured Notes Trustee and the Office of the United States Trustee to the extent provided for in the DIP Credit Agreement relating to such DIP Facility, all rights and remedies against the Collateral provided for in the DIP Financing Documents relating to such DIP Facility (including without limitation, the right to setoff monies of the Debtors in accounts maintained with either DIP Agent or any DIP Lender). In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default under the relevant DIP Facility has occurred and is continuing, and no other issue or argument shall be relevant to any opposition to the exercise by any of the DIP Agents or the DIP Lenders of rights and remedies under this Order or any of the DIP Financing Documents. In no event shall any of the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Pre-Petition Lenders, the Senior

Secured Notes Trustee or the holders of the Senior Secured Notes be subject to the equitable

doctrine of "marshaling" or any similar doctrine with respect to the Pre-Petition Collateral or the

Collateral. Immediately upon the occurrence and continuation of an Event of Default under the

DIP Facilities or a violation of this Order by any of the Debtors (i) the DIP Lenders and the DIP

Agents shall have no further obligation to provide financing under the DIP Loan Documents or

this Order, (ii) at the discretion of either DIP Agent and subject to the terms of the Post-Petition

Intercreditor Agreement, any authorization to use Cash Collateral shall terminate, and (iii) the

DIP Agents are hereby authorized to, without providing any prior notice thereof, charge interest

at the default rate set forth in the relevant DIP Credit Agreement and require cash

collateralization of obligations relating to letters of credit issued pursuant to the relevant DIP

Credit Agreement.

11.    *Cash Collateral.* Any proceeds of the Pre-Petition Collateral are cash collateral of

the Senior Secured Notes Trustee within the meaning of section 363(a) of the Bankruptcy Code.

The Debtors' cash and all such proceeds of Pre-Petition Collateral are referred to herein as "Cash

Collateral."

12.    *Use of Cash Collateral.* Subject to the limitations contained in this Order, the

Debtors are hereby authorized to use all Cash Collateral of the Senior Secured Notes Trustee, and

the Senior Secured Notes Trustee is directed promptly to turn over to the Debtors all Cash

Collateral received or held by it, *provided* that the Senior Secured Notes Trustee is granted

adequate protection as hereinafter set forth.

13.    *Adequate Protection.* The Debtors have requested that the Senior Secured Notes

Trustee consent to, among other things, (i) the Debtors' use of the Cash Collateral and the other

Pre-Petition Collateral, and (ii) the incurrence of the Financing and the Debtors' granting of

priming liens in connection therewith. Pursuant to sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, as adequate protection of the Senior Secured Notes Trustee's interest in the Pre-Petition Collateral, including the Cash Collateral, for and equal in amount to the aggregate diminution in value of the Senior Secured Notes Trustee's interest in the Pre-Petition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of Cash Collateral and any other Pre-Petition Collateral, the priming of the Trustee's security interests and liens in the Pre-Petition Collateral by the DIP Agents and the DIP Lenders pursuant to the DIP Financing Documents and this Order, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, the Senior Secured Notes Trustee is hereby granted the following (collectively, the "Adequate Protection Obligations"):

(a)     Adequate Protection Liens. The Senior Secured Notes Trustee (for itself and for the benefit of the holders of the Senior Secured Notes) is hereby granted (effective and perfected upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or other agreements) a replacement security interest in and lien upon all the Collateral, subject and subordinate only to (i) other valid and enforceable liens and security interests existing as of the Petition Date, which attach to the Collateral, (ii) the DIP Liens granted to the DIP Agents for the benefit of the DIP Lenders in this Order and pursuant to the DIP Financing Documents and any liens on the Collateral to which such liens so granted to the DIP Agents are junior and (iii) the Carve Out (the "Adequate Protection Liens").

(b)     Section 507(b) Claim. The Senior Secured Notes Trustee is hereby granted, subject to the payment of the Carve Out, a superpriority claim as provided for in section

31158498_V7                              24

507(b) of the Bankruptcy Code, immediately junior to the Superpriority Claims under section 364(c)(1) of the Bankruptcy Code held by the DIP Agents and the DIP Lenders;

(c)     Interest Accrual. Interest shall accrue (but shall not be paid current) on the Senior Secured Notes on and after the Petition Date at the contractual default rate (to the extent such interest is allowable under section 506(b) of the Bankruptcy Code).

(d)     Additional Adequate Protection. The Debtors shall pay the reasonable fees and expenses, without the necessity of any further application with the Court for approval or payment, of i) O'Melveny & Myers LLP in accordance with that certain agreement dated July 28, 2005, local counsel to the Ad Hoc Committee, and Houlihan Lokey Howard & Zukin in accordance with that certain agreement dated July 20, 2005, including without limitation monthly payments upon the submission of invoices, and ii) the Senior Secured Notes Trustee, including outside counsel. To the extent determined that the Senior Secured Notes are not oversecured, in accordance with section 506(b) of the Bankruptcy Code, any payments made pursuant to this paragraph 12(d) in excess of the amounts to which the Senior Secured Notes are otherwise entitled under section 506(b) shall be deemed a payment on the allowed secured claim of the holders of the Senior Secured Notes and the Senior Secured Notes Trustee. The professionals seeking payment pursuant to this paragraph 12(d) shall submit monthly invoices to the Debtors, counsel for each of the DIP Lenders, the United States Trustee and counsel to any official committee appointed in theses cases. If no objection to the payment of such invoices is filed and served on the professional submitting such invoice and the Debtors within 10 business days, the Debtors shall be authorized to pay such invoices in accordance with the terms of this Order.

(e)     The Debtors shall furnish to the Senior Secured Notes Trustee and the Ad Hoc Committee copies of all financial information and reports furnished to the DIP Lenders pursuant to any of the DIP Financing Documents.

(f)     Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Senior Secured Notes Trustee. The Senior Secured Notes Trustee consents to the priming of its liens by the DIP Liens granted by this Order and the DIP Financing Documents.

14.     *Perfection of DIP Liens and Adequate Protection Liens.*

(a)     Subject to the provisions of paragraph 9 above, the DIP Agents, the DIP Lenders and the Senior Secured Notes Trustee are hereby authorized, but not required, to obtain, file or record financing statements, trademark filings, patent filings, copyright filings, mortgages, notices of lien, landlord waivers, bailee waivers, warehouseman waivers, other waivers or consents or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not either of the DIP Agents on behalf of the relevant DIP Lenders or the Senior Secured Notes Trustee shall, in its sole discretion, choose to file such financing statements, trademark filings, patent filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to it hereunder, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination, as of the time and on the date of entry of this Order.

(b)     A certified copy of this Order may, in the discretion of either of the DIP Agents or the Senior Secured Notes Trustee be filed with or recorded in filing or recording

offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

15.    *Preservation of Rights Granted Under the Order.*

(a)    Except for the Carve-Out, no claim or lien having a priority superior to or *pari passu* with those granted by this Order to the DIP Agents and the DIP Lenders or the Senior Secured Notes Trustee, respectively, shall be granted or allowed while any portion of the Financing (or any refinancing thereof) or the Commitments thereunder or the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise.

(b)    Unless all DIP Obligations shall have been paid in full, all Commitments (as defined in the DIP Revolving Credit Agreement) have been terminated and the Adequate Protection Obligations shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default and a termination of the right to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this Order without the prior written consent of the DIP Agents, or with respect to the rights and benefits granted to, and interests of, the Senior Secured Notes Trustee, the Senior Secured Notes Trustee, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agents or the Senior Secured Notes Trustee, as applicable, or (ii) an order dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at

any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, priming and other liens and security interests granted to the DIP Agents and the DIP Lenders and the Adequate Protection Liens granted to the Senior Secured Notes Trustee, as applicable, pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations and Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming and other liens and replacement security interests shall, notwithstanding such dismissal, remain binding on all parties in interest) and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above, to the extent possible.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agents or the Senior Secured Notes Trustee, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Financing Documents with respect to any DIP Obligations or Adequate Protection Obligations. Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the DIP Agents, the DIP Lenders or the Senior Secured Notes Trustee prior to the actual receipt of written notice by the DIP Agents or the Senior Secured Notes Trustee, as applicable, of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the DIP Agents, DIP Lenders, and Senior Secured Notes Trustee

shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Financing Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Order or in the DIP Financing Documents, the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agents, the DIP Lenders, the Senior Secured Notes Trustee and the holders of the Senior Secured Notes granted by the provisions of this Order and the DIP Financing Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of these Cases or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors will waive any discharge as to any remaining DIP Obligations. The terms and provisions of this Order and the DIP Financing Documents shall continue in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority Claims and all other rights and remedies of the DIP Agents and the DIP Lenders granted by the provisions of this Order and the DIP Financing Documents shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full and the Commitments (as defined in the DIP Revolving Credit Agreement) are terminated.

16.     *Effect of Debtors' Stipulations on Third Parties.* Any Committee appointed in the Cases or any other party in interest, including any trustee appointed prior to the expiration of the 90-day period referred to below (other than the Debtors), shall be permitted to investigate the

31158498_v7                                       29

validity, enforceability, priority and/or extent of the Pre-Petition Obligations and the Pre-Petition

Senior Secured Note Obligations, respectively, and the liens and security interests of the Pre-

Petition Agents, the Pre-Petition Lenders and the Senior Secured Notes Trustee. Any adversary

proceeding or contested matter challenging the validity, enforceability, priority and/or extent of

any of the Pre-Petition Obligations or the Pre-Petition Senior Secured Note Obligations, or any of

the Pre-Petition Agents', the Pre-Petition Lenders' or the Senior Secured Notes Trustee's liens on

the Pre-Petition Collateral must be commenced no later than the date that is ninety (90) days

from the date of the entry of this Order on the docket of the Bankruptcy Court (or such later date

as extended by written consent of the Pre-Petition Revolving Credit Agent (in the case of the

credit facility under Pre-Petition Revolving Credit Agreement), the Pre-Petition Term Loan B

Agent (in the case of the credit facility under the Pre-Petition Term Loan B Agreement) and/or

the Senior Secured Notes Trustee (in the case of the Senior Secured Notes Indenture) or pursuant

to further order of the Court). The Official Committee of Unsecured Creditors (the "Creditors'

Committee") may bring any adversary proceeding or contested matter against either of the Pre-

Petition Agents, any of the Pre-Petition Lenders and/or the Senior Secured Notes Trustee in

respect of the matters referred to in the preceding sentence without the necessity of first filing a

motion seeking authority to do so. In the event of a successful challenge, nothing in this Order

shall preclude the Court from fashioning an appropriate remedy with respect to either of the Pre-

Petition Agents, any of the Pre-Petition Lenders and/or the Senior Secured Notes Trustee after

hearing from all parties affected thereby, including, without limitation, disgorgement of amounts

received by either of the Pre-Petition Agents or any of the Pre-Petition Lenders in connection

with the refinancing of the Pre-Petition Obligations. If no such adversary proceeding or

contested matter is timely filed or to the extent such adversary proceeding is timely filed with

respect to less than the entire Pre-Petition Obligations or the Pre-Petition Senior Secured Note Obligations or less than all of the Pre-Petition Collateral, (x) the Pre-Petition Obligations and the Pre-Petition Senior Secured Note Obligations, respectively, and all related obligations of the Debtors with respect to which no adversary proceeding has been commenced or relates shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 cases, (y) the Pre-Petition Agents', the Pre-Petition Lenders' and the Senior Secured Notes Trustee's liens on the Pre-Petition Collateral with respect to which no adversary proceeding has been commenced or relates shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance and (z) with respect to which no adversary proceeding has been commenced or relates, the Pre-Petition Obligations, the Pre-Petition Senior Secured Note Obligations, the Pre-Petition Agents', the Pre-Petition Lenders' and the Senior Secured Notes Trustee's liens on the Pre-Petition Collateral and the Pre-Petition Agents, the Pre-Petition Lenders and the Senior Secured Notes Trustee and the admissions, stipulations and agreements contained in paragraph 3 hereof shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto (including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors).

17.     *Limitation on Use of Financing Proceeds and Collateral.* Notwithstanding anything herein or in any other order by this Court to the contrary, no DIP Loans, letters of credit, Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under any of the DIP Financing Documents, the Pre-Petition Financing Documents or the Senior Secured

Notes Indenture, or the liens or claims granted under any of this Order, the DIP Financing

Documents, the Pre-Petition Financing Documents or the Senior Secured Notes Collateral

Documents, (b) assert any claims or defenses or causes of action against any of the DIP Agents,

the Pre-Petition Agents, the DIP Lenders, the Pre-Petition Lenders, the Senior Secured Notes

Trustee or the holders of the Senior Secured Notes, or their respective agents, affiliates,

representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay either of the DIP

Agent's enforcement or realization on the Cash Collateral or the Collateral in accordance with

the relevant DIP Financing Documents or this Order, (d) seek to modify any of the rights granted

to any of the DIP Agents or the DIP Lenders or the Pre-Petition Agents or the Pre-Petition

Lenders hereunder or under any of the DIP Financing Documents or the Pre-Petition Financing

Documents, in each of the foregoing cases without such parties' prior written consent or (e) pay

any amount on account of any claims arising prior to the Petition Date unless such payments are

permitted under the terms of the DIP Financing Documents and approved by an Order of this

Court; provided that nothing in this Paragraph 16 shall be construed to limit any investigation as

to the matters described.

18.  *Order Governs.*  In the event of any inconsistency between the provisions of this

Order and the DIP Financing Documents, the provisions of this Order shall govern.

19.  *Binding Effect; Successors and Assigns.*  The DIP Financing Documents and the

provisions of this Order, including all findings herein, shall be binding upon all parties in interest

in these Cases, including, without limitation, the DIP Agents, the DIP Lenders, the Pre-Petition

Agents, the Pre-Petition Lenders, the Senior Secured Notes Trustee, any Committee appointed in

these Cases and the Debtors and their respective successors and assigns (including any chapter 7

or chapter 11 trustee hereinafter appointed or elected for the estate of any of the Debtors) and

shall inure to the benefit of the DIP Agents, the DIP Lenders, the Pre-Petition Agents, the Pre-Petition Lenders, the Senior Secured Notes Trustee, and the Debtors and their respective successors and assigns; *provided, however,* that the DIP Agents and the DIP Lenders shall have no obligation to extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

20.     *Creditors' Committee Access to Information.*  The Debtors shall furnish to the Creditors' Committee copies of all financial information and reports furnished to the DIP Lenders pursuant to any of the Financing Documents.

Dated:  October 17, 2005 Wilmington, Delaware

UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT 5

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| HOMEBANC MORTGAGE | ) | Case No. 07-11079 (KJC) |
| CORPORATION, *et al.*,[1] | ) |  |
|  | ) | Jointly Administered |
| Debtors. | ) |  |
| | ) | **Ref. Docket No. 101, 166** |

**ORDER (I) AUTHORIZING DEBTORS (A) TO OBTAIN POST-**
**PETITION FINANCING PURSUANT TO 11 U.S.C. §§105, 361, 362, 364(C)(1),**
**364(C)(2), 364(C)(3), 364(D)(1) AND 364(E) AND (B) TO UTILIZE CASH**
**COLLATERAL PURSUANT TO 11 U.S.C. §363, AND (II) GRANTING**
**ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES**
**PURSUANT TO 11 U.S.C. §§ 361, 362, 363 AND 364**

Upon the motion (the "Motion"), dated August 24, 2007, of HomeBanc Mortgage

Corporation (the "Borrower"), and certain of its direct and indirect affiliates and subsidiaries

(other than Funding, Funding II, and Acceptance) (jointly and severally, the "Guarantors"), each

as debtor and debtor-in-possession (collectively, the "Debtors"), in the above-captioned cases

(the "Cases") pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3),

364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the

"Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), seeking, among other things:

> (1)    authorization for the Borrower to incur, and for the Guarantors to
>
> guaranty, post petition financing (the "Financing"), up to an aggregate principal
>
> amount of $8,500,000 (the actual available principal amount at any time being

---

[1]    The last four digits of the taxpayer identification numbers for each of the Debtors follow in parentheses: (i) HomeBanc Mortgage Corporation ("HBMC") (2745); (ii) HomeBanc Corp. ("HomeBanc") (3067); (iii) HomeBanc Funding Corp. II (6229) ("Funding II"); (iv) HMB Acceptance Corp. (6280) ("Acceptance"); (v) HMB Mortgage Partners, LLC  (9446); and (vi) HomeBanc Funding Corp. (5742) ("Funding"). Each of these entities has a mailing address of: 2002 Summit Boulevard, Suite 100, Atlanta, GA  30319.

subject to those conditions set forth in the DIP Documents (as defined below)), pursuant to a credit facility with JPMorgan Chase Bank, N.A. ("JPMCB"), acting as Administrative Agent (in such capacity, the "Agent"), for itself and the other lenders from time to time party to the Financing (together with JPMCB, the "DIP Lenders");

(2)    authorization for the Debtors to execute and enter into the DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(3)    the granting of adequate protection to (x) the lenders (the "Prepetition MSR Lenders") under or in connection with that certain Loan and Security Agreement among JPMCB, as administrative agent (in such capacity, the "Prepetition MSR Agent"), the Prepetition Secured Lenders (as defined below), and HomeBanc and HBMC, as borrowers, dated November 17, 2006 (as heretofore amended, supplemented or otherwise modified, and the mortgages and all other documentation executed in connection therewith, the "Prepetition Credit Agreement"); and (y) solely with respect to security interests in the Additional Collateral granted by and defined in Section 8 of the Warehouse Facility (as defined below) and to the extent the transactions thereunder are deemed to be loans and not purchases and sales, the buyers (collectively, the "Buyers" and, together with the Prepetition MSR Lenders, the "Prepetition Secured Lenders") under or in connection with the Master Repurchase Agreement, between, among others, JPMCB, as administrative agent (the "Administrative Agent" and, in its capacities as both the Administrative Agent and the Prepetition MSR Agent, the

2

"Prepetition Agent"), the Buyers, and HomeBanc and HBMC, as sellers, dated October 31, 2006 (as heretofore amended, supplemented or otherwise modified, and the mortgages and all other documentation executed in connection therewith, the "Warehouse Facility" and, together with the Prepetition Credit Agreement, and any related agreements, the "Existing Agreements"), whose liens and security interests, to the extent set forth above, are being primed by the Financing;

(4)     authorization for the Debtors to use cash collateral (as such term is defined in the Bankruptcy Code) in which the Prepetition Secured Lenders have an interest (the "Cash Collateral"), and the granting of adequate protection to the Prepetition Agent and the Prepetition Secured Lenders with respect to, *inter alia*, such use of their Cash Collateral, the use, sale or lease of any other of the Prepetition Collateral (as defined below), the imposition of liens in favor of the DIP Lenders on the Prepetition Collateral and from the imposition of the automatic stay (with respect to the Prepetition Credit Agreement);

(5)     the granting of certain superpriority claims to the DIP Lenders payable from, and having recourse to, all prepetition and postpetition property of the Debtors' estates and all proceeds thereof, subject to the Carve Out (as defined below), and the granting of liens on all prepetition and postpetition property of the Debtors and the proceeds thereof;

(6)     pursuant to Bankruptcy Rule 4001, that an interim hearing (the "Interim Hearing") on the Motion be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order"); and

(7)     that this Court schedule a final hearing (the "Final Hearing") to

3

consider entry of a final order authorizing, among other things, the balance of the borrowings under the DIP Documents on a final basis, the continued use of cash collateral, the granting of liens and superpriority claims for the benefit of the DIP Lenders and the granting of adequate protection for the benefit of the Prepetition Secured Lenders and the Buyers as set forth in the Motion and the DIP Documents filed with this Court (the "Final Order").

Due and appropriate notice of the Motion, the relief requested therein and the Interim Hearing and the Final Hearing having been served by the Debtors on the Notice Parties.

The Interim Hearing and the Final Hearing having been held by this Court on August 30, 2007 and September 12, 2007, respectively.

Upon the record made by counsel to the Debtors at the Interim Hearing and the Final Hearing and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.    Jurisdiction.  This Court has core jurisdiction over the Cases, the Motion, and the parties and property affected under this Order pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to  28 U.S.C. §§ 1408 and 1409.

2.    Notice.  Under the circumstances, the notice given by the Debtors of the Motion and the Final Hearing constitutes due and sufficient notice thereof has been given pursuant to Bankruptcy Rules 4001(b) and (c).

3.    Prepetition Debt.  Subject to the rights of parties in interest set forth in paragraph 16 hereof, the Prepetition Agent and the Prepetition Secured Lenders assert and the Debtors agree that:

(a)    as of the filing of the Debtors' chapter 11 petitions (the "Petition Date"),

4

certain of the Debtors were indebted and liable to (i) the Prepetition MSR Lenders, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $67,600,000 under the Prepetition Credit Agreement, plus accrued and accruing interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Prepetition Credit Agreement), charges and other obligations incurred in connection therewith as provided in the Prepetition Credit Agreement that are reimbursable thereunder (the "MSR Debt") ; and (ii) the Buyers, without defense, counterclaim or offset of any kind, in the aggregate principal amount of approximately $318,000,000 under the Warehouse Facility, plus accrued and accruing interest thereon and fees, expenses (including any attorneys', accountants', appraisers' and financial advisors' fees that are chargeable or reimbursable under the Warehouse Facility), charges and other obligations incurred in connection therewith as provided in the Warehouse Facility that are reimbursable thereunder (the "Warehouse Debt," and together with the MSR Debt, the "Prepetition Debt"), the Prepetition Debt constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with its terms (other than, solely with respect to the Prepetition Credit Agreement, in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no portion of the Prepetition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law, and the Debtors do not have any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or otherwise, against the Prepetition Secured Lenders, the Prepetition Agent and their respective affiliates, agents, officers, directors, employees and attorneys;

(b)     the purchase and sale of mortgage loans under the Warehouse Facility and the Master Repurchase Agreement, between JPMorgan as Buyer and certain of the Debtors, as

5

sellers, dated January 23, 2007 (as amended, the "Aggregation Facility"), and all rights and remedies with respect thereto, are not subject to the automatic stay because, among other things, the Warehouse Facility and the Aggregation Facility constitute repurchase agreements under section 559 of the Bankruptcy Code; and

        (c)     the liens and security interests granted to the Prepetition Agent pursuant to and in connection with the Existing Agreements (including, without limitation, all security agreements, pledge agreements, mortgages, deeds of trust and other security documents executed by any of the Debtors in favor of the Prepetition Agent, for its benefit and for the benefit of the Prepetition Secured Lenders), are (i) valid, binding, perfected, enforceable, first-priority liens and security interests in the property described in the Prepetition Credit Agreement and the Warehouse Facility (to the extent transactions thereunder are deemed to be loans and not purchases and sales) (collectively, the "Prepetition Collateral"), (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) the DIP Liens (as defined below), (B) the Carve Out (as defined below) to which the DIP Liens are subject and (C) valid, perfected and unavoidable liens, if any, to the extent such liens, under the explicit terms of the Existing Agreements, are senior to or *pari passu* with the liens of the Prepetition Agent on the Prepetition Collateral.

        4.     Findings Regarding the Financing.

        (a)     Good cause has been shown for the entry of this Interim Order.

        (b)     The Debtors have an immediate need to obtain the Financing and use Cash Collateral in order to permit, among other things, the orderly continuation of the operation of their businesses pending their liquidation or sale, to maintain the Debtors' mortgage servicing

6

business (the "Servicing Business") (pending any transfer thereof), to fund the Servicing Asset Sale (as defined in the DIP Credit Agreement (as defined below)), to maintain business relationships with vendors and suppliers, to make payroll and to satisfy other operational needs. The ability of the Debtors to obtain sufficient working capital and liquidity through the use of Cash Collateral (as defined below), incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation of the Debtors' business pending its sale. In the absence of the relief requested hereby, the continued operation of the Debtors (pending a sale) would not be possible and immediate and irreparable harm to the Debtors' creditors (including, without limitation, unsecured creditors) and the Debtors' estates would occur.

(c)     The Debtors are unable to obtain financing from sources other than the DIP Lenders on more favorable terms than under the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtors are also unable to obtain secured credit allowable under section 364(c) of the Bankruptcy Code without the Debtors granting to the Agent and the DIP Lenders, subject to the Carve Out as provided for herein, the DIP Liens and the Superpriority Claims (as defined below) under the terms and conditions set forth in this Order and in the DIP Documents.

(d)     The terms of the Financing and the use of Cash Collateral are fair and reasonable, and reflect the Debtors' exercise of good and prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The Financing has been negotiated in good faith and at arm's length among the Debtors, the Agent and the DIP Lenders, and all of the Debtors' obligations and

7

indebtedness arising under, in respect of or in connection with the Financing and the DIP Documents, including without limitation, (i) all loans made to the Borrower pursuant to the Revolving Credit, Guaranty and Security Agreement substantially in the form annexed to the Motion as Exhibit "A" (the "DIP Credit Agreement"), and (ii) any "Obligations" (as defined in the DIP Credit Agreement), including credit extended in respect of overdrafts and related liabilities and other depository, treasury and cash management services and other clearing services provided by the Agent or its affiliates (all of the foregoing in clauses (i) and (ii) collectively, the "DIP Obligations"), are deemed to have been extended by the Agent and the DIP Lenders and their affiliates in good faith, as that term is used in section 364(e) of the Bankruptcy Code and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

(f)     The Debtors have requested entry of this Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2). Absent entry of this Order, the Debtors' estates will be immediately and irreparably harmed. Consummation of the Financing and the use of Cash Collateral in accordance with this Order and the DIP Documents are therefore in the best interest of the Debtors' estates.

5.     Authorization of the Financing and the DIP Documents.

(a)     The Debtors are hereby authorized to enter into the DIP Documents. The Borrower is hereby authorized to borrow money, and the Guarantors are hereby authorized to guarantee, pursuant to, and subject to the terms and conditions of, the DIP Credit Agreement, up to an aggregate principal amount of $8,500,000 (plus interest, fees and other expenses provided

8

for in the DIP Documents), subject to any limitations of borrowings under the DIP Documents and all in accordance with the terms of this Order and the DIP Documents, which shall be used solely for the purposes permitted under the DIP Documents, including, to fund Servicing Advances (as defined in the DIP Credit Agreement) and for working capital purposes of the Debtors, including the payment of fees and expenses in respect of the Cases and the Servicing Asset Sale (as defined in the DIP Credit Agreement) and other sales of the Debtors' businesses, in each case solely in the amounts set forth in the budget attached to the DIP Credit Agreement as Exhibit F (as amended from time to time with the consent of the requisite DIP Lenders, the "Budget"), provided, however, the Debtors will be authorized to borrow money pursuant to the DIP Credit Agreement only at such times, and to the extent that, the Debtors have insufficient cash or cash collateral available to fund the amounts then provided for under the Budget and subject to the terms and conditions of the DIP Credit Agreement. Use of Cash Collateral and borrowings under the DIP Credit Agreement shall be limited by, among other things, amounts set forth in expenditure line items in the Budget (with such line items as agreed by the Agent, the Debtors and the Committee) and a line item limiting aggregate use of Cash Collateral and borrowings under the DIP Credit Agreement for each calendar week (each, a "Budget Period"), which shall be subject to a 10% variance; provided that the amount of any expense (other than a Servicing Advance) provided for under the Budget for a Budget Period which is not incurred in such Budget Period may be carried forward by the Borrower to future Budget Periods (but only with respect to the same line item for which such expense was allocated); provided further that expenditures for Servicing Advances shall be subject to a 30% variance. In addition to such loans and obligations, the Debtors are authorized to incur overdrafts and related liabilities arising from treasury, depository and cash management services or in connection with any automated

9

clearing house fund transfers provided to or for the benefit of the Debtors by JPMCB or any of its affiliates; provided, however, that nothing herein shall require JPMCB or any other party to incur overdrafts or to provide any such services or functions to the Debtors.

(b)     In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized and directed to perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages and financing statements), and to pay all fees, that may be required or necessary for the Debtors' performance of their obligations under the Financing, including, without limitation:

(i)     the execution, delivery and performance of the DIP Credit Agreement and any related agreements and any exhibits attached thereto, including, without limitation, the DIP Credit Agreement contemplated thereby (collectively, the "DIP Documents"),

(ii)     the execution, delivery and performance of one or more amendments to the DIP Credit Agreement for, among other things, the purpose of adding additional financial institutions as DIP Lenders and reallocating the commitments for the Financing among the DIP Lenders, in each case in such form as the Debtors, the Agent and the DIP Lenders may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Credit Agreement that do not shorten the maturity of the extensions of credit thereunder or increase the commitments, or the rate of interest payable thereunder),

(iii)     the non-refundable payment to the Agent or the DIP Lenders, as the case may be, of the fees referred to in the DIP Credit Agreement and reasonable costs and expenses as may be due from time to time, including, without limitation, reasonable fees and

10

expenses of the professionals retained as provided for in the DIP Documents, and

(iv)    the performance of all other acts required or advisable under or in connection with the DIP Documents.

(c)    Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the DIP Documents. No obligation, payment, transfer or grant of security under the DIP Documents or this Order shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code (including without limitation, section 502(d) thereunder) or any other law, or subject to any defense, reduction, recoupment, setoff or counterclaim.

6.    Superpriority Claims.

(a)    Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed claims against the Debtors with priority over any and all administrative expenses, diminution claims (including all Adequate Protection Obligations (as defined below) and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code (the "Superpriority Claims"), whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment (other than to the extent of any statutory liens or security interest arising after the Petition Date and permitted under the DIP Credit Agreement that by operation of law would have priority over a previously perfected security interest), which allowed claims shall be

11

payable from and have recourse to all pre- and postpetition property of the Debtors and all proceeds thereof (other than the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code, any other avoidance actions under the Bankruptcy Code, or the proceeds of any of the foregoing, but excluding any property securing liens that have been avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code, to which the DIP Liens provided for by paragraph 7(a) shall attach (collectively, "Avoidance Actions")), subject only to the payment of the Carve Out (defined below) to the extent specifically provided for herein.  All intercompany loans and administrative expense or other priority given thereto shall be junior and subordinate in all respects (including, without limitation, in terms of payment or the exercise of remedies) to the DIP Obligations and the Adequate Protection Obligations.

   (b) For purposes hereof, the "Carve Out" means, collectively, (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code; and (ii) an aggregate amount not exceeding the sum of (x) the amount of any professional compensation or reimbursement of expenses incurred by the Debtors' or the Committee's professionals in compliance with the Budget and unpaid at the time of the occurrence of an Event of Default (as defined in the DIP Credit Agreement), to the extent allowed by the Bankruptcy Court; and (y) $450,000, which amount may be used after the occurrence and during the continuance of an Event of Default subject to the terms of this Order, including, without limitation, paragraph 13 hereof, to pay any fees or expenses incurred by the Debtors and any statutory committees appointed in the Cases (each, a "Committee") that remain unpaid subsequent to the application of any retainer held by the Debtors' professionals and payment, *pro rata* with other nonpriority administrative creditors,

12

of such fees and expenses from available funds remaining in the Debtors' estates for such

creditors, in respect of (A) allowances of compensation for services rendered or reimbursement

of expenses awarded by the Bankruptcy Court to the Debtors' or any Committee's professionals

and (B) the reimbursement of expenses allowed by the Bankruptcy Court incurred by Committee

members in the performance of their duties (but excluding fees and expenses of third party

professionals employed by such members); provided, however, that the dollar limitation in this

clause 6(b)(ii) on fees and disbursements shall neither be reduced nor increased by the amount of

any compensation or reimbursement of expenses paid prior to the occurrence of an Event of

Default in respect of which the Carve Out is invoked or by any fees, expenses, indemnities or

other amounts paid to any Agent, DIP Lender or their respective attorneys and agents under the

DIP Credit Agreement or otherwise, and provided, further, that nothing herein shall be construed

to impair the ability of any party to object to any of the fees, expenses, reimbursement or

compensation described in clauses (A) and (B) above.

   7.  DIP Liens.  As security for the DIP Obligations, effective and perfected upon the

Petition Date and without the necessity of the execution, recordation of filings by the Debtors or

any other person of mortgages, security agreements, control agreements, pledge agreements,

financing statements or other similar documents, the following security interests and liens are

hereby granted to the Agent for its own benefit and the benefit of the DIP Lenders (all property

identified in clauses (a), (b) and (c) below, being collectively referred to as the "Collateral"),

subject to the payment of the Carve Out (all such liens and security interests granted to the

Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order and the DIP

Documents, the "DIP Liens"):

     (a)  First Lien on Cash Balances and Unencumbered Property.  Pursuant to

13

section 364(c)(2) of the Bankruptcy Code, the Agent is hereby granted (for the benefit of itself and the DIP Lenders) a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all pre- and postpetition assets of the Debtors, including, without limitation, all property of the Debtors' estates, whether existing on the Petition Date or thereafter acquired, that, on or as of the Petition Date is not subject to valid, perfected and non-avoidable liens (collectively, "Unencumbered Property"), including without limitation, all cash and cash collateral of the Debtors (whether maintained with the Agent or otherwise) and any investment of such cash and cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing; provided; however, that the DIP Liens will not attach to the Avoidance Actions, and Unencumbered Property shall exclude Avoidance Actions.

      (b)    Priming Liens. Pursuant to section 364(d)(1) of the Bankruptcy Code, the Agent (for the benefit of itself and the DIP Lenders) is hereby granted a valid, binding, continuing, enforceable, fully-perfected first priority senior priming security interest in and lien upon all pre- and postpetition property of the Debtors (including, without limitation, cash collateral, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interests in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, capital stock of subsidiaries, and the proceeds of all the foregoing), whether existing as such on the Petition Date or there- or hereafter acquired, that is subject to

14

existing liens which secure (i) the MSR Debt and the Warehouse Debt (solely to the extent that transactions under the Warehouse Facility are deemed to be loans and not purchases and sales); and (ii) other obligations or indebtedness of the Borrower and Guarantors, if any, pursuant to other agreements between the Debtors and the Prepetition Secured Lenders (collectively, the "Primed Liens"). Such security interests and liens shall be senior in all respects to the Primed Liens and any other interests in such property of the Prepetition Secured Lenders arising from current and future liens of the Prepetition Secured Lenders (including, without limitation, the Adequate Protection Liens (as defined below)), but shall not be senior to any valid, perfected and unavoidable interests of other parties arising out of liens, if any, on such property existing immediately prior to the Petition Date.

(c)     Liens Junior to Certain Other Liens. Pursuant to section 364(c)(3) of the Bankruptcy Code, the Agent (for the benefit of itself and the DIP Lenders) is hereby granted valid, binding, continuing, enforceable, fully-perfected security interests in and liens upon all pre- and postpetition property of the Debtors (other than the property described in clauses (a) or (b) of this paragraph 7, as to which the liens and security interests in favor of the Agent will be as described in such clauses), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which security interests and liens in favor of the Agents are junior to such valid, perfected and unavoidable liens.

(d)     Liens Senior to Certain Other Liens. The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security

15

interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors other than liens or security interests arising after the Petition Date and permitted under the DIP Credit Agreement to be senior to the DIP Liens.

8. Protection of DIP Lenders' Rights.

(a) So long as there are any borrowings or other amounts outstanding, or the DIP Lenders have any Commitment (as defined in the DIP Credit Agreement) under the DIP Credit Agreement, the Prepetition Agent and Prepetition Secured Lenders shall (i) take no action to foreclose upon or recover in connection with the liens granted thereto pursuant to the Existing Agreements or this Order, or otherwise exercise remedies against any Collateral, except to the extent authorized by an order of this Court or consented to by the DIP Lenders; (ii) be deemed to have consented to any release of Collateral authorized under the DIP Documents; and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the Collateral. Notwithstanding the foregoing, the Prepetition Secured Lenders shall be permitted to file pleadings with respect to any proposed sale, transfer or other disposition of the Collateral by the Debtors outside the ordinary course of business.

(b) The automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary (i) to permit the Agent and the DIP Lenders to exercise, upon the occurrence of an Event of Default, all rights and remedies under the DIP Documents other than those rights and remedies against the Collateral and (ii) to the extent

16

necessary to permit the Agent and the DIP Lenders to exercise, upon the occurrence and during

the continuance of an Event of Default and the giving of five business days prior written notice

to the Creditors' Committee and to the extent provided for in the DIP Credit Agreement, all

rights and remedies against the Collateral provided for in the DIP Documents (including, without

limitation, the right to setoff monies of the Debtors in accounts maintained with the Agent or any

DIP Lender, which amounts shall not include money held in custodial accounts for the benefit of

others). In any hearing regarding any exercise of rights or remedies, the only issue that may be

raised by any party in opposition thereto shall be whether, in fact, an Event of Default has

occurred and is continuing, and the Debtors and the Prepetition Secured Lenders hereby waive

their right to seek relief, including, without limitation, under section 105 of the Bankruptcy

Code, to the extent such relief would in any way impair or restrict the rights and remedies of the

Agent or the DIP Lenders set forth in this Order or the DIP Documents. In no event shall the

Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders be subject to

the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral.

9.    <u>Limitation on Charging Expenses Against Collateral</u>.  Except to the extent of the

Carve Out, upon entry of an order approving the Servicing Asset Sale, no expenses of

administration of the Cases or any future proceeding that may result therefrom, including

liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged

against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or

any similar principle of law or equity, without the prior written consent of the Agent or the

Prepetition Agent, as the case may be, and no such consent shall be implied from any other

action, inaction, or acquiescence by the Agent, the DIP Lenders, the Prepetition Agent or the

Prepetition Secured Lenders.

17

10.    Use of Cash Collateral. Pursuant to the Existing Documents, certain of the Borrowers' and Guarantors' cash, as well as any proceeds of the Prepetition Collateral constitute Cash Collateral of the Prepetition Agent for the benefit of the Prepetition Secured Lenders, within the meaning of section 363(a) of the Bankruptcy Code. Solely upon the depletion of all cash that is not Cash Collateral, if any, the Debtors are hereby authorized to use Cash Collateral of the Prepetition Secured Lenders subject to the terms of the DIP Credit Agreement, including without limitation, limited to the amounts set forth in the Budget, provided that the Prepetition Secured Lenders are granted adequate protection as hereinafter set forth. The Prepetition Agent on behalf of the Prepetition Secured Lenders shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral on the occurrence and continuance of an Event of Default under the DIP Credit Agreement. In addition, the Debtors' right to use Cash Collateral shall terminate automatically upon the Termination Date (as defined in the DIP Credit Agreement); provided, that if the Termination Date occurs because of the Servicing Asset Sale, the Prepetition Agent shall have the right to allow the Debtors to continue to use Cash Collateral. In addition, so long as there are any amounts outstanding pursuant to the Existing Agreements, the Debtors shall, for the benefit of the Prepetition Secured Lenders, continue to comply with the requirements of Sections 5 and 6 of the DIP Credit Agreement and, upon any failure by the Debtors to observe any such requirement or upon the occurrence of any event that would have constituted an Event of Default under the DIP Credit Agreement prior to the termination of the Commitments and payment of all Obligations thereunder, the Prepetition Agent on behalf of the Prepetition Secured Lenders shall have the immediate right unilaterally to terminate the Debtors' right to use Cash Collateral.

11.    Adequate Protection. The Prepetition Secured Lenders are entitled, pursuant to

18

sections 361, 363(e) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their

interest in the Prepetition Collateral, including the Cash Collateral, for the diminution in value of

the Prepetition Secured Lenders' interests in the Prepetition Collateral, including, without

limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other

decline in value) of Cash Collateral and any other Prepetition Collateral, the priming of the

Prepetition Agent's security interests and liens in the Prepetition Collateral by the Agent and the

DIP Lenders pursuant to the DIP Documents and this Order, and, with respect to the Prepetition

Credit Agreement, the imposition of the automatic stay pursuant to section 362 of the

Bankruptcy Code (collectively, the "Adequate Protection Obligations"). As adequate protection,

the Prepetition Agent and the Prepetition Secured Lenders are hereby granted the following:

(a)     Adequate Protection Liens. As security for the payment of the Adequate

Protection Obligations, the Prepetition Agent (for itself and for the benefit of the Prepetition

Secured Lenders) is hereby granted (effective and perfected upon the date of this Order and

without the necessity of the execution by the Debtors of mortgages, security agreements, pledge

agreements, financing statements or other agreements) a replacement security interest in and lien

(the "Adequate Protection Liens") upon the Collateral, and proceeds thereof (which excludes the

Avoidance Actions), subject and subordinate only to (i) the DIP Liens and any liens on the

Collateral to which the DIP Liens are junior, and (ii) the Carve Out;

(b)     Section 507(b) Claim. The Prepetition Agent and the Prepetition Secured

Lenders are hereby granted, subject to the payment of the Carve Out and excluding the

Avoidance Actions, a superpriority claim in the amount of the Adequate Protection Obligations

as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the claims under

section 364(c)(1) of the Bankruptcy Code held by the Agent and the DIP Lenders provided,

19

however, that the Prepetition Agent and the Prepetition Secured Lenders shall not receive or retain any payments, property or other amounts in respect of the superpriority claims under section 507(b) of the Bankruptcy Code granted hereunder or under the Existing Agreements unless and until the DIP Obligations have indefeasibly been paid in cash in full. All intercompany loans and administrative expense or other priority given thereto shall be junior and subordinate in all respects (including, without limitation, in terms of payment or the exercise of remedies) to the Adequate Protection Obligations;

(c) <u>Interest, Fees and Expenses</u>. The Prepetition Agent shall receive from the Debtors (i) current cash payments of all fees and expenses payable to the Prepetition Agent under the Existing Agreements, including, but not limited to, the reasonable fees and disbursements of counsel, financial and other consultants for the Prepetition Agent, including, without limitation, the reasonable fees and expenses of Milbank, Tweed, Hadley & McCloy LLP, Clayton Services, Inc., and BearingPoint, whether such fees and expenses were incurred prior to the date hereof or prior to or after the Petition Date; (ii) current cash payment of the reasonable fees and disbursements of counsel, financial and other consultants for the Prepetition Secured Lenders under the Existing Agreements, including without limitation, White & Case LLP, whether such fees and expenses were incurred prior to the date hereof or prior to or after the Petition Date; and (iii) on the first business day of each month, all interest, accrued after the Petition Date and unpaid, on the MSR Debt at the non-default contract rate applicable on the Petition Date (including LIBOR pricing options) under the Prepetition Credit Agreement, <u>provided</u> that, without prejudice to the rights of any other party to contest such assertion, the Prepetition Secured Lenders reserve their rights to assert claims for the payment of additional interest calculated at any other applicable rate of interest (including, without limitation, default

20

066530.1001

rates), or on any other basis, provided for in the Existing Agreements; provided, however, that if the liens securing the Prepetition Debt are invalidated or if the Prepetition Debt is determined to be invalid or undersecured, the treatment of the fees, expenses and interest payable under clauses (i), (ii) and (iii) of this Paragraph 12(c) shall be subject to further judicial review. The Borrowers shall send copies of invoices received by them for such out-of-pocket costs and expenses (including attorneys' fees and expenses) to the United States Trustee. The payment of the fees, expenses and disbursements set forth in this paragraph shall be made within ten (10) days after receipt by the Debtors (the "Review Period") of invoices thereof (the "Invoiced Fees") (subject in all respects to applicable work product doctrines) and without the necessity of filing formal fee applications, including amounts arising before and after the Petition Date, provided, however, that the Debtors and the United States Trustee may preserve their right to dispute (on grounds other than those set forth in sections 327 and 330 of the Bankruptcy Code) the payment of any portion of the Invoiced Fees (the "Disputed Invoiced Fees") if, within the Review Period, (i) the Debtors pay in full the Invoiced Fees, including the Disputed Fees, and (ii) the Debtors or the United States Trustee file with the Court a motion or pleading, on at least ten (10) days' prior written notice to the counsel to the Administrative Agent and counsel to the Prepetition Secured Lenders of any hearing on such motion or other pleading, setting forth the specific objections to the Disputed Invoiced Fees;

(d)    Sale of Servicing Business.  The auction and sale procedures for the Servicing Asset Sale (as defined in the DIP Credit Agreement) shall be in form and substance satisfactory to the Prepetition Secured Lenders (including without limitation credit bid protections).  In addition, any proceeds from such sale (the "Servicing Sale Proceeds") shall, at the option of the Prepetition Agent (or as directed by the required Prepetition Secured Lenders),

21

be paid immediately upon the closing of the sale to the Prepetition MSR Agent to be applied to the MSR Debt, subject to the prior payment in full of all Obligations under the DIP Documents and the termination of the Commitments thereunder; provided that (i) if the Servicing Sale Proceeds are equal to or less than the amount of the MSR Debt, the aggregate amount of the costs necessary, after giving effect to anticipated reductions of workforce, to wind down the operations of the Debtors (as set forth in a budget, including, without limitation, amounts for payroll, benefits, and key employee incentive compensation payments that have previously been approved by the Bankruptcy Court with the consent of the DIP Lenders and the Prepetition Secured Lenders, which budget shall be reasonably satisfactory to the Prepetition Agent, the Debtors and the Committee and approved as part of the Order approving the Servicing Asset Sale) (collectively, the "Wind-Down Costs") shall also be deducted from the Servicing Sale Proceeds, prior to their payment to the Prepetition Agent; and (ii) if the Servicing Sale Proceeds are greater than the amount of the MSR Debt, such excess proceeds (after payment of the MSR Debt and deduction of the Wind-Down Costs) shall be paid to and held by the Prepetiton Agent, for the benefit of the Buyers, to satisfy any deficiency claim of the Buyers under the Warehouse Facility, subject to the right of the Debtors to seek return to the Debtors' estates of any amounts not necessary to satisfy deficiency claims and the Buyers' rights under section 507(b) of the Bankruptcy Code and Paragraph 12(b) of this Order. The mechanism for valuing the Collateral and disposing of excess proceeds shall be determined by the Debtors, the Agent and the Committee and approved as part of the Order approving the Servicing Asset Sale.

(e)    Intermediate Transfer of Subservicing. Prior to the consummation of the sale of the Servicing Business, the Debtors shall provide for JPMCB (or its affiliates) to become the subservicer of the Servicing Business, subject to a subservicing agreement on terms and

22

conditions acceptable to the JPMCB (or its affiliates) and the Prepetition Secured Lenders. The Debtors shall fully cooperate in such transfer and provide any further assurance or assistance as necessary to effectuate such transfer, including providing all documentation that related to the Servicing Business, including electronic information.

(f)　　Monitoring of Collateral. The Prepetition Secured Lenders shall be permitted to retain expert consultants and financial advisors at the expense of the Debtors as provided for in the Existing Agreements, which consultants and advisors shall be given reasonable access to, among other things, monitor the Collateral, collect files, tapes, meet with rating agencies and other notice parties (all without liability to the Debtors); and

(g)　　Mortgage Servicing Materials. The Debtors shall provide to the Prepetition Agent all materials, information and documents necessary to facilitate the sale of the mortgage servicing rights under the Prepetition Credit Agreement and the loans under the Warehouse Facility.

(h)　　Information. The Debtors shall provide the Prepetition Agent with any written financial information or periodic reporting that is provided to, or required to be provided to, the Agent or the DIP Lenders.

12.　　Reservation of Rights. Under the circumstances and given that the above described adequate protection is consistent with the Bankruptcy Code, the Court finds that the adequate protection provided herein is reasonable to protect the interests of the Prepetition Secured Lenders at this time. However, the Prepetition Agent and the Prepetition Secured Lenders may request further or different adequate protection. Moreover, nothing contained in this Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify the right of the Prepetition Agent, any Prepetition Secured Lender or DIP

23

Lender to propose a chapter 11 plan or plans of reorganization or liquidation, subject to the Debtors' exclusive periods set forth in section 1121(b) of the Bankruptcy Code, as the same may be extended from time to time.

      13.    <u>Perfection of DIP Liens and Adequate Protection Liens</u>.

      (a)    The Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Secured Lenders are hereby authorized, but not required, to file or record financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments in any jurisdiction or take any other action in order to validate and perfect the liens and security interests granted to them hereunder. Whether or not the Agent on behalf of the DIP Lenders or the Prepetition Agent on behalf of the Prepetition Secured Lenders shall, in their sole discretion, choose to file such financing statements, trademark filings, copyright filings, mortgages, notices of lien or similar instruments or otherwise confirm perfection of the liens and security interests granted to them hereunder, but subject to paragraph 15 hereof, such liens and security interests shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge dispute or subordination, at the time and on the date of entry of this Order. Upon the request of the Agent, each of the Debtors, Prepetition Agent and Prepetition Secured Lenders, without any further consent of any party, is authorized to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Agent to further validate, perfect, preserve and enforce DIP Liens.

      (b)    A certified copy of this Order may, in the discretion of the Agent, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

24

14.    Preservation of Rights Granted Under the Order.

(a)    No claim or lien having a priority superior to or *pari passu* with those granted by this Order to the Agent and the DIP Lenders or to the Prepetition Agent and the Prepetition Secured Lenders, respectively, shall be granted or allowed while any portion of the Financing (or any refinancing thereof), the Commitments thereunder, the DIP Obligations or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be (i) subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or (ii) subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise (other than as specifically provided in this Order).

(b)    Unless all DIP Obligations, Adequate Protection Obligations and obligations under the Existing Agreements shall have been paid in full, the Debtors shall not seek, and it shall constitute an Event of Default and a termination of the right to use Cash Collateral if any of the Debtors seek, or if there is entered, (i) any modifications or extensions of this Order without the prior written consent of the Agent and the Prepetition Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the Agent or the Prepetition Agent, or (ii) an order dismissing any of the Cases. If an order dismissing any of the Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (i) the Superpriority Claims, priming liens, security interests and replacement security interests granted to the Agent and, as applicable, the Prepetition Agent pursuant to this Order shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP

25

Obligations and Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest); and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in (i) above.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacation shall not affect (i) the validity of any DIP Obligations or Adequate Protection Obligations incurred prior to the actual receipt of written notice by the Agent or Prepetition Agent, as applicable, of the effective date of such reversal, stay, modification or vacation or (ii) the validity or enforceability of any lien or priority authorized or created hereby or pursuant to the DIP Credit Agreement with respect to any DIP Obligations or Adequate Protection Obligations.  Notwithstanding any such reversal, stay, modification or vacation, any use of Cash Collateral, or DIP Obligations or Adequate Protection Obligations incurred by the Debtors to the Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders prior to the actual receipt of written notice by the Agent and Prepetition Agent of the effective date of such reversal, stay, modification or vacation shall be governed in all respects by the original provisions of this Order, and the Agent, DIP Lenders, Prepetition Agent and Prepetition Secured Lenders shall be entitled to all the rights, remedies, privileges and benefits granted in section 364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all uses of Cash Collateral, DIP Obligations and Adequate Protection Obligations.

(d)     Except as expressly provided in this Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, and all other rights and

26

remedies of the Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Secured

Lenders granted by the provisions of this Order and the DIP Documents shall survive, and shall

not be modified, impaired or discharged by (i) the entry of an order converting any of the Cases

to a case under chapter 7, dismissing any of the Cases, terminating the joint administration of

these Cases or by any other act or omission; or (ii) the entry of an order confirming a plan of

reorganization in any of the Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code,

the Debtors have waived any discharge as to any remaining DIP Obligations and such waiver is

hereby approved. The terms and provisions of this Order and the DIP Documents shall continue

in these Cases, in any successor cases if these Cases cease to be jointly administered, or in any

superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Superpriority

Claims, the Adequate Protection Liens, and all other rights and remedies of the Agent, the DIP

Lenders, the Prepetition Agent and the Prepetition Secured Lenders granted by the provisions of

this Order and the DIP Documents shall continue in full force and effect until the DIP

Obligations or the Prepetition Debt, as applicable, is indefeasibly paid in full.

     15.    _Effect of Stipulations on Third Parties_. The stipulations, admissions, agreements,

waivers and assertions contained in this Order, including, without limitation, the assertions

contained in paragraph 3 of this Order, shall be binding upon the Debtors and all other parties in

interest, including, without limitation, any Committee, unless (a) a party in interest has timely

filed an adversary proceeding or contested matter (subject to the limitations contained herein,

including, _inter alia_, in paragraph 16) by no later than the date that is ninety (90) days after the

date an application (subsequently approved) to retain counsel by the Official Committee of

Unsecured Creditors (the "Creditors' Committee") in the Cases is filed (or such later date as has

been agreed to, in writing, by the Prepetition Agent in its sole discretion) (the "Committee

27

Investigation Period"), (i) challenging the validity, enforceability, priority or extent of the Prepetition Debt or the Prepetition Agent's or the Prepetition Secured Lenders' liens on the Prepetition Collateral or (ii) otherwise asserting or prosecuting any action under recharacterization, subordination, preference, fraudulent conveyance, or other avoidance power theories or any other any claims, counterclaims or causes of action, objections, contests or defenses against the Prepetition Agent or any of the Prepetition Secured Lenders or their affiliates, representatives, attorneys or advisors in connection with matters related to the conduct of any Agent or Lender or related to the Existing Agreements, the Prepetition Debt, the Prepetition Collateral; and (b) there is a final order in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter. Nothing contained herein is intended to assign any claim of the Debtors to any third party and/or to bestow any standing with respect thereto. If no such adversary proceeding or contested matter is timely filed, (x) the Prepetition Debt and all related obligations of the Debtors (the "Prepetition Obligations") shall constitute allowed claims, whether or not a proof of claim has been filed respecting them, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Cases and any subsequent chapter 7 cases, (y) the Prepetition Agent's and the Prepetition Secured Lenders' liens on the Prepetition Collateral shall be deemed to have been, as of the Petition Date, legal, valid, binding and perfected, not subject to recharacterization, subordination or avoidance, and (z) the Prepetition Obligations, the Prepetition Agent's and the Prepetition Secured Lenders' liens on the Prepetition Collateral and the Prepetition Agent and the Prepetition Secured Lenders shall not be subject to any other or further challenge by any party in interest, including, without limitation, the Debtors, seeking to exercise the rights of the Debtors' estates, including, without limitation, any successor thereto

28

(including, without limitation, any chapter 7 or 11 trustee appointed or elected for any of the Debtors). If any such adversary proceeding or contested matter is timely filed, the assertions contained in paragraph 3 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on any official committee (including the Creditors' Committee) and on any other person or entity, except to the extent that such assertions were expressly challenged in such adversary proceeding or contested matter and then only with respect to such party making such timely allegations.

16.     <u>Limitation on Use of Financing Proceeds and Collateral</u>.  Notwithstanding anything herein or in any other order by this Court to the contrary, no borrowings, Cash Collateral, Collateral or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents or the Existing Agreements, or the liens or claims granted under this Order, the DIP Documents or the Existing Agreements, (b) assert any claims or defenses or causes of action against the Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders or their respective agents, affiliates, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the Agent's or the Prepetition Agent's assertion, enforcement or realization on the Cash Collateral or the Collateral in accordance with the DIP Documents, the Existing Agreements and this Order, (d) seek to modify any of the rights granted to the Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Lenders hereunder or under the DIP Documents or the Existing Agreements, in each of the foregoing cases without such parties' prior written consent, (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court and (ii) in accordance with the Budget (as defined in the DIP Credit Agreement) as approved by the Agent in its discretion;

29

or (f) bring any action seeking to affect the rights and remedies granted to the agent and the purchasers under the Existing Repo Agreements (as defined in the DIP Credit Agreement); provided, however, that notwithstanding anything to the contrary herein, all Committees shall be limited to $50,000 in the aggregate to perform investigations with respect to prepetition obligations and prepetition liens.

17.    JPMCB as Agent.  To the extent JPMCB, in its role as Prepetition Agent under the Existing Agreements, is listed as loss payee under the Debtors' insurance policies as required under the Security Agreement or is the secured party under any other Existing Agreement, JPMCB, in its role as Collateral Agent under the DIP Credit Agreement, is also deemed to be the loss payee under the Debtors' insurance policies and the secured party under any other Existing Agreement and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Lenders in accordance with the DIP Credit Agreement and second, subsequent to indefeasible payment in full of all DIP Obligations, for the benefit of the Prepetition Secured Lenders under the Existing Agreements.

18.    Limits on Liability.  The Prepetition Agent, the Prepetition Secured Lenders, the Agent and the DIP Lenders, and each of their respective participants, agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives, successors, and assigns, are forever released and discharged from any claims, rights, demands, damages, actions, causes of action, costs, expenses, whether known or unknown, of or by any person or entity and each of its participants, agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives (including any Committee), successors and assigns, arising or accruing prior to the date hereof and arising from or relating to the DIP Credit Agreement, the application of the Collateral to the DIP Obligations or the Prepetition Debt or the application of the Prepetition

30

Collateral to the Prepetition Debt, or any claim or assertion of a right, interest or claim in or to

the Collateral or the Prepetition Collateral. Nothing in this Order or in any of the DIP

Documents or any other documents related to this transaction shall in any way be construed or

interpreted to impose or allow the imposition upon the Prepetition Agent, the Prepetition Secured

Lenders, the Agent or the DIP Lenders any liability for any claims arising from the prepetition or

postpetition activities of the Debtors or Debtors in possession and their Affiliates (as defined in

the Bankruptcy Code) in the operation of their businesses, or in connection with their

restructuring efforts. The DIP Lenders, the Agent, the Prepetition Agent and the Prepetition

Secured Lenders and Buyers shall not, in any way or manner, be liable or responsible for (A) the

safekeeping of the Collateral, (B) any loss or damage thereto occurring or arising in any manner

or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of

any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss,

damage or destruction of the Collateral shall be borne by the Debtors. The limitations of liability

provided in this paragraph 18 shall only be effective as of the date hereof with respect to claims

arising or accruing prior to the date hereof and shall be subject to the Committee's investigation

rights set forth in paragraph 15.

19.     Order Governs.  In the event of any inconsistency between the provisions of this

Order and the DIP Documents, the provisions of this Order shall govern.

20.     Binding Effect; Successors and Assigns.  The DIP Documents and the provisions

of this Order, including all findings herein, shall be binding upon all parties in interest in these

Cases, including, without limitation, the Agent, the DIP Lenders, the Prepetition Agent, the

Prepetition Secured Lenders, any Committee appointed in these Cases, and the Debtors and their

respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter

31

appointed or elected for the estate of any of the Debtors) and shall inure to the benefit of the Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Secured Lenders and the Debtors and their respective successors and assigns, provided, however, that the Agent and the DIP Lenders shall have no obligation to extend any financing to any trustee or similar responsible person appointed for the estates of the Debtors.

21.    Filing of Master Proof of Claim.   The Prepetition Agent is authorized (but not required) to file one master proof of claim (the "Master Proof of Claim") on behalf of itself and the Prepetition Secured Lenders on account of their claims arising under the Existing Agreements and hereunder, provided, however, that the Master Proof of Claim shall only relate to the liquidated amount of the Prepetition Secured Lenders' claims and not to the secured status or priority thereof.

22.    First Charter.

(a)    All "Collections" as that term is defined in the September 22, 2003, February 3, 2004 and June 24, 2004 Participation Agreements between the HomeBanc Mortgage Corporation and First Charter Bank (the "FCB Participation Agreements") received by the Debtors on or after the Petition Date on account of the Loans, as that term is defined in the FCB Participation Agreements (the "FCB Collections"), shall be deposited into a segregated account, to be held in trust by the Debtors, and to be disposed of as provided upon further Order of this Court. The Debtors are not authorized to use the FCB Collections for any purposes.

(b)    All "Collections," as that term is defined in the FCB Participation Agreements, that were received before the Petition Date and that are identifiable shall also be deposited into the segregated trust account to be disposed of as provided upon further Order of this Court.

32

(c)      No liens, claims, interests, rights or remedies granted pursuant to the terms of this Order shall attach to or impair any rights of First Charter Bank, if any, under the terms of the Participation Agreements or attach to or impair the Loans, the Collateral, the Loan Documents or the Collections, as those terms are defined in the FCB Participation Agreements.

(d)      The servicing rights with respect to the Loans, as that term is defined in the FCB Participation Agreements, are not transferred or affected, in any way, by this Order.

23.      No liens, claims, interests, rights or remedies granted pursuant to the terms of this Order shall attach to or impair (a) any rights, title or ownership of any trustee, paying agent, certificate holder, master servicer or any successor thereto under any trusts (collectively, the "Trusts") in mortgage loans originated and/or being serviced by any of the Debtors (collectively, the "Trust Loans"), to the extent that such Trust Loans, and interests, rights and remedies with respect thereto, are not property of the Debtors' estates; and/or (b) any obligations of the Debtors or any other party with respect to the Trusts and/or the Trust Loans.

Dated: September 13, 2007

KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

33

# EXHIBIT 6

# ORIGINAL

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | : | **Chapter 11** |
| | : | |
| **NEW CENTURY TRS HOLDINGS,** | : | **Case No. 07-10416 (KJC)** |
| **INC., a Delaware corporation, et al.,**[1] | : | |
| | : | **Jointly Administered** |
| **Debtors.** | : | |
| | : | **Related to Doc. No. 12** |

## FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362 AND 364 AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 4001 AND 9014 (A) APPROVING DEBTOR-IN-POSSESSION FINANCING WITH ADMINISTRATIVE EXPENSE SUPERPRIORITY AND SECURED BY LIENS, (B) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE CLAIM, AND (C) GRANTING OTHER RELIEF

Upon the Emergency Motion of Debtors and Debtors in Possession for Interim and Final

Orders (a) Approving Debtor-in-Possession Financing with Administrative Expense

Superpriority and Secured by Senior Liens, (b) Granting Liens and Superpriority Administrative

Expense Claim, (c) Granting Other Relief and (d) Setting Final Hearing (the "Motion") dated

April 2, 2007 of New Century Financial Corporation ("New Century") and the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors"), filed in the above-captioned

cases (collectively, the "Cases") to, inter alia:

(i)     Obtain secured credit pursuant to sections 105 and 364(c) of title 11 of the

United States Code (11 U.S.C. § 101 et seq., as amended, the "Bankruptcy Code") and

---

[1] The Debtors are the following entities: New Century Financial Corporation (f/k/a New Century REIT, Inc.), a Maryland corporation; New Century TRS Holdings, Inc. (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation (f/k/a JBE Mortgage) (d/b/a NCMC Mortgage Corporate, New Century Corporation, New Century Mortgage Ventures, LLC), a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation (f/k/a The Anyloan Corporation, 1800anyloan.com, Anyloan.com), a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC (d/b/a Summit Resort Lending, Total Mortgage Resource, Select Mortgage Group, Monticello Mortgage Services, Ad Astra Mortgage, Midwest Home Mortgage, TRATS Financial Services, Elite Financial Services, Buyers Advantage Mortgage), a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCoral, L.P., a Delaware limited partnership.

Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"),

from Greenwich Capital Financial Products, Inc. in its capacity as Lender and Administrative

Agent[2] ("Greenwich") and The CIT Group/Business Credit, Inc. in its capacity as Lender and

Documentation Agent ("CIT") (collectively, the "Secured Parties") pursuant to that certain

Debtor-in-Possession Loan and Security Agreement Dated as of April 2, 2007 by and among

New Century Mortgage Corporation, as debtor and debtor-in-possession, certain of its Affiliates,

as debtors and debtors-in-possession, Greenwich Capital Financial Products, Inc., as

Administrative Agent, and The CIT Group/Business Credit, Inc., as Documentation Agent

substantially in the form attached as Exhibit A hereto and the related Loan Documents

(collectively, the "DIP Loan Agreement") by and among the Debtors and the Secured Parties, in

the aggregate principal amount outstanding from time to time of up to $150,000,000 (the "DIP

Facility"); and

        (ii)    requesting, pursuant to Bankruptcy Rule 4001, that an emergency interim

hearing (the "Emergency Interim Hearing") be held before this Court on an emergency basis to

consider entry of the Interim Order authorizing the Debtors to obtain the financing contemplated

in the DIP Loan Agreement (the "Interim Order"), and further requesting that a final hearing (the

"Final Hearing") thereafter be held before this Court to consider entry of a final order (the "Final

Order") authorizing the financing contemplated by the DIP Loan Agreement, as set forth in the

Motion and the DIP Loan Agreement;

        The Emergency Interim Hearing having been held on April 3, 2007 and the

Interim Order having been approved and entered on April 5, 2007, upon all of the pleadings filed

---

[2] Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the DIP Loan Agreement.

with the Court and upon the record of the Emergency Interim Hearing and the Final Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACTS AND CONCLUSIONS OF LAW[3]:**

> A.    **Petition.**  On April 2, 2007 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code . The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to sections 1107(a) and 1108.  Pursuant to order of this Court, the Debtors' cases are being jointly administered under the case number listed in the above caption.

> B.    **Jurisdiction and Venue.**  This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334 and this is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

> C.    **Necessity of Financing.**  The Debtors submit that the proposed financing pursuant to the DIP Loan Agreement will allow them to continue the operations of their businesses and administer, preserve and increase the value of their estates.  The ability of the Debtors to finance their operations requires the availability of additional working capital, the absence of which would immediately and irreparably harm the Debtors, their estates and their creditors and the possibility for the Debtors' successful reorganization.  Entry of this Final Order approving the DIP Facility will benefit the Debtors and their estates and creditors.

---

[3] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact pursuant to Fed. R. Bankr. P. 7052.  Any statements of the Court from the bench at the Emergency Interim Hearing and the Final Hearing shall constitute additional findings of fact and conclusions of law as appropriate and are expressly incorporated by reference into this Order to the extent not inconsistent herewith.

3

D.    **Willingness to Lend.** The Secured Parties are willing to make the DIP Facility available and to make the loans and advances thereunder pursuant to the terms of the DIP Loan Agreement, only upon the condition that the Secured Parties are granted with respect to the Obligations as provided herein and in the DIP Loan Agreement, (i) pursuant to section 364(c)(1) of the Bankruptcy Code, a superpriority administrative expense claim in each Chapter 11 Case and (ii) Liens on and security interests in the Collateral pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code in the priority set forth herein and in the DIP Loan Agreement (collectively, the "Secured Parties' Liens").

E.    **No Credit Available on Other Terms**. The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.

F.    **Business Judgment and Good Faith**. Based on the record before the Court, the terms of the DIP Facility (including the DIP Loan Agreement) are fair, just, and reasonable under the circumstances, are appropriate for secured financing to a debtor in possession, reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. Based on the record before the Court, the terms of the DIP Facility have been negotiated in good faith and at arms' length by and between the parties, with all parties represented by counsel. Based on the record before the Court, any credit extended under the terms of the DIP Facility shall be extended in good faith by the Secured Parties as that term is used in section 364(c) of the Bankruptcy Code. Based on the record before the Court, Secured Parties will also be acting in good faith within the meaning of section 364(e) of the Bankruptcy Code in closing the transactions contemplated in the DIP Loan Agreement at any time after the entry of this Final

4

Order. Based on the record before the Court, Secured Parties are not "insiders" or "affiliates" of any of the Debtors (as such terms are defined in the Bankruptcy Code).

G. **No Representations or Reliance**. The Debtors stipulate that the Agents, Secured Parties and the Indemnified Parties have made no representations, offered no opinions, and have taken no positions, either individually or collectively, regarding the value of any portion of the Collateral, and, in determining the value of the Collateral, the Debtors have not relied upon any representation, opinion or position of the Agents or the Secured Parties in regard thereto.

H. **Property of the Estate**. Each item of the Collateral constitutes property of the estate of at least one Debtor.

I. **Good Cause.** The DIP Loan Agreement and relief requested in the Motion are necessary, essential, appropriate and in the best interest of the Debtors, their creditors, and their Estates, as its implementation will, among other effects, provide Debtors with the necessary liquidity (a) to minimize disruption to Debtors' businesses and on-going operations, (b) to preserve and maximize the value of the Estates for the benefit of all creditors of Debtors, and (c) to avoid immediate irreparable harm to Debtors, their creditors, their businesses, their employees, and their assets.

J. **Notice.** Pursuant to Bankruptcy Rule 4001(c), notice of the Final Hearing has been given to (i) the United States Trustee, (ii) counsel for the Secured Parties, (iii) all known holders of Liens, encumbrances, or security interests in the Collateral, (iv) the fifty largest unsecured creditors of the Debtors, and (v) counsel for the official committee of unsecured creditors (the "Committee"). Based on the record made by the Debtors, the Court finds that appropriate notice of the Final Hearing has been given.

5

Based on the foregoing,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED**, that:

1.    The Motion is granted in accordance with the terms of this Final Order.
The Debtors are immediately authorized and, pursuant to the terms of this Final Order and the
terms and conditions of the DIP Loan Agreement, empowered to borrow funds under the DIP
Facility in such amount or amounts as may be available to or for the benefit of the Debtors from
Secured Parties, which shall not exceed the aggregate amount of $150,000,000 for the purposes
permitted under the DIP Loan Agreement and this Final Order.

2.    Any objections to the Motion with respect to entry of this Final Order that
have not been withdrawn, waived or settled, and all reservations of rights included therein, are
hereby denied and overruled.

3.    The terms and conditions of the DIP Loan Agreement are hereby approved
in all respects. All provisions in the DIP Loan Agreement are binding and enforceable in full
even if not expressly referenced in this Final Order. The Debtors and the Secured Parties with
respect to the DIP Loan Agreement may finalize, amend, modify, supplement or waive any
provision of the DIP Loan Agreement if such amendment, modification, supplement or waiver is
permitted under the terms of the DIP Loan Agreement and is not material (in the good faith
judgment of the Secured Parties and the Debtors) upon three days written notice to counsel for
the Committee without any need to apply to, or receive further approval from, the Court.

4.    The Debtors are hereby authorized to (a) do and perform all acts and to
make, execute, and deliver all instruments and documents which may be requisite or necessary
for the performance by the Debtors under the DIP Loan Agreement, and (b) pay all principal,
interest, reasonable fees and other expenses which may be required or necessary for the Debtors

6

to perform all of their Obligations under this Final Order and the DIP Loan Agreement (collectively, the "DIP Obligations"). Each officer of each Debtor, and each such other individual as may be so authorized by the Board of Directors of such Debtor, acting singly, is hereby authorized to execute and deliver any and all of the DIP Loan Agreement and related documents, such execution and delivery to be conclusive of their respective authority to act in the name and on behalf of the Debtors.

5.      The Debtors are hereby authorized and directed to pay the fees as they come due under the DIP Loan Agreement to Secured Parties without further Court order, including without limitation, the Commitment Fee, the Facility Fee (including the Interim Fee Amount), and, all reasonable out-of-pocket costs and expenses of the Secured Parties (including reasonable attorney's fees and expenses, subject to the agreement with the Committee made on the record at the hearing on April 12, 2007 regarding attorney's fees) as provided for under the DIP Loan Agreement. The Debtors shall send copies of invoices received by them for such costs and expenses (including attorneys' fees and expenses) to (i) counsel for the United States Trustee, and (ii) counsel to any official committee appointed in these cases. The Committee's rights to challenge such costs and expenses for reasonableness are reserved.

6.      In providing for the advancement of post-petition financing under the DIP Loan Agreement, each of the Debtors and Secured Parties acknowledges, stipulates and agrees that, in entering into the DIP Loan Agreement, and as consideration therefor:

(a)      all of the Debtors have obtained all authorizations, consents and approvals necessary from, and have made all filings with and given all notices (if any such notice was required) to, all federal, state and local governmental agencies, authorities and instrumentalities required to be obtained, made or given by the Debtors in connection with the execution, delivery,

7

performance, validity and enforceability of the DIP Loan Agreement to which each Debtor is a party; and

(b)    the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Agreement, the Debtors shall not in any way prime or otherwise adversely affect the Secured Parties' Liens granted under this Final Order by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to sections 364(d) or 507(b) of the Bankruptcy Code or otherwise; and

(c)    the Debtors hereby agree that until such time as all DIP Obligations are indefeasibly paid in full in cash and the commitments thereunder are terminated in accordance with the DIP Loan Agreement, the Debtors shall not in any way grant junior encumbrances on the Collateral upon which the Secured Parties possess Liens provided to them under this Final Order; and further, the Debtors agree that the Debtors shall not otherwise encumber otherwise unencumbered assets.

## COLLATERAL SECURITY

7.    Pursuant to section 364(c)(2) and 364(c)(3) of the Bankruptcy Code, and as protection to the Secured Parties and to secure the repayment of the DIP Obligations, the Administrative Agent, for the benefit of the Secured Parties, shall have and is hereby granted a valid, binding, and enforceable perfected security interest in and to and Lien on all the Collateral, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, excluding only the Avoidance Actions and recoveries thereupon.

8.    The Lien in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to section 364(c)(2) of the Bankruptcy Code shall be a valid, binding,

8

and enforceable first priority perfected security interest in and to and Lien on all the Collateral that is included in the Borrowing Base, whether now owned or hereafter acquired, now existing or hereafter created and wherever located, subject as to priority, in the case of the security interest in and to and Lien on all the Collateral that is included in the Tranche B Borrowing Base, only to the Liens securing the Obligations (as defined in the Citibank Servicer Advance Facility Agreement).

9.    The Lien in favor of the Administrative Agent for the benefit of the Secured Parties pursuant to section 364(c)(3) of the Bankruptcy Code shall be a valid, binding, and enforceable first priority perfected security interest in and to and Lien on all of its right, title and interest in, to and under all the Collateral except for Collateral subject to Liens existing on the Filing Date securing the Senior Claims; provided however that should any such Lien securing such a Senior Claim be voided, extinguished or determined not be valid, the Liens granted to the Secured Parties hereunder shall, notwithstanding anything to the contrary in Section 551 of the Bankruptcy Code, be deemed perfected first priority Liens without any further action by the Secured Parties or this Court.

10.    The Liens and security interests granted to the Secured Parties under this Final Order and the DIP Loan Agreement shall continue to be at all times first and senior in priority to all other Liens or security interest of every kind and shall not be subordinate or pari passu with any other Lien or security interest or right of setoff, and no Lien or security interest shall be permitted which shall be senior to or pari passu with the Liens and security interests granted to the Secured Parties hereby or under the DIP Loan Agreement; provided, however that the Secured Parties' Liens shall be junior and shall be subject only to the valid, binding, and

9

enforceable Liens securing and setoff, netting and recoupment rights with respect to the Senior Claims as of the Filing Date and the Carve Out.

11.    The above-described Secured Parties' Liens and security interests granted to the Secured Parties herein shall not (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates as a result of any Avoidance Actions, or (ii) be subordinated to or made pari passu with any other lien or security interest under section 364(d) of the Bankruptcy Code or otherwise.

12.    This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Secured Parties' Liens upon the Collateral, without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action to validate or perfect the Secured Parties' Liens on and its security interests in the Collateral or to entitle the Secured Parties to the priorities granted herein. The Secured Parties shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the Secured Parties' Liens and security interests granted by or pursuant to this Final Order or the DIP Loan Agreement.

13.    Pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code, any provision of any lease or other license, contract or other agreement that requires the consent or approval of one or more parties, or requires the payment of any fees or obligations to any governmental entity, in order for any of the Debtors to pledge, grant, sell, or otherwise transfer any such interest or the proceeds thereof or other Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect with

10

respect to the transactions granting the Secured Parties a senior security interest in such interest or the proceeds of any assignment and/or sale thereof by any of the Debtors in favor of the Secured Parties in accordance with the terms of the DIP Loan Agreement.

14.    Should the Secured Parties, in their sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien or similar instruments, take possession of any Collateral, or take any other action to validate or perfect any such security interests or Liens, the Debtors and their officers are hereby directed to execute any such documents or instruments as the Secured Parties may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the entry of this Final Order.

15.    The Secured Parties may, in their discretion, file a copy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtors have real or personal property, and, in such event, the applicable filing or recording officer or registrar is authorized to file or record such copy of this Final Order.

16.    The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby lifted to grant the Secured Parties' Liens and security interests to the Secured Parties contemplated by the DIP Loan Agreement and this Final Order, and is further lifted to the extent of the exercise by the Secured Parties of any rights or remedies under the DIP Loan Agreement, subject only to the notice requirement set forth in paragraph 21 herein.

## ADMINISTRATIVE CLAIM

17.    As further protection to the Secured Parties and to secure the repayment of the DIP Obligations, all of the DIP Obligations shall have the status of allowed superpriority

11

administrative expense claims, in accordance with section 364(c)(1) of the Bankruptcy Code, and shall have priority over all administrative expense claims and unsecured claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code to the extent permitted by applicable law, provided, however, that the DIP Obligations shall not be payable from the Avoidance Actions and recoveries thereupon.

18.     Notwithstanding the foregoing provisions of this Final Order, the following amounts shall be payable from and chargeable against the Collateral (and prior to the Secured Parties' Liens) (the "Carve-Out"):

(a)     amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the clerk of the Court (collectively, the "UST/Clerk Fees"); and

(b)     allowed fees and expenses of attorneys, accountants, and other professionals retained in the Chapter 11 Cases pursuant to sections 327 and 1103 of the Bankruptcy Code (except to the extent such fees and expenses incurred for services rendered in connection with the investigation, assertion or prosecution of actions, claims or causes of action against the Secured Parties or in the investigation or challenging of the extent, validity, perfection, priority, or amount of any claim or Lien granted to the Secured Parties pursuant to this Final Order, the Interim Order, or the DIP Loan Agreement) (the "Priority Professional Expenses"), but the amount entitled to priority under this sub-clause shall not exceed $7,000,000 outstanding in the aggregate at any time (the "Carve-Out Amount"), which sublimits shall be as follows:  (i) Priority Professional Expenses (inclusive of any holdbacks required by the Court)

12

accruing after an Event of Default shall not exceed $4,000,000 in the aggregate; (ii) any unpaid Priority Professional Expenses accrued prior to an Event of Default shall not exceed $3,000,000 in the aggregate; and (iii) Union Bank of California fees shall not exceed $440,000, conditioned upon Union Bank of California promptly allowing the Debtors immediate access to accounts maintained with Union Bank of California pursuant to the Court's order approving the maintenance of the cash management system; provided, however, that after the Secured Parties have provided notice to New Century of the occurrence of an Event of Default or a default hereunder by the Debtors in any of their obligations under this Final Order, any payments actually made to such professionals after the occurrence of such Event of Default or default hereunder, under sections 330 and 331 of the Bankruptcy Code or otherwise, to the extent allowed by final order of the Court, shall reduce the Carve-Out Amount on a dollar-for-dollar basis. Nothing contained herein shall be construed as consent to the allowance of any fees and expenses referred to above and shall not affect any right of the Secured Parties to object to the reasonableness of such amounts. For the avoidance of doubt, the Carve-Out Amount shall not exceed $7,000,000 in the aggregate, irrespective of the sublimits established in this paragraph 18.

19.     So long as an Event of Default shall not have occurred, Debtors shall be permitted to pay the Priority Professional Expenses of the kind specified in Section 503(b) of the Bankruptcy Code allowed under Sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable, within the parameters of this Final Order and subject to availability under the DIP Facility; provided that the aggregate of any such payments made on or after the occurrence of a Default or Event of Default to professionals shall not exceed the Carve-Out Amount. The Debtors shall not be permitted under any circumstance to pay, from the Carve-Out Amount or any amounts advanced by the Secured Parties under the DIP Facility, any fees or

13

expenses incurred by any party, including the Debtors or the Creditors' Committee, in connection with the filing and prosecution or defense of any claims, causes of action, adversary proceedings or other litigation against the Secured Parties, including, without limitation, challenging the amount, validity, priority or enforceability of, or asserting any defense, counterclaim, or offset to, the DIP Obligations or the Secured Parties' Liens in respect thereof.

20.    No other Liens or priority status, other than Permitted Liens, shall have priority superior to or pari passu with that granted by this Final Order to Secured Parties, or shall be granted while any portion of the DIP Obligations under the DIP Loan Agreement remains outstanding, absent the express written consent of the Secured Parties.

21.    Notwithstanding the provisions of section 362 of the Bankruptcy Code and without any further order of, or application or motion to, this Court, in the event of the occurrence of an Event of Default, and at all times thereafter, and without any restriction or restraint by any stay under section 362 of the Bankruptcy Code against the enforcement of the Liens and security interests or any other rights granted to the Secured Parties pursuant to the DIP Loan Agreement, the Secured Parties may, by written notice to the Debtors and the Committee, (i) terminate forthwith all or any portion of the DIP Facility and the Secured Parties' obligation to make any further loans or advances, (ii) declare the DIP Obligations to be immediately due and payable, and (iii) take any and all actions and exercise any and all rights and remedies allowed under the DIP Loan Agreement, which the Secured Parties may deem appropriate. Notwithstanding the foregoing, but without limiting any of the Secured Parties' rights or remedies, the Secured Parties shall not consummate foreclosure on the Collateral or otherwise seize control of assets of the Debtors' estates absent five (5) Business Days' prior written notice of an Event of Default to the Debtors, any official committee appointed in these Cases and the

14

Office of the United States Trustee. The foregoing is without prejudice to the rights of the Debtors or the Committee, during such five Business Day notice period, to seek an order of the Court on notice to the Secured Parties enjoining or restraining them from exercising such remedies (subject to the Secured Parties' rights to oppose any such application by the Debtors or the Committee); provided however, that the seeking of such application by the Debtors or the Committee to enjoin or restrain the Secured Parties shall not prohibit the Secured Parties from exercising all of their rights and remedies with respect to the Collateral upon the expiration of the five Business Day notice period.

22.     Neither the Collateral nor Secured Parties shall be subject to surcharge, pursuant to sections 506(c) or 105 of the Bankruptcy Code or otherwise, by any of the Debtors or any other party in interest, until all DIP Obligations are indefeasibly paid in full to the Secured Parties in cash, and no such consent shall be implied from any other action, inaction, or acquiescence by the Secured Parties in these Cases, including but not limited to funding of the Debtors' ongoing operations by the Secured Parties. In no event shall the Secured Parties be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

### MISCELLANEOUS PROVISIONS

23.     Upon satisfaction of all DIP Obligations and to the greatest extent permissible by law, the Secured Parties solely in their capacity as secured lenders, and each of their respective participants, agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives, successors, and assigns, shall be forever released and discharged from any claims, rights, demands, damages, actions, causes of action, costs, expenses, whether known or unknown, of or by any person or entity and each of its participants, agents,

15

officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives (including any creditors' committee), successors, and assigns, arising from or relating to the DIP Loan Agreement, the application of Collateral to the DIP Obligations, or any claim or assertion of a right, interest, or claim in or to the Collateral.

24.    As and to the extent set forth in Section 11.04 of the DIP Loan Agreement, each Borrower shall hold each Agent, each Lender-Related Party and each Participant (each Agent, each Lender-Related Party and each Participant, an "Indemnified Party") harmless from and indemnify any Indemnified Party, on an after-Tax basis, against all liabilities, losses, damages, judgments, costs and expenses of any kind which may be imposed on, incurred by or asserted against such Indemnified Party (collectively, the "Indemnified Liabilities") relating to or arising out of this Final Order, the DIP Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, the Loan Agreement, the Note, any other Loan Document or any transaction contemplated hereby or thereby.  Without limiting the generality of the foregoing, each Borrower agrees to hold any Indemnified Party harmless from and indemnify such Indemnified Party against all Indemnified Liabilities with respect to all Mortgage Loans relating to or arising out of any violation or alleged violation of any environmental law, rule or regulation or any consumer credit laws, including without limitation laws with respect to unfair or deceptive lending practices and predatory lending practices, the Truth in Lending Act or the Real Estate Settlement Procedures Act.

25.    Nothing in this Final Order, the DIP Facility, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the Secured Parties any liability for any claims arising from the pre-petition or

16

post-petition activities of the Debtors in the operation of their business, or in connection with their restructuring efforts. So long as the Secured Parties comply with their obligations under the DIP Loan Agreement (including Section 4.11 thereof) and their obligations, if any, under applicable law (including the Bankruptcy Code), (i) the Secured Parties shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and (ii) all risk of loss, damage or destruction of the Collateral shall be borne by the Debtors; The Secured Parties are each hereby relieved of the requirement to file proofs of claim in the Cases with respect to any DIP Obligations and any other claims or liens granted hereunder or created hereby.

26.    The Secured Parties' Liens, security interests, administrative priorities and other rights and remedies granted to the Secured Parties by the provisions of this Final Order and any actions taken pursuant hereto, as well as the Debtors' obligations to allow access to the Secured Parties' representatives, provide information and otherwise comply with its undertakings and agreements set forth in the DIP Loan Agreement and this Final Order, shall continue beyond and survive the expiration of this Final Order, and, to the extent permitted by applicable law, shall not be modified, altered or impaired in any manner by (a) any other financing or extension of credit or incurrence of indebtedness by any of the Debtors under section 364 of the Bankruptcy Code or otherwise (except as contemplated by the DIP Loan Agreement), (b) the entry of an order or orders confirming any plan or plans of reorganization in the Cases, or (c) the entry of an order converting these Cases to cases under chapter 7 of the Bankruptcy Code or dismissing these Cases.

17

27.     The terms and provisions of this Final Order and the DIP Loan Agreement, and the Secured Parties' Liens and security interests granted to the Secured Parties and the superpriority status of the administrative claims and payment provisions contained in this Final Order and the DIP Loan Agreement shall continue in full force and effect until the DIP Obligations are indefeasibly paid in full in cash, and DIP Loan Agreement is terminated.

28.     The Debtors shall not request any order dismissing these Cases under section 1112 of the Bankruptcy Code unless each and every DIP Obligation of the Debtors to the Secured Parties shall have been paid indefeasibly in full in cash and completely satisfied prior to the entry thereof. The Debtors shall not seek entry of an order providing for the sale of the Collateral under section 363 of the Bankruptcy Code unless either: (i) all DIP Obligations shall have been paid indefeasibly in full in cash and completely satisfied as part of such transaction; or (ii) the Secured Parties expressly consent to said transaction.

29.     To the extent of any conflict between or among the express terms or provisions of any of the DIP Loan Agreement, the Motion, any other order of this Court, or any other agreements and the terms and provisions of this Final Order, unless such term or provisions herein is phrased in terms of "as defined in" or "as described in," the terms and provisions of this Final Order shall govern.

30.     New Century is hereby authorized to act on behalf of each other Debtor with respect to the Debtors' rights and obligations under the DIP Loan Agreement. Any notice given to, or demand made on, New Century by the Secured Parties, pursuant to this Final Order or the DIP Loan Agreement shall constitute notice to, or demand on, all Debtors.

31.     This Final Order and DIP Loan Agreement shall be valid, binding and enforceable by the Secured Parties against the Debtors, their respective successors and assigns,

18

including, without limitation, any chapter 11 or chapter 7 trustee appointed as a representative of any of the Debtors' Estates; provided, however, that the Secured Parties shall have no obligation to extend any financing to any such chapter 11 or chapter 7 trustee or similar person.

32.     The Debtors are authorized and directed to maintain their cash management system in a manner consistent with the DIP Loan Agreement and any order of the Court with respect to the same.

33.     If any provision of this Final Order is hereafter modified, vacated, reversed or stayed by subsequent order of this or any other court for any reason, such modification, vacation, reversal or stay shall not affect the validity and priority of any of the DIP Obligations incurred under this Final Order and the DIP Loan Agreement, and prior to the effective date of any such modification, vacation, reversal or stay, the validity, enforceability or priority of the DIP Obligations shall be governed in all respects by the original provisions of this Final Order, and the Secured Parties shall be entitled to all the rights, privileges and benefits granted herein. The transactions contemplated by the DIP Facility have been entered into by the Secured Parties in good faith, and, as a result, the Secured Parties are entitled to the protections afforded by Section 364(e) of the Bankruptcy Code in the event of any reversal or modification of this Final Order.

34.     The security interests and Secured Parties' Liens granted to or for the benefit of the Secured Parties hereunder and the rights of the Secured Parties pursuant to this Final Order shall not be altered, modified, extended, impaired or affected by any plan of reorganization or other order of the Debtors and shall continue after confirmation and consummation of any plan until the DIP Obligations are indefeasibly paid in full.

19

35.     This Final Order shall not be construed in any way as a waiver or relinquishment of any rights that the Secured Parties may have to bring or be heard on any matter brought before this Court.

36.     This Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Final Order.

37.     Notwithstanding Rules 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules or any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

38.     Notwithstanding anything herein to the contrary, the liens and security interests granted to the Secured Parties shall not extend to accounts maintained by the Debtors in trust or as custodians for the benefit of parties other than a Debtor, or to other assets that are not property of the estates.

39.     Notwithstanding anything to the contrary in the DIP Loan Agreement, it shall not be an Event of Default under the DIP Loan Agreement if the Debtors are not permitted to retain AlixPartners or Lazard Freres & Co., so long as (an)other financial advisor(s) reasonably acceptable to the Secured Parties is/are retained.

40.     No rights of any entity in connection with a contract or transaction of the kind listed in § 561(a) of the Bankruptcy Code, whatever they might or might not be, are affected by the entry of this Order.

41.     Any notice or financial information required to be provided by the Debtors or received by the Debtors under the DIP Loan Agreement shall be provided by the Debtors also to counsel for the Committee.

20

42.    Without limiting the joint and several liability of each of the Debtors for the DIP Obligations, the Debtors shall use reasonable efforts so that Debtors that receive the benefit of funds advanced under the DIP Facility or the services contemplated thereunder or hereunder repay their share thereof on a dollar for dollar basis. To the extent a Debtor (i) receives funds advanced under the DIP Facility (including as a result of intercompany balances incurred after the Petition Date to the extent such balances arise from the incurrence of DIP Obligations), or (ii) receives a postpetition intercompany loan or transfer of funds advanced under the DIP Facility (including as a result of the Debtors' cash management system or otherwise) (each a "Beneficiary Debtor"), and such DIP Obligations were repaid or such postpetition intercompany loan or transfer is made (including from cash collateral) (each an "Advance") by any other Debtor that is an obligor under the DIP Facility (an "Advancing Debtor"), the Advancing Debtor shall have (a) an allowed claim under sections 503(B)(1)(A) and 507(a)(2) of the Bankruptcy Code against the Beneficiary Debtor for the amount of such Advance junior to the super-priority administrative claim granted to the Secured Parties pursuant to paragraph 17 of this Final Order.

Dated:  May 7, 2007
Wilmington, Delaware

THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

21

# EXHIBIT 7

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
| SHARPER IMAGE CORPORATION, Debtor | : | Case No. 08-10322(KG) |

**FINAL ORDER PURSUANT TO 11 U.S.C. SECTIONS 105, 361, 362, 363 AND 364 AND RULES 2002, 4001 AND 9014 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (1) AUTHORIZING INCURRENCE BY THE DEBTOR OF POST-PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTOR PURSUANT TO 11 U.S.C. SECTION 363 AND PROVIDING FOR ADEQUATE PROTECTION, AND (4) MODIFYING THE AUTOMATIC STAY**

THIS MATTER having come before this Court upon motion (the "**DIP Motion**") by Sharper Image Corporation (the "**Debtor**"), as a debtor and debtor-in-possession in the above captioned chapter 11 case (the "**Case**") seeking, among other things, entry of an interim order (the "**Interim Order**") and a final order (this "**Final Order**") authorizing the Debtor to:

(i) Obtain credit and incur debt, pursuant to Sections 363, 364(c) and 364(d) of the Bankruptcy Code, up to the aggregate committed amount of $60,000,000 (on terms and conditions more fully described herein) secured by first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of title 11 of the United States Code, as amended (the "**Bankruptcy Code**") on property of the Debtor's estate pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)    (a) Establish on a final basis that financing arrangement (the "**DIP Facility**") pursuant to (I) that certain Debtor-In-Possession Credit Agreement (the "**DIP Credit Agreement**")[1], substantially in the form filed of record in the Case and introduced into evidence at the Interim Hearing (defined below) on the DIP Motion, by and among Sharper Image Corporation., as borrower (the "**Borrower**"), Wells Fargo Retail Finance LLC, as agent (the "**DIP Agent**"), and the Lenders party thereto (the "**DIP Lenders,**" collectively with the DIP Agent, the "**DIP Secured Parties**"), and (II) all other agreements, documents, and instruments executed and/or delivered with, to, or in favor of the DIP Secured Parties, including, without limitation, securities agreements, notes, mortgages, and Uniform Commercial Code ("**UCC**") financing statements and all other related agreements, documents, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, modified or supplemented and in effect from time to time, the "**DIP Financing Agreements**"); and (b) incur the "**Obligations**" under as and defined in the DIP Credit Agreement (collectively, the "**DIP Obligations**");

(iii)    Authorize the use of the proceeds of the DIP Facility (net of any amounts used to pay fees under the DIP Financing Agreements) in each case in a manner consistent with the terms and conditions of the DIP Financing Agreements, and in accordance with the Budget (as defined below) solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Case, to the extent set forth in the Budget, (c) all pre-petition letters of credit issued under the Pre-Petition Financing Agreement, which shall be deemed issued under the DIP Credit Agreement, and (d) Adequate Protection Payments on account of the Pre-Petition Debt (as defined below).

---

[1] Capitalized terms used in this Final Order but not defined herein shall have the meanings ascribed to such terms in

2

(iv)    Grant, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders) first priority priming, valid, perfected and enforceable liens, subject only to the Carve-Out (as defined below) and the Prior Permitted Liens (as defined below), upon all of the Debtor's real and personal property as provided in and as contemplated by the Interim Order, this Final Order, the DIP Facility and the DIP Credit Agreement;

(v)    Grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders) superpriority administrative claim status in respect of all DIP Obligations, subject to the Carve Out as provided herein;

(vi)    Authorize the use of "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Pre-Petition Secured Parties (as defined below) have an interest;

(vii)    Grant the Pre-Petition Agents (for the benefit of the Pre-Petition Secured Parties) (as defined below) Pre-Petition Replacement Liens and Pre-Petition Superpriority Claims (each as defined below) to the extent of any diminution in the value of the Pre-Petition Agents' interest in the Pre-Petition Collateral and make Adequate Protection Payments (as defined below) as adequate protection for the granting of the DIP Liens (as defined below) to the DIP Agent, the use of Cash Collateral, and for the imposition of the automatic stay;

(viii)    Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Financing Agreements and this Final Order; and

---

the DIP Credit Agreement.

(x)    Waive the ten (10) day stay provisions of Federal Rule of Bankruptcy Procedure 6004(h).

On February 20, 2008, this Court entered an Interim Order (i) authorizing the Debtor to use cash collateral pursuant to 11 U.S.C. §363, (ii) authorizing the Debtor to obtain post-petition financing pursuant to sections 105, 361, 362, 364(c)(1), (2) and (3) and 364 (d)(1) of the Bankruptcy Code, and Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, (iii) granting adequate protection to Pre-Petition Secured Parties, (iv) modifying the automatic stay, and (v) setting Final Hearing.

The Bankruptcy Court having considered the DIP Motion, the Declaration of Rebecca L. Roedell in support of the Debtor's first day motions and orders, the exhibits attached thereto, the DIP Facility and the DIP Credit Agreement, and the evidence submitted at the hearing on the DIP Motion on February 19, 2008 (the "Interim Hearing") and the evidence submitted at the final hearing on March 7, 2008 (the "Final Hearing"); and in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and the local rules of the Bankruptcy Court, due and proper notice of the DIP Motion and the Final Hearing having been given; and it appearing that approval of the relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtor and otherwise is fair and reasonable and in the best interests of the Debtor, its creditors, its estate and its equity holders, and is essential for the continued operation of the Debtor's business; and it further appearing that the Debtor is unable to secure unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code section 503(b)(1); and there is adequate protection of the interests of holders of liens on the property of the estates on which liens are to be granted; and all objections, if any, to the entry of this Final Order having been

4

withdrawn, resolved or overruled by this Court; and after due deliberation and consideration, and for good and sufficient cause appearing therefor

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING AND THE FINAL HEARING, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.    **Petition Date.**  On February 19, 2008 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.  The Debtor has continued in the management and operation of its business and property as Debtor-in-Possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Case.

B.    **Jurisdiction and Venue.**  This Court has jurisdiction over these proceedings, pursuant to 28 U.S.C. §§ 157(b) and 1334, and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

C.    **Committee Formation.**  On February 27, 2008, the Office of the United States Trustee for the District of Delaware appointed an official committee of unsecured creditors (the "**Creditors' Committee**").

D.    **Notice.**  The Final Hearing is being held pursuant to the authorization of Bankruptcy Rule 4001 and Local Rule 4001-2. Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtor, whether by telecopy, email, overnight courier or hand delivery on February 20, 2008, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the Internal Revenue Service, (iii) the Securities and Exchange Commission, (iv) the Debtor's twenty (20) largest unsecured creditors, (v) counsel to the Creditors' Committee, (vi) counsel to the Pre-Petition Agent (as defined below), (vii) the

5

Pre-Petition Agent (as defined below), (vii) counsel to the proposed DIP Agent, (viii) any party

which a request for notices with this Court prior to the date of the notice of Final Hearing having

been delivered, (ix) all secured creditors of record, (x) all of the Debtor's current landlords; and

(xi) the Office of the United States Attorney General for the District of Delaware. Under the

circumstances, such notice of the Final Hearing and the relief requested in the DIP Motion is due

and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy

Code, Bankruptcy Rules 2002, 4001(c), 4001(d) and the local rules of the Bankruptcy Court.

    E.    **Debtor's Acknowledgements and Agreements**. Without prejudice to the rights

of parties in interest as set forth in paragraph 7 below, the Debtor admits, stipulates,

acknowledges and agrees that (collectively, paragraphs E (i) through E (vii) hereof shall be

referred to herein as the "**Debtor's Stipulations**"):

        (i)    **Pre-Petition Financing Agreement**. Prior to the commencement of the
Case, Wells Fargo Retail Finance LLC ("**WFRF**") made certain revolving
advances (the "**Pre-Petition Revolving Loans**") and a term loan (the "**Term
Loan**") to the Borrower, (collectively the Pre-Petition Revolving Loans and the
Term Loan, the "**Pre-Petition Facility**") pursuant to (A) the Second Amended
and Restated Loan and Security Agreement, dated as of August 20, 2007, by and
among the Borrower, WFRF, as agent (the "**Pre-Petition Agent**"), and the
Lenders party thereto (the "**Pre-Petition Lenders**", collectively with the Pre-
Petition Agent, the "**Pre-Petition Secured Parties**"), and (B) all other
agreements, documents, and instruments executed and/or delivered with, to, or in
favor of Pre-Petition Secured Parties, including, without limitation, notes,
mortgages, and UCC financing statements and all other related agreements,
documents, and instruments executed and/or delivered in connection therewith or
related thereto (collectively, as may be amended, modified or supplemented and
in effect from time to time, the "**Pre-Petition Financing Agreement**");

        (ii)    **Pre-Petition Debt Amount**. As of the Petition Date, the Debtor was
indebted under the Pre-Petition Financing Agreement (i) pursuant to the Pre-
Petition Revolving Loans in the approximate principal amount of $25,598,702.00,
plus letters of credit in the approximate stated amount of $7,909,531.53; (ii)
pursuant to the Term Loan in the approximate principal amount of $10,000,000;
plus interest accrued and accruing, costs, expenses, fees (including attorneys' fees
and legal expenses) other charges and other obligations, including, without
limitation, on account of cash management, credit card, depository, investment,

hedging and other banking or financial services (collectively the **"Pre-Petition Debt"**).

(iii)    **Pre-Petition Collateral**    To secure the Pre-Petition Debt, the Debtor granted security interests and liens (the **"Pre-Petition Liens"**) to the Pre-Petition Secured Parties upon all of the Debtor's assets and personal property (other than Excluded Collateral, as defined in the Pre-Petition Financing Agreement and fee owned real property), including, without limitation, Accounts; Books; Deposit Accounts, Equipment; General Intangibles; Goods, Inventory; Investment Property; Negotiable Collateral; Commercial Tort Claims, Leasehold Interests and Real Property, and the proceeds and products, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the Collateral and money, deposit accounts, or other tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof (each as defined in the Pre-Petition Financing Agreement) (collectively, the **"Pre-Petition Collateral"**),[2] with priority over all other liens except any liens otherwise permitted by the Pre-Petition Financing Agreement (to the extent any such permitted liens are valid, properly perfected, unavoidable, and senior, including, without limitation, any valid, properly perfected, unavoidable, and senior liens claimed by the local Texas taxing authorities who have filed objections to this Motion, they are referred to herein as the **"Permitted Prior Liens"**).  To avoid any doubt, the term "Permitted Prior Liens" does not include, and specifically excludes, the liens securing the Pre-Petition Debt, which pre-petition liens and claims are to be subordinated to, and junior to, the liens and claims of the DIP Secured Parties.

(iv)    **Pre-Petition Liens.** (a) As of the Petition Date, the Debtor believes that (i) the Pre-Petition Liens are valid, binding, enforceable, and perfected first-priority liens, other than with respect to Excluded Collateral and any fee owned real property, subject only to any Permitted Prior Liens and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Pre-Petition Debt constitutes legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of the Pre-Petition Financing Agreement (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Debt exists, and no portion of the Pre-Petition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Debt constitutes allowed secured claims, and (b) on the date that the Interim Order was entered, the Debtor has waived, discharged and released the

---

[2]    The acknowledgment and agreement by Debtor of the Pre-Petition Debt and the related liens, rights priorities and protections granted to or in favor of the Pre-Petition Lenders, as set forth herein and in the Pre-Petition Financing Agreement, shall constitute a proof of claim on behalf of the Pre-Petition Lenders in this Case.

Pre-Petition Secured Parties, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtor may have (x) to challenge or object to any of the Pre-Petition Debt, (y) to challenge or object to the security for the Pre-Petition Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Financing Agreement or otherwise.

The Debtor does not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Financing Agreement or the Pre-Petition Secured Parties' liens, and/or security interests in the Pre-Petition Collateral, or any claim of the Pre-Petition Secured Parties pursuant to the Pre-Petition Financing Agreement.

(v)    **Cash Collateral.** The Pre-Petition Secured Parties have a security interest in Cash Collateral, including all amounts on deposit in the Debtor's banking, checking, or other deposit accounts and all proceeds of Pre-Petition Collateral to secure the Pre-Petition Debt, to the same extent and order of priority as that which was held by each such party pre-petition.

(vi)    **Priming of DIP Facility.** In entering into the DIP Financing Agreements, and as consideration therefor, the Debtor hereby agrees that until such time as all DIP Obligations are indefeasibly paid in full in cash and the DIP Credit Agreement is terminated in accordance with the terms thereof, the Debtor shall not in any way prime or seek to prime the security interests and DIP Liens provided to the DIP Lenders under this Final Order by offering a subsequent lender or a party-in-interest a superior or pari passu lien or claim pursuant to Section 364(d) of the Bankruptcy Code or otherwise.

F.    **Findings Regarding the Post-Petition Financing.**

(i)    **Need for Post-Petition Financing.** An immediate need exists for the Debtor to obtain funds from the DIP Facility in order to continue operations and to administer and preserve the value of its estate. The ability of the Debtor to finance its operations, to preserve and maintain the value of the Debtor's assets and maximize a return for all creditors requires the availability of working capital from the DIP Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors and equity holders and the possibility for a successful reorganization or sale of the Debtor's assets as a going concern or otherwise.

8

(ii)    **No Credit Available on More Favorable Terms.**  The Debtor has been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense.  The Debtor is also unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Final Order.  The Debtor is unable to obtain credit for borrowed money without granting to the DIP Lenders the DIP Protections (as defined below).

(iii)    **Prior Liens.**  Nothing herein shall constitute a finding or ruling by this Court that any Permitted Prior Liens are valid, senior, perfected and unavoidable.  Moreover, nothing shall prejudice the rights of any party in interest including, but not limited to, the Debtor, the DIP Lenders and any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Prior Lien and or security interest.

G.    **Section 506(c) Waiver.**  Subject to the provisions of Paragraph 10, at no time during the Case or any successor cases shall costs or expenses of administration which have been or may be incurred at any time be charged against the DIP Secured Parties or the Pre-Petition Secured Parties, their claims, the DIP Collateral and the Pre-Petition Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Secured Parties and  the Pre-Petition Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Secured Parties or the Pre-Petition Secured Parties.

H.    **Use of Proceeds of the DIP Facility.**  Proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) shall be

9

used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget (as defined below), solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Case, to the extent set forth in the Budget, (c) all pre-petition letters of credit issued under the Pre-Petition Financing Agreement, which are deemed issued under the DIP Credit Agreement pursuant to the Interim Order, and (d) Adequate Protection Payments on account of the Pre-Petition Debt.

I.    **Application of Proceeds of Collateral to Pre-Petition Debt**. All proceeds of the sale or other disposition of the Collateral (as defined below) shall be applied: (a) first, to permanently reduce the obligations pursuant to the Pre-Petition Revolving Loans and Term Loan, (b) second, to reduce the DIP Obligations in accordance with the DIP Credit Agreement. Payment of the Pre-Petition Debt in accordance with this Final Order is necessary as the Pre-Petition Secured Parties will not otherwise consent to the priming of the Pre-Petition Liens. Such payment will not prejudice the Debtor or its estate, because payment of such amounts is subject to the rights of parties-in-interest under paragraph 7 below.

J.    **Adequate Protection for Pre-Petition Secured Parties**. As a result of the grant of the DIP Liens and the use of Cash Collateral authorized herein, the Pre-Petition Secured Parties are entitled to receive adequate protection pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any decrease in the value of their respective interest in the Pre-Petition Collateral (including Cash Collateral) resulting from the automatic stay or the Debtor's use, sale or lease of the Pre-Petition Collateral (including Cash Collateral) during the Case. As adequate protection, the Pre-Petition Agents (for the benefit of the Pre-Petition Secured Parties) will receive: (1) the Pre-Petition Replacement Liens, (2) the Pre-Petition Superpriority Claim, and (3) the Adequate Protection Payments .

10

K.   **Section 552**.   In light of their agreement to subordinate their liens and superpriority claims (i) to the Carve Out in the case of the DIP Secured Parties, and (ii) the Carve Out and the DIP Liens in the case of the Pre-Petition Secured Parties, the DIP Secured Parties and the Pre-Petition Secured Parties are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply to the DIP Secured Parties and the Pre-Petition Secured Parties.

L.   **Extension of Financing**.   The DIP Lenders have indicated a willingness to provide financing to the Debtor in accordance with the DIP Credit Agreement and subject to (i) the entry of the Interim Order and this Final Order, and (ii) findings by the Bankruptcy Court that such financing is essential to the Debtor's estate, that the DIP Lenders are good faith financiers, and that the DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim Order, this Final Order and the DIP Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of the Interim Order or this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

M.   **Business Judgment and Good Faith Pursuant to Section 364(e)**.   The terms and conditions of the DIP Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration; (ii) the DIP Facility was negotiated in good faith and at arms' length between the Debtor, the DIP Lenders and the Pre-Petition Secured Parties, and (iii) use of the proceeds to be extended under the DIP Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is

11

that the DIP Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

N.    **Relief Essential; Best Interest.**    The relief requested in the DIP Motion is necessary, essential, and appropriate for the continued operation of the Debtor's business and the management and preservation of the Debtor's assets and personal property. It is in the best interest of Debtor's estates to be allowed to establish the DIP Facility contemplated by the DIP Credit Agreement.

O.    **Entry of Final Order.**    For the reasons stated above, the Debtor has requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

**NOW, THEREFORE,** on the DIP Motion of the Debtor and the record before this Court with respect to the DIP Motion, and with the consent of the Debtor, the Pre-Petition Secured Parties, and the DIP Secured Parties to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.    **Motion Granted.**    The DIP Motion is granted in accordance with the terms and conditions set forth in this Final Order and the DIP Credit Agreement.

2.    **DIP Financing Agreements** .

(a)    Modifications to DIP Credit Agreement.    The Debtor, the Creditors' Committee and the DIP Secured Parties agree that the DIP Credit Agreement is hereby amended as follows:

(i)    The definition of "Applicable Prepayment Premium" is hereby deleted in its entirety and the following substituted in its stead:

> "Applicable Prepayment Premium" means $525,000, provided that
> if all Obligations and all Pre-Petition Obligations are indefeasibly paid in full and

12

all Commitments terminated by virtue of a refinancing (and not a liquidation of Collateral or sale under Section 363 of the Bankruptcy Code) on or before the date that is (a) forty-five (45) days after the Petition Date, the Applicable Prepayment Premium shall be $0, (b) sixty (60) days after the Petition Date, the Applicable Prepayment Premium shall be $250,000, and (c) seventy-five (75) days after the Petition Date, the Applicable Prepayment Premium shall be $425,000.

(ii)     The definition of "Borrower Collateral" is hereby amended by deleting

clause (k) thereof and substituting the following in its stead:

(k)     All proceeds realized by the Borrower from the sale, transfer or other disposition of the Borrower's Leasehold Interests,

(iii)    The definition of "Termination Date" is hereby amended by deleting

clause (i) thereof and substituting the following in its stead:

(i) August 20, 2008, provided that if the Borrower has filed a Plan of Reorganization or a motion to sell substantially all of its assets under section 363 of the Bankruptcy Code, in each case containing terms acceptable to the DIP Secured Parties, the date August 20, 2008 shall be extended, at the option of the Borrower, until November 20, 2008 in order to permit confirmation of the Plan of Reorganization or consummation of the sale of such assets,

(iv)    The provisions of Section 2.4(a) are hereby deleted in their entirety and the following substituted in their stead:

(a)    **Voluntary Reduction of Commitment.**  Borrower may from time to time, on at least one Business Day's written notice or telephonic notice (followed immediately by written confirmation thereof) to Agent (which shall promptly advise each Lender thereof) not later than 11:00 a.m. Massachusetts time on such day, reduce the unused Commitments in whole or in part, provided that the Borrower shall be required to pay the Applicable Prepayment Premium, if any only if the Commitments are terminated in whole.

(v)     The following sentence is hereby added at the end of Section 6.16(b):

The Agent shall furnish copies of any appraisals and valuations obtained by the Agent to counsel for the Creditors' Committee (and the Borrower hereby consents thereto), as long as the Agent shall not thereby breach any confidentiality obligations to the Persons undertaking such appraisals and valuations in furnishing such copies.

(vi)    The following subparagraph is hereby added at the end of Section 6.16:

13

(c)     The Borrower or the Creditors' Committee may cause additional appraisals of the assets included in the Borrowing Base to be undertaken at the Borrower's sole expense. Any such appraisals shall be conducted by such Persons selected by the Borrower (the "Borrower's Appraiser"), in consultation with the Creditors' Committee and shall be subject to the prior written approval of the Agent. In the event that the results of such appraisal differ from the results of the appraisal conducted by or on behalf of the Agent, the parties shall use reasonable efforts to resolve such differences, but nothing contained herein shall obligate the Agent to utilize the results of the appraisal of the Borrower's Appraiser in calculating the Borrowing Base.

(vii)   The provisions of Section 6.18 are hereby deleted in their entirety and the following substituted in their stead:

The Borrower shall strictly perform in accordance with the Budget subject to the following: (a) (i) the Borrowers' actual sales and cash receipts shall not be less than 87.5% of the projected amounts set forth in the Budget on a cumulative basis; and (ii) the Borrowers' actual total expenses and cash expenditures shall not be greater then 112.5% of the projected amounts set forth in the Budget on a cumulative basis, all of the foregoing measured on a weekly basis; and (b) the Borrowers' actual inventory levels shall not be less than 87.5% and not greater than 112.5% of the projected amounts set forth in the Budget on a cumulative basis, as measured on a monthly basis at the end of each fiscal month of the Borrower; provided that for the first 21 days after the Petition Date only, the reference to 87.5% shall rather be 85%. The foregoing shall be tested each week or month, as applicable, pursuant to the Variance Report delivered by the Borrower to the Agent on Wednesday of each week for the immediately preceding week with respect to clause (a) above, and on the fifth day of each fiscal month of the Borrower for the immediately preceding fiscal month with respect to clause (b) above.

(viii)  The provisions of Section 6.19(a) are hereby deleted in their entirety and the following substituted in their stead:

(a)     As soon as practicable after the Petition Date but in any event on or before March 5, 2008, the Borrower shall have filed a motion seeking authority to establish bidding procedures, in connection with the liquidation of inventory in store closing sales of not less than 90 stores (the "Initial Closing") and shall diligently proceed thereafter to obtain an order approving such a sale to a professional liquidator on an equity bid (cash guarantee) basis within 14 days after the entry of the Bankruptcy Court order establishing the bidding procedures (subject to the Court's calendar, and as long as the Debtor is diligently pursuing the same, completion of the auction and completion of the sale approval hearing), all of the foregoing to be on terms reasonably acceptable to the Agent.

14

(b)     **Approval of Entry Into DIP Financing Agreements**. The Debtor is expressly and immediately authorized, empowered and directed to execute and deliver the DIP Financing Agreements and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Financing Agreements, and to execute and deliver all instruments and documents which may be required or necessary for the performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Final Order and the DIP Financing Agreements.  The Debtor is hereby authorized and directed to do and perform all acts, pay the principal, interest, fees, expenses and other amounts described in the DIP Credit Agreement and all other documents comprising the DIP Facility as such become due, including, without limitation, closing fees, administrative fees, commitment fees, letter of credit fees and reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Credit Agreement and this Final Order, which amounts shall not otherwise be subject to approval of this Court; subject to, and in accordance with the provisions of Paragraph 19(b) of this Final Order. Upon execution and delivery, the DIP Financing Agreements shall represent valid and binding obligations of the Debtor enforceable against the Debtor in accordance with its terms.

(c)     **Authorization to Borrow.**  In order to enable it to continue to operate its business, subject to the terms and conditions of this Final Order, the DIP Credit Agreement, documents comprising the DIP Facility, and the Budget (as defined below), the Debtor is hereby authorized under the DIP Facility to borrow up to a total committed amount of $60,000,000 (including the issuance of letters of credit) comprised of a senior revolving credit facility with a sublimit for letters of credit up to $10,000,000, in accordance with the terms and conditions of the DIP Credit Agreement.

(d) **Application of DIP Proceeds**. The proceeds of the DIP Facility (net of any amounts used to pay fees, costs and expenses under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget (as defined below) solely for (a) working capital and general corporate purposes, (b) payment of costs of administration of the Case, to the extent set forth in the Budget, (c) all pre-petition letters of credit issued under the Pre-Petition Financing Agreements, which are deemed issued under the DIP Credit Agreement, and (d) Adequate Protection Payments on account of the Pre-Petition Debt as provided in the DIP Credit Agreement and this Final Order.

(e) **Conditions Precedent**. The DIP Lenders shall have no obligation to make any loan or advance under the DIP Credit Agreement unless the conditions precedent to make such loan under the DIP Credit Agreement and this Final Order have been satisfied in full or waived by the DIP Lenders in their sole discretion.

(f) **Post-Petition Liens**. Effective immediately upon the execution of this Final Order, the DIP Lenders are hereby granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, priming first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests and liens (collectively, the **"DIP Liens"**), senior and superior in priority to all other secured and unsecured creditors of the Debtor's estates except as otherwise provided in the Interim Order and this Final Order, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following:

    (a)    Accounts;

    (b)    Equipment;

    (c)    General Intangibles, including, without limitation, Payment Intangibles and Intellectual Property, tax refunds and other claims of the Debtor against any

16

Governmental Authority, and all choses in action, goodwill, customer lists, formulae, permits research and literary rights, and franchises;

(d)    Inventory;

(e)    Negotiable Collateral;

(f)    Commercial Tort Claims;

(g)    Deposit Accounts;

(h)    Fixtures;

(i)    Real Property;

(j)    Proceeds from the sale, transfer or other dispositions of Leasehold Interests;

(k)    Goods;

(l)    Supporting Obligations;

(m)    Securities Accounts, Security Entitlements, Securities, Financial Assets and all other Investment Property, including, without limitation, all ownership or membership interests in any subsidiaries or affiliates (whether or not controlled by the Debtor);

(n)    any money, policies and certificates of insurance, deposits, cash or other assets;

(o)    all of Debtor's Books relating to any of the foregoing ((a) through (n)) and/or to the operation of any Debtor's business, and all rights of access to such Debtor's Books, and all property in which such Debtor's Books are stored, recorded and maintained;

(p)    all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing ((a) through (o)) or otherwise;

(q)    all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing ((a) through (p)), including the right of stoppage in transit; and

(r)    any of the foregoing, and all products, Proceeds (cash and non-cash), substitutions, Accessions and/or replacements of or to any of the foregoing;

provided, however, that the Collateral shall not include (i) any leases of real property other than

the proceeds therefrom as set forth in clause (j) above, or (ii) any avoidance action under Chapter

5 of the Bankruptcy Code or the proceeds thereof, other than proceeds of any avoidance action

brought pursuant to section 549 of the Bankruptcy Code to recover any post petition transfer of

17

collateral (collectively, the "**DIP Collateral**" and, together with the Pre-Petition Collateral, the "**Collateral**").

(g) **DIP Lien Priority**. The DIP Liens to be created and granted to the DIP Lenders, as provided herein, (a) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (b) are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to any of the DIP Collateral, and are subject only to: (x) the Carve Out, and (y) the Permitted Prior Liens. The DIP Liens shall secure all DIP Obligations. The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Case except for the Prior Permitted Liens; and shall be valid and enforceable against any trustee appointed in the Case, upon the conversion of the Case to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), and/or upon the dismissal of the Case. The DIP Liens shall not be subject to sections 506(c), 510, 549, 550 or 551 of the Bankruptcy Code.

(h) **Enforceable Obligations**. The DIP Financing Agreements shall constitute and evidence the valid and binding obligations of the Debtor, which obligations shall be enforceable against the Debtor, its estate and any successors thereto and its creditors, in accordance with their terms.

(i) **Protection of DIP Lenders and Other Rights**. The DIP Lenders shall have no obligation to make any extension of credit pursuant to the DIP Facility or the DIP Credit Agreement unless all of the conditions precedent to the making of such extension of credit under the DIP Facility or the DIP Credit Agreement are satisfied or waived by the DIP Agent in its sole discretion. From and after the Petition Date, the Debtor shall use the proceeds of the extensions

18

of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Final Order and in strict compliance with the Budget, subject to the variances permitted in Section 6.18 of the DIP Credit Agreement, as modified by this Final Order.

(j)    **Superpriority Administrative Claim Status.**  Subject to the Carve Out all DIP Obligations shall be an allowed superpriority administrative expense claim (the "**DIP Superpriority Claim**" and, together with the DIP Liens, the "**DIP Protections**") with priority (except as otherwise provided in paragraph 7 below) in any Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever under sections 503(b) and 507(b) whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or (subject to the Pre-Petition Superpriority Claim as set forth herein) on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Lenders arising hereunder.

3.    **Authorization to Use Cash Collateral and Proceeds of DIP Financing Agreements.**  Pursuant to the terms and conditions of this Final Order, the DIP Facility and the DIP Credit Agreement, and in accordance with the budget (as the same may be modified from time to time consistent with the terms of the DIP Credit Agreement, the "**Budget**"), filed on record in the Case and introduced into evidence at the Interim Hearing and the Final Hearing, the

Debtor is authorized to use Cash Collateral and the advances under the DIP Credit Agreement (during the period commencing immediately after the entry of the Interim Order and terminating upon the date set forth in Paragraph 13 of this Final Order). The Budget may be updated (with the consent and/or at the request of the DIP Agent) from time to time, provided that such updated Budget shall be in form and substance acceptable to the DIP Agent, in its reasonable discretion, and the Debtor shall be required always to comply with the Budget (subject to the variances permitted in Section 6.18 of the DIP Credit Agreement, as modified by this Final Order) and the DIP Credit Agreement pursuant to the terms of the DIP Facility. Nothing in this Final Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business or other proceeds resulting therefrom, except as permitted in the DIP Facility and the DIP Credit Agreement and in accordance with the Budget.

     4.    **Adequate Protection for Pre-Petition Secured Parties**. As adequate protection for the interest of the Pre-Petition Secured Parties in the Collateral (including Cash Collateral) on account of the granting of the DIP Liens, the Debtor's use of Cash Collateral and other decline in value arising out of the automatic stay or the Debtor's use, sale, depreciation, or disposition of the Pre-Petition Collateral including Cash Collateral, the Pre-Petition Secured Parties shall receive adequate protection as follows:

     (a)    **Pre-Petition Replacement Liens**. Solely to the extent of the diminution of the value of the interest of the Pre-Petition Secured Parties in the Pre-Petition Collateral, the Pre-Petition Secured Parties shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and liens in the Collateral (the **"Pre-Petition Replacement Liens"**) which shall be junior only to the DIP Liens, Permitted Prior Liens and the Carve-Out as provided herein.

20

(b)    **Pre-Petition Superpriority Claim**.  Solely to the extent of the diminution of the value of the interest of the Pre-Petition Secured Parties in the Pre-Petition Collateral, the Pre-Petition Secured Parties shall have an allowed superpriority administrative expense claim (the **"Pre-Petition Superpriority Claim"**) which shall have priority (except with respect to the DIP Liens, the DIP Superpriority Claim, and the Carve Out) in any Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtor and its estate, now existing or hereafter arising, of any kind or nature whatsoever.

(c)    **Adequate Protection Payment**.  The Pre-Petition Secured Parties shall receive adequate protection in the form of repayment of the principal amount of the Pre-Petition Debt in accordance with this Final Order, including Paragraph 14 hereof, and (ii) payments in the amount of interest (at the non-default rate), fees, costs, expenses, and other amounts (other than principal) with respect to the Pre-Petition Debt in accordance with the Pre-Petition Financing Agreements and this Final Order (collectively, the **"Adequate Protection Payment"**).

(d)    **Pre-Petition Indemnity Account**.  Subject to the prior funding of the Carve Out in accordance with paragraph 8 of this Final Order, upon payment in full of the DIP Obligations and termination of the DIP Credit Facility, the Debtor shall establish an account in the control of the Pre-Petition Agent (the **"Pre-Petition Indemnity Account"**), into which the sum of $150,000 of proceeds of any sale, lease or other disposition of any of the Collateral shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtor in favor of the Pre-Petition Secured Parties under the Pre-Petition Financing Agreements (the **"Pre-Petition Indemnity Obligations"**); *provided, however,* that the Pre-Petition Indemnity Account shall terminate and all remaining amounts held therein shall be

21

released to the Debtor, if all Pre-Petition Debt has been irrevocably paid in full in cash and the earliest to occur of: (a) the Challenge Period Termination Date if, as of such date, no party has filed or asserted an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 7 hereof, (b) a further order of this Court, (c) the date the Bankruptcy Court enters a final order closing the Case. The Pre-Petition Indemnity Obligations shall be secured by a first priority lien on the Pre-Petition Indemnity Account.

(e)    **Adequate Protection Upon Sale of Collateral**. Upon the sale of any Collateral pursuant to section 363 of the Bankruptcy Code, any such Collateral shall be sold free and clear of the Pre-Petition Liens and the Pre-Petition Replacement Liens, provided however, that such Liens shall attach to the proceeds of any such sale in the order and priority as set forth in this Final Order and the DIP Credit Agreement.

5.    **Section 507(b) Reservation**. Nothing herein shall impair or modify the Pre-Petition Secured Parties' rights under section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Pre-Petition Secured Parties hereunder is insufficient to compensate for the diminution in value of the interest of the Pre-Petition Secured Parties in the Pre-Petition Collateral during the Case or any Successor Case, provided, however, that any section 507(b) claim granted in the Case shall be junior in right of payment to all DIP Obligations and subject to the Carve Out.

6.    **Post-Petition Lien Perfection**. This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Pre-Petition Replacement Liens without the necessity of filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt,

22

entering into any deposit account control agreement) to validate or perfect the DIP Liens and the Pre-Petition Replacement Liens or to entitle the DIP Lenders and the Pre-Petition Replacement Liens to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent and the Pre-Petition Agent may, each in their sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the Case. The Debtor shall execute and deliver to the DIP Agent and Pre-Petition Agent all such financing statements, mortgages, notices and other documents as the DIP Agent and the Pre-Petition Agent may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Pre-Petition Replacement Liens granted pursuant hereto. The DIP Agent, in its discretion, may file a photocopy of this Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Debtor has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. The DIP Agent shall, in addition to the rights granted to it under the DIP Financing Agreements, be deemed to be the successor in interest to the Pre-Petition Secured Parties with respect to all third party notifications in connection with the Pre-Petition Financing Agreements, all Pre-Petition Collateral access agreements and all other agreements with third parties (including any agreement with a customs broker or freight forwarder) relating to, or waiving claims against, any Pre-Petition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtor and including, for the avoidance of doubt,

23

all deposit account control agreements and credit card agreements, provided, that the Pre-Petition Agent shall continue to have all rights pursuant to each of the foregoing.

7.    **Reservation of Certain Third Party Rights and Bar of Challenges and Claims**. Nothing in this Final Order or the DIP Credit Agreement shall prejudice whatever rights the Creditors' Committee(s) or any other party in interest with requisite standing (other than the Debtor) may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the mortgage, security interests and liens of the Pre-Petition Secured Parties in and to the Pre-Petition Collateral, or (ii) the validity, allowability, priority, status or amount of the Pre-Petition Debt, or (b) to bring suit against the Pre-Petition Secured Parties in connection with or related to the Pre-Petition Financing Agreement, or the actions or inactions of Pre-Petition Secured Parties arising out of or related to the Pre-Petition Financing Agreement; provided, however, that, unless the Creditors' Committee(s) or any other party in interest with requisite standing commences a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Pre-Petition Secured Parties in the nature of a setoff, counterclaim or defense to the Pre-Petition Debt (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Secured Parties) (any of the foregoing, a **"Challenge"**), within 90 days after the date of this Final Order, provided that the Pre-Petition Secured Parties promptly provide counsel to the Creditors' Committee such information and documents in their possession responsive to the requests of counsel to the Creditor's Committee relative to the validity, extent, priority, perfection, allowability or amount of the Pre-Petition Secured Parties' liens and claims (collectively, (a) and (b) shall be referred to as the **"Challenge Period,"** and the date that is the

24

next calendar day after the termination of the Challenge Period, in the event that no Challenge is raised during the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, the Creditors' Committee(s), any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Case, and any other party in interest) shall be deemed to be forever waived and barred, and the Pre-Petition Debt shall be deemed to be allowed in full and shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with the Case and the Debtor's Stipulations shall be binding on all creditors, interest holders and parties in interest. The Challenge Period may be extended upon the written agreement between counsel to the Pre-Petition Secured Parties and counsel to the Creditors' Committee or, without limiting the Pre-Petition Secured Parties' right to object thereto, by further order of this Court. The Creditors' Committee is hereby granted (i) authority pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure to investigate the liens and claims of the Pre-Petition Secured Parties, including authority to compel production of documents and issue subpoenas for oral examination (nothing contained herein being deemed a waiver of any objections that the Pre-Petition Secured Parties may have with respect thereto), and (ii) automatic standing to pursue any Challenge it determines appropriate against the Pre-Petition Secured Parties without the need to file a motion with the Court seeking authority to bring such action on behalf of the Debtor's estate. To the extent any such Challenge is made, the Pre-Petition Secured Parties shall be entitled to include such costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending the Challenge as part of the Pre-Petition Debt to the extent allowable under section 506(b) of the Bankruptcy Code unless, and to the extent, a final order is entered sustaining such

Challenge. Nothing contained herein shall limit the remedies that the Court may order if any such Challenge is sustained by the Court.

8.    **Carve Out**. Subject to the terms and conditions contained in this paragraph 8, the DIP Liens, DIP Superpriority Claims, Pre-Petition Replacement Liens and Pre-Petition Superpriority Claim are subordinate only to the following (the "**Carve Out**"): (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6); (b) allowed actual and necessary expenses incurred by members of the Creditors' Committee, and (c) allowed reasonable fees and expenses of attorneys and financial advisors employed by the Debtor and the Creditors' Committee pursuant to sections 327 and 1103 of the Bankruptcy Code (the "**Case Professionals**") up to an aggregate amount under clauses (b) and (c) not to exceed $1,000,000, (inclusive of any fees and expenses of Case Professionals which have actually incurred but are unpaid as of the occurrence of an Event of Default) provided that such fees and expenses are ultimately approved by the Bankruptcy Court, or such lesser amount as so approved. The Carve-Out shall exclude any fees and expenses (x) incurred in connection with the assertion or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defenses or other contested matter, the purpose of which is to seek any order, judgment, determination or similar relief (A) invalidating, setting aside, avoiding, or subordinating, in whole or in part, (i) the DIP Obligations, (ii) the Pre-Petition Debt, (iii) the Pre-Petition Lien in the Pre-Petition Collateral, or (iv) the DIP Agent's or DIP Lenders' Liens in the Collateral, or (B) preventing, hindering or delaying, whether directly or indirectly, the DIP Agent's, DIP Lenders' or Pre-Petition Secured Parties' assertions or enforcement of their Liens, security interest or realization upon any Collateral, *provided,* however, that such exclusion does not encompass any investigative work conducted by the Case Professionals prior to bringing any action relating to

the foregoing, (y) in using cash collateral of the DIP Agent or the DIP Lenders, selling or otherwise disposing of any other Collateral, or incurring any indebtedness not permitted under the DIP Credit Agreement, without the DIP Agent's express written consent or (z) arising after the conversion of the Chapter 11 case to a case under chapter 7 of the Bankruptcy Code. Except as otherwise provided in this paragraph, nothing contained in this Final Order shall be deemed a consent by the Pre-Petition Secured Parties, or DIP Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise. Nothing herein shall be construed to obligate the Pre-Petition Secured Parties, or DIP Secured Parties, in any way, to pay the professional fees or U.S. Trustee Fees, or to assure that the Debtor has sufficient funds on hand to pay any professional fees or U.S. Trustee Fees. So long as no Event of Default shall have occurred and is continuing, subject to Paragraph 9 hereof, the Debtor shall be permitted to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may be due and payable and the same shall not reduce the Carve-Out.

9.    **Payment of Compensation**. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtor, any official committee or of any person or shall affect the right of the DIP Lenders, the Pre-Petition Agents to object to the allowance and payment of such fees and expenses or to permit the Debtor to pay any such amounts not set forth in the Budget.

10.    **Section 506(c) Claims**. At no time during the Case or any Successor Cases shall costs or expenses of administration which have been or may be incurred at any time be charged (a) against the DIP Secured Parties, their claims, or the DIP Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP

27

Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lenders, or (b) if the claims of the Pre-Petition Secured Parties are a fully secured claim within the meaning of section 506 of the Bankruptcy Code, against the Pre-Petition Secured Parties, their claims or the Pre-Petition Collateral pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without the prior written consent of the Pre-Petition Secured Parties, and no such consent shall be implied from any other action, inaction, or acquiescence by the Pre-Petition Secured Parties. Nothing contained in this Final Order shall be deemed a consent by the Pre-Petition Secured Parties or the DIP Secured Parties to any charge, lien, assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

11.    **Collateral Rights**. Unless the DIP Agent has provided its prior written consent or all DIP Obligations and Pre-Petition Debt have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), all commitments to lend have terminated, all Letters of Credit (as defined in the DIP Credit Agreement) have been secured as required by the DIP Credit Agreement, all indemnity obligations under the DIP Credit Agreement have been cash secured and the Pre-Petition Indemnity Account has been established, there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes any of the following:

(a)    the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Lenders, or the Pre-Petition Secured Parties; or

28

(b)      relief from stay by any person other than of the DIP Lenders on all or any portion of the Collateral; or

(c)      the Debtor's return of goods constituting Collateral pursuant to section 546(h) of the Bankruptcy Code, except as permitted in the DIP Credit Agreement.

12.      **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of paragraph 11 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Lenders' obligations to make loans and advances under the DIP Facility, including subsequent to the confirmation of any Chapter 11 plan or plans (the "**Plan**") with respect to the Debtor, and the repayment in full of the Pre-Petition Debt, the Debtor's estate, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent in reduction of the DIP Obligations and the Pre-Petition Debt.

13.      **Commitment Termination Date**. All (i) DIP Obligations of the Debtor to the DIP Lenders shall be immediately due and payable, and (ii) authority to use the proceeds of the DIP Financing Agreements and to use cash collateral shall cease, both on the date that is the earliest to occur of: (i) August 20, 2008, unless extended as provided in Paragraph 2(a) of this Final Order, (ii) the date on which the maturity of the Obligations is accelerated and the Commitments are irrevocably terminated in accordance with the DIP Credit Agreement, or (iii) the Consummation Date (the "**Commitment Termination Date**"). Nothing contained herein shall limit the right of the Debtor on or after the Commitment Termination Date to seek

29

authorization from the Court to use Cash Collateral or the right of the DIP Lenders and Pre-Petition secured Parties to object thereto.

14.    **Payment from Proceeds of Collateral.**  Subject to the rights, if any, of the holders of Permitted Prior Liens, all products and proceeds of the Collateral (including, for the avoidance of doubt, proceeds from receivables and sales in the ordinary course of business, insurance proceeds, and proceeds of all dispositions of Collateral, whether or not in the ordinary course) regardless of whether such Collateral came into existence prior to the Petition Date, shall be remitted (i) directly to the Pre-Petition Agent and applied by the Pre-Petition Agent first to the Pre-Petition Revolving Loans and then to the Term Loan until paid in full; and (ii) thereafter, to the DIP Agent for application to the DIP Obligations outstanding pursuant to the DIP Credit Agreement.

15.    **Disposition of Collateral.**  The Debtor shall not (a) sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral, without the prior written consent of the DIP Lenders (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Lenders or an order of this Court), except for sales of the Debtor's inventory in the ordinary course of business or except as otherwise provided for in the DIP Credit Agreement and this Final Order and as approved by the Bankruptcy Court, or (b) assume, reject or assign any Leasehold Interest (as defined in the DIP Credit Agreement) without the prior consultation with the DIP Agent, except as otherwise provided for in the DIP Credit Agreement.

16.    **Events of Default.**  The occurrence of any of the following events shall constitute an Event of Default under this Final Order:

(a)    Failure by the Debtor to comply with any term of this Final Order.

(b)    The occurrence of the Commitment Termination Date.

30

Unless and until the Pre-Petition Debt and DIP Obligations are irrevocably repaid in full, all commitments to lend have irrevocably terminated, all Letters of Credit (as defined in the DIP Financing Agreements) have been cash secured as required by the DIP Credit Agreement, and all DIP Obligations which survive termination obligations have been cash secured to the reasonable satisfaction of the Pre-Petition Agents and DIP Agent, and the Pre-Petition Indemnity Account has been established, the protections afforded to Pre-Petition Secured Parties and the DIP Secured Parties pursuant to this Final Order and under the DIP Credit Agreement, and any actions taken pursuant thereto, shall survive the entry of any order confirming a Plan or converting this Case into one or more Successor Cases, and the DIP Liens, the DIP Super-Priority Claim, and the Pre-Petition Superpriority Claim shall continue in these proceedings and in any Successor Case, and such Liens, DIP Super-Priority Claim, and the Pre-Petition Superpriority Claim shall maintain their priority as provided by this Final Order.

17.    **Rights and Remedies Upon Event of Default.**

(a)    Any automatic stay otherwise applicable to the Pre-Petition Secured Parties and DIP Secured Parties is hereby modified so that after the occurrence of any Event of Default and at any time thereafter upon seven (7) business days prior notice of such occurrence, in each case given to each of the Debtor, counsel for the Creditors' Committee and the U.S. Trustee, the Pre-Petition Secured Parties and DIP Secured Parties, shall be entitled to exercise their rights and remedies in accordance with the Pre-Petition Financing Agreement, the DIP Financing Agreements and applicable state law, subject to the provisions of Paragraph 17(c) hereof. Immediately following the giving of notice by the DIP Agent of the occurrence of an Event of Default: (i) the Debtor shall continue to deliver and cause the delivery of the proceeds of Collateral to the DIP Agent as provided in the DIP Credit Agreement and this Final Order; (ii)

31

the DIP Agent shall continue to apply such proceeds in accordance with the provisions of this Final Order and of the DIP Credit Agreement; (iii) the Debtor shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the Pre-Petition Debt and DIP Obligations and the Carve-Out; and (iv) any obligation otherwise imposed on the DIP Agent or the DIP Lenders to provide any loan or advance to the Debtor pursuant to the DIP Facility shall be suspended.

(b)     Following the giving of notice by the DIP Agent of the occurrence of an Event of Default, the Debtor and/or the Creditors' Committee shall be entitled to an emergency hearing before this Court for the purpose of contesting whether an Event of Default has occurred. If neither the Debtor nor the Creditors' Committee contests the right of the Pre-Petition Secured Parties and DIP Secured Parties, to exercise their remedies based upon whether an Event of Default has occurred within such time period, or if the Debtor or the Creditors' Committee timely contests the occurrence of an Event of Default and the Bankruptcy Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the Pre-Petition Secured Parties and DIP Secured Parties, shall automatically terminate at the end of such notice period.

(c)     If the Pre-Petition Secured Parties or DIP Secured Parties exercise any of their rights and remedies upon the occurrence of an Event of Default under the Pre-Petition Financing Agreement or the DIP Financing Agreements, the DIP Agent may retain one or more agents to sell, lease, or otherwise dispose of the Collateral, provided that, except to the extent permitted under applicable state law or with the consent of the applicable landlord, the conduct of any "store closing" or similar sale by the DIP Agent or its agents from any leased store and the rights of access to such store shall be subject to further approval of the Court. In any exercise

32

of their rights and remedies upon an Event of Default under the DIP Financing Agreements, the DIP Agent and DIP Lenders are authorized to proceed under or pursuant to the DIP Credit Agreement, subject to applicable state law and the provisions of this Section 17(c). Without limiting the foregoing, subject to the terms of the DIP Credit Agreement, in the exercise of the DIP Agent's rights and remedies upon Event of Default, the DIP Agent may by written notice to the Debtor require the Debtor to file a motion seeking to retain one or more agents to sell, lease, or otherwise dispose of the Collateral on terms acceptable to the DIP Agent. The Debtor shall file such motion within ten (10) days of the DIP Agent's request and shall diligently prosecute such motion. If the Debtor fails to so file the motion, the DIP Agent may, file and prosecute such a motion in the name of the Debtor. The Creditors' Committee shall have the right to be heard with respect to any such motion by the Debtor or the DIP Agent.

All proceeds realized from any of the foregoing shall be turned over to the DIP Agent for application to the Carve-Out, the DIP Obligations, and Pre-Petition Debt under, and in accordance with the provisions of, the DIP Financing Agreements, the Pre-Petition Financing Agreements and this Final Order.

(d)    The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (1) permit the Debtor to grant the Pre-Petition Replacement Liens and the DIP Liens and to incur all liabilities and obligations to the Pre-Petition Secured Parties, the DIP Lender under the DIP Financing Agreements, the DIP Facility and this Final Order, and (2) authorize the DIP Lender and the Pre-Petition Secured Parties to retain and apply payments hereunder.

(e)    Nothing included herein shall prejudice, impair, or otherwise affect Pre-Petition Secured Parties' or DIP Secured Parties' rights to seek any other or supplemental relief

33

in respect of the Debtor nor the DIP Agent's or DIP Lenders' rights, as provided in the DIP Credit Agreement, to suspend or terminate the making of loans under the DIP Credit Agreement.

18. **Proofs of Claim.** The Pre-Petition Secured Parties and the DIP Lenders will not be required to file proofs of claim in the Case or Successor Case. The Pre-Petition Secured Parties are hereby authorized and entitled, in their sole discretion, but not required, to file (and amend and/or supplement, as they see fit) aggregate proofs of claim in the Case or any Successor Case. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Secured Parties.

19. **Other Rights and Obligations.**

(a) **Good Faith Under Section 364(e) of the Bankruptcy Code. No Modification or Stay of this Final Order.** Based on the findings set forth in this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Lenders hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Lenders shall be governed in all respects by the original provisions of this Final Order, and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made

34

in reliance on this Final Order, the obligations owed the DIP Lenders prior to the effective date of any stay, modification or vacation of this Final Order cannot, as a result of any subsequent order in the Case, or in any Successor Case, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lenders under this Final Order and/or the DIP Financing Agreements.

(b)    **Expenses**. As provided in the Pre-Petition Financing Agreement and DIP Financing Agreements, all costs and expenses of the DIP Secured Parties and Pre-Petition Secured Parties in connection with the DIP Financing Agreements and Pre-Petition Financing Agreement, including, without limitation, reasonable, documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses will be paid by the Debtor, whether or not the transactions contemplated hereby are consummated. The DIP Secured Parties and Pre-Petition Secured Parties shall provide to the U.S. Trustee, the Debtor and counsel to the Creditors' Committee appointed in these chapter 11 cases the invoices relating to such fees and expenses and, if no objection as to the reasonableness of such fees and expenses is served on the DIP Agent within seven (7) days following receipt of such invoices, the Debtor shall be authorized to pay such fees and expenses. Payment of such fees shall not be subject to allowance by the Court; provided however, if the Debtor ~~the U.S.~~ or the ~~Trustee~~ Creditors' Committee objects to payment of such fees and expenses, unresolved disputes as to the reasonableness of any such fees shall be determined by the Court absent agreement between the DIP Agent and the Debtor or the Creditors' Committee, as applicable (for clarity, that portion of the fees and expense not disputed shall be promptly paid by the Debtor). Under no

35

circumstances shall professionals for the DIP Lenders or Pre-Petition Secured Parties be required to comply with the U.S. Trustee fee guidelines.

      (c)    **Binding Effect**. The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lenders and the Pre-Petition Secured Parties, the Debtor and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor) whether in the Case, in any Successor Case, or upon dismissal of any such chapter 11 or chapter 7 Case.

      (d)    **No Waiver**. The failure of the Pre-Petition Secured Parties and the DIP Lenders to seek relief or otherwise exercise their rights and remedies under the DIP Financing Agreements, the DIP Facility, the Pre-Petition Financing Agreements or this Final Order, as applicable, shall not constitute a waiver of any of the Pre-Petition Secured Parties' and the DIP Lenders' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the Pre-Petition Secured Parties or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Pre-Petition Secured Parties and the DIP Lenders to (i) request conversion of the Case to a case under Chapter 7, dismissal of the Case, or the appointment of a trustee in the Case (but only in the event an Event of Default has occurred and is continuing), or (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Plan or (iii) any of the rights, claims or privileges (whether legal, equitable or otherwise) the DIP Lenders or the Pre-Petition Secured Parties.

36

(e)    **No Third Party Rights**.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)    **No Marshaling**.  Neither the DIP Lenders nor the Pre-Petition Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral,

(g)    **Section 552(b)**.  The DIP Lenders and the Pre-Petition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Lenders or the Pre-Petition Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or the Collateral.

(h)    **Amendment**.  The Debtor and the DIP Agent may, upon five (5) days notice to counsel to the Creditors' Committee (unless such notice is waived in writing by the Creditors' Committee or the counsel to the Creditor's Committee) amend or waive any provision of the DIP Financing Agreements, provided that such amendment or waiver, in the judgment of the Debtor and the DIP Agent, is either nonprejudicial to the rights of third parties or is not material. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of the Debtor and the DIP Agent (after having obtained the approval of the DIP Lenders as provided in the DIP Financing Agreements) and approved by the Bankruptcy Court.

(i)    **Survival of Final Order**.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (i) confirming any Plan in the Case, (ii) converting the Case to a case under chapter 7 of the

37

Bankruptcy Code, or (iii) dismissing the Case, (iv) withdrawing of the reference of the Case from this Court, or (v) providing for abstention from handling or retaining of jurisdiction of the Case in this Court, and the terms and provisions of this Final Order as well as the DIP Protections granted pursuant to this Final Order and the DIP Financing Agreements, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Final Order until all the obligations of the Debtor to the DIP Lenders pursuant to the DIP Financing Agreements, and all obligations of the Debtor to the Pre-Petition Secured Parties under the Pre-Petition Financing Agreement are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms). The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code. The Debtor shall not propose or support any Plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations and the Pre-Petition Debt, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)    **Inconsistency.**  In the event of any inconsistency between the terms and conditions of the DIP Financing Agreements and of this Final Order, and notwithstanding any provision of the DIP Financing to the contrary, the provisions of this Final Order shall govern and control.

(k)    **Enforceability.**  This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nun pro tunc* to the Petition Date immediately upon execution hereof.

38

(l)     **Objections Overruled.** All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(m)     **No Waivers or Modification of Final Order.** The Debtor irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of the DIP Agent and the Pre-Petition Agent and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and the Pre-Petition Agent.

(n)     **Waiver of the Ten (10) Day Stay Under Bankruptcy Rule 6004(h).** The ten (10) day stay provisions of Bankruptcy Rule 6004(h) are waived and shall not apply to this Final Order.

21.     **Retention of Jurisdiction.** The Bankruptcy Court has and will retain jurisdiction to enforce this Final Order according to its terms.

SO ORDERED by the Bankruptcy Court this ___ day of March, 2008.

The Honorable Kevin Gross
United States Bankruptcy Judge

1064998.5

39

# EXHIBIT 8

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **In re** | **Chapter 11**<br>**Case No. 07-10787 (PJW)** |
| **Tweeter Home Entertainment Group, Inc.,**<br>**et al.,** | **Jointly Administered** |
| **Debtors.** | **Related Docket Nos. 21, 48, 217** |

### FINAL ORDER (1) APPROVING POST-PETITION FINANCING, (2) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363, (3) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS PURSUANT TO 11 U.S.C. §§ 363 AND 364 AND (4) MODIFYING AUTOMATIC STAY PURSUANT TO 11 U.S.C. § 362

THIS MATTER having come before the Court upon motion (the "**DIP Motion**") by New England Audio Co., Inc., Sound Advice of Arizona, Inc., NEA Delaware, Inc., THEG USA, LP, Hillcrest High Fidelity, Inc., Sound Advice, Inc. and Sumarc Electronics Incorporated (each a "**Borrower**" and collectively, the "**Borrowers**"), Tweeter Home Entertainment Group, Inc. (a "**Guarantor**" and together with the Borrowers, the "**Debtors**"), each as a debtor and debtor-in-possession in the above captioned chapter 11 cases (collectively, the "**Cases**") seeking, among other things, entry of a final order (this "**Final Order**") authorizing the Debtors to:

(i)     Obtain credit and incur debt, pursuant to sections 363, 364(c) and 364(d) of the Bankruptcy Code up to the aggregate committed amount of $60,000,000 (on terms and conditions more fully described herein) secured by first priority perfected liens (as defined in section 101(37) of chapter 11 of title 11 of the United States Code, as amended (the "**Bankruptcy Code**") and referred to and defined in more detail herein as the "**DIP Liens**") on

1

ACTIVE/72064200.7

substantially all of the property of the Borrowers' estates, and second priority perfected liens (the "**Tivoli Liens**") on all equity and other interests held by any Debtor in the Tivoli Collateral (as defined below), in each case as more fully described herein and pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)      (a) Establish on a final basis that financing arrangement (as amended, modified and in effect from time to time, the "**DIP Credit Facility**") as provided for in that certain Secured Super-Priority Debtor-in-Possession Credit Facility, substantially in the form filed on record in the Cases and introduced into evidence at the hearing on the DIP Motion (as amended, modified and in effect from time to time, including by that certain First Amendment to Secured Super-Priority Debtor-in-Possession Credit Facility dated as of June 26, 2007 (the "**First DIP Amendment**", attached as Exhibit A hereto) and together with any and all other related documents and agreements entered into in connection with or related to the DIP Credit Agreement, including, without limitation, any fee letters, the "**DIP Credit Agreement**", attached as Exhibit B hereto) by and among the Borrowers, the Guarantor and General Electric Capital Corporation, as Administrative Agent (the "**DIP Agent**"), the lenders signatory thereto from time to time and the parties who are Pre-Petition Credit Agreement Lenders (as defined below) (the "**DIP Lenders**"), and (b) incur the "**Obligations**" under and as defined in the DIP Credit Agreement (collectively, the "**DIP Obligations**");

(iii)     Authorize the use of the proceeds of the DIP Credit Facility (net of any amounts used to pay fees under the DIP Credit Agreement) in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget (as

2

defined below) solely for (a) working capital and general corporate purposes to the extent set forth in the Budget (but excluding the making of any Restricted Payment as that term is defined in the DIP Credit Agreement), (b) payment of costs of administration of the Cases, and (c) payment of such prepetition expenses as contemplated in the Budget or as consented to by the DIP Agent in its sole discretion and as approved by the Bankruptcy Court;

(iv)    Grant, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders) first priority perfected liens, subject only to the Carve-Out (as defined below), the Permitted Prior Liens (as defined below) and the Consignment Liens (as defined below) upon all of the Borrowers' real and personal property (subject only to the Junior DIP Tivoli Liens as more fully described herein) as provided in and as contemplated by this Final Order, the DIP Credit Facility and the DIP Credit Agreement, and subject to the entry of the Final Junior DIP Order and terms of the Intercreditor Agreement (as defined below);

(v)    Grant, pursuant to section 364(c)(1) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders) superpriority administrative claim status in respect of all DIP Obligations, subject to the Carve Out as provided herein;

(vi)    Authorize the use of "cash collateral" as such term is defined in section 363 of the Bankruptcy Code (the "**Cash Collateral**") in which the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders (each as defined below) have an interest;

(vii)    Grant pursuant to sections 361, 363 and 364 of the Bankruptcy Code, as adequate protection for the DIP Liens and the Tivoli Liens and the use of Cash Collateral, in favor of the Pre-Petition Credit Agreement Lenders (as defined below), (a) replacement liens on all of the Debtors' currently owned or after-acquired property and proceeds thereof, *pari passu* to the DIP

3

Liens and subject to the Carve Out (as defined below), the Permitted Prior Liens and the Consignment Liens and (b) a superpriority administrative expense claim, which shall be *pari passu* with the DIP Superpriority Claim (as defined below) and subject to the Carve Out;

(viii)    Authorize adequate protection payments in the amount of interest, fees and other amounts (other than principal) due under the Pre-Petition Credit Agreement; and

(ix)    Vacate and modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Credit Agreement and this Final Order.

The Court having considered the DIP Motion, the Declaration of Gregory W. Hunt in support of the Debtors' first day motions and orders, the exhibits attached thereto, the DIP Credit Facility and the DIP Credit Agreement, the First DIP Credit Amendment, the evidence submitted at the hearing on the DIP Motion conducted on June 12, 2007 (the **"Interim Hearing"**), the evidence submitted at the hearing to approve the Debtors' Emergency Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 364 and Federal Rule of Bankruptcy Procedure 4001 (I) Authorizing Debtors to Obtain Junior Secured Postpetition Financing; (II) Authorizing and Approving Debtors' Entry into Waiver and First Amendment to Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement in Connection Therewith, and (III) Scheduling Interim and Final Hearings (the **"Junior DIP Motion"**; the order entered by the Court on June 27, 2007 granting, on an interim basis, the Junior DIP Motion being referred to herein as the **"Junior DIP Interim Order"**, attached as <u>Exhibit C</u> hereto) and the evidence submitted at the final hearing on the DIP Motion conducted on June 29, 2007 (the **"Final Hearing"**); in accordance with Rules 2002, 4001(b), (c), and (d), and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**), due and proper notice of the DIP Motion and the Final

4

Hearing having been given; and it appearing that approval of the relief requested in the DIP Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and their equity holders, and is essential for the continued operation of the Debtors' businesses; and it further appearing that the Borrowers are unable to secure unsecured credit for money borrowed allowable as an administrative expense under Bankruptcy Code section 503(b)(1); and there is adequate protection of the interests of holders of liens on the property of the estates on which liens are to be granted; and all objections, if any, to the entry of this Final Order having been withdrawn, resolved or overruled by the Court; and upon all pleadings filed with this Court, all proceedings held before the Court, and the evidence adduced in connection therewith; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM AND FINAL HEARINGS BY THE DEBTORS, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition Date.  On June 11, 2007 (the "**Petition Date**"), the Debtors each filed a voluntary petition under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware.  The Debtors have filed a motion requesting joint administration of the Cases.  The Debtors have continued in the management and operation of their business and property as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in these cases.

B.    Jurisdiction and Venue.  This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby.  Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Cases and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

5

C.    Committee Formation.    An official committee of unsecured creditors (the **"Committee"**) was appointed by the United States Trustee for the District of Delaware on June 22, 2007.

D.    Junior DIP.    On June 27, 2007, this Court entered the Junior DIP Interim Order approving, on an interim basis, and as more fully described in the Junior DIP Interim Order: (1), a post-petition financing arrangement (the **"Junior DIP Facility"**) whereby, (1) the Debtors were authorized to enter into that certain Junior Secured, Super-Priority Debtor-In-Possession Credit Agreement dated as of June 26, 2007 (the **"Junior DIP Credit Agreement"**, as filed with this Court at the hearing on the Junior DIP Motion) among the Borrowers as borrowers, the Guarantor as guarantor, Schultze Agency Services, LLC as Agent (the **"Junior DIP Agent"**) and the lenders signatory thereto from time to time (the **"Junior DIP Lenders"**) and to borrow pursuant to the terms of the Junior DIP Credit Agreement, up to $10,000,000 (together with all amounts owing under the Junior DIP Credit Agreement, the **"Junior DIP Loan"**), (2) the Debtors granted the Junior DIP Agent first priority perfected post-petition liens on the Senior DIP Collateral (as defined below, but excluding the Tivoli Collateral) (the **"Junior DIP Liens"**) subject and junior in all respects to the DIP Liens and the Credit Agreement Replacement Liens, the Permitted Prior Liens, the Carve Out and the Consignment Liens, (3) the Debtors granted the Junior DIP Agent first priority perfected post-petition liens in the Tivoli Collateral (the **"Junior DIP Tivoli Liens"**), senior to the liens of the DIP Agent and the Pre-Petition Agent only on the Tivoli Collateral, (4) the Junior DIP Agent and the Junior DIP Lenders were granted superpriority administrative claims junior in priority to the DIP Superpriority Claim and the Pre-Petition Superpriority Claim, each as defined below, (the **"Junior DIP Superpriority Claims"**) (5) the Junior DIP Agent for itself and on behalf of the Junior DIP Lenders and the DIP Agent

6

for itself and on behalf of the DIP Lenders entered into an intercreditor agreement dated as of June 26, 2007 (the "**Intercreditor Agreement**", attached as Exhibit D hereto) and (6) this Court approved the First DIP Amendment (including fees payable in connection therewith), whereby, among other things, the DIP Agent and the DIP Lenders (x) consented to the Junior DIP Facility, the Junior Credit Agreement, the form of the Junior DIP Interim Order, the granting of the Junior DIP Tivoli Liens and the Junior DIP Liens on the basis described herein and therein, and (y) amended the terms of the DIP Credit Agreement in conformity with the foregoing.

E.    Notice.  Notice of the Final Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by telecopy, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the United States Trustee, (ii) the Securities and Exchange Commission, (iii) the Internal Revenue Service, (iv) the Debtors' twenty 20 largest unsecured creditors, (v) counsel to the Pre-Petition Agent for itself and for the Pre-Petition Credit Agreement Lenders, and (vi) the DIP Agent.  Under the circumstances, such notice of the Final Hearing and the relief requested in the DIP Motion constitutes due and sufficient notice and complies with sections 102(1), 364(c) and 364(d) of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001(c).

F.    Borrowers' Acknowledgements and Agreements.  After consultation with their attorneys and financial advisors, but without prejudice to the rights of the Committee and other parties in interest as set forth in paragraph 7 below to assert claims and causes of action of the Debtors and/or their estates, the Debtors admit, stipulate, acknowledge and agree that (collectively, paragraphs F(i) through F(v) hereof shall be referred to herein as the "**Debtors' Stipulations**"):

(i)    Pre-Petition Credit Agreement.  Prior to the commencement of the Cases, the Borrowers were borrowers and the Guarantor was a guarantor under that

7

certain Credit Agreement dated as of March 21, 2007, as amended and in effect (including by that certain First Amendment to Credit Agreement dated as of May 30, 2007, together with all related documents and agreements, including, without limitation, the Pre-Petition Security Agreement, as hereinafter defined, the "**Pre-Petition Credit Agreement**"), by and among the Borrowers, the Guarantor, the lenders and other financial institutions party thereto plus GE Money Bank (each a "**Pre-Petition Credit Agreement Lender**" and, collectively, the "**Pre-Petition Credit Agreement Lenders**"), General Electric Capital Corporation as Administrative Agent, Lender and Issuing Bank (in such capacity, the "**Pre-Petition Agent**" and, in its individual capacity, "**GE Capital**") for the Pre-Petition Credit Agreement Lenders, and GE Capital Markets, Inc. as Lead Arranger and Bookrunner for the Pre-Petition Credit Agreement Lenders.

(ii)    Pre-Petition Debt Amount. As of the Petition Date, the Borrowers were indebted under the Pre-Petition Credit Agreement (the "Obligations" as defined therein) in the approximate amount of $25 million in principal amount of revolving loans, swingline loans, advances and/or other financial accommodations or services (plus, any additional obligations related to cash management, credit card, depository, investment, letter of credit, hedging arrangements, equipment leasing or other banking or financial services) provided to or for the benefit of the Borrowers (the "**Pre-Petition Loans**"), including, without limitation, approximately $5.4 million in letters of credit (the "**Pre-Petition Letters of Credit**" and together with the Pre-Petition Loans and any and all unpaid principal, accrued and unpaid interest, unpaid fees and attorneys' fees, treasury, cash management and derivative obligations, and other charges, amounts and costs owing, accrued, accruing or chargeable in respect of any of the Borrowers' obligations pursuant to the Pre-Petition Credit Agreement, the "**Pre-Petition Debt**"). For the avoidance of doubt, the Pre-Petition Debt shall include any amounts of such debt that have at any time been repaid in accordance with the Interim Order, the Final Order and the DIP Credit Agreement and which subsequently have been reinstated after payment thereof because such payment is required by final order to be returned, disgorged or repaid to the Debtors, DIP Agent or DIP Lenders.

(iii)    Pre-Petition Security Agreement. The Borrowers and the Guarantor were party to that certain Security Agreement dated as of March 21, 2007 (the "**Pre-Petition Security Agreement**") pursuant to which the Borrowers and the Guarantor granted certain liens and certain interests to the Pre-Petition Agent to secure the Pre-Petition Debt.

(iv)    Pre-Petition Credit Liens. (a) As of the Petition Date, (i) the Pre-Petition Credit Liens (as defined below) are valid, binding, enforceable, and perfected first-priority liens subject only to the Permitted Prior Liens (as defined below) and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Pre-Petition Debt constitutes legal, valid and binding obligations of the Debtors, enforceable in

8

accordance with the terms thereof (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Debt exists, and no portion of the Pre-Petition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Debt constitutes allowed secured claims, and (b) on the date that this Final Order is entered, the Debtors have waived, discharged and released the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders, together with their affiliates, agents, attorneys, officers, directors and employees, of any right the Debtors may have (x) to challenge or object to any of the Pre-Petition Debt, (y) to challenge or object to the security for the Pre-Petition Debt, and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Credit Agreement or otherwise.

(v)    Pre-Petition Credit Collateral.    To secure the Pre-Petition Debt, the Borrowers and the Guarantor granted, assigned and transferred security interests and liens (collectively referred to herein as the "**Pre-Petition Credit Liens**") to the Pre-Petition Agent, for the benefit of the Pre-Petition Credit Agreement Lenders, as follows on all personal property assets of each Borrower and Guarantor, including, without limitation, all (a) Accounts, (b) Documents, (c) Deposit Accounts (d) Commercial Tort Claims, (e) Equipment, (f) General Intangibles, (g) Inventory, (h) Goods, (i) Fixtures, (j) Chattel Paper, (k) Investment Property, (l) Letter-of-Credit Rights, (m) Payment Intangibles, (n) Supporting Obligations, (o) Instruments, (p) money, policies and certificates of insurance, deposits, cash, or other property, (q) all books, records, and information relating to any of the foregoing and/or to the operation of any Borrower's or Guarantor's business, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded and maintained, (r) all insurance proceeds, refunds, and premium rebates, including, without limitation, proceeds of fire and credit insurance, whether any of such proceeds, refunds, and premium rebates arise out of any of the foregoing clauses (a) through (q) or otherwise, (s) all liens, guaranties, rights, remedies, and privileges pertaining to any of the foregoing clauses (a) through (r), including the right of stoppage in transit, and (t) any of the foregoing whether now owned or now due, or in which any Borrower or Guarantor had an interest, or thereafter acquired, arising, or to become due, or in which any Borrower or Guarantor obtained an interest, and all products, Proceeds, substitutions, and accessions of or to any of the foregoing. (each as defined in the Pre-Petition Security Agreement) (collectively, the "**Pre-Petition Collateral**"), with priority over all other liens except for those certain liens otherwise permitted by the Pre-Petition Credit Agreement (to the extent any such permitted liens are

9

valid, properly perfected, unavoidable, and senior, they are referred to herein as the **"Permitted Prior Liens"**).[1]

G.     Findings Regarding the Post-Petition Financing.

(i)     Need for Post-Petition Financing and Use of Cash Collateral.     An immediate need exists for the Borrowers to obtain funds from the DIP Credit Facility and use of Cash Collateral in order to continue operations and to administer and preserve the value of their estates. The ability of the Borrowers to finance their operations requires the availability of working capital from the DIP Credit Facility and the use of Cash Collateral, the absence of which would immediately and irreparably harm the Borrowers, their estates, their creditors and equity holders and the possibility for a successful reorganization.

(ii)     No Credit Available on More Favorable Terms. The Borrowers have been unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Borrowers are also unable to obtain secured credit, allowable only under Bankruptcy Code sections 364(c)(2), 364(c)(3), and 364(d) on more favorable terms and conditions than those provided in the DIP Credit Agreement and this Final Order. The Borrowers are unable to obtain credit for borrowed money without the Borrowers granting to the DIP Agent (i) liens on all of the assets of the Borrowers pursuant to Bankruptcy Code sections 364(c)(2), 364(c)(3) and 364(d) and (ii) superpriority administrative expense claim status pursuant to Bankruptcy Code sections 503(b) and 507(b) as provided in section 364(c)(1) of the Bankruptcy Code (such superpriority administrative expense claim having priority as provided by this Final Order).

H.     Section 506(c) Waiver. At no time during the Cases or any Successor Cases shall

costs or expenses of administration which have been or may be incurred at any time be charged

against the DIP Agent or the DIP Lenders, their claims, or the Senior DIP Collateral and the

Tivoli Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise,

---

[1]     Nothing herein shall constitute a finding or ruling by this Court that any such Permitted Prior Liens are valid, senior, perfected and unavoidable. Moreover, nothing shall prejudice the rights of any party in interest including, but not limited, to the Debtors, the DIP Agent and the DIP Lenders, and any committee appointed pursuant to section 1102 of the Bankruptcy Code to challenge the validity, priority, perfection and extent of any such Permitted Prior Lien and or security interest. For the avoidance of doubt, subject to the liens of the DIP Agent, as provided for herein, the Pre-Petition Agent's liens have priority over and above all other liens except for those liens which were valid, senior, perfected and otherwise unavoidable as of the Petition Date.

10

without the prior written consent of the DIP Agent and the DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or the DIP Lenders.

I.     Use of Proceeds of the DIP Credit Facility.   Proceeds of the DIP Credit Facility (net of any amounts used to pay fees under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget (as defined below), solely for (a) working capital and general corporate purposes to the extent set forth in the Budget (but excluding the making of any Restricted Payment as that term is defined in the DIP Credit Agreement), (b) payment of costs of administration of the Cases, and (c) payment of such prepetition expenses as contemplated in the Budget or as consented to by the DIP Agent in its sole discretion that are approved by separate order of Bankruptcy Court.

J.     Application of Proceeds of Collateral.   Net proceeds of the sale or other disposition of the Senior Collateral (as defined below) shall be applied:  (a) first, to permanently reduce the Pre-Petition Debt, subject to the challenge rights set forth in paragraph 7 (b) second, to reduce the DIP Obligations (with exceptions to be mutually agreed) in accordance with the DIP Credit Agreement, and (c) third, to permanently reduce the Junior DIP, subject to the Intercreditor Agreement and in accordance with paragraph 19 hereof.  Payment of the Pre-Petition Debt in accordance with this Final Order is necessary as the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders will not otherwise consent to the priming of the Pre-Petition Liens.  Such payment will not prejudice the Borrowers or their estates, because payment of such amounts is subject to the rights of the Committee and parties-in-interest under paragraph 7 below.

11

K.    Application of Proceeds of Tivoli Collateral.  Net proceeds of the sale or other disposition of the Tivoli Collateral shall be applied: (a) first, to permanently reduce the Junior DIP, subject to paragraph 19 hereof and the Intercreditor Agreement, (b) second, to permanently reduce the Pre-Petition Debt, and (c) third, to reduce the DIP Obligations (with exceptions to be mutually agreed) in accordance with the DIP Credit Agreement.

L.    Adequate Protection.  As a result of the grant of the DIP Liens and the Tivoli Liens and the Tivoli Liens to the DIP Lenders and the use of Cash Collateral authorized herein, the Pre-Petition Agent is entitled to receive, for the benefit of the Pre-Petition Credit Agreement Lenders, adequate protection pursuant to sections 361, 362 and 363 of the Bankruptcy Code for any diminution in the value of its interest in the Borrowers' interest (subject to paragraph 7 of this Final Order) in the Pre-Petition Collateral (including the Cash Collateral) resulting from the Borrowers' use, sale or lease of the Pre-Petition Collateral (including the Cash Collateral) that it proves occurred during the Cases.  As adequate protection, the Pre-Petition Agent, for the benefit of the Pre-Petition Credit Agreement Lenders, will receive: (1) the Credit Agreement Replacement Liens, (2) the Pre-Petition Superpriority Claim, (3) the Adequate Protection Payments, and (4) the Pre-Petition Indemnity Account (each as defined below).

M.    Section 552.  In light of their agreement to subordinate their liens and superpriority claims to the Carve Out in the case of the DIP Lenders, and the Carve Out, the DIP Liens and the Tivoli Liens in the case of the Prepetition Credit Agreement Lenders, the DIP Agent, the DIP Lenders and the Pre-Petition Credit Agreement Lenders are each entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception shall not apply.

12

N.  Extension of Financing. The DIP Lenders have indicated a willingness to provide financing to the Borrowers in accordance with the DIP Credit Agreement, subject to: (1) the entry of this Final Order and a final order approving the Junior DIP Motion substantially in the form of the Junior DIP Interim Order (the "Junior DIP Final Order"), and (2) findings by the Court that (a) such financing is essential to the Debtors' estates, (b) the DIP Lenders are good faith financiers, and (c) the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests and liens and other protections granted pursuant to the Interim Order, this Final Order and the DIP Credit Facility will not be affected by any subsequent reversal, modification, vacatur or amendment of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

O.  Business Judgment and Good Faith Pursuant to Section 364(e). The terms and conditions of the DIP Credit Facility and the DIP Credit Agreement, and the fees paid and to be paid thereunder are fair, reasonable, and the best available under the circumstances, reflect the Borrowers' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Credit Facility and the use of Cash Collateral were both negotiated in good faith and at arms' length between the Borrowers, the DIP Agent, the Pre-Petition Agent, the DIP Lenders and the Pre-Petition Credit Agreement Lenders. Use of Cash Collateral and credit to be extended under the DIP Credit Facility will be so extended in good faith, and for valid business purposes and uses, the consequence of which is that the DIP Agent and the DIP Lenders are entitled to the protection and benefits of section 364(e) of the Bankruptcy Code.

P.  Entry of Final Order. For the reasons stated above, the Debtors have requested immediate entry of this Final Order pursuant to Bankruptcy Rule 4001(c)(2).

13

NOW, THEREFORE, on the DIP Motion of the Debtors and the record before the Court with respect to the DIP Motion, and with the consent of the Debtors, the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the DIP Agent and the DIP Lenders to the form and entry of this Final Order, and good and sufficient cause appearing therefor,

IT IS ORDERED that:

1.    Motion Granted.  The DIP Motion is granted in its entirety subject to the terms and conditions set forth in this Final Order.

2.    DIP Credit Agreement Authorization.

(a)    Approval of DIP Credit Agreement.  The Debtors are expressly and immediately authorized, empowered and directed to execute, deliver and enter into the DIP Credit Agreement and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Final Order and the DIP Credit Agreement, and to deliver all instruments and documents which may be required or necessary for the performance by the Borrowers under the DIP Credit Facility and the creation and perfection of the DIP Liens and the Tivoli Liens described in and provided for by this Final Order and the DIP Credit Agreement.  The Debtors are hereby authorized and directed to pay the principal, interest, fees, expenses and other amounts described in the DIP Credit Agreement and all other documents comprising the DIP Credit Facility as such become due, including, without limitation, agents' fees, facility fees, arranger fees, commitment fees, letter of credit fees and reasonable attorneys', financial advisors' and accountants' fees and disbursements as provided for in the DIP Credit Agreement which amounts shall not otherwise be subject to approval of this Court; *provided, however,* that unresolved disputes as to the reasonableness of any professional fees and expenses may be determined by the Court.  Upon execution and delivery, the DIP Credit Agreement shall represent valid and binding obligations

14

of the Borrowers and Guarantor, enforceable against each of the Borrowers and the Guarantor in accordance with its terms.

(b)     Authorization to Borrow.  In order to enable them to continue to operate their business, subject to the terms and conditions of this Final Order, the DIP Credit Agreement, documents comprising the DIP Credit Facility, and the Budget (as defined below), the Borrowers are hereby authorized under the DIP Facility to request extensions of credit up to a total committed amount of $60,000,000, composed of a senior revolving credit facility not to exceed $60,000,000 in aggregate principal amount (the **"DIP Revolving Loans"**), with a sublimit for letters of credit up to $20,000,000 (the **"DIP Letters of Credit"**, collectively with the DIP Revolving Loans, the **"DIP Loan"**).

(c)     Application of DIP Proceeds.  The Borrowers are authorized to borrow the DIP Loan under the DIP Credit Facility, and the proceeds of the DIP Credit Facility (net of any amounts used to pay fees under the DIP Credit Agreement) shall be used, in each case in a manner consistent with the terms and conditions of the DIP Credit Agreement, and in accordance with the Budget (as defined below) solely for (a) working capital and general corporate purposes to the extent set forth in the Budget (but excluding the making of any Restricted Payment as that term is defined in the DIP Credit Agreement), (b) payment of costs of administration of the Cases, and (c) payment of such prepetition expenses as contemplated in the Budget or as consented to by the DIP Agent in its full discretion and as approved by the Bankruptcy Court.

(d)     Conditions Precedent.  The DIP Agent and the DIP Lenders shall have no obligation to make any loan or advance or issue any letters of credit under the DIP Credit Agreement unless the conditions precedent to make such loan or advance or issue such letter of

15

credit under the DIP Credit Agreement have been satisfied in full or waived by the DIP Agent in its full discretion.

(e)     Post-Petition Liens.  (1) Effective immediately upon the execution of this Final Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code and in accordance with the Intercreditor Agreement, (x) first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens (collectively, the "**DIP Liens**"), senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates (including the Junior DIP Liens), and except as otherwise provided in this Final Order (but subject to the liens and claims as set forth in paragraphs 2 and 4 of this Final Order), upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors, including, without limitation, the following (but excluding the Tivoli Collateral):

(i)      all Accounts;

(ii)     all Chattel Paper;

(iii)    all Documents;

(iv)    all General Intangibles (including payment intangibles and software);

(v)     all Goods (including Inventory, Equipment and Fixtures);

(vi)    all Instruments;

(vii)   all Investment Property;

(viii)  all Deposit Accounts and all other bank accounts and all deposits therein (including, without limitation, cash deposits for future shipment of goods);

(ix)    all money, cash or cash equivalents;

16

(x)     all Supporting Obligations and Letter of Credit Rights;

(xi)    all (a) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, derivatives contracts or derivatives accounts) and (ii) monies, credit balances, deposits and other property of Borrowers and Guarantors now or hereafter held or received by or in transit to the DIP Agent, any DIP Lender or their respective affiliates or at any other depository or other institution from or for the account of Borrowers or Guarantors, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xii)   all Records;

(xiii)  all Commercial Tort Claims;

(xiv)   all real property (owned and leased) including Real Estate and Leasehold Properties; provided, however, that to the extent applicable nonbankruptcy law prohibits the granting of a lien on any particular leasehold interest, the DIP Liens shall extend only to the proceeds of such leasehold interests;

(xv)    the proceeds of avoidance actions under section 547 of the Bankruptcy Code, but only with respect to the dollar amount expended from the Carve-Out (as defined below) to fund the Debtors' expenses in investigating such actions, commencing such actions, and conducting the litigation and/or settlement discussions that resulted in the receipt of such proceeds;

(xvi)   proceeds of any avoidance actions brought pursuant to section 549 of the Bankruptcy Code to recover any post-petition transfer of collateral (other than recoveries, if any, from the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the Pre-Petition Secured Parties, the DIP Agent, and/or the DIP Lenders);

(xvii)  any unencumbered assets of the Debtors;

17

(xviii)    all capital stock and other equity interests in the Borrowers and their subsidiaries (the "**Capital Stock**") to the extent pledged in connection with Pre-Petition Credit Agreement;

(xix)    to the extent not otherwise described above, all Receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of Borrowers or Guarantors; and

(xx)    to the extent not otherwise included, all Proceeds, insurance claims and other rights to payments not otherwise included in the foregoing and products of the foregoing and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing. (collectively, (i) through and including (xx), the "**Senior DIP Collateral**"[2] and, together with the Pre-Petition Collateral, the "**Senior Collateral**"), and (y) first priority, continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests in and liens on the Tivoli Collateral (the "**Tivoli Liens**"), subject only to the Junior DIP Tivoli Liens, which, in accordance with the Intercreditor Agreement and the Junior DIP Interim Order, shall be senior to the Tivoli Liens, and to the Carve Out.

Notwithstanding the foregoing, the DIP Liens, the Credit Agreement Replacement Liens and the Prepetition Liens shall not extend to any avoidance actions under the chapter 5 of the Bankruptcy Code ("Avoidance Actions") except to the extent set forth in subparagraph (xv) above.

---

[2] All defined terms used in the description of DIP Collateral as set forth in paragraph 2(e) shall have the meanings ascribed thereto in the DIP Credit Agreement. All terms not specifically defined in the DIP Credit Agreement and used in paragraph 2(e) shall have the meanings assigned to such term in Article 8 or 9 of the Uniform Commercial Code as the same may, from time to time, be enacted and in effect in the State of New York.

18

(2)     In no event shall any lien or security interest that is avoided and preserved for the

benefit of the Debtors' estates under section 551 of the Bankruptcy Code, or any person or entity

who pays (or through the extension of credit to any Debtor, causes to be paid) any of the DIP

Obligations, be subrogated, in whole or in part, to any rights, remedies, claims, privileges, liens

or security interests granted in favor of, or conferred upon the DIP Agent and the DIP Lenders by

the terms of the DIP Credit Agreement or this Final Order, until such time as all of the DIP

Obligations shall be indefeasibly paid in full in cash in accordance with the DIP Credit

Agreement and this Final Order.  Upon (i) the Final Order becoming final and non-appealable

and (ii) the expiration of the Challenge Period Termination Date (as defined below), all pre-

petition liens and security interests of the Pre-Petition Agent and the Pre-Petition Credit

Agreement Lenders in the Pre-Petition Credit Collateral shall be deemed to be assigned (and not

terminated or released to the extent so assigned) to the DIP Agent and the DIP Lenders as

additional collateral security for so much of the DIP Obligations as shall at any time have been

used to repay or refinance the Pre-Petition Debt, and such assignment shall be in addition to, and

shall not limit, prejudice or impair in any way any of the claims or liens of the DIP Agent and the

DIP Lenders in the Senior Collateral and the Tivoli Collateral granted pursuant to the DIP Credit

Agreement and this Final Order.  In no event shall the DIP Lenders have any liability in

connection with such assignment or the pre-petition liens so assigned.

(f)     DIP Lien Priority.  The DIP Liens to be created and granted to the DIP Agent and

the DIP Lenders, as provided herein, (1) are created pursuant to sections 364(c)(2), 364(c)(3) and

364(d) of the Bankruptcy Code, (2) are first, valid, prior, perfected, unavoidable, and superior to

any security, mortgage, or collateral interest or lien or claim in any of the Senior DIP Collateral

(including the Junior DIP Lien), and are subject only to: (x) the Carve Out, (y) the Prior

19

Permitted Liens, and (z) post-petition liens that have been approved by the Court in one or more separate orders in favor of pre-petition consignors of inventory that have first-priority valid, perfected unavoidable pre-petition liens on consigned inventory and in favor of postpetition consignors of inventory (collectively the "**Consignors**"), which liens shall in all cases be limited to the value of consigned inventory and the portion of the proceeds thereof in which the Debtors do not have an interest, and the rights of Polk Audio, Inc. in consigned inventory and the proceeds thereof (to the extent that Polk Audio, Inc. holds a first-priority valid, perfected unavoidable pre-petition lien on consigned inventory and the proceeds from the sale of consigned inventory; *provided, however*, that the DIP lenders, the Pre-Petition Credit Agreement Lenders, the Debtors and Polk Audio, Inc. shall reserve all rights with respect to such parties' interests in such proceeds) (collectively, the "**Consignment Liens**"); (3) shall secure all DIP Obligations, and (4) are subject to the Intercreditor Agreement. The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any court order heretofore or hereafter entered in the Cases except for the Prior Permitted Liens, the Consignment Liens and the Credit Agreement Replacement Liens as set forth herein; and shall be valid and enforceable against any trustee appointed in the Cases, upon the conversion of any of the Cases to a case under Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (any "**Successor Cases**"), and/or upon the dismissal of any of the Cases. The DIP Liens shall not be subject to sections 506(c) 510, 549, 550 or 551 of the Bankruptcy Code.

(g)     Priority of Liens on Tivoli Collateral. The Tivoli Liens to be created and granted to the DIP Agent and the DIP Lenders, as provided herein, (1) are created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, (2) are first, valid, prior, perfected,

20

unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim in the Tivoli Collateral, and subject only to the Carve Out and the Junior DIP Tivoli Liens.

(h)     Enforceable Obligations.    The DIP Credit Agreement shall constitute and evidence the valid and binding obligations of the Borrowers and the Guarantor, which obligations shall be enforceable against the Borrowers and the Guarantor, their estates and any successors thereto and their creditors, in accordance with their terms.

(i)     Protection of DIP Lenders and Other Rights.   The DIP Lender shall have no obligation to make any extension of credit pursuant to the DIP Credit Facility unless all of the conditions precedent to the making of such extension of credit under the DIP Credit Facility are satisfied or waived by the DIP Agent in its full discretion.  From and after the Petition Date, the Debtors shall use the proceeds of the extensions of credit under the DIP Facility only for the purposes specifically set forth in the DIP Credit Agreement and this Final Order and in compliance with the Budget.

(j)     Superpriority Administrative Claim Status.   Subject to the Carve Out, all DIP Obligations shall be an allowed superpriority administrative expense claim (the **"DIP Superpriority Claim"** and, together with the DIP Liens and the Tivoli Liens, the **"DIP Protections"**) with priority (except as otherwise provided in paragraph 8 below) in any Case under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330 (except as otherwise provided in paragraph 8 below), 331, 503(a), 503(b), 506(c), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code (including the Junior DIP

21

Superpriority Claim), *provided, however*, that the Pre-Petition Superpriority Claim (as defined below) shall be granted a priority that is *pari passu* with the DIP Superpriority Claim. Other than the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to, prior to, or (subject to the Pre-Petition Superpriority Claim as set forth) on a parity with the DIP Protections or the DIP Obligations, or with any other claims of the DIP Agent or the DIP Lenders arising hereunder. The DIP Superpriority Claim shall be senior in all respects to the Junior DIP Superpriority Claim. Notwithstanding the foregoing, the DIP Superpriority Claim and the Pre-Petition Superpriority Claim (as defined below) shall not extend to the proceeds of Avoidance Actions.

  3. <u>Authorization to Use Cash Collateral</u>. Pursuant to the terms and conditions of this Final Order, the DIP Credit Facility and the DIP Credit Agreement, and in accordance with the budget (on a cumulative basis and as the same may be modified from time to time consistent with the terms of the DIP Credit Agreement, and subject to such variations as permitted in section 6.15 of the DIP Credit Agreement, the **"Budget"**), filed on record in the Cases and introduced into evidence at the Final Hearing, the Debtors are authorized to use the Cash Collateral of the Pre-Petition Credit Agreement Lenders (during the period commencing immediately after the filing of the Cases and terminating upon the earlier to occur of notice being provided by the Pre-Petition Agent to the Debtors that an Event of Default (as defined in paragraph 18 of this Final Order) has occurred and is continuing, and the Commitment Termination Date (the **"Cash Collateral Use Period"**)). The Budget shall be updated (with the consent and/or at the request of the DIP Agent) from time to time (provided that such updated

22

Budget shall be in form and substance acceptable to the DIP Agent and approved by the DIP

Agent in its discretion), but in any event not less than on a monthly basis (with delivery to the

DIP Agent on or before the 15th day of each calendar month) and the Borrowers shall be

required to comply with the Budget for purposes of the DIP Credit Facility. As set forth above,

the Debtors' authorization to use Cash Collateral of the Pre-Petition Credit Agreement Lenders

shall terminate upon notice being provided by Pre-Petition Agent to the Debtors that an Event of

Default has occurred and is continuing, *provided, however,* during the Remedies Notice Period

(as defined below) the Debtors may use Cash Collateral solely to meet payroll obligations and

pay expenses essential to the preservation of the Debtors and their estates and as agreed by the

DIP Agent, *provided, however,* that any such payments are made in a manner consistent with the

terms and provisions of the Budget. Nothing in this Final Order shall authorize the disposition of

any assets of the Debtors or their estates outside the ordinary course of business or any Debtor's

use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in the DIP

Credit Facility and the DIP Credit Agreement and in accordance with the Budget.

4.    Adequate Protection.  On the Closing Date, as adequate protection for the interest

of the Pre-Petition Credit Agreement Lenders in the Pre-Petition Collateral (including the Cash

Collateral) on account of the granting of the DIP Liens, the Debtors' use of Cash Collateral and

other diminution in value of the Pre-Petition Collateral (subject to paragraph 7 of this Final

Order), the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders shall receive

adequate protection as follows:

(a)    Credit Agreement Replacement Liens.  The Pre-Petition Agent and the Pre-

Petition Credit Agreement Lenders shall have, subject to the terms and conditions set forth below

pursuant to sections 361 and 363(e) of the Bankruptcy Code additional and replacement security

23

interests and liens (the "**Credit Agreement Replacement Liens**") which shall be *pari passu* with the DIP Liens and the Tivoli Liens, as applicable, and subject to the Carve Out, the Permitted Prior Liens and the Consignment Liens, but shall be senior in all respects to the Junior DIP Liens;

(b)  Pre-Petition Superpriority Claim.  The Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders shall have an allowed superpriority administrative expense claim (the "**Pre-Petition Superpriority Claim**") which shall be *pari passu* with the DIP Superpriority Claim and which shall have priority (except with respect to the DIP Liens, the Tivoli Liens and the Credit Agreement Replacement Liens, the Carve Out, the Permitted Prior Liens and the Consignment Liens) in any Case under sections 361, 363, 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code; *provided, however*, that the Pre-Petition Superpriority Claim over proceeds of any Avoidance Action shall extend only to the amount of the Carve Out expended in investigating and/or pursuing such Avoidance Action.  The Pre-Petition Superpriority Claim shall be senior in all respects to the Junior DIP Superpriority Claim. Notwithstanding the foregoing, the Pre-Petition Superpriority Claim shall not extend to the proceeds of any Avoidance Actions, except to the extent set forth in subparagraph 2(c)(xv) above.

(c)  Adequate Protection Payments.  The Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders shall receive adequate protection payments in the amount of interest,

24

fees and other amounts (other than principal) due under the Prepetition Credit Agreement at the times specified therein, which payments shall be subject to paragraph 7.

(d) <u>Pre-Petition Indemnity Account</u>. In accordance with and subject to section 1.10 of the DIP Credit Agreement, and further subject to the prior funding of the Carve Out in accordance with paragraph 8 of this Final Order, the Debtors shall establish an account in the control of the Pre-Petition Agent (the **"Pre-Petition Indemnity Account"**), into which, upon the first occurrence of an Event of Default (as defined below), $600,000 of proceeds of any sale, lease or other disposition of any of the Senior Collateral held by any of the Debtors shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders under the Pre-Petition Credit Agreement (the **"Pre-Petition Indemnity Obligations"**); *provided, however*, that the Pre-Petition Indemnity Account shall terminate and all remaining amounts held therein shall be released to the Debtors (and shall be applied in accordance with this Final Order and the DIP Credit Agreement) upon the earliest to occur of:  (a) the Challenge Period Termination Date if, as of such date, no party has filed or asserted an adversary proceeding, cause of action, objection, claim, defense or other challenge as contemplated in paragraph 7 hereof, (b) a further order of this Court, and (c) the date the Bankruptcy Court enters a final order closing the Debtors' Cases. The Pre-Petition Indemnity Obligations shall be secured by a first priority lien on the Pre-Petition Indemnity Account which shall be *pari passu* with the Credit Agreement Replacement Liens and shall be subject to the Carve Out.

(e) <u>Conditions to Adequate Protection</u>. The adequate protection granted to the Pre-Petition Credit Agreement Lenders under paragraph 4 is expressly conditioned upon the following:  (1) the Credit Agreement Replacement Liens shall be *pari passu* in all respects to the

25

DIP Lenders' liens and security interests upon and in the Senior Collateral and the Tivoli Collateral and shall be subject to the Carve Out; (2) until such time as all of the DIP Obligations are indefeasibly paid in full in cash in accordance with the DIP Credit Agreement and this Final Order, the Pre-Petition Credit Agreement Lenders shall have no right to seek or exercise any enforcement rights or remedies in connection with the Pre-Petition Debt or the Credit Agreement Replacement Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in paragraph 18 hereof); (3) the Pre-Petition Credit Agreement Lenders shall be deemed to have consented to any sale or disposition of Senior Collateral or (subject to paragraph 19 hereof) the Tivoli Collateral approved, arranged for or by the DIP Agent, and shall terminate and release upon any such sale or disposition all of its liens on and security interests in such Senior Collateral and the Tivoli Collateral; and (4) the Pre-Petition Credit Agreement Lenders shall deliver or cause to be delivered, at the Debtors' cost and expense (for which the Pre-Petition Credit Agreement Lenders shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases or other documents necessary to effectuate and/or evidence the release and termination of the Pre-Petition Credit Agreement Lenders' liens on or security interests in any portion of the Senior Collateral or the Tivoli Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

(f)     The Secured Parties as defined under the Pre-Petition Security Agreement, other than the parties receiving adequate protection and other creditor protections under this Final Order, shall have the right to request such creditor protections upon motion to this Court, and all other parties in interest, including the Committee, shall have the right to object to the granting of such adequate protection and creditor protections.

26

5.      Section 507(b) Reservation.  Subject to paragraph 7 of this Final Order, nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Pre-Petition Credit Agreement Lenders hereunder is insufficient to compensate for the diminution in value of the interest in the Pre-Petition Collateral during the Cases or any Successor Cases, *provided, however,* that any section 507(b) claim granted in the Cases shall be *pari passu* in right of payment to all DIP Obligations and subject to the Carve Out.

6.      Post-Petition Lien Perfection.  This Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens and the Tivoli Liens and the Credit Agreement Replacement Liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect the DIP Liens or the Tivoli Liens or to entitle the DIP Agent to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent may, in its sole discretion, file such financing statements, mortgages, notices of liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded at the time and on the date of the commencement of the respective Cases.  The Borrowers and Guarantors shall execute and deliver to the DIP Agent all such financing statements, mortgages, notices and other documents as the DIP Agent or any of the DIP Lenders may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens or the Tivoli Lien granted pursuant hereto.  The DIP Agent, in its discretion, may file a photocopy of this

27

Final Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which the Borrowers have real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Final Order. The DIP Agent shall, in addition to the rights granted to it under the DIP Credit Agreement, be deemed to be the successor in interest to the Pre-Petition Agent with respect to all third party notifications in connection with the Pre-Petition Credit Agreement, all Pre-Petition Collateral access agreements and all other agreements with third parties (including any agreement with a customs broker) relating to, or waiving claims against, any Pre-Petition Collateral, including without limitation, each collateral access agreement duly executed and delivered by any landlord of the Debtors and including, for the avoidance of doubt, all deposit account control agreements.

7.    Reservation of Certain Third Party Rights and Bar of Challenges and Claims. The Committee shall have the right and standing, and is hereby appointed estate representative for the Debtors' estates, to bring any claims or causes of action of the Debtors or their estates against the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders or any other party (other than the DIP Agent and the DIP Lenders with respect to the DIP Facility) notwithstanding any stipulation, agreement, release or waiver by the Debtors or any of them in this Order, the Interim Order, the DIP Credit Agreement, or otherwise. Nothing in this Final Order or the DIP Credit Agreement shall prejudice the rights the Committee has, or that any other party in interest with requisite standing other than the Borrowers and Guarantors may have (a) to object to or challenge the findings herein, including, but not limited to, those in relation to (i) the validity, extent, perfection or priority of the mortgage, security interests and liens of the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders or any other party in and to the Pre-

28

Petition Collateral, or (ii) the validity, allowability, priority, status or size of the Pre-Petition Debt, or (b) to bring suit against the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders or any other party in connection with or related to the Pre-Petition Credit Agreement, or the actions or inactions of the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders arising out of or related to the Pre-Petition Credit Agreement and seek disgorgement if appropriate under applicable law and all other appropriate remedies; *provided, however,* that, unless the Committee or any other party in interest with requisite standing commences a contested matter or adversary proceeding raising such objection or challenge, including without limitation any claim against the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders or any other party (other than the DIP Agent and the DIP Lenders with respect to the DIP Facility) in the nature of a setoff, counterclaim or defense to the Pre-Petition Debt (including but not limited to, those under sections 506, 544, 547, 548, 549, 550 and/or 552 of the Bankruptcy Code or by way of suit against the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders or any other party), on or before September 5, 2007 (the "**Challenge Period**") and the date that is the next calendar day after the termination of the Challenge Period, in the event that no objection or challenge is raised during the Challenge Period shall be referred to as the "**Challenge Period Termination Date**"), then upon the Challenge Period Termination Date, any and all such challenges and objections by any party (including, without limitation, any official creditors' committee(s) and any Chapter 11 or Chapter 7 trustee appointed herein or in any Successor Cases) shall be deemed to be forever waived and barred, and the Pre-Petition Debt shall be deemed to be allowed in full and, to the extent of the value of the Pre-Petition Credit Collateral on the Petition Date, shall be deemed to be allowed as a fully secured claim within the meaning of section 506 of the Bankruptcy Code for all purposes in connection with these Cases

29

*the amount set forth in the Budget attached hereto as Exhibit E-15 on the date of the Event of Default, and in no event greater than $1,900,000,*

and the Debtors' Stipulations shall be binding on all creditors, interest holders and parties in interest.

*and the Pre-Petition Credit Liens*

8.    Carve Out.  Subject to the terms and conditions contained in this paragraph 8, the DIP Liens, the Tivoli Liens ~~and~~ the Credit Agreement Replacement Liens are subordinate only to the following (the **"Carve Out"**):  (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930 (a)(6); and (b) allowed reasonable fees and expenses of attorneys and financial advisors employed by the Debtors and the Committee pursuant to Sections 327 and 1103 of the Bankruptcy Code (the **"Case Professionals"**).  For purposes of clause (b), (i) if, at the time of reference, an Event of Default (as defined below) has not occurred, the amount of the Carve Out shall not be limited, except that no payment may be made to any Case Professional absent an order of the Bankruptcy Court (including any interim compensation order entered by the Court) allowing or permitting such payment either on an interim or final basis, and (ii) if, at the time of reference, an Event of Default has occurred and is continuing, the amount of the Carve Out (the **"Carve Out Amount"**) shall be ~~as set forth in the Budget submitted at the Final Hearing up to a maximum of $1,900,000~~ exclusive of retainers, provided such fees and expenses are ultimately approved by the Bankruptcy Court, or such lesser amount as so approved.  The DIP Lenders shall fund the Carve Out upon the closing by the Debtors of the Sale Transaction (as defined below) or occurrence of an Event of Default.  The DIP Lenders' obligation to fund or otherwise pay the Carve Out, including allowed professional fees, shall be added to and made a part of the DIP Obligations, secured by the Senior Collateral, and the DIP Lenders shall be entitled to all of the rights, claims, liens, priorities and protections under this Final Order, the DIP Credit Agreement, the Bankruptcy Code, and/or applicable law in connection therewith.  No portion of the Carve Out may be used to litigate, object, contest or challenge in any manner or raise any

30

defenses to the debt or collateral position of the DIP Agent and the DIP Lenders under the DIP

Credit Facility or the Pre-petition Agent or the Pre-Petition Credit Agreement Lenders under the

Prepetition Credit Agreement, whether by challenging the validity, extent, amount, perfection,

priority or enforceability of the indebtedness under the DIP Credit Facility or the Pre-Petition

Credit Agreement or the validity, perfection or priority of any mortgage, security interest or lien

with respect thereto or any other rights or interests or replacement liens with respect thereto or

any other rights or interests of the DIP Agent, the DIP Lenders, the Pre-Petition Agent or the

Pre-Petition Credit Agreement Lenders, or by seeking to subordinate or recharacterize the DIP

Credit Facility or the Pre-Petition Credit Agreement or disallow any claim, mortgage, security

interest, lien, or replacement lien or by asserting any claims or causes of action, including,

without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Agent,

the DIP Lender, the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders, or any of

their respective officers, directors, agents or employees; *provided, however*, that the Carve-Out

Amount may be used for allowed fees and expenses incurred by the Committee in investigating

the validity, enforceability, perfection, or priority of the Prepetition Liens and/or in investigating

other claims concerning the Prepetition Debt prior to the Challenge Period Termination Date. In

addition, the Carve Out shall not be used in connection with (i) preventing, hindering or delaying

the DIP Lenders' or the DIP Agent's enforcement or realization upon the Senior Collateral once

an Event of Default has occurred, except to contest that an Event of Default has occurred, (ii)

using or seeking to use Cash Collateral or selling or otherwise disposing of the Senior Collateral

or the Tivoli Collateral without the consent of the DIP Agent, (iii) using or seeking to use any

insurance proceeds related to the Senior Collateral or the Tivoli Collateral without the consent of

the DIP Agent; or (iv) incurring Indebtedness (as defined in the DIP Credit Agreement) senior to

31

the DIP Protections other than as permitted in the DIP Credit Agreement. The DIP Lenders shall not be responsible for the direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Cases under any chapter of the Bankruptcy Code, and nothing in this Final Order or otherwise shall be construed to obligate the DIP Lenders in any way to pay compensation to or to reimburse expenses of any professional, or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement. Without limiting the DIP Lenders' rights under the DIP Credit Agreement and this Final Order, the DIP Lender shall implement a Reserve (as such term is defined in the DIP Credit Agreement) in respect of the Carve Out in accordance with the terms and conditions of the DIP Credit Agreement. Such Reserve shall reduce the amount of Loans and Letters of Credit otherwise available to the Borrowers under the DIP Credit Agreement. The allocation of the Carve Out Amount as between the DIP Loan and the Junior DIP Loan is governed by the Intercreditor Agreement.

9.     Payment of Compensation. Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any official committee or of any Person or shall affect the right of the DIP Agent, the DIP Lenders, the Pre-Petition Agent and/or the Pre-Petition Credit Agreement Lenders to object to the allowance and payment of such fees and expenses.

10.     Section 506(c) Claims. At no time during the Cases or any Successor Cases shall costs or expenses of administration which have been or may be incurred at any time be charged against the DIP Agent or the DIP Lenders, their claims, the Senior DIP Collateral or the Tivoli Collateral, pursuant to sections 105, 506(c) or 522 of the Bankruptcy Code, or otherwise, without

32

the prior written consent of the DIP Agent and the DIP Lenders, and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Agent or the DIP Lenders.

11.     Collateral Rights. Unless the DIP Agent has provided its prior written consent or all DIP Obligations have been paid in full in cash (or will be paid in full in cash upon entry of an order approving indebtedness described in subparagraph (a) below), all commitments to lend have terminated and all DIP Letters of Credit have been cash collateralized as required by the DIP Credit Agreement, there shall not be entered in these proceedings, or in any Successor Cases, any order (other than the Junior DIP Interim Order and the Junior DIP Final Order) which authorizes any of the following:

(a)     the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other lien on all or any portion of the Senior Collateral or the Tivoli Collateral and/or entitled to priority administrative status which is equal or senior to those granted to the DIP Agent, the DIP Lender, the Pre-Petition Agent or the Pre-Petition Credit Agreement Lenders herein other than in accordance with this Final Order in connection with the Consignment Liens;

(b)     the enforcement of any claimed junior security, mortgage, or collateral interest or other junior lien of any person other than of the DIP Agent on all or any portion of the Senior Collateral or the Tivoli Collateral (other than in connection with the Prior Permitted Liens);

(c)     the Borrowers' return of goods constituting Senior Collateral pursuant to section 546(h)[3] of the Bankruptcy Code.

---

[3] As correctly numbered in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

33

12.    Proceeds of Subsequent Financing.    Without limiting the provisions and protections of paragraph 11 above, if at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Agent's and DIP Lenders' obligation to make loans and advances under the DIP Credit Facility, including subsequent to the confirmation of any plan with respect to any or all of the Borrowers, the Borrowers' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) in violation of section 6.1 of the DIP Credit Agreement, then all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent in pro rata reduction of the DIP Obligations and thereafter to the Junior DIP Agent in pro rata reduction of the Junior DIP.

13.    Commitment Termination Date.    All (i) DIP Obligations of the Debtors to the DIP Agent and the DIP Lenders shall be immediately due and payable, and (ii) authority to use the Cash Collateral shall cease, both on the date (the "**Commitment Termination Date**") that is the earliest to occur of:

(a) January 11, 2008;

(b) the effective date of any plan of reorganization for any of the Debtors confirmed pursuant section 1129 of the Bankruptcy Code;

(c) the date of consummation of a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code;

(d) the date that is a "Termination Declaration Date" as defined herein; and

(e) the date that is a "Commitment Termination Date" as defined in the DIP Credit Agreement.

34

*Notwithstanding the foregoing, the payment of such proceeds shall be subject to disgorgement in the event the value of the Debtors' inventory and/or other personal property in Texas's later becomes insufficient to satisfy any valid and senior prepetition and postpetition liens of Texas taxing authorities, unless the amount of such asserted senior secured claims of such taxing authorities is paid or otherwise reserved for by the Debtors from the proceeds of any such sale or other disposition of the Senior Collateral.*

14.     <u>Payment Upon Maturity</u>.    The DIP Obligations shall be due and payable in accordance with the terms of the DIP Credit Agreement, without notice or demand, on the Commitment Termination Date.   Any DIP Letter of Credit outstanding on the Commitment Termination Date shall be cash collateralized in an amount equal to 110% of the maximum drawing amount.   If any such Cash Collateral is subject to the Carve Out, then the amount thereof shall be increased by the amount of the Carve Out to which it is subject.

15.     <u>Payment on Effective Date of Plan</u>.    The DIP Obligations shall be paid indefeasibly in full on the effective date of any plan of reorganization confirmed in the Cases.

16.     <u>Payment from Proceeds of Collateral</u>.    Subject to paragraph 19 hereof, net proceeds of the sale or other disposition of the Senior Collateral shall be applied:  (a) first, to permanently reduce the Pre-Petition Debt (subject to the challenge rights set forth in paragraph 7 of this Final Order), (b) second, to reduce the DIP Obligations (with exceptions to be mutually agreed) in accordance with the DIP Credit Agreement, and (c) third, to permanently reduce the Junior DIP Loan, subject to the Intercreditor Agreement.   Net proceeds of the sale or other disposition of the Tivoli Collateral shall be applied:  (a) first, to permanently reduce the Junior DIP Loan, subject to the Intercreditor Agreement, (b) second, to permanently reduce the Pre-Petition Debt, and (c) third, to reduce the DIP Obligations (with exceptions to be mutually agreed) in accordance with the DIP Credit Agreement as modified in accordance with this Final Order.

17.     <u>Disposition of Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Senior Collateral or the Tivoli Collateral, or assume, reject or assign any Leasehold Property (as defined in the DIP Credit Agreement) without the prior written consent of the DIP Agent (and no such consent shall be implied, from any other

35

action, inaction or acquiescence by the DIP Agent or the DIP Lenders or an order of this Court),

except for sales of the Debtors' inventory in the ordinary course of business or except as

otherwise provided for in the DIP Credit Agreement and this Final Order and as approved by the

Bankruptcy Court.

    18.    Events of Default; Remedies.

(a) Events of Default. The occurrence of any of the following events shall constitute an

Event of Default under this Final Order:[4]

    (1)    Failure by any of the Debtors to comply with any term of this Final Order.

    (2)    An "Event of Default" as defined in the DIP Credit Agreement, which Events of Default include usual and customary events of default for transactions of this type and, in addition, include the failure by the Debtors to comply with any of the covenants set forth below, which comprise Schedule S to the DIP Credit Agreement:

        i)    On or before June 29, 2007 (A) the Borrowers shall have entered into stalking horse bids for a Sale Transaction that will result in the Borrowers' receipt of cash in an amount sufficient to pay the Obligations and the Pre-Petition Revolver Outstandings in full in cash (or shall have delivered cash collateral in accordance with the terms hereof in connection with any contingent Obligations) and (B) the Bankruptcy Court shall have approved and entered a sales procedures order with respect to the Sale Transaction and the proposed orders with respect to the Sale Transaction, shall be in form and substance satisfactory to the Agent. The bidding procedures with respect to the Sale Transaction shall be in form and substance satisfactory to the Agent.

        ii)    On or before July 10, 2007, the Borrowers shall commence the auction for the Sale Transaction.

---

[4]    Capitalized terms used in paragraph 18(a)(2)(i) -(iii) hereof and not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

36

iii) (A) On or before July 13, 2007, the Borrowers shall receive the approval of the Bankruptcy Court for the Sale Transaction and the order approving such Sale Transaction shall be in form and substance satisfactory to the Agent and (B) all of the agency documents or purchase agreements and all other relevant documents in connection with the Sale Transaction shall have been executed and the Sale Transaction consummated on or before July 16, 2007.

(b) Rights and Remedies Upon Event of Default.

(1) Immediately upon the occurrence and during the continuation of an Event of Default, (i) the DIP Agent may declare all obligations owing under the DIP Credit Agreement to be immediately due and payable and may declare the termination, reduction or restriction of any further commitment to extend credit to the Borrowers to the extent any such commitment remains (the declaration of any of the foregoing being herein referred to as a **"Termination Declaration"** and the date of such declaration being herein referred to as the **"Termination Declaration Date"**), (ii) the Pre-Petition Agent may declare a termination, reduction or restriction of the ability of the Debtors to use any Cash Collateral, and (iii) the DIP Agent may increase the rate of interest applicable to the Loans and the Letter of Credit Fees to the Default Rate under the DIP Credit Agreement.

(2) In addition to the remedies described above and other customary remedies, any automatic stay otherwise applicable to the DIP Agent or the DIP Lenders is hereby modified so that upon the occurrence and during the continuance of an Event of Default, and, notwithstanding anything to the contrary in the DIP Credit Agreement, following the giving of five (5) business days' prior written notice (the **"Remedies Notice Period"**) to the Borrowers, any official committee(s) of creditors appointed in the Cases, and the United States Trustee, the DIP Agent shall be entitled to foreclose on all or any portion of the Senior DIP Collateral, collect accounts receivable and apply the proceeds thereof in

37

accordance with the Intercreditor Agreement, section 1.10 of the DIP Credit Agreement, paragraph 19 hereof and as permitted by applicable nonbankruptcy law, occupy the Debtors' premises to complete inventories (subject to five (5) days written notice to the affected landlord as provided under the lease), fulfill orders and sell inventories, execute going out-of-business sales or otherwise exercise remedies against the Senior DIP Collateral and as permitted by applicable nonbankruptcy law. During the Remedies Notice Period, the Borrowers and the Committee shall be entitled to an emergency hearing with the Bankruptcy Court to challenge the occurrence of an Event of Default and, unless ordered otherwise prior to the expiration of the Remedies Notice Period, the automatic stay, as to the DIP Lenders and the DIP Agent, shall be automatically terminated at the end of the Remedies Notice Period and without further notice or order.

(3) If the DIP Agent or the DIP Lenders exercise any of their rights and remedies upon the occurrence of an Event of Default, the DIP Agent may retain one or more agents to sell, lease, or otherwise dispose of the Senior DIP Collateral. In any exercise of their rights and remedies upon an Event of Default under the DIP Credit Agreement, the DIP Agent and DIP Lenders are authorized to proceed under or pursuant to the DIP Credit Agreement.

All proceeds realized from any of the foregoing (subject to the Carve Out, any Prior Permitted Liens or any Consignment Liens) shall be turned over to the DIP Agent for indefeasible application in accordance with the provisions of the DIP Credit Agreement and this Final Order.

(c)     Modification of Automatic Stay. The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified as necessary to (1) permit the Debtors to grant the Credit Agreement Replacement Liens, the DIP Liens and the Tivoli Liens and to incur all liabilities and

38

obligations to the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the DIP Agent and the DIP Lenders under the DIP Credit Agreement, the DIP Credit Facility and this Final Order, and (2) authorize the DIP Agent and the Pre-Petition Agent to retain and apply payments hereunder.

(d)     Other Remedies. Nothing included herein shall prejudice, impair, or otherwise affect (1) the Pre-Petition Agent's and the Pre-Petition Credit Agreement Lenders' right to seek any other or supplemental relief in respect of the Debtors, (2) the DIP Agent's or DIP Lenders' rights to seek any other or supplemental relief in respect of the Debtors, or (c) the DIP Agent's or DIP Lenders' (or their affiliates') rights, as provided in the DIP Credit Agreement or the DIP Credit Facility, to suspend or terminate providing any form or type of financial accommodation to the Borrowers, including, without limitation, in relation to any of the DIP Loan, the DIP Obligations, the DIP Credit Agreement, or the DIP Facility, in accordance with the terms of and to the extent provided for in the DIP Credit Agreement.

19.     Relationship of this Order to the Junior DIP Interim Order.

(a)     Nothing in the Junior DIP Interim Order or the Junior DIP Final Order shall affect the rights of the DIP Agent, the DIP Lenders, the Pre-Petition Credit Agreement Lenders or the Pre-Petition Agent except with respect to the Tivoli Collateral and as otherwise specifically set forth herein. The Intercreditor Agreement shall govern the respective rights of the DIP Agent, the DIP Lenders, the Pre-Petition Credit Agreement Lenders, the Pre-Petition Agent, the Junior DIP Lender, the Junior DIP Agent and the Junior DIP Lenders. To the extent that the Junior DIP Final Order is not entered or is not substantially in accordance with the Junior DIP Interim Order, the lien and payment priorities, administrative expenses, adequate protection and other changes pursuant to the Junior DIP Interim Order shall be modified as necessary and appropriate

39

to ensure that the DIP Agent, DIP Lenders, Pre-Petition Agent and Pre-Petition Credit Agreement Lenders are not prejudiced thereby.

(b)     Until payment in full in cash of all Prepetition Debt and the DIP Obligations and termination of the commitments under the DIP Facility and cancellation of any letters of credit thereunder: (i) no proceeds of the Senior Collateral may be applied to the Junior DIP Debt, but instead such proceeds shall be turned over to the DIP Agent for immediate application (in the case of cash), or to be held by the DIP Agent for subsequent application (in the case of non-cash proceeds, including but not limited to, reorganization securities), to the Pre-Petition Debt and the DIP Obligations in accordance with the DIP Credit Agreement and this Final Order; (ii) the Junior DIP Agent and Junior DIP Lenders shall have no right to take any action with respect to the Senior Collateral, or object to any sale, transfer or disposition of the Senior Collateral by the DIP Agent, and (iii) the Junior DIP Agent's or Junior DIP Lenders' consent will not be necessary with respect to any disposition, transfer, sale of other action that the DIP Agent proposes to take with respect to the Senior Collateral and, in the case of sales, transfers or other dispositions of the Senior DIP Collateral by the Debtors and supported by the DIP Agent and the Pre-Petition Agent, the Junior DIP Agent and Junior DIP Lenders shall release any applicable Junior DIP Liens on the Senior DIP Collateral sold or otherwise disposed of.

(c)     Until payment in full in cash of the Junior DIP Loan and subject to the terms of the Intercreditor Agreement, (i) no proceeds of the Tivoli Collateral will be applied to the Pre-Petition Debt or the DIP Obligations, but instead such proceeds shall be turned over to the Junior DIP Agent for immediate application (in the case of cash), or to be held by the Junior DIP Agent for subsequent application (in the case of non-cash proceeds including, but not limited to reorganization securities), to the Junior DIP Loan in accordance with the Junior DIP Facility

40

documents and this Final Order, (ii) the DIP Agent and the lenders under the DIP Facility shall have no right to take any action with respect to the Tivoli Collateral or object to any sale or disposition of the Tivoli Collateral, (iii) the consent of the DIP Agent or the DIP Lenders shall not be necessary with respect to any disposition, transfer, sale of other action that the Junior DIP Agent proposes to take with respect to the Tivoli Collateral and, in the case of sales, transfers or other dispositions of the Tivoli Collateral by the Debtors and supported by the Junior DIP Agent, the Senior DIP Agent and or the lenders under the Senior DIP Facility shall release any applicable liens on the Tivoli Collateral sold or otherwise disposed of.

20.     Proofs of Claim. The DIP Agent, the DIP Lenders, the Prepetition Agent, and the Prepetition Credit Agreement Lenders will not be required to file proofs of claim in any of the Cases or Successor Cases. The Pre-Petition Agent is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) aggregate proofs of claim in each of the Cases or Successor Cases on behalf of the Pre-Petition Credit Agreement Lenders. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Pre-Petition Credit Agreement Lenders. Any order entered by the Bankruptcy Court in relation to the establishment of a bar date in any of the Cases or Successor Cases shall so provide.

21.     Other Rights and Obligations.

(a)     Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Final Order. Based on the findings set forth in the Interim Order and this Final Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Credit Facility contemplated by this Final Order, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this or any

41

other Court, the DIP Agent and the DIP Lenders are entitled to the protections provided in section 364(e) of the Bankruptcy Code and no such modification, amendment or vacation shall affect the validity and enforceability of any advances made hereunder or lien or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Agent or the DIP Lenders hereunder arising prior to the effective date of such modification, amendment or vacation of any DIP Protections granted to the DIP Agent for the sole benefit of the DIP Agent and the DIP Lenders shall be governed in all respects by the original provisions of this Final Order, and the DIP Agent and the DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits, including the DIP Protections granted herein, with respect to any such claim. Since the loans made pursuant to the DIP Credit Agreement are made in reliance on this Final Order, the obligations owed the DIP Lenders prior to the effective date of any stay, modification or vacation of this Final Order cannot, as a result of any subsequent order in the Cases, or in any Successor Case, be subordinated, lose their lien priority or superpriority administrative expense claim status, or be deprived of the benefit of the status of the liens and claims granted to the DIP Lenders under this Final Order and/or the DIP Credit Agreement.

(b)     Expenses.    As provided in the DIP Credit Agreement, including, without limitation, reasonable, documented legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, indemnification and reimbursement of fees and expenses, and other out of pocket expenses of the DIP Agent and the DIP Lenders in connection with the DIP Credit Facility will be paid by the Borrowers, whether or not the transactions contemplated hereby are consummated. Payment of such fees shall not be subject to allowance by the Bankruptcy Court. The DIP Lenders shall provide to the

42

U.S. Trustee and counsel to any committee(s) appointed in these chapter 11 cases, on a monthly basis, the total amount of professional fees incurred per calendar month in these chapter 11 cases. Under no circumstances shall professionals for the DIP Lenders be required to comply with the U.S. Trustee fee guidelines.

(c)     Binding Effect.   The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the Pre-Petition Agent and the Pre-Petition Credit Agreement Lenders, the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereinafter appointed as a legal representative of the Debtors or with respect to the property of the estate of the Debtors) whether in the Cases, in any Successor Cases, or upon dismissal of any such chapter 11 or chapter 7 case.

(d)     No Waiver.   The failure of the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the DIP Agent or the DIP Lenders to seek relief or otherwise exercise their rights and remedies under the DIP Credit Agreement, the DIP Credit Facility or this Final Order, as applicable, shall not constitute a waiver of any of the Pre-Petition Agent's, the Pre-Petition Credit Agreement Lenders', the DIP Agent's or DIP Lenders' rights hereunder, thereunder, or otherwise. Notwithstanding anything herein, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair (1) the rights of the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the DIP Agent or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including without limitation, the rights of the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the DIP Agent or the DIP Lenders to (i) request conversion of any of the Cases to cases under chapter 7, dismissal of any of the Cases, or the appointment of a trustee in any of the Cases (but only in the event an Event of Default has occurred and is continuing), or (ii) propose, subject to the

43

provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans or (2) any of the rights, claims or privileges (whether legal, equitable or otherwise) of the Pre-Petition Agent, the Pre-Petition Credit Agreement Lenders, the DIP Agent or the DIP Lenders.

(e)    No Third Party Rights. Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

(f)    No Marshaling. None of the DIP Agent, the DIP Lenders and/or the Pre-Petition Credit Agreement Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Senior Collateral or the Tivoli Collateral.

(g)    Section 552(b). The DIP Agent, the DIP Lenders and the Pre-Petition Credit Agreement Lenders shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of the DIP Agent, the DIP Lender or the Pre-Petition Credit Agreement Lenders with respect to proceeds, product, offspring or profits of any of the Pre-Petition Credit Collateral, the Senior Collateral or the Tivoli Collateral.

(h)    Amendment. The Borrowers and the DIP Agent (after having obtained the approval of the DIP Lenders to the extent required by the DIP Credit Agreement) may amend or waive any provision of the DIP Credit Agreement or amend the DIP Credit Agreement to conform it to this Final Order on reasonable prior notice to the Committee, provided that such amendment or waiver, in the judgment of the Borrowers and the DIP Agent, is either nonprejudicial to the rights of third parties or is not material. Except as otherwise provided herein, no waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by on behalf of all the Borrowers and the DIP Agent (after

44

having obtained the approval of the DIP Lenders as provided in the DIP Credit Agreement) and approved by the Bankruptcy Court.

(i)    Survival of Final Order.  The provisions of this Final Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (1) confirming any plan of reorganization in any of the Cases, (2) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code, or (3) dismissing any of the Cases, and the terms and provisions of this Final Order as well as the DIP Protections granted pursuant to this Final Order and the DIP Credit Agreement, shall continue in full force and effect notwithstanding the entry of such order, and such DIP Protections shall maintain their priority as provided by this Final Order until all the obligations of the Borrowers to the DIP Agent, the DIP Lenders pursuant to the DIP Credit Agreement, and this Final Order are indefeasibly paid in full and discharged (such payment being without prejudice to any terms or provisions contained in the DIP Credit Facility which survive such discharge by their terms).  The DIP Obligations shall not be discharged by the entry of an order confirming a Plan, the Borrowers and the Guarantors having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.  None of the Debtors shall propose or support any Plan that is not conditioned upon the payment in full in cash of all of the DIP Obligations, on or prior to the earlier to occur of (i) the effective date of such Plan and (ii) the Commitment Termination Date.

(j)    Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Credit Agreement and of this Final Order, the provisions of this Final Order shall govern and control.

(k)    Joint and Several Liability.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Borrowers' or Guarantors' estates, it being

45

understood, however, that the Borrowers and Guarantors shall be jointly and severally liable to the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Credit Facility and the DIP Credit Agreement.

(l)     Enforceability. This Final Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

(m)     Objections Overruled. All objections to the DIP Motion to the extent not withdrawn or resolved, are hereby overruled.

(n)     No Waivers or Modification of Final Order. The Debtors irrevocably waive any right to seek any modification or extension of this Final Order without the prior written consent of the DIP Agent and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent.

(o)     Retention of Jurisdiction. The Court has and will retain jurisdiction to enforce this Final Order according to its terms.

SO ORDERED by the Court this 29 day of June, 2007.

Honorable Peter J. Walsh
UNITED STATES BANKRUPTCY JUDGE

46

ACTIVE/72064200.7

# EXHIBIT 9

Westlaw.

11 U.S.C.A. § 361                                                                                              Page 1

**c**

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 3. Case Administration (Refs & Annos)
         Subchapter IV. Administrative Powers
          &rarr; **§ 361. Adequate protection**

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by--

   **(1)** requiring the trustee to make a cash payment or periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale, or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

   **(2)** providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease in the value of such entity's interest in such property; or

   **(3)** granting such other relief, other than entitling such entity to compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2569; Pub.L. 98-353, Title III, § 440, July 10, 1984, 98 Stat. 370.)

Current through P.L. 110-198 approved 3-24-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Westlaw.

11 U.S.C.A. § 363                                                                                              Page 1

▷

**Effective:[See Notes]**

United States Code Annotated Currentness
  Title 11. Bankruptcy (Refs & Annos)
    Chapter 3. Case Administration (Refs & Annos)
      Subchapter IV. Administrative Powers
        → § 363. Use, sale, or lease of property

**(a)** In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

**(b)(1)** The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless--

  **(A)** such sale or such lease is consistent with such policy; or

  **(B)** after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease--

    **(i)** giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

    **(ii)** finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

**(2)** If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then--

  **(A)** notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

  **(B)** notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended--

    **(i)** pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a cash tender offer;

(ii) pursuant to subsection (g)(2) of such section; or

(iii) by the court after notice and a hearing.

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless--

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section only--

(1) in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust; and

(2) to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if--

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

(g) Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

(h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

(i) Before the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated.

(j) After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

(k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

(l) Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

(n) The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

(o) Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

(p) In any hearing under this section--

    (1) the trustee has the burden of proof on the issue of adequate protection; and

    (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2572; Pub.L. 98-353, Title III, § 442, July 10, 1984, 98 Stat. 371; Pub.L. 99-554, Title II, § 257(k), Oct. 27, 1986, 100 Stat. 3115; Pub.L. 103-394, Title I, § 109, Title II, §§ 214(b), 219(c), Title V, § 501(d)(8), Oct. 22, 1994, 108 Stat. 4113, 4126, 4129, 4144; Pub.L. 109-8, Title II, §§ 204, 231(a), Title XII, § 1221(a), Apr. 20, 2005, 119 Stat. 49, 72, 195.)

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Pub.L. 109-8, Title XII, § 1221(d), Apr. 20, 2005, 119 Stat. 196, provided that: "The amendments made by this section [amending this section and 11 U.S.C.A. §§ 541 and 1129, and enacting provisions set out as a note under this section] shall apply to a case pending under title 11, United States Code [11 U.S.C.A. § 101 et seq.], on the date of enactment of this Act [Apr. 20, 2005], or filed under that title on or after that date of enactment, except that the court shall not confirm a plan under chapter 11 of title 11, United States Code [11 U.S.C.A. § 1101 et seq.], without considering whether this section would substantially affect the rights of a party in interest who first acquired rights with respect to the debtor after the date of the filing of the petition. The parties who may appear and be heard in a proceeding under this section include the attorney general of the State in which the debtor is incorporated, was formed, or does business."

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

11 U.S.C.A. § 363

Current through P.L. 110-198 approved 3-24-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 11

c

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
　　Title 11. Bankruptcy (Refs & Annos)
　　　　Chapter 3. Case Administration (Refs & Annos)
　　　　　　Subchapter IV. Administrative Powers
　　　　　　→ **§ 364. Obtaining credit**

**(a)** If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

**(b)** The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

**(c)** If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

　　**(1)** with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

　　**(2)** secured by a lien on property of the estate that is not otherwise subject to a lien; or

　　**(3)** secured by a junior lien on property of the estate that is subject to a lien.

**(d)(1)** The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

　　**(A)** the trustee is unable to obtain such credit otherwise; and

　　**(B)** there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

**(2)** In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

**(e)** The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

**(f)** Except with respect to an entity that is an underwriter as defined in section 1145(b) of this title, section 5 of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the Securities Act of 1933, the Trust Indenture Act of 1939, and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to the offer or sale under this section of a security that is not an equity security.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2574; Pub.L. 99-554, Title II, § 257(*l*), Oct. 27, 1986, 100 Stat. 3115; Pub.L. 103-394, Title V, § 501(d)(9), Oct. 22, 1994, 108 Stat. 4144.)

Current through P.L. 110-198 approved 3-24-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 12

▷

**Effective:[See Notes]**

United States Code Annotated Currentness
   Title 11. Bankruptcy (Refs & Annos)
      Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
         Subchapter I. Creditors and Claims
         → § 506. Determination of secured status

(a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

(2) If the debtor is an individual in a case under chapter 7 or 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.

(b) To the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose.

(c) The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

(d) To the extent that a lien secures a claim against the debtor that is not an allowed secured claim, such lien is void, unless--

   (1) such claim was disallowed only under section 502(b)(5) or 502(e) of this title; or

   (2) such claim is not an allowed secured claim due only to the failure of any entity to file a proof of such claim under section 501 of this title.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2583; Pub.L. 98-353, Title III, § 448, July 10, 1984, 98 Stat. 374; Pub.L. 109-8, Title III, § 327, Title VII, § 712(d), Apr. 20, 2005, 119 Stat. 99, 128.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-198 approved 3-24-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 13

Westlaw.

C

**Effective:[See Notes]**

United States Code Annotated.Currentness
    Title 11. Bankruptcy (Refs & Annos)
        Chapter 5. Creditors, the Debtor, and the Estate (Refs & Annos)
           Subchapter III. The Estate (Refs & Annos)
           → **§ 552. Postpetition effect of security interest**

**(a)** Except as provided in subsection (b) of this section, property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

**(b)(1)** Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

**(2)** Except as provided in sections 363, 506(c), 522, 544, 545, 547, and 548 of this title, and notwithstanding section 546(b) of this title, if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to amounts paid as rents of such property or the fees, charges, accounts, or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties, then such security interest extends to such rents and such fees, charges, accounts, or other payments acquired by the estate after the commencement of the case to the extent provided in such security agreement, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

CREDIT(S)

(Pub.L. 95-598, Nov. 6, 1978, 92 Stat. 2602; Pub.L. 98-353, Title III, § 466, July 10, 1984, 98 Stat. 380; Pub.L. 103-394, Title II, § 214(a), Oct. 22, 1994, 108 Stat. 4126; Pub.L. 109-8, Title XII, § 1204(2), Apr. 20, 2005, 119 Stat. 194.)

2005 Acts. Amendments by Pub.L. 109-8 effective, except as otherwise provided, 180 days after April 20, 2005, and inapplicable with respect to cases commenced under Title 11 before the effective date, see Pub.L. 109-8, § 1501, set out as a note under 11 U.S.C.A. § 101.

Current through P.L. 110-198 approved 3-24-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 14

Westlaw.

Federal Rules of Bankruptcy Procedure, Rule 8013                                        Page 1

C

United States Code Annotated Currentness
 Bankruptcy Rules (Refs & Annos)
  Part VIII. Appeals to District Court or Bankruptcy Appellate Panel (Refs & Annos)
   → **Rule 8013. Disposition of Appeal; Weight Accorded Bankruptcy Judge's Findings of Fact**

On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

CREDIT(S)

(As amended Mar. 30, 1987, eff. Aug. 1, 1987.)

Amendments received to 02-19-08

Copr. (C) 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works
END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 15

**Rule 4001-2    Cash Collateral and Financing Orders**.

(a)    <u>Motions</u>. Except as provided herein and elsewhere in these Local
       Rules, all cash collateral and financing requests under
       11 U.S.C. §§ 363 and 364 shall be heard by motion filed under
       Fed. R. Bankr. P. 2002, 4001 and 9014 ("Financing Motions").

       (i)    <u>Provisions to be Highlighted</u>.  All Financing Motions
              must (a) recite whether the proposed form of order
              and/or underlying cash collateral stipulation or loan
              agreement contains any provision of the type indicated
              below, (b) identify the location of any such provision
              in the proposed form of order, cash collateral
              stipulation and/or loan agreement and (c) justify the
              inclusion of such provision:

              (A)    Provisions that grant cross-collateralization
                     protection (other than replacement liens or other
                     adequate protection) to the prepetition secured
                     creditors (<u>i.e.</u>, clauses that secure prepetition
                     debt by postpetition assets in which the secured
                     creditor would not otherwise have a security
                     interest by virtue of its prepetition security
                     agreement or applicable law);

              (B)    Provisions or findings of fact that bind the estate
                     or other parties in interest with respect to the
                     validity, perfection or amount of the secured
                     creditor's prepetition lien or the waiver of
                     claims against the secured creditor without first
                     giving parties in interest at least seventy-five
                     (75) days from the entry of the order and the
                     creditors' committee, if formed, at least sixty
                     (60) days from the date of its formation to
                     investigate such matters;

              (C)    Provisions that seek to waive, without notice,
                     whatever rights the estate may have under
                     11 U.S.C. § 506(c);

              (D)    Provisions that immediately grant to the
                     prepetition secured creditor liens on the debtor's
                     claims and causes of action arising under
                     11 U.S.C. §§ 544, 545, 547, 548 and 549;

              (E)    Provisions that deem prepetition secured debt to
                     be postpetition debt or that use postpetition

41

loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b);

(F)  Provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out; and

(G)  Provisions that prime any secured lien without the consent of that lienor.

(ii)  All Financing Motions shall also provide a summary of the essential terms of the proposed use of cash collateral and/or financing (e.g., the maximum borrowing available on a final basis, the interim borrowing limit, borrowing conditions, interest rate, maturity, events of default, use of funds limitations and protections afforded under 11 U.S.C. §§ 363 and 364).

(b)  Interim Relief. When Financing Motions are filed with the Court on or shortly after the petition date, the Court may grant interim relief pending review by interested parties of the proposed Debtor-in-Possession financing arrangements.  Such interim relief shall be only what is necessary to avoid immediate and irreparable harm to the estate pending a final hearing.  In the absence of extraordinary circumstances, the Court shall not approve interim financing orders that include any of the provisions previously identified in Local Rule 4001-2(a)(i)(A)-(F).

(c)  Final Orders. A final order shall be entered only after notice and a hearing under Fed. R. Bankr. P. 4001 and Local Rule 2002-1(b). Ordinarily, the final hearing shall be held at least ten (10) days following the organizational meeting of the creditors' committee contemplated by 11 U.S.C. § 1102.

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| EXAERIS, INC., and | ) | Case No. 07-10887 (KG) |
| INYX USA, LTD., | ) | Case No. 07-10888 (KG) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | |
| | ) | |
| DR. JACK KACHKAR, | ) | |
| | ) | |
| Appellant | ) | Civil Action No. 07-621 (GMS) |
| v. | ) | |
| | ) | |
| WESTERNBANK PUERTO RICO, | ) | |
| STEPHEN S. GRAY, Chapter 11 | ) | |
| Trustee of INYX USA, LTD. | ) | |
| | ) | |
| Appellees. | ) | |
| _____ | ) | |

## CERTIFICATE OF SERVICE

I, Bruce Grohsgal, hereby certify that on the 14th day of April, 2008 I caused a
copy of the following document to be served on the individuals on the attached service list in the
manner indicated:

**Addendum of Statutes, Rules, Unreported Orders, or Similar Material to
Brief of Appellee, Chapter 11 Trustee of Inyx USA, Ltd.**

Bruce Grohsgal (Bar No. 3583)

**Exaeris/Inyx Brief and Addendum**
**Service List**
**Case No. 07-10887 & 07-10888**
**Document No.136719**
**04 – Hand Delivery**
**02 – First Class Mail**


**Hand Delivery**
Tobey M. Daluz, Esquire
Ballard Spahr Andrews & Ingersoll, LLP
919 N. Market Street, 12th Floor
Wilmington, DE  19801

**Hand Delivery**
Sheldon K. Rennie, Esquire
Anthony Sacullo, Esquire
Fox Rothschild LLP
919 N. Market Street, Ste. 1300
Wilmington, DE  19801

**Hand Delivery**
Steven K. Kortanek, Esquire
Klehr Harrison Harvey Branzburg & Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE  19801

**Hand Delivery**
Richard L. Schepacarter
United Trustee
844 King Street, Room 2207
Lockbox #35
Wilmington, DE  19899-0035

**First Class Mail**
Michael Menkowitz, Esquire
Fox Rothschild O'Brien & Frankel
2000 Market Street, 10th Floor
Philadelphia, PA  19103

**First Class Mail**
Harvey Miller, Esquire
Weil Gotshal & Manges, LLP
767 Fifth Avenue
New York, NY 10153